**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

RICHARD M. KIPPERMAN, not     :
individually but solely in his capacity   :
as Trustee for the Magnatrax Litigation   :
Trust,     :
    :    CIVIL ACTION NO.
    Plaintiff,     :    1:05-CV-1242-JOF
    :
    v.     :
    :
ONEX CORPORATION, et al.,     :
    :
    Defendants.     :

**<u>OPINION AND ORDER</u>**

The instant matter is before the court on Plaintiff's Motion for Sanctions [574] and

Plaintiff's Motion for Sanctions Renewed [594].

**I.     Background**

The instant matter is a constructive transfer and fraud case arising out of the 2003

bankruptcy of Magnatrax Corporation. This case has been pending for almost four years

and contains more than 600 docket entries. The court addressed the complex set of facts

underlying this matter extensively in its substantive order of September 27, 2007, denying

Defendants' Motions to Dismiss. The motions currently before the court relate to the

parties' behavior during discovery, which began in earnest in January of 2007. The final

deadline for fact discovery in this matter was February 29, 2008; however, the parties continued to file motions to compel and for protective order well into the Fall of 2008. The lengthy discovery process, which has spawned four discovery hearings, has been contentious at best and abusive at worst, and the court has expressed its displeasure with the parties' behavior on numerous occasions.

Following the official close of fact discovery, the court expressed its frustration with the proceedings in its March 19, 2008 Case Management Order. The court chronicled the parties' missteps, noted that this matter was being "over lawyered" on all sides, made clear that it would not compel parties to comply with orders already issued by the court, and notified the parties that it was currently tallying their disobedience and would award sanctions at their request. In response to the court's order Plaintiff filed its first broad Motion for Sanctions [500]. During a hearing on April 29, 2008, the court denied Plaintiff's motion with leave to renew and stated:

> [I]t is my intention before we get to summary judgment stage but after everything else is closed to give either party a chance to come in here and argue for any sanctions including the ultimate sanction. I'm going to look at the state of the record.

(4/29/08 Tr. at 82-83, 93).

AO 72A
(Rev.8/82)

Plaintiff filed two motions in response to the court's statements.[1] On November 20, 2008, Plaintiff filed its Motion for Sanctions for the Onex Defendants' Violation of the Court's April 29, 2008 Order [574]. This motion related exclusively to so-called "transfer discovery." Plaintiff asked the court, pursuant to Fed. R. Civ. P. 37(b)(2), to designate a specific schedule of transfer-related facts as established for purposes of this action. Plaintiff also requested that the court award it fees and costs incurred in bringing the motion as well as two prior motions compelling responses to transfer-related interrogatories. On January 14, 2009, Plaintiff renewed its first broad Motion for Sanctions [500] and filed its Motion for Sanctions Renewed [589]. The court found that this motion exceeded the court's set page limit and Plaintiff modified it and re-filed it on January 22, 2009, as its Motion for Sanctions Renewed [594]. This motion dealt with a broad range of conduct that had

---

[1] Defendants have also filed motions for sanctions throughout this matter. Defendants filed a Motion for Sanctions on November 16, 2007 [344] regarding privilege which the court denied at its discovery hearing on January 9, 2008. On February 28, 2008, Defendants filed a motion for sanctions related to Plaintiff's unauthorized disclosure of Onex tax documents to a third party [466]. In an order on April 25, 2008, the court granted-in-part and denied-in-part Defendants' motion, ordered Plaintiff to pay Defendants the cost of bringing it, and declined to award additional sanctions absent any evidence of actual harm. On February 26, 2008, Defendants filed a motion for sanctions regarding Plaintiff's responses to Defendants' requests for admission. On July 22, 2008, Defendants filed a cross motion for sanctions relating to Plaintiff's disclosure of information to its financier IML. On September 19, 2008, the court denied both of Defendants' underlying motions to compel and refused to award sanctions in either matter. Defendants did not file a motion for sanctions in response to the court's Case Management Order and comments during the April 2008 hearing.

AO 72A
(Rev.8/82)

occurred throughout discovery. Plaintiff demanded the ultimate sanction and asked the court to strike Defendants' answer and enter a default judgment against them.

Given the overwhelming nature of the docket in this matter and the severity of Plaintiff's request, the court entered an order on February 23, 2009, demanding additional information. The court asked Plaintiff to provide it with "a list in chart form of each instance of alleged misconduct on the part of Defendants which the court has not yet punished and the financial harm in the form of attorney time and costs to Plaintiff as a result of this misconduct." The court also asked Plaintiff to propose a list of alternative sanctions. The court gave Defendants an opportunity to respond to the data provided by Plaintiff. The court scheduled a hearing to address both of Plaintiff's motions for sanctions along with a number of other discovery matters on March 26-27, 2009.

Plaintiff's response to the court's request identified six broad categories of alleged discovery abuse – (1) so-called "transfer discovery," (2) electronic or e-mail discovery, (3) the "Ammerman Letter," (4) redactions, (5) confidential designations, and (6) misrepresentations to the court. The court instructed the parties in a telephone conference that it would structure the hearing around these categories. The court gave Plaintiff an opportunity to argue why each category of conduct was sanctionable and gave Defendants an opportunity to respond. Plaintiff's response listed the cost, in terms of attorney time, necessary to (1) address each category of sanctionable conduct, (2) prepare motions for

4

sanctions, and (3) deal with other frivolous motions. Plaintiff supported its list with affidavits by counsel at King & Spalding, LLP, and Jenner & Block, LLP, documenting individual time entries related to each area of Defendants' misconduct. Defendants responded with a memorandum explaining how Plaintiff had failed to follow the appropriate procedure in moving for attorneys' fees and a detailed, sixty-three-page appendix with hundreds of exhibits disputing Plaintiff's individual time entries.

## II.    Transfer Discovery

The so-called "transfer discovery" relates to interrogatories one and two found in Plaintiff's First Set of Interrogatories to Onex Corporation filed January 2, 2007. These interrogatories asked Defendants to "[i]dentify each Transfer to or from any of the Debtors, directly or indirectly, pursuant to Amended [and Second Amended] and Restated Credit Agreement[s]." (Mot. to Compel [257], Ex 1). The interrogatories stated that "identify" "meant to state (a) the date, time, and amount of such Transfer, (b) the instrumentality (*i.e.*, cash, check, wire transfer) of such Transfer, and (c) the transferor and recipient of each Transfer. (*Id.*). Defendants responded to these interrogatories on February 5, 2007, by (1) objecting to the language "directly or indirectly"; (2) stating that it was not a party to any alleged transfers because all loan transactions were between the Debtors and the Lenders; and (3) identifying thousands of "non-privileged" documents by Bates ranges which they contended "appear to show payments made and/or received." (*Id.* Ex. 3). For example,

5

Defendants' response to interrogatory one stated in part, "pursuant to Federal Rule of Civil Procedure 33(d), certain non-privileged documents have been produced that appear to show payments made and/or received in connection with the Amended and Restated Credit Agreement, including without limitation at Bates ranges . . . ." (*Id.*). Plaintiff filed a Motion to Compel with regard to these interrogatories on August 9, 2007 [257]. Plaintiff maintained that the Defendants' responses were insufficient because (1) they used the word appear and without limitation rather than stating that all payments had been identified; (2) the answer did not sufficiently "identify" the transfers as that term was defined; and (3) the Defendants' answer only identified Tranche B loan payments and omitted other payments contemplated under the Agreements including Tranche A loan payments, revolving credit commitments, etc. Defendants filed a Cross Motion for Failure to Meet and Confer on August 21, 2007, which the court denied for failure to conform to Local Rule 37.1(A)(1) [271, 370]. Defendants insisted that they had responded according to the Federal Rules of Civil Procedure. Much of the information Plaintiff sought came from Magnatrax and bank documents. Citing to a procedure treatise, Defendants contended that "a responding party need not answer interrogatories that seek information that is not reasonably available to the party or information that is beyond its control and need not conduct extensive independent research in order to acquire such information." (Cross Mot. [271-2] at 17). The Defendants

AO 72A
(Rev.8/82)

limited their answers to the Tranche B structure because that was the only transaction in which they were directly involved.

The court addressed interrogatories one and two at its hearing on January 9, 2008. During the hearing Ms. Shortall, as counsel for the Onex Defendants, attempted to explain that the Onex Defendants had provided all the documents in their possession that related to payments that were made in connection with the Tranche B part of the lending arrangement and they were only required to produce these documents because Onex was only directly involved in the Tranche B portion of the lending arrangement memorialized in the Amended and Restated Credit Agreements. The following colloquy occurred:

> THE COURT: No. No, that is not the question I am asking.

> MS. SHORTALL: Okay.

> THE COURT: Very simple question. Are you representing to this court that with Tranche A, Tranche B and any other kind of assignment that would be covered by these interrogatories that you have produced every document from your client or its affiliates or subsidiary corporations that would satisfy this interrogatory, yes or no.

> MS. SHORTALL: Yes, to the extent we found it. Our search has been diligent. We have produced and identified in our interrogatories the Bates ranges of those documents.

> THE COURT: Since this is the heart of the case, you understand that if I later find that there are documents and unless it's pretty clear and compelling that they weren't just simply overlooked, that in this court's mind would be grounds to strike your answer.

> MS. SHORTALL: I understand, Your Honor.

THE COURT: Okay

(1/09/08 Tr. 12:8-21). In the face of Defendants' certification that they had provided all they could and Plaintiff's contentions that Defendants' response was insufficient, the court granted Plaintiff leave to amend its interrogatories to point out the types of documents that it was missing and directed the Defendants either to produce those documents or give a sworn response that they did not exist in their possession. The court defined "their" to include collectively the Onex Defendants. The court stated that it "would expect" Plaintiff to file in "about four or five days." (*Id.* 13:6-9).

Plaintiff spent a stated forty hours re-reviewing the documents identified by Defendants in their responses. Plaintiff found that Defendants had only produced documents with respect to the Tranche B structure and that many of the Tranche B documents contradicted each other and thus failed to provide any meaningful answers. On January 30, 2008, twenty-one calendar days after the hearing, Plaintiff filed a very detailed set of Second Supplemental Interrogatories outlining the deficiencies in Defendants' responses [416]. Defendants found Plaintiff's Supplemental Interrogatories to be untimely and beyond the authority granted by the court and told Plaintiff that they would not answer them. Plaintiff filed an Emergency Motion to Compel Compliance with the Court's January 9, 2008 Order on February 15, 2008 [439]. Four days after Plaintiff filed this motion Defendants filed their response which stated simply: "In accordance with the

8

Court's ruling at the January 9, 2008 conference, Onex Corp. and Onex LP state that, to the best of their present knowledge, information, and belief, based upon a diligent search they have produced all documents, if any, in their possession reflecting [the specific transfers at issue]." At this point in time, Defendants had produced hundreds of thousands of pages of documents. Defendants argued that Plaintiff's Motion to Compel was moot and premature.

The court addressed Plaintiff's motion to compel during its hearing on April 29, 2008. The court found Defendants' responses to be insufficient and granted Plaintiff's motion. The court granted Defendants fifteen calendar days to fix their responses and said:

> I am not interested in gamesmanship and you may not answer by reference to documents. You have given up that right. You have got to use plain English that doesn't require any interpretation.
>
> You either say it's a transfer, or if you don't, then I will hold that fact against you if I determine that it is clearly a transfer. In other words, I will find that you have not complied with the motion to compel. I am not interested in gamesmanship anymore in this case. I want an answer. Identify each transfer of proceeds of revolver principal.
>
> Let's say there are ten of them. You either give them the date, the amount, from, to, or you don't. If you don't, you better have a good reason. Because if I find you should have and you didn't, you will have violated an order of the court.

(Tr. 04/29/08 23:20 - 24:9). Defense counsel asked the court to clarify whether Defendants' exercise should be based upon the documents that were produced by their clients as opposed to all the documents produced in the case. The court clarified that Defendants would only be held accountable for the information their documents showed. Defense counsel also

AO 72A
(Rev.8/82)

requested thirty days rather than fifteen. The court denied Defendants' request on the ground that Defendants had already represented to the court that they had done everything they should have done under the rules the first time, and if this statement was true Defendants should need no additional time.

Defendants supplemented their answers on May 14, 2008; Defendants insist it took them 260 hours to do so [532]. Plaintiff found Defendants' responses to be inaccurate and incomplete. Two months later, on June 27, 2008, Defendants modified their answers again. Defendants discovered documents were missing from their initial production while preparing for their supplemental production. These new documents came largely from defense counsel's files and Defendants' accountants. On July 24, 2008, Defendants responded again to incorporate documents located in electronic discovery. In November 2008, several months after Defendants' final production, Plaintiff presented Defendants with detailed schedules of the transfers at issue in this case and a chart identifying the documents to back them up. Plaintiff asked Defendants to stipulate to the transfers. Plaintiff gave Defendants five days to commit to such a stipulation. Defendants refused to do so. Defendants believed that the stipulation was incomplete, included seven transfers which had previously been excluded from the case by the court, and included thinly veiled legal conclusions going to liability. Defendants believed any stipulation to the facts was premature and would be more appropriate after summary judgment during which many

AO 72A
(Rev.8/82)

claims might be eliminated. The parties negotiated with regard to the stipulation but were never able to agree.

Plaintiff contends that Defendants have intentionally withheld transfer discovery to prevent Plaintiff from ever arguing its case on the merits. Plaintiff avers that Defendants' multiple responses, each with newly identified documents and transfer, illustrate that Defendants' representations about the diligence used to prepare their initial response were false and misleading.

The court finds that Defendants' behavior with respect to Plaintiff's transfer interrogatories is sanctionable. Defendants committed their first error when they assured the court that they had searched diligently for and identified every document relating to Tranche A, Tranche B, or any other kind of assignment responsive to Plaintiff's interrogatories. It is now clear to the court that this assertion was false for two reasons. First, Defendants had only produced documents relating to Tranche B. Second, Defendants had not been "diligent." Defendants asked the court for thirty days rather than fifteen to complete their third set of responses. Defendants spent more than 260 hours to complete those responses following the April 2008 hearing. Defendants would not have needed this time if their initial search had indeed been diligent. Defendants continued to locate documents well into the summer which they had "inadvertently" failed to produce. Defendants failed to find documents in a folder labeled "litigation" within the files of

11

Onex's CEO until January 2008.[2]  The identification of these documents provides evidence that Defendants' first search was anything but diligent.

The court relied on Defendants' misleading statements about diligence to craft its relief.  The court required Plaintiff to reexamine all the documents Defendants had identified in their first set of responses and supplement their interrogatories based upon Defendants' statements.  Plaintiff spent at least forty hours to confirm information they already knew and about which they had already informed the court – Defendants' initial responses were insufficient.  To make matters worse, Plaintiff was forced to spend this time, and time to craft the supplemental interrogatories, during the Spring of 2008 when the parties were engaged in taking crucial depositions, securing expert reports, and reviewing the mass of new electronic and e-mail discovery.

Defendants committed their second error in refusing to file and then filing their second responses.  First, Defendants ignored the spirit of the court's comments during the January 2008 order and seized on the court's "four or five days" language to make a timeliness argument and  refuse to provide second responses at all.  Defendants provided responses only in the face of a motion to compel.  These responses were cursory at best.  It appears that Defendants provided them solely so that they could argue, as they did, that Plaintiff's motion to compel was moot and premature.  As Defendants have argued on

---

[2]*See* Part V, *infra.*

numerous occasions, Fed. R. Civ. P. 33(d) does give a party the option of responding to interrogatories with documents;[3] however, it does not allow a party to simply refer to its entire production.

As this court noted in its opinion in *Hashemi v. Campaigner Publications, Inc.*, 572 F. Supp. 331, 333 (N.D. Ga. 1983):

> Rule 37(d) plainly requires a party receiving interrogatories to make one of two responses: an answer or a motion for a protective order. If parties are allowed to flout this obligation, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

Plaintiff served its interrogatories in January 2007; Defendants did not provide anything resembling a sufficient response until mid-May 2008. The court has addressed Plaintiff's interrogatories and Defendants' responses in three hearings, in an independent motion for sanctions, and at least two motions to compel. As this court has stated before when

---

[3] If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:

(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

(2) giving the interrogating party a reasonable opportunity to examine and audit the records and make copies, compilations, abstracts, or summaries.

13

addressing Plaintiff's request for admissions, "the outcome of this case will not turn on whether a check was actually sent from point A to point B and subsequently cashed. These matters are not in dispute; the ultimate outcome will depend upon the motivations and activities surrounding the movement of that check." (Order [379] at 18-19). The court finds it deplorable that it has been forced to spend so much time and spill so much ink over an issue, the issue of the physical "transfers" involved in this case, that the parties will likely stipulate to and which will never come before a jury.

## III.    Electronic Discovery

Throughout discovery the parties have engaged in a dispute about Defendants' obligation to provide back-up electronic documents in response to Plaintiff's requests for document production. Defendants originally agreed to search their clients' active computer files and servers. This produced very little e-mail. At the beginning of discovery the parties jointly collected documents from Magnatrax Corporation relevant to this case. There were e-mails within these documents. The parties noted eighteen e-mails in the Magnatrax production involving Onex individuals which were not produced by Onex. (Mot. to Compel [312] Ex. 5 at Ex. I). At least one of these e-mails was sent from a Blackberry. (*Id.* Ex. 6). Defendants contended that these documents were likely on e-mail backup tapes. Defendants did not believe they were obligated to undergo a costly search, restoration, and production of information from backup media at their own expense in order to produce these e-mails

14

and others like them.  Defendants agreed to consider restoring backup tapes at Plaintiff's expense.

The parties engaged in extensive back and forth beginning in March of 2007 as Plaintiff sought to determine what e-mails Defendants had produced from the live server (*i.e.*, what data stays on the server and for how long), what types of e-mail might be on backup tapes, other sources for such e-mails, and the costs of restoration.  (*Id.* Ex. 5). Frustrated with the inability to get e-mail production and information, Plaintiff ultimately filed a Motion to Compel on October 2, 2007 [312].  Defendants responded by arguing that Plaintiff was not entitled to backup tape data under the federal rules and accusing Plaintiff of using the e-mail dispute to avoid depositions and unilaterally extend the discovery deadline.  Defendants attached an affidavit by counsel to their response which stated that efforts were presently underway to search a sample of three backup tapes, that the test was complete as to the 2003 file server tape, and that approximately 28,000 "hits" or documents had been identified on the file server portion of that tape which could result in an estimated 392,000 pages of production.  (Resp. [316] Ex. 2).  Defendants did not test the e-mail server portion of the tape.  This affidavit also indicated that there were roughly ten labeled and forty unlabeled backup tapes.  Plaintiff had not received this information before Defendants filed their response.

15

The court first addressed the e-mail issue during its hearing on January 9, 2008.

Plaintiff contended that the Trustee had at best 100 e-mails from the 1999-2003 time period,

and that the 28,000 test hits, along with the presence of e-mail in the Magnatrax production,

indicated that far more responsive e-mails existed. Plaintiff argued that Defendants were

obligated to bear the cost of recovering and producing these e-mails. Defendants argued that

the costs would be high and that the value of the information of the tapes was dubious at

best.

> They did not find 28,000 e-mails. They didn't even look on the e-mail server part of the backup tapes. They looked on the file server part of the backup tapes. There were 28,000 hits. Well, of course if you put in the word "Magnatrax" and you are going to get spreadsheets and all kinds of data where the word "Magnatrax" and all of the other words and many words are going to be there. But like other backup tapes these are not organized in a way in which anything is readily retrievable.

> The Plaintiffs don't know and we don't know whether there is a single e-mail on there, a single e-mail in any way related to this case. . . .

> . . . [W]e're talking about somewhere around 380 to $410,000 worth of costs. And for what? No one literally knows. The fact that there are two or three e-mails that they have found in the Magnatrax documents would tend to indicate that there is a very low likelihood of any e-mails. Again, they have not taken the depositions of Onex deponents, they didn't even ask Mr. Wright, who they took as a 30(b)(6) witness, a single, you know, question about e-mail usage and what might be stored and what might not be stored.

> So what we have is a pig in a poke, but for everybody. No one knows what's in there. We are at the end of discovery, they finally have decided this is -- this is interesting to them. It hasn't been critical until today, but now it's critical.

AO 72A
(Rev.8/82)

This can put a complete stop to this case. We don't know how long it's going to take.

(Tr. 01/09/08 111:12-22, 112:5-18). Defense counsel also indicated to the court, based on the affidavit of Defendants' technical person, that each tape reached back as far as it could reach and thus there would be considerable overlap on tapes. He also said, "We don't even know whether people readily used e-mails. This was not a BlackBerry era at the time. So there is no information that there is really anything to be gained by this, and certainly it shouldn't be at Onex's expense." (*Id.* 114:17-21). Plaintiff did not demand that the Defendants restore all forty tapes initially; Plaintiff simply wanted to see a subset to get an idea of what was out there.

The court directed Plaintiff to designate two tapes and design a search and directed Defendants to pay for it. The court made Plaintiff the guarantor of the search's success, however, and granted Defendants the right to demand fees if it produced little discoverable material. Plaintiff selected its tapes and provided its terms by January 16, 2008. Defendants performed a search on the two tapes, received hits resulting in thousands of documents, and began releasing documents to Plaintiff on a rolling basis. Defendants unilaterally decided to search seven witnesses' mailboxes rather than the entire tape and decided to redact documents. Defendants chose the seven boxes of the individuals Plaintiff wished to depose. These were the witnesses Defendants believed had knowledge or had something to do with the instant matter. Defendants refused to search the hundred or so mailboxes of employees

17

they believed were not related to the case. Plaintiff found Defendants' production to be incomplete.

On February 18, 2008, Plaintiff filed a motion to compel Defendants to fully comply with the court's order [441]. On February 19, 2008, Plaintiff received an enormous production of documents. The parties were deposing key witnesses during this time, and Plaintiff's experts were writing their reports. Plaintiff argued that it did not have the documents it needed in time to prepare for depositions and expert reporting. During production Plaintiff also learned that the tapes did not go back and overlap in the way it had anticipated. As such the 2000 and 2003 tapes it selected did not cover the entire time frame. Plaintiff wanted an additional tape to fill in the gaps. Defendants responded to the motion to compel by essentially arguing that Plaintiff's demand was baseless and that Defendants should not have to search the boxes of all its employees.

The court addressed Plaintiff's motion at its hearing on April 29, 2008. There, Plaintiff argued the value of the production and requested an additional tape, a certification of completion from Defendants, and some mechanism to deal with the fact that Plaintiff deposed many of its witnesses without full access to the relevant documents. Defendants argued against an additional tape and contended that only a portion of the existing production was relevant. Defendants explained that the volume of the production was related to (1) the broad nature of Plaintiff's search terms, (2) the fact that many of the e-

18

mails contained spreadsheets with multiple blank pages, (3) the fact that attachments were reproduced every time an e-mail was forwarded or replied to, and (4) Plaintiff's demand for every e-mail sent to or received by certain individuals including items they were copied on. Plaintiff's counsel represented to the court that at least ten to twenty percent of the documents were extremely relevant, or the kind of documents that the Trustee would put on an exhibit list at trial. Defendants informed the court that it had cost them more than $600,000 to search the two tapes. This figure included attorney time for privilege review. Defendants never filed a protective order asking to be relieved of the burden of searching the entire tapes. Defendants made an oral motion for a modification of the court's January order during the hearing.

The court itself examined examples of some of the e-mails produced to assess relevance: "I don't consider myself enough of an expert on the law in this area to declare these to be smoking guns but they certainly are hot and they certainly do smell like they have been discharged lately." (Tr. 04/29/08 54:10-13). The court stated that it would enforce its existing order but that it would give Defendants a chance to narrow Plaintiff's search terms and provide Plaintiff with a list of employees, their positions, departments, etc., so that Plaintiff could agree to narrow the number of employee boxes that needed to be searched. The court also agreed to give Plaintiff an additional tape. In conclusion, the court found, "It is apparent to the court that the Defendants did not do what the court ordered them

19

to do previously, and so this is an instance where I could impose sanctions." (Tr. 04/29/08 82:14-17).[4]

The parties began e-mail production again. Plaintiff complained that Defendants were withholding documents. On July 25, 2008, Defendants filed a Motion for Protective Order requesting that the court enter an order holding that they were not responsible for producing documents they deemed to be irrelevant, documents responsive to the search term "Armtec," which is the Canadian Jannock subsidiary sold to ONCAP in August 2001, and documents captured from the e-mail mailboxes of Onex subsidiary ONCAP [561]. The court issued an order on September 19, 2008, granting Defendants' request as to Armtec and

---

[4]During the hearing defense counsel attempted to justify his earlier statements to the court about e-mail and justify Defendants' actions. Defense counsel also conceded that Defendants should have asked for a protective order with respect to its initial production. The court said:

> I appreciate the fact that you wish to say that. I thought the Plaintiff's Motions for Sanctions was exceptionally well done. As a young judge I probably would have granted it.
>
> I am trying to tell you in the clearest way that I know how that you're about a millimeter away from having your answers struck, and it goes back to the beginning argument we had today to come through this.
>
> . . . I didn't say come close. I said this is what you have to do. That's an order of the court, and as an officer of the court you are obliged to follow that or to get a protective order to get relieved of that, and failing either, maybe you have to get rid of your client, I don't know, but what I'm trying to explain to you is something that's been said a lot before. Close doesn't count in hand grenades, horseshoes and it doesn't count here when you have to abide by an order of the court.

(Tr. 04/29/08 97:1-8, 11-18).

AO 72A
(Rev.8/82)

ONCAP and denying Defendants' request as to the supposedly "irrelevant" material [571].

In doing so the court found:

> Defendants' actions have delayed the production of electronic discovery throughout this litigation. Defendants have consistently tried to minimize the likely value of this discovery. The court's minimal forays into the electronic discovery that has been produced has shown just the opposite. Despite all of this, the court is not unsympathetic to the massive amount of discovery involved in this matter, the considerable burden of working with it, and the overproduction that often comes with e-mail production. Therefore, the court gave Defendants numerous tools by which to reduce the burden of e-mail discovery, including an opportunity to limit Plaintiff's search terms and an opportunity to provide a list by which the number of people and the number of boxes being searched could be reduced. Defendants did not take advantage of these opportunities. Defendants must now lie in the bed that they have made.

Defendants certified their production as complete for the last time in December 2008.

The court believes that some of the most interesting evidence in this matter has come from e-mail production. The court is deeply disturbed by Defendants' handling of this production. The court recognizes the difficulties associated with electronic discovery and notably the difficulties in producing older documents archived on mediums which were not designed to withstand the rigorous searching associated with modern e-discovery. As such, the court does not fault Defendants for their initial refusal to produce electronic discovery from the so-called "backup tapes" or for asserting legitimate legal arguments under Fed. R. Civ. P. 26(b)(2)(B) in their response to Plaintiff's initial motion to compel this information.[5]

---

[5]Pursuant to Fed. R. Civ. P. 26(b)(2)(B),
[a] party need not provide discovery of electronically stored information from

The court does condemn Defendants, however, for making blatant misrepresentations about the value of e-mail discovery in this case in an effort to influence the court's ruling, for refusing to follow the court's ruling once made, and for behaving as if they, and not the court, got to decide what electronic material was relevant and discoverable under Rule 26 and what material was not.

Experienced defense counsel misrepresented the scope and value of e-mail discovery to this matter. The court has outlined the colloquy that occurred between it and defense counsel regarding e-mail during the January 9, 2008 hearing. Defense counsel notably argued: (1) "Plaintiffs don't know and we don't know whether there is a single e-mail on there, a single e-mail in any way related to this case"; (2) "[t]he fact that there are two or

---

sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for discovery.

Rule 26(b)(2)(C) allows the court to limit the frequency or extent of discovery if,

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

three e-mails that they have found in the Magnatrax documents would tend to indicate that there is a very low likelihood of any e-mails"; (3) "they didn't even ask Mr. Wright, who they took as a 30(b)(6) witness, a single, you know, question about e-mail usage and what might be stored and what might not be stored"; (4) "[w]e are at the end of discovery, they finally decided . . . this is interesting to them. It hasn't been critical until today, but now it's critical"; and (5) "[w]e don't even know whether people readily used e-mails. This was not a BlackBerry era at the time." Counsel also relied upon an employee affidavit and argued that there would be considerable overlap of date on different backup tapes.

The court relied upon these statements to make a determination under Rule 26(b)(2) as to whether Plaintiff had shown "good cause" to order discovery of the backup tapes, whether discovery of all of the tapes would be cumulative or duplicative, and in sum whether the burden or expense of the discovery outweighed its likely benefit. The court relied on these statements in crafting the "two tape" solution at Defendants' expense with Plaintiff to bear the cost should the search ultimately be fruitless. Looking at the state of the record as a whole, it now appears that defense counsel's statements were either purposefully misleading or made with a reckless disregard for the truth.

First, the record indicates that Plaintiff's counsel raised the issue of electronic data from backup materials in letters to Defendants' counsel at least as early as March 2007. (Motion to Compel [312], Stiffler Aff. Ex. 5, at Ex. A). Further, the parties were far from

23

"the end" of discovery. The heart of discovery in this matter occurred in the Winter and Spring of 2008. As of the January 2008 hearing, the parties had taken a minimal number of depositions and had only completed roughly half of their ultimate document production. The issue of backup e-mail discovery was certainly not something that Plaintiff only became interested in on the eve of a discovery deadline. Second, both Plaintiff and Defendants' counsel were aware that the parties involved in this case used e-mail. Letters between counsel indicate that everyone was aware of at least eighteen e-mails which had been produced from Magnatrax documents, which were not produced from Onex's live servers, and which likely existed on Onex backup tapes. (*Id.* Ex. 5, at Ex. I). The parties were all aware of an e-mail chain sent on August 15, 2001, which began with an e-mail from Nigel Wright to Charles Blackmon, Robert Ammerman, and Mark Hilson. (*Id.* Ex. 6). This e-mail referenced e-mail addresses with "magnatrax.com" and "onex.com" extensions indicating that both companies used e-mail at this time. The chain continued with a response from Mark Hilson sent from his BlackBerry. This e-mail indicated that at least one of the relevant parties was using BlackBerry technology at this time, and such technology is synonymous with the regular use of e-mail. Despite defense counsel's assertions it is clear that Plaintiff's counsel *did* discuss e-mail usage and retention with Nigel Wright during Onex's 30(b)(6) deposition. (*Id.* Ex 5, at Ex A). Further, the court finds it absolutely inconceivable that defense counsel did not know in January of 2008, more than two years

24

into the case and more than one year into full discovery, whether his client readily used e-mails. Any competent counsel should be expected to ask his client such questions in the infancy of discovery. If counsel did not know, it was because he did not wish to know, and reckless indifference to the truth of a matter is a close brother to willful omission or misrepresentation.[6]

Defendants blatantly disregarded the court's order that they produce all documents responsive to Plaintiff's search terms on the two tapes designated. Rather than seeking a protective order Defendants determined themselves that it would be overly burdensome to search the e-mail boxes of hundreds of individuals employed with Onex and its related companies that had no role in the Magnatrax transactions. Defendants likewise found that Plaintiff's search was producing a lot of "irrelevant" material and independently decided to redact this material. Plaintiff was forced to file a second motion to compel to seek to compel Defendants to do what the court had already ordered that they must do. Defendants' behavior is inexcusable. During electronic discovery, the parties learned that the tapes did not include as much overlap as they had originally anticipated. Plaintiff's motion to compel

---

[6]The court finds it notable that Defendants' legal team chose to have local counsel argue the e-mail portion of the hearing. Local counsel likely had the least personal knowledge about the workings of Onex and Magnatrax and the least daily telephone and face contact with the clients. Therefore, the court can conceive of a situation in which local counsel had not had discussions about e-mail usage with his client. Regardless, he was responsible for being familiar with the state of the record. Further, his co-counsel were responsible for ensuring that he made no misrepresentations to the court or for correcting any made.

requested an additional tape or tapes to rectify this problem. Defendants vehemently fought this request and implied that it was inappropriate under the court's January 2008 order. In reality, it was evident from the court's order that the court elected the two tape solution based on overlap. Plaintiff's request for a third tape was neither baseless nor inappropriate.

Despite Defendants' blatant disregard of its first order, the court graciously granted Defendants the ability to work with Plaintiff to limit search terms and the number of mailboxes to be searched. Defendants squandered this opportunity and proceeded with discovery; however, when this discovery became too burdensome, Defendants came to the court on this issue *again* demanding relief in the form of a protective order. Defendants wanted the court to grant them relief from producing e-mails they unilaterally determined were irrelevant or unrelated to this action. This was merely another effort by Defendants to improperly control the scope of discovery.

## IV. Redactions and Confidential Designations

Plaintiff issued document requests in the Winter of 2006-2007 and in April 2007. Defendants responded with paper and electronic discovery. The court approved a protective order on June 1, 2007, defining what documents would be "confidential." Plaintiff has argued to the court on multiple occasions that Defendants have improperly redacted and designated as confidential both electronic and paper discovery necessitating multiple rounds of timely and costly document review. Plaintiff raised the redaction issue in its Motion to

26

Compel the Onex Defendants to Fully Respond to Plaintiff's Document Requests on October 2, 2007. Plaintiff argued that the Defendants had produced numerous redacted documents without documenting the reasons for the redactions in their privilege log. Defendants argued that certain portions of the documents were redacted because they did not respond to Plaintiff's requests. After Plaintiff filed its motion to compel and before the court ruled, Defendants produced a number of the documents in less redacted form. The court addressed Plaintiff's motion to compel in its December 21, 2007 order.

> [T]he court recognizes that the Onex entities are involved in numerous business ventures, many of which have nothing to do with the present action and that all of the Onex Corporation's Board Meeting Minutes are likely not relevant to Plaintiff's document requests. However, Plaintiff has identified several categories of documents that he believes the Onex Defendants have redacted that the court finds highly relevant and believes Plaintiff should be able to read in context without redactions. The court refers particularly to minutes from Onex Corporation Board of Directors meetings, Onex Compensation Committee meetings, Executive Committee meetings, and Audit Committee meetings which concern the acquisitions of ABCO, Republic, and Jannock, the financial condition of Magnatrax, the payment of management fees by Magnatrax, and then expenses incurred by Onex as part of the acquisitions which were later charged to Magnatrax under the Management Agreement. Documents that touch and concern these topics should be produced in unredacted form.

The court gave the Onex Defendants leave to bring the documents not touching or concerning these topics to the court in unredacted form for *in camera* review. Defendants filed the second, or less redacted, set of documents they had produced to Plaintiff with the

27

court for review on January 7, 2008. On March 24, 2008, the court issued an order concerning the submitted documents.

> The court has carefully reviewed these documents, paying especially close attention to those documents specifically referenced in Plaintiff's motion to compel, and the court finds that the Onex Defendants' redactions were proper. The court finds that the portions of the minutes redacted from Onex Corporation Board of Directors meetings, Onex Compensation Committee meetings, Executive Committee meetings, and Audit Committee meetings do not concern the acquisitions of ABCO, Republic, and Jannock or the financial condition of Magnatrax. The court finds that the expenses redacted from the Onex Defendants' expense documents do not relate to Magnatrax and could not have been charged to Magnatrax under the Management Agreement. The court finds no indication that any of the redactions relate to the management fees paid by Magnatrax.

The court did have concern about one document and asked the Defendants to offer an *in camera* explanation for its redactions.

In pleadings before the court, Plaintiff has maintained that Defendants redacted electronic discovery to the point of making the documents virtually impossible to use. Plaintiff has insisted that of the approximately 10,000 documents (totaling more than 140,000 pages) produced during the last week of discovery in February 2008, nearly 300 documents (totaling 7,000 pages) contained redactions that were found nowhere in Defendants' privilege logs. Plaintiff has also noted that Defendants had even redacted public press releases and other publicly filed documents. Plaintiff contended that Defendants produced another 224 documents (more than 1,980 pages) after April 29, 2008, containing redactions. Defendants have not refuted these assertions; Defendants have

merely insisted that they only redacted material that was either irrelevant or confidential because it related to other Onex investments and internal matters. As a result of the parties' disputes over these matters, on October 8, 2008, Defendants reproduced more than 11,687 pages of documents without redactions.

Plaintiff insists that Defendants' redactions evidence an intent to "hide the ball." Defendants contend that all their redactions were consistent with the court's December 2007 and March 2008 orders. Plaintiff references one document, in redacted and unredacted form, to its motion for sanctions.[7] Defendants have provided a credible excuse for the improper redaction of this document. Without more, the court cannot find that Defendants' redactions evidence a willful intent to hide information from Plaintiff. The court can tell from the state of the record, however, that Defendants have unnecessarily prolonged the time and expense necessary to complete document production in this matter. The parties have a confidentiality agreement in place. Defendants could have sought additional protection from the court. Defendants improperly relied on the court's December and March orders. The court's March order merely sanctioned the redactions Defendants had put before it; it did not give Defendants leave to redact other documents. Defendants had absolutely no cause to unilaterally redact thousands of documents only to be forced to reproduce them later.

---

[7]The court notes that Plaintiff provided additional documents at the sanctions hearing.

29

## V.    The Ammerman Letter

The "Ammerman Letter" is a letter written by Robert T. Ammerman, former Chief Executive Officer at Magnatrax, to Defendants Gerald Schwartz, Mark Hilson, and Nigel Wright on September 8, 2003.  Ammerman wrote the letter in an effort to offer his thoughts on and bring closure to "the MAGNATRAX nightmare."  (Motion [594] Ex 2. at Ex. K). In January of 2008 defense counsel met with Schwartz to prepare him for his deposition. Defense counsel contends that she asked Schwartz, "have you ever had any conversations with, you know, any of the Magnatrax people."  (Tr. 4/29/08 104:11-12).  He told her about the Ammerman letter.  Counsel contends she was unaware of this letter.  They went and looked and located the letter in a litigation file that counsel contends she was unaware of. The litigation file contained the letter, copies of the deposition transcripts in the bankruptcy case, a cover letter from defense counsel providing Schwartz with copies of the deposition transcripts, and Schwartz's response to the letter.  Defendants produced this letter on January 22, 2008.  Plaintiff had settled with Ammerman and submitted a notice of withdrawal to the court on January 8, 2008.  Defense counsel told the court at the April 29, 2008 hearing that she did not find this document before because she had "never spoken to Mr. Schwartz about that subject before, so [she] had no reason to know about it."  (*Id.* 105:13-15).

AO 72A
(Rev.8/82)

Plaintiff contends that Defendants were aware of this document as early as February 2007 when they were preparing for Onex's 30(b)(6) deposition and either concealed it or failed to look for it. Plaintiff believes that Defendants became aware of the letter when counsel for Onex discussed it with counsel for Ammerman. Plaintiff supports its allegations with the declarations of its counsel describing a telephone conference they had on April 25, 2008, with William Holley, Ammerman's counsel. The declarations contend that Holley said he received a call from the Onex Defendants' counsel earlier in February 2007 asking him whether he was aware of the "Ammerman letter," informing him that the letter contained negative statements about Onex's management of Magnatrax, and implying that the letter was not responsive to Plaintiff's document requests. Holley told the Onex counsel he was not aware of the letter. Onex defense counsel unequivocally denies attempting to get Holley to withhold the letter from production. Defendants support their assertion with a declaration made by Holley and an e-mail he sent on July 31, 2008. (Resp. [604] Ex. 3). In his declaration Holley contends that he met with Plaintiff's counsel in January 2008 and Plaintiff's counsel asked him if he had ever seen the "Ammerman Letter" or if he knew how the Onex Defendants obtained it. He responded that he had not seen it and did not know how they got it. Holley does recall telling Plaintiff's counsel that he had a conversation with Onex counsel earlier in the case regarding whether Ammerman had made critical comments regarding Onex. Holley states that the conversation did not involve any discussions of the

31

Ammerman Letter, and at that time Ammerman had no recollection of making any comments critical to Onex. Holley's declaration states that he saw a footnote in one of Plaintiff's pleadings dated July 24, 2008, in this action addressing this incident, and he felt the need to respond. As such, he wrote an e-mail to lead counsel for Plaintiff and Defendants in which he unequivocally denied seeing or knowing about the Ammerman letter before January 2008. Defendants have acknowledged that the letter should have been produced sooner. Defendants have maintained that they made all efforts to produce the letter once they learned about it. Defendants produced the letter before the depositions of Ammerman, Wright, Schwartz, and Hilson. Plaintiff asked each of these individuals about the letter.

Plaintiff contends that the Ammerman letter is evidence of both misconduct and poorly conducted document discovery. The court was initially confused at Plaintiff's emphasis on the "Ammerman Letter" in its motions for sanctions. It is an interesting piece of evidence, no doubt, but the court did not initially believe it worthy of the massive amount of conversation and briefing it has incited. The court has throughly examined the record and can find no conclusive evidence that Defendants or defense counsel intentionally withheld the Ammerman letter or knew about it and chose not to look for it. The court does find the circumstances surrounding the Ammerman letter to be an excellent illustration of Defendants' lack of due diligence in its initial round of document discovery.

AO 72A
(Rev.8/82)

Defendants located this document in January 2008, more than a year into discovery, in a Schwartz file labeled "litigation." Defense counsel claims that she never located this file before because she never asked her client a question that would elicit a response concerning this file. The court finds defense counsel's assertion to be absolutely ridiculous. Competent defense counsel would have and most assuredly should have asked the CEO of Onex whether he kept a "litigation" file or whether he had ever had discussions with the leaders of Magnatrax.

## VI.    Misrepresentations to the Court

Plaintiff contends that Defendants made misrepresentations or misleading statements to the court with respect to (1) the state of their production vis-a-vis Plaintiff's deadline to file their statement of additional transfers, (2) the date of the ABCO Acquisition, and (3) Onex's ownership of Magnatrax.

In September 2007 the court denied Defendants' motion to dismiss. The court granted Plaintiff limited authority to add new transfers in certain categories because these transfers could not be plead with particularity in the amended complaint without additional documents from Onex. The court gave Plaintiff thirty days from receiving the necessary documents from Onex to file its statement of additional transfers. Onex claimed their production was complete on October 15, 2007, and Plaintiff's list was due on November 14, 2007. Plaintiff provided a list on this day but amended it on December 7, 2007. Plaintiff

33

maintained the amendment was timely because Defendants were still producing documents well into June 2008. Defendants moved to strike these additional seven transfers and the court granted that request.

Plaintiff now contends here that Defendant improperly represented to the court that their production was complete by October 2007 and that this misrepresentation affected the court's ruling. In actuality, the court struck Plaintiff's additional transfers because it found that they were not within the limited categories the court had allowed Plaintiff to re-plead and thus they should have been plead with particularity in the amended complaint.

The parties have engaged in numerous arguments throughout this matter about the date of the ABCO Acquisition Transfers. Plaintiff's initial complaint stated:

> 35. At the expiration of the Offer on May 10, 1999, approximately 473 million shares, or approximately 98% of ABC's outstanding common stock, had been tendered pursuant to the Offer.
> 36. In this "going private" transaction, ABCO Holdings purchased the outstanding common stock of ABCO for cash consideration of approximately $200.3 million on or about May 12, 1999.
> 37. Onex Corp., through its affiliates, was able to complete the merger with ABCO on or about May 12, 1999 under Delaware corporate "short form" merger provisions.

In their 2005 Motion to Dismiss Defendants argued that because the ABCO Acquisition Transfer occurred on May 10, 1999 it was time barred. Defendants supported the May 10, 1999 date with Board Minutes from May 11, 1999, appointing Onex affiliated people as Board members. In its Motion for Clarification Regarding ABCO Acquisition Transfers

Ruling filed on November 25, 2008, Plaintiff presented the court with Onex and Magnatrax documents which showed that the payment of tendered shares, the tender offer, and the acquisition took place on May 12, 1999. Plaintiff also identified these documents by reference on page sixteen of its Renewed Motion for Sanctions (Motion [594] at 16).

The court based its decision in the motion to dismiss on whether Plaintiff had adequately pled that the transactions occurred on or prior to May 12, 1999, not whether the transaction actually occurred during that time. Regardless, the court is very disturbed by Plaintiff's allegation that Defendants had these documents in their possession at the time Defendants filed their motion to dismiss on statute of limitation grounds.[8] The court told the parties during the hearing, however, that it believed this matter could be more properly adjudicated under a Rule 11 motion. Therefore, the court will not address it here.

In the Defendants' original memorandum in support of their motion to dismiss, Defendants claimed that "no Onex entity has had any connection to Magnatrax since November 2003, when the Debtors were reorganized under the Plan." (Mem. [42-3] at 31). Defendants asserted this argument in an attempt to get this matter dismissed on personal jurisdiction grounds. The Onex Defendants' 2003 Annual Report stated that following the confirmation of Magnatrax's plan of reorganization in November 2003, Onex held "only a

---

[8]During the hearing defense counsel argued that he could not address these documents because they were not properly before the court in the sanctions motion. The court is unpersuaded by this argument. As the court stated above, Plaintiff clearly referenced these documents in its motion for sanctions.

small interest in the continuing company . . . ." Plaintiff asked Schwartz, as Chairman of Onex, about this interest, but he claimed to have no information about it. Plaintiff asked Defendants to produce documents supporting this interest. On February 22, 2008, Defendants ultimately produced an agreement between Onex and the Magnatrax lenders entered into in July 2005 which transferred an interest in Magnatrax to Onex.

Plaintiff contends that Defendants' failure to produce any documents to explain their interest in the 2003 report calls into serious question the completeness of Defendants' non-electronic document production. Plaintiff does not appear to be moving for independent sanctions based on the Defendants' alleged misrepresentations to the court. If Plaintiff is arguing that Defendants made knowingly false statements to the court in an attempt to have the claims against them dismissed, Plaintiff may wish to address these accusations in a Rule 11 motion as well.

The court will not consider Defendants' alleged "misrepresentations" as independently sanctionable conduct for purposes of this motion.

AO 72A
(Rev.8/82)

## VII. Frivolous Motions

On February 4, 2008, Defendants filed an Emergency Motion to Compel Seeking an Order Compelling Plaintiff to Provide Adequate Answers to Defendants' Contention Interrogatories and to Produce a Witness to Testify in Response to the Rule 30(b)(6) Deposition Notice Served Upon the Magnatrax Litigation Trust. The court denied Defendants' Motion in its March 24, 2008 order. In doing so, the court found "the Onex Defendants' motion to be completely meritless" and "another example of the needless 'over lawyering' present in this case." On March 14, 2008, Defendants filed an Emergency Motion for Order Granting as Unopposed the Onex Defendants' Motion to Limit Plaintiff's Claims to Those Alleged in the Amended Complaint. The court denied Defendants' motion in an order on April 25, 2008. In doing so, the court found the motion "to be yet another example of the 'over lawyering' present in this case." Plaintiff maintains the court should consider these frivolous pleadings when determining whether Defendants have purposefully acted to extend this litigation and in determining the award of fees.

## VIII. Sanctions

As the Eleventh Circuit has recognized, discovery imposes costs on the litigant from whom discovery is sought, the party seeking discovery, and the judicial system itself. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). The parties expend time and money searching for and compiling relevant documents, preparing for and

37

attending depositions, copying and shipping documents, interpreting discovery requests, drafting responses to interrogatories and coordinating responses to production requests, advising the clients as to which documents should be disclosed and which ones withheld, determining whether certain information is privileged, and drafting discovery requests and reviewing the opponent's objections and responses. The judicial system uses scarce judicial resources that must be diverted from other cases to resolve discovery disputes. As such, trial courts have numerous mechanisms to discourage discovery abuse. A district court may sanction the parties before it for discovery abuse under the Federal Rules of Civil Procedure or under its own inherent power.

Fed. R. Civ. P. 26(g) was "designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993). Rule 26(g) states:

> (1) Signature Required; Effect of Signature. Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record . . . . By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:
>> (A) with respect to a disclosure, it is complete and correct as of the time it is made; and
>> (B) with respect to a discovery request, response, or objection, it is:
>>> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>>> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.
>
> . . . .
>
> (3) Sanction for Improper Certification. If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

"The decision whether to impose sanctions under Rule 26(g)(3) is not discretionary," and "[o]nce the court makes the factual determination that a discovery filing was signed in violation of the rule, it must impose 'an appropriate sanction.'" *Id.* at 1372. The court does have considerable discretion in determining what sanction is appropriate. *Id.* However, an order imposing costs under Rule 26(g)(3) should be limited to the reasonable expenses incurred because of the violation. *Id.* at 1372 n.45.

District courts enjoy substantially more discretion in deciding whether and how to impose sanctions under Fed. R. Civ. P. 37. *Id.* at 1366. A district court may impose sanctions against a party which violates a discovery order "as are just." *Id.* Such sanctions may include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;

AO 72A
(Rev.8/82)

(v) dismissing the action or proceeding in whole or in part;
(vi) rendering a default judgment against the disobedient party; or
(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(2)(b)(2). In addition to the non-monetary sanctions above, the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.*

Dismissal or non-monetary sanctions that are the equivalent of dismissal should be used sparingly and only in situations where their deterrent value cannot be substantially achieved by use of less drastic sanctions. *Marshall v. Segona*, 621 F.2d 763, 768 (5th Cir. 1980). Although this issue is not dispositive, the court should consider whether the other party's preparation for trial was substantially prejudiced by the sanctionable conduct. *Id.* A court should not use the sanction of dismissal where the sanctionable party's actions are due to "simple negligence, grounded in confusion or sincere misunderstanding of the Court's orders" or where the party's failure to comply was due to inability, for example where requested information is not yet available, though it will later become so. *Id.* A sanction of dismissal or default judgment requires a willful or bad faith failure to obey a discovery order. *Malautea*, 987 F.2d at 1542. In addition, the Supreme Court has interpreted the Rule 37 requirement of a "just" sanction to require "general due process restrictions on the court's discretion." *Id.*

40

A court may also sanction litigation misconduct using its inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, No. 08-11026, 2009 WL 613603, *5 (11th Cir. Mar. 12, 2005) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). The court must exercise its power, however, with restraint and discretion. *Id.* "The key to unlocking the court's inherent power is a finding of bad faith," and a party may demonstrate bad faith by delaying or disrupting litigation or hampering the enforcement of a court order. *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006). A party is entitled to due process before a court determines that the party has acted in bad faith and the court invokes its inherent power to impose sanctions and assess fees. *Id.* at 1306. "Due process requires that the party be given fair notice that its conduct may warrant sanctions and the reasons why." *Id.* at 1306-07. A party can be given fair notice by either the court or the party seeking sanctions. *Id.* Once a party has notice that it might be subject to sanctions, the court must afford it the opportunity to justify its actions either orally or in writing. *Id.*

Plaintiff contends that Defendants' actions have prejudiced its prosecution of this matter by denying the Trustee an organized examination of key witnesses, including Hilson, Schwartz, Govan, and Wright, based on all the available documents and complete and accurate expert reports based on full documents. Plaintiff maintains that no amount of money can remedy this prejudice and insists that the court award non-monetary sanctions

41

to caution Defendants and other parties from engaging in sanctionable behavior in the future. Defendants maintain that they have rectified many of Plaintiff's concerns; Plaintiff has suffered no prejudice; and the court has already provided procedures for re-deposing witnesses if necessary. Defendants submit that non-monetary sanctions in the form of default are too severe a punishment for the conduct at issue.

The court regards the instant case as a textbook case of discovery abuse. The court finds that Plaintiff has been prejudiced in two ways – the Trustee has been denied all the documents necessary to depose witnesses and prepare expert reports and the Trustee's preparation has been made disjointed and difficult and it has been forced to expend a fair amount of time and money and effort to get that which should have been more easily obtained. The court is most disturbed about Defendants' behavior with respect to the transfer interrogatories and e-mail discovery. In both of these areas, Defendants have blatantly ignored orders of the court and prompted multiple motions to compel. Defendants' only defense is their unpersuasive argument that they have *now* complied and Plaintiff has suffered no prejudice. Defendants' defense completely ignores the burdens the court and Plaintiff have endured to garner their compliance and the destructive precedent this court would set were it to allow Defendants to escape the consequences of three years of bad behavior simply because they believe they have *now* complied.

42

Plaintiff has asked the court for the ultimate sanction. Given the Defendants' behavior, the court is tempted to grant Plaintiff's request. That being said, the court will not strike Defendants' answer. The court believes there are novel issues of liability present in this matter. Further, the *ad damnum* clause in this case is hundreds of millions of dollars. Were this court to avoid trying this case on the merits, it might be granting the largest default judgment sought by a defendant in the history of the nation. As this matter currently stands, Plaintiff has the raw material and documentation it needs to proceed with its case and this court has the means, through re-depositions and supplemental expert reports, to minimize a large portion of the damage done. The court is simply unwilling to take the dramatic action of striking Defendants' answer and entering default in the face of moderate prejudice. That being said, Defendants should not and will not go unpunished. The court will exercise its discretion under Rules 26 and 37 and its inherent powers to award monetary sanctions.

Plaintiff contends that it expended roughly $804,000 in attorneys' fees related to difficulties with Defendants regarding the transfer interrogatories and e-mail production. Plaintiff maintains that it expended roughly $38,400 to address redactions, $4,100 to address confidential designations, $160,200 to move for sanctions, and $16,000 to address motions the court deemed frivolous. The court will use these figures as a benchmark for awarding just monetary sanctions.

AO 72A
(Rev.8/82)

The court GRANTS-IN-PART and DENIES-IN-PART Plaintiff's Motions for

Sanctions [574 and 594] and ORDERS Defendants to pay Plaintiff $1,022,700.


**IT IS SO ORDERED** this 26th day of May 2009.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE