**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

RICHARD M. KIPPERMAN,
          Plaintiff,           :
                             :      CIVIL ACTION NO.
      v.                   :      1:05-CV-1242-JOF
                             :
ONEX CORPORATION, et al.,    :
          Defendants.      :

I.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    The Acquisitions or LBOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            1.    ABCO Acquires Windsor Door Using the Credit Agreement . . . . 6
            2.    Onex Acquires a Majority Interest in ABCO in May 1999 . . . . . . 6
                i.     The Acquisition of ABCO through ABCO Holdings . . . . . 6
                ii.    The Financing of the ABCO LBO by the Lenders . . . . . . . 9
                iii.   The Management Agreement between ABCO and Onex . 13
            3.    ABCO Acquires Republic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                i.     The Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                ii.    The Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            4.    ABCO Acquires Jannock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                i.     The Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                ii.    The Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     C.    The Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     D.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
II.    Discussion of Plaintiff's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     A.    Fraudulent Conveyance Counts I, III, VII, and IX . . . . . . . . . . . . . . 26
            1.    Plaintiff's Standing to Bring Claims Related to Transfers
                Before December 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
            2.    ABCO Acquisition Claims and Statute of Limitations . . . . . . . . 40
            3.    Insolvency/Financial Condition and Reasonably
                Equivalent Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
                i.     Proving Insolvency or Poor Financial Condition . . . . . . . 46

|   |   |   | ii. | Proving Lack of Reasonably Equivalent Value . . . . . . . . . | 50 |
|   |   |   | iii. | Admissibility of Logue's Expert Testimony under Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54 |
|   |   |   |   | a. | Standards for Admission of Expert Testimony under Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
|   |   |   |   | b. | Logue's "Zone of Insolvency" Testimony . . . . . . . | 66 |
|   |   |   |   | c. | Logue's Methodology for Calculating DCF Variables . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 |
|   |   |   |   | d. | Logue's Calculation of Reasonably Equivalent Value . . . . . . . . . . . . . . . . . . . . . . . . | 77 |
|   |   |   | iv. | Showing Insolvency or Lack of Reasonably Equivalent Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
|   |   |   |   | a. | Credit Agreement Transfers . . . . . . . . . . . . . . . . . . | 81 |
|   |   |   |   | b. | Management Agreement Transfers . . . . . . . . . . . | 84 |
|   |   | 4. | Proving Actual Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 86 |
|   |   | 5. | Conclusion on Fraudulent Transfer Claims . . . . . . . . . . . . . . . . . | 99 |
|   | B. | Preferences Count XVII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 |
|   |   | 1. | General Law with Respect to Preferences under 11 U.S.C. § 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 101 |
|   |   | 2. | Plaintiff's Prima Facie Case for the Five Management Agreement Transfers at Issue in its Motion for Partial Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 103 |
|   |   | 3. | Plaintiff's Prima Facie Case for Tranche B Preference Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 |
|   |   | 4. | Defendants' Affirmative Defenses under Section 547(c) . . . . . . | 111 |
|   | C. | Breach of Fiduciary Duty Count X and XI . . . . . . . . . . . . . . . . . . . . . | 118 |
|   | D. | Aiding and Abetting Breach of Fiduciary Duty Count XI and Civil Conspiracy Count XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
|   | E. | Unjust Enrichment Count XIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 127 |
|   | F. | Lender Liability Count XVI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| III. | Discussion of Defendants' Defenses as to Plaintiff's Remaining Claims . . . . | 130 |
|   | A. | The Parties' Cross Motions on "Cap" Defense or Defense 4 . . . . . . . . | 133 |
|   |   | 1. | The Absolute Priority Rule Does Not "Cap" the Trustee's Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 134 |
|   |   | 2. | Section 550 Does Not "Cap" the Trustee's Recovery . . . . . . . . | 138 |
|   |   | 3. | Judicial Estoppel Does Not "Cap" the Trustee's Recovery . . . . | 141 |
|   | B. | The Parties' Cross Motions on the Doctrine of *In Pari Delicto* . . . . . . | 143 |

C.    Defendants' Claim that the Court Lacks Personal Jurisdiction over
        Gerald Schwartz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  150
D.    Plaintiff's Request to Establish Certain "Transfers" . . . . . . . . . . . . . . .  155
E.    Plaintiff's Motion to Bar Defenses 7, 11, 12, 27 and 28 . . . . . . . . . . .  156
IV.   Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  162

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RICHARD M. KIPPERMAN, | : | |
| not individually but solely in his | : | |
| capacity as Trustee for the | : | |
| Magnatrax Litigation Trust, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:05-CV-1242-JOF |
| | : | |
| ONEX CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

The instant matter is before the court on the Trustee's Motion for Partial Summary Judgment [620]; the Onex Defendants' Motion for Partial Summary Judgment [621]; and Plaintiff's Motion for Leave to File Post-Hearing Submission on *Daubert* Issues [639].

## I.   Background

The instant action arises out of Magnatrax Corporation ("Magnatrax") and its subsidiaries' (collectively "the Debtors") bankruptcy in 2003 in the Delaware Bankruptcy Court following a number of leveraged buyouts ("LBOs") involving Magnatrax, its predecessor entity American Building Company ("ABCO") and Onex Corporation ("Onex").

-1-

**A.     The Parties**

The Plaintiff in this matter is Richard M. Kipperman, not individually but solely in his capacity as Trustee for the Magnatrax Litigation Trust ("the Trust"). The court will refer to Plaintiff as "the Trustee." The Trust was established during Magnatrax's bankruptcy pursuant to the Litigation Trust Agreement and the Magnatrax Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("the Plan").

The Defendants in this matter include Onex, various entities associated with Onex (referred to collectively as "the Onex entities"), and individuals who serve or have served as officers for Onex or the Onex entities. Onex is a publicly traded private equity firm with its principal place of business in Toronto, Ontario. Onex makes money by buying or acquiring businesses, improving their value and selling them at a profit, and by charging management fees to its subsidiaries. Onex engages in the practice of acquiring businesses through leveraged buyouts. Onex explains its leveraged buyout business model in part in its annual reports as follows:

> In completing acquisitions, it is generally Onex's policy to finance a large portion of the purchase price with debt provided by third-party lenders. This debt is assumed by the company acquired and is without recourse to Onex – the Parent Company – or its subsidiaries or partnerships. The foremost consideration, however, in developing a financing structure for an acquisition is to identify the appropriate amount of equity to invest. In Onex's view, that is the amount of equity which maximizes the risk/reward equation for both Onex and the acquired company; in other words the amount which allows the

-2-

acquired company to not only manage its debt but also have significant financial latitude for business to vigorously pursue its growth objectives.

While we seek to maximize the risk/reward equation in all acquisitions, there is risk that the acquired company will not generate sufficient profitability or cash flow to service its debt requirements.  If such circumstances arise, the recovery of Onex's equity and any other investment in that subsidiary is at risk.

The following Defendants are "Onex entities":  Onex ABCO Limited Partnership ("Onex LP"), 1354495 Ontario, Inc. ("Ontario"), Onex American Holdings, LLC ("Onex American"), 302733 Nova Scotia, Inc. ("Nova Scotia"), Onex ABCO Finance, LLC ("Onex Finance I"), Onex ABCO Finance II, LLC ("Onex Finance II"), and OMI Partnership Holdings, LTD ("OMI").[1]

Gerald Schwartz founded Onex in 1983; he is the company's President, Chief Executive Officer, Chairman of the Board of Directors, and majority shareholder.  Schwartz holds the right to elect six out of the ten members of the Board of Directors of Onex Corporation.  Christopher Govan, Nigel Wright, and Mark Hilson were at all relevant times Managing Directors of Onex.  Hilson and Wright also served as directors of Magnatrax from

---

[1]Onex owns ninety-nine percent of Onex LP.  Ontario, a wholly-owned subsidiary of Onex, owns the remaining one percent.  Onex LP is the sole shareholder of Onex American.  Nova Scotia is a wholly-owned subsidiary of Onex LP and serves as the majority shareholder for Onex Finance I and II.  Onex Finance I and II are wholly-owned indirect subsidiaries of Onex.  OMI was at all relevant times a wholly-owned indirect subsidiary of Onex.

May 11, 1999 through at least May 12, 1999.[2]  All of these individuals reside in Canada. The court will refer to Onex, the Onex entities, Schwartz, Govan, Hilson, and Wright collectively as the "Onex Defendants."

Magnatrax and its various subsidiary entities including ABCO are not parties to this action; however, they feature prominently in the factual scenario underlying it.  The company known as ABCO has been involved in the manufacture and marketing of metal building systems since 1947.  ABCO was incorporated in Delaware and was licensed to do business in and had manufacturing facilities in numerous states.  ABCO was headquartered in Eufaula, AL.  Onex engaged in a LBO with ABCO in 1999, and the new company was renamed Magnatrax.  Following the LBO, Onex American owned more than 50% of Magnatrax, and had control of more than 50% of its voting stock.  Onex was the indirect owner of all of Onex American through Onex LP.  Magnatrax moved its corporate headquarters to Alpharetta, GA sometime in 2002.  The court will use the term "the Debtors" to refer to Magnatrax and its related entities affiliated with the Plan coming out of Delaware bankruptcy court.

---

[2]Defendants contend that none of the named individual defendants has ever served as an officer, director, or employee of Onex American.  Plaintiff has presented documents which show that Hilson signed numerous documents on behalf of Onex American and documents which show that notice to Hilson and Wright was notice to Onex American.  (P. Resp. D. SMF ¶ 7).

Charles Blackmon served as Executive Vice President and Chief Financial Officer of ABCO/Magnatrax during the relevant LBOs and through 2002. Robert Ammerman served as President during this period. Both individuals reside in the United States. Ammerman testified that he was on the Board of Directors for ABCO/Magnatrax from some time in 1992 through January 10, 2002. Blackmon testified he was on the Board from May 1999 through November 4, 2002.[3]

Numerous other entities and individuals are relevant to this matter. Canadian Imperial Bank of Commerce ("CIBC") is a financial institution that was heavily involved in the transactions relevant to this case. The court will refer to CIBC and other affiliated institutions that lent money to the Debtors as "the Lenders." CIBC World Markets is the investment arm of CIBC. CIBC World Markets and the Ontario Teachers' Pension Plan Board both invested in ABCO/Magnatrax.

**B.     The Acquisitions or LBOs**

There are four primary acquisitions relevant to the instant matter – the Windsor Door Acquisition, the ABCO Acquisition, the Republic Acquisition, and the Jannock Acquisition. Each of these acquisitions involved a number of financial transactions.

---

[3]A Board resolution dated May 12, 1999, indicates that the only members of the Board at that time were Hilson and Wright. (P. Resp. D. SMF ¶ 20).

### 1.    ABCO Acquires Windsor Door using the Credit Agreement

In December 1997 ABCO acquired the Windsor Door division of Dominion Industries, Inc., a metal door manufacturer.  In order to finance the acquisition, ABCO entered into a credit agreement with CIBC and several other lenders dated December 4, 1997 ("the Credit Agreement").  Under the Credit Agreement, CIBC provided ABCO with $75 million in revolving credit, a $40 million term loan, and a $5 million swing line loan, and ABCO pledged its assets as security.  William L. Selden, a partner at Sterling Investment Partners ("Sterling"), a private equity firm, was the Chairman of ABCO's Board of Directors during this time, and ABCO had a management agreement with Sterling from January 19, 1993 until May 1999 (the "Sterling Management Agreement").  Pursuant to the Sterling Management Agreement, ABCO agreed to pay Sterling an annual management fee of $375,000 and a $487,500 fee for the Windsor Door transaction.

### 2.    Onex Acquires a Majority Interest in ABCO in May 1999

### i.    The Acquisition of ABCO through ABCO Holdings

Onex's relationship with ABCO began in 1998 while Hilson and Wright were researching the metal buildings industry on Onex's behalf.  Both Onex and ABCO were considering a transaction with Jannock Limited ("Jannock"), a Canadian supplier of metal building products. In January 1999 Onex contacted Selden, as Chairman of ABCO's Board of Directors, about an acquisition.  By the spring of 1999 three companies were interested

-6-

in acquiring ABCO – Jannock, Onex and Citicorp Venture Capital ("CVC").   ABCO

obtained an investment advisor to assist with acquisition negotiations.

In late March and early April of 1999 Onex and Jannock  performed some  "due

diligence" on ABCO.  ABCO allowed both companies to access its data room.  On behalf

of Onex, Hilson and Wright researched the metal buildings industry; reviewed ABCO's

accounting records; spoke with ABCO's customers, competitors and sellers; spoke with

industry analysts; interviewed builders who used ABCO's systems and the systems of

ABCO's competitors; examined the company's historical performance; met with ABCO

management; and visited ABCO facilities and other companies in the industry.  Onex also

reviewed ABCO's Strategic Plan for 1999-2003 which contained financial projections for

each of ABCO's business units.[4]

In March 1999, Onex expressed a willingness to pay $32 per share of ABCO stock;

Jannock indicated it would pay between $30-33 per share; and CVC proposed to pay

between $31 and $32 per share.   On April 7, 1999, Onex and ABCO agreed to an

acquisition.[5]  Onex created two entities to help effectuate the acquisition – ABCO Holdings

_____

[4]Blackmon characterized the Strategic Plan for 1999-2003 as a "bottom-up" process,
and testified that the Strategic Plan contained financial projections for each of ABCO's
business units.  Both Ammerman and Blackmon testified that the Plan's estimates for the
future were reasonable.

[5]On April 7, 1999, Hilson and Wright outlined the rationale for acquiring ABCO, and
the Onex Board of Directors, including Schwartz, approved Onex's acquisition of ABCO.
On the same day ABCO's Board unanimously approved Onex's acquisition offer.

and its subsidiary ABCO Acquisition Corp.  ABCO entered into an Agreement and Plan of Merger ("Merger Agreement") with ABCO Holdings and ABCO Acquisition Corp. on April 7, 1999.[6]  Pursuant to the Merger Agreement (1) ABCO was to merge with ABCO Acquisition Corp. under Delaware law, and (2) ABCO Acquisition Corp. was to acquire the stock of ABCO by tender offer.  On April 13, 1999, Onex, ABCO Holdings, and ABCO Acquisition filed a Schedule 14D-1 setting forth ABCO Acquisition's tender offer for ABCO's stock (the "Tender Offer") with the Securities and Exchange Commission ("SEC"), and ABCO filed its Schedule 14D-9, setting forth, among other things, the bidding process and negotiations.

Pursuant to the Tender Offer, ABCO Acquisition offered to purchase all of the outstanding shares of common stock in ABCO for $36 per share; all ABCO shareholders who accepted the offer were to tender their shares by midnight on May 10, 1999.  ABCO Acquisition and American Stock Transfer & Trust Company ("AST") entered into a Depository Agreement dated "as of April 13, 1999" which provided for AST to act as agent for ABCO Acquisition's purchase of ABCO's shares pursuant to the Tender Offer, to accept ABCO Acquisition's payment of the purchase price for those shares, and to transmit the purchase price to those shareholders who had tendered their shares pursuant to the Tender Offer.  On May 11, 1999, ABCO Acquisition, ABCO Holdings  and AST entered into the

---

[6]Following the signing of the Merger Agreement, Jannock offered to pay ABCO $37 a share.

-8-

Disbursing Agent Agreement pursuant to which AST was appointed paying agent to deliver checks to those shareholders who had tendered their shares pursuant to the Tender Offer for the $36 per share purchase price. On May 12, 1999, ABCO Acquisition merged with ABCO, and ABCO thereby became a subsidiary of ABCO Holdings. ABCO Holdings was then renamed Magnatrax.

### ii.    The Financing of the ABCO LBO by the Lenders

Onex agreed to provide or cause to be provided the total amount of funds required for ABCO Acquisition and ABCO Holdings to purchase all of the ABCO shareholders' shares and to pay the related fees and expenses. The purchase price for the ABCO Acquisition was financed through equity contributions to ABCO Holdings and two credit agreements – the Tender Facility Credit Agreement dated as of May 10, 1999, and the Amended and Restated Credit Agreement ("ARCA") dated as of May 10, 1999.

The total equity contributions in ABCO Holdings as of June 7, 1999, were approximately $100 million. The Onex entities, members of Onex's management team, members of ABCO's management team, CIBC World Markets and the Teachers' Pension Fund invested in ABCO Holdings. It is clear that the Onex entities invested at least $60.6 million in ABCO Holdings as of June 7, 1999. Members of ABCO management collectively contributed roughly $4.5 million. Of that amount Ammerman invested roughly

-9-

$2 million and Blackmon invested roughly $750,000.[7]  It is unclear how much Schwartz, Hilson, Wright and Govan personally committed.[8]  On June 9, 1999, CIBC World Markets contributed roughly $15 million and the Teachers' Pension Fund contributed roughly $20 million to ABCO Holdings in order to acquire stock.

ABCO Acquisition and ABCO Holdings entered into the Tender Facility Credit Agreement with CIBC and other Lenders.  Under the Tender Facility Credit Agreement the Lenders agreed to loan ABCO Acquisition $110 million secured by the ABCO shares being tendered.  ABCO Holdings, ABCO as borrower, and Onex LP as "Tranche B borrower,"[9]

---

[7]Ammerman testified that he invested $2 million in ABCO Holdings because he "believed in the company, I thought it was a great investment opportunity, and I thought I would make some money off of it."  (D. SMF ¶ 68).  Ammerman netted approximately $4.1 million on his ABCO options as a result of the acquisition.  Blackmon testified that he invested $750,000 in ABCO Holdings because he "thought it was a very good opportunity to get a very good return on the investment . . . ."  He netted approximately $1.7 million on his ABCO options post acquisition.

[8]Defendants contend in their response to Plaintiff's First Set of Interrogatories that Schwartz invested $5,346,938; Hilson invested $574,868.66; Wright invested $82,908.53; and Govan invested $63,704.13 in Magnatrax.  Govan testified that he invested in Magnatrax under the Management Investment Plan but he does not recall how much. Defendants offer no other support for their assertions.  Plaintiff presents 12/31/2001, 12/31/2000, and 02/4/2003 lists of Magnatrax shareholders which do not include Schwartz, Hilson, Wright and Govan among the list of individual shareholders.  Shareholder lists cited by Defendants as of June 7, 1999, do not have Govan, Wright, Hilson, and Schwartz as shareholders either.  The lists do catalogue holdings for "Onex Group" which could include Onex management.

[9]A "tranche" is "a division or portion of a pool or whole; *specifically*: an issue of bonds derived from a pooling of like obligations (a securitized mortgage debt) that is differentiated from other issues especially by maturity or rate of return."  Merriam-Webster

-10-

entered into the ARCA with the Lenders.  The ARCA refinanced the Debtors' existing debt under the 1997 Credit Agreement and the Tender Facility Credit Agreement.  Under ARCA the Lenders provided a $40 million five-year term loan facility to ABCO ("the Tranche A Loan"), a $30 million revolving credit facility to ABCO ("the Revolving Credit Loan"), and a $140 million, six-and-one-half-year term loan facility to Onex LP ("the Tranche B Loan").

The Tranche B loan flowed through the Tranche B Structure, which was a "tower" financing structure.  Such a financing structure, commonly used in transactions involving Canadian companies, permits a Canadian company, under certain circumstances, to report the equivalent of interest expense deduction, without removing the deduction of interest from the U.S. taxpayer, or in other words allowing the company to "double dip."  Under the Tranche B Structure, CIBC lent money to Onex LP rather than directly to ABCO.  The money flowed through numerous subsidiaries and shells to ABCO.  The Tranche B Structure involved six steps – (1) the Lenders distribute the Tranche B Loan proceeds to the Tranche B Borrower, Onex LP; (2) Onex LP invests all the proceeds in the capital common stock of Nova Scotia; (3) Nova Scotia invests all the proceeds of Onex LP's investment in the capital common stock of Onex Finance II; (4) Onex Finance II invests all the money from the prior transaction in Onex Finance I; (5) on the closing date Onex Finance I lends ABCO, Windsor Door, and an ABCO subsidiary ABC Transportation the entire amount invested in Onex

---

Online Dictionary. http://mw1.merriam-webster.com/dictionary/tranche.

AO 72A
(Rev.8/82)

Finance I on economic terms and conditions identical to those applicable to the Tranche B Term Loans, except with an interest rate 25 basis points higher; and finally (6) Windsor Door and ABC Transportation pay cash dividends and/or repay existing debts owed to ABCO in an amount equal to the principal amount of the loans made to them by Onex Finance I. The parties dispute the ultimate impact of the Tranche B Structure on the Debtors and its ultimate benefit to the Onex Defendants.

Before agreeing to enter into the ARCA and the Tender Facility Credit Agreement, CIBC investigated ABCO. In the May 1999 Confidential Information Memorandum prepared by CIBC to syndicate the ARCA, CIBC set forth historical ABCO financial data. It looked at ABCO's performance under the ABCO managements' predictions, or the best case scenario, a moderate case scenario, and a downside case scenario. In deciding to invest, CIBC considered ABCO's favorable industry growth dynamics, substantial market share, geographically diverse operations, established builder/dealer network, diversification of product mix and consumer base, strong historical financial performance, solid cash flow and credit statistics, experienced management team, and strong equity sponsor in the form of Onex. Standard & Poor's awarded a B+ rating to the ARCA debt. This is a "sub investment" or "speculative" grade rating.

### iii.    The Management Agreement between ABCO and Onex

-12-

The ARCA funds were also used to finance costs under a management agreement between Onex and ABCO dated as of May 11, 1999 ("the Management Agreement").  The Management Agreement was backdated and was actually executed on June 8, 1999.  Under the Management Agreement Onex agreed to perform certain management functions and "consulting services" for ABCO.  Specifically, Onex would

> consult[] with and assist[] [ABCO's] Board and management in the following: (i) developing and implementing corporate and strategic plans; (ii) budgeting future corporate investments; (iii) developing and implementing acquisition and divestiture strategies; (iv) providing other management, administration, financial and support services; (v) subsequent debt and equity financing; and (vi) developing international joint ventures or licensing arrangements with prospective partners or licensees.

(P. Resp. D. SMF ¶ 141).  The Management Agreement only obligated Onex to perform such services "as may be reasonably requested from time to time by the Board or management of [ABCO]."  (*Id*).

Pursuant to the Management Agreement, ABCO agreed to pay the Onex entities an initial fee of $1.5 million and a yearly fee of $375,000, subject to an increase equal to 0.75% of the annual EBITDA[10] of any businesses acquired by ABCO or its subsidiaries.  ABCO was also required to "reimburse Onex for such reasonable travel expenses and other direct out-of-pocket expenses as may be incurred by Onex or its subsidiaries and their personnel

---

[10]"EBITDA is defined as Earnings Before Interest, Taxes, Depreciation, and Amortization.  It is a widely-used measure of a company's earnings and its ability to service debt."  *In re Vivendi Universal, S.A. Securities Litigation*, 605 F. Supp. 2d 586, 590 n.4 (S.D.N.Y. 2009)

-13-

in connection with the rendering of services [under the Management Agreement], including, without limitation, services of such personnel as members of the Board and the fees of external advisors, consultants and professionals."   The Management Agreement also provided for ABCO to pay the Onex entities "[i]f [ABCO] uses Onex personnel to provide investment banking or financial advice in connection with any acquisition, Onex will be entitled, if the acquisition is consummated, to receive fees equal to 1.25% of the transaction value of such acquisition . . . less any amount paid by the Company for similar services to any investment banker or other third party in connection such [sic] transaction."   The larger payments received by Onex under the Management Agreement were for these "investment banking services."   ABCO paid the Onex entities transaction fees associated with the Republic and Jannock acquisitions.  The parties disagree as to whether Onex ever actually performed any services pursuant to the Management Agreement.

The last payment of quarterly fees under the Management Agreement was made to OMI on August 16, 2002 for the period July 1 – September 30, 2002.  As of the date of the bankruptcy filing, Magnatrax still owed $592,876.80, plus $8,934.93 in interest, pursuant to the terms of the Management Agreement.  Onex filed a proof of claim for these fees and was paid $45,987.12.

### 3.        ABCO Acquires Republic

#### i.        The Acquisition

Republic Builders Products ("Republic"), based in Tennessee, manufactured and sold metal doors and frames for commercial, industrial, and instructional use.  In May 1999 ABCO management, including Ammerman and Blackmon, saw the potential for synergies by combining Republic with Windsor Door.  Ammerman believed Republic could be a great "bolt-on acquisition," very similar to the Windsor Door transaction in late 1997, and would allow ABCO to increase sales by 12-15% a year.  Howard Burns, as President of Windsor Door, wrote Ammerman and Blackmon about the value of obtaining Republic, and ABCO management proposed to Onex that ABCO acquire Republic.  ABCO and Onex representatives met with Republic management, toured Republic's facilities and requested information from Republic.  Ammerman wrote to Republic's investment banking firm on behalf of ABCO and indicated ABCO's hope that an acquisition would produce synergies. Hilson and Wright analyzed the Republic acquisition in internal memoranda to Onex management.  Hilson and Wright estimated that ABCO's acquisition of Republic would result in $2.9 million in further EBITDA per year resulting from cost savings, purchasing economies of scale, and margins on incremental sales.

Other parties bid on Republic; one bid higher than ABCO.  It is unclear how much information the parties had before they bid.  On or about September 1, 1999, Republic Builders Products Company, a subsidiary of ABCO and a Delaware corporation, purchased

-15-

Republic pursuant to the Asset Purchase Agreement dated August 11, 1999, as amended on September 1, 1999, for $44.1 million.

### ii.    The Financing

ABCO funded the acquisition of Republic with additional equity and additional funds from the Lenders.  CIBC, Onex LP and the Debtors amended the ARCA as of August 5, 1999, to provide for additional loans from the Lenders to ABCO to partially fund the purchase of Republic.  The terms of the Second Amendment increased the Tranche A loan by $5 million and the $140 million Tranche B loan by $20 million, to $160 million, and increased the interest on the existing $140 million Tranche B loan by 25 basis points.  Increasing the Tranche B loan by $20 million increased the size of each of the last two balloon payments which would become due on the Tranche B loans in 2005.  The remainder of the purchase was funded by $8.5 million equity contribution by Onex, a $1.9 million equity contribution by CIBC World Markets, and a $2.5 million contribution by Teachers' Pension Fund.  ABCO represented to CIBC that it intended to finance the Republic acquisition with $9.1 million in existing cash.

CIBC investigated Republic and how it would fit into ABCO's overall strategy and current loans before agreeing to the Second Amendment.  CIBC determined that the Second Amendment would allow CIBC to "sell down" its "remnant position" from the ABCO acquisition in 1999.  CIBC had been unable to syndicate to other banks as much of the

-16-

original loan exposure as it had planned to do because the transaction was perceived by the market as a highly leveraged senior stretch transaction for a cyclical company.  Following the Republic transaction, Standard & Poor's assigned a B+ debt rating, and Moody's assigned a Ba3 rating to the ABCO debt.  The year 1999 was ABCO's most profitable year on an operating basis.

### 4.   ABCO Acquires Jannock

#### i.   The Acquisition

After Jannock lost the bid to acquire ABCO in June 1999, Jannock put itself up for sale in a public auction process.  Merrill Lynch prepared a Confidential Descriptive Memorandum about Jannock and its future prospects.  Ammerman, as CEO of ABCO, believed that an acquisition of Jannock was very important to ABCO's three-to-five-year vision and believed it would achieve synergies and other efficiencies.  Other companies, including CVC and Robertson-Ceco, were also interested in acquiring Jannock.  ABCO conducted due diligence of Jannock, building on the prior discussions between the two companies regarding a potential acquisition in 1998, and reviewed Jannock's historic performance, prospects for future industry growth and projections for future revenues.  On January 26, 2000, the Executive Committee of the Onex Board of Directors approved Onex's participation in the Jannock acquisition.  The Magnatrax Board of Directors unanimously approved the acquisition of Jannock.  Pursuant to the acquisition, Jannock

-17-

shareholders were to receive CND$16 per share in cash and CND$2.50 per share in subordinated notes, plus a share in certain Jannock real estate assets that were not being sold to Magnatrax.  Magnatrax Corporation acquired Jannock on March 10, 2000, pursuant to the Jannock Arrangement Agreement for a purchase price of $445 million.

### ii.      The Financing

ABCO financed the acquisition of Jannock through additional equity contributions and loans from the Lenders.  On March 10, 2000, Magnatrax, through its wholly-owned subsidiary Delta Acquisition Corporation ("Delta"), executed the Second Amended and Restated Credit Agreement ("SARCA") with the Lenders.  Under the SARCA the Lenders provided financing for the Jannock transaction including an additional $5 million in Tranche A borrowing, $27 million in additional Tranche B borrowing, and $15 million in revolving credit commitments, as well as certain Canadian credit facilities.  Delta ultimately merged with Jannock.  This company became VicWest, a wholly-owned subsidiary of ABCO.  American Buildings Interholdings, Inc. ("ABI"), then acquired the stock of Vicwest from ABCO.

In addition to the SARCA indebtedness, the Debtors incurred additional debt relating to a seven-year subordinated note (the "Subordinated Note") in the amount of CND$83,984,035 (approximately US$57 million).  The Subordinated Note had a fixed coupon equal to 12.5% per annum which was to pay cash interest semiannually, and mature

on the seventh anniversary of the date of issuance.  The Subordinated Note was supported in part by a "Mirror Note" provided by Magnatrax Finance Co. ("Magnatrax Finance"). Magnatrax Finance was created for the sole purpose of incurring the indebtedness under the Mirror Note.   Through various agreements, ABCO indirectly guaranteed Vicwest's obligations under the Subordinated Note and directly guaranteed Magnatrax Finance's obligations under the Mirror Note.

CIBC World Markets contributed roughly $16 million and Teachers' Pension Fund contributed $30 million in additional equity.   Defendants also contributed funds as Magnatrax shareholders to fund the Jannock acquisition.  Before deciding to invest, CIBC World Markets prepared an analysis of the Jannock transaction.  CIBC World Markets found ABCO's valuation of Jannock to be attractive and to compare favorably to similar publicly traded companies and noted ABCO's belief that the transaction would produce synergies. Prior to the financing of the Jannock acquisition, CIBC also conducted what it characterized as a "due diligence" meeting with Jannock, ABCO and Onex personnel; visiting Jannock plants; and reviewing public filings, internal data room "due diligence" materials, research analyst reports and other industry data.  CIBC concluded that Jannock was a sound strategic fit for ABCO's goal of acquiring similar businesses to gain market share, realize synergies, and leverage its existing infrastructure, and that the loan was a good investment even under a downside case.  Prior to, and in anticipation of the Jannock acquisition, Standard & Poor's

-19-

raised the corporate credit rating and bank loan rating of ABCO to BB- from B+.  The syndication of the debt following the Jannock transaction was well received and oversubscribed.

### C.      The Bankruptcy

In early 2001 the United States economy began to slip into a recession, and by November 2001, the construction industry was experiencing severe challenges.  In March 2002, the U.S. Government imposed tariffs on certain types of steel imported into the United States — a core raw material in Magnatrax's business.  On May 12, 2003, Magnatrax and its subsidiaries, including ABCO, Republic, and Jannock, each filed Chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware.  On November 17, 2003, the U.S. Bankruptcy Court for the District of Delaware confirmed the Plan which outlined how all the Debtors' assets would be allocated.  Under the Plan, CIBC and the Lenders, on account of their approximately $250 million secured claim, received $100 million in notes plus 92% of the equity in the reorganized Magnatrax.  Pursuant to a settlement among the Magnatrax Debtors, CIBC and the Creditors' Committee, the unsecured creditors received $5 million, plus a 2% contingent interest in the reorganized Magnatrax.  In return, the unsecured creditors released any claims they might have had against Magnatrax, its officers and directors, and the Lenders.  Under the Plan, equity interests were "cancelled and extinguished" and received no distribution.

As stated above, the Plan also established the Trust pursuant to the Litigation Trust Agreement and confirmed Richard Kipperman as the Trustee. The Magnatrax Debtors transferred the assigned causes of action[11] to the Litigation Trust, for and on behalf of the Trust Beneficiaries. The Plan gave the Debtors' Class 9 general unsecured creditors the opportunity to opt into the Trust, contribute a portion of their bankruptcy distributions, and become one of the Trust Beneficiaries. As a Trust Beneficiary an unsecured creditor would be eligible to receive a portion of any return garnered by the Trustee minus litigation expenses. Under the Litigation Trust Agreement, the Trustee agreed to distribute whatever he recovered only "to the Trust Beneficiaries as described in the Plan and this Litigation Trust Agreement," and  the Trust Beneficiaries were not required to pay any portion of any recovery in this action to either Magnatrax or to unsecured creditors who did not opt into the Trust. The Plan stated that the exact amount of the unsecured creditors' claims was unknown at that time but that "the Magnatrax Debtors estimate[d] that the [unsecured creditors' claims] [would] not exceed $56.6 million in the aggregate . . . ."

---

[11]Assigned causes of action under the Plan means "all right, title, and interest of the Magnatrax Debtors and the Reorganized Debtors to pursue, litigate, settle, or otherwise resolve any Cause of Action against Onex Corporation or any Onex Affiliate, but specifically excluding any Cause of Action against any Released Party." Causes of action include, "without limitation, any and all actions, causes of actions, liabilities, obligations, suits, debts, indebtedness, dues, sums of money, accounts, reckonings, bonds, bills, specialities, covenants, trespasses, damages, rights, executions, claims, objections to claims, judgments and demands, whatsoever, whether known or unknown, choate or inchoate, existing or hereafter arising, suspected or unsuspected, in law, equity or otherwise."

-21-

At the Creditors' Committee's request, the following language was included in the Debtors' Disclosure Statement filed with the Bankruptcy Court prior to confirmation of the Plan:

> The value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonable certainty because of the amount of discovery and investigation yet to be completed. Based on the limited discovery obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million.

(D.A.11 at 98). Among the causes of action included in this estimate were claims against Onex based on the Management Agreement fees paid by ABCO, claims that Onex directed Magnatrax to "substantially overpay" for Republic and Jannock, and claims that Onex "created and implemented a financing structure designed to provide a tax benefit to Onex" while damaging Magnatrax through the payment of additional interest. The total allowable claims of the unsecured creditors who opted into the Trust was a little over $14 million. As of September 28, 2007, the unsecured creditors who opted into the Trust had been paid a little over $2.5 million in the aggregate on their claims.

### D.    Procedural History

The procedural history of this matter is voluminous and occupies more than 636 docket entries. For a complete procedural history of this matter the court directs the reader to the more than thirty orders entered in the case. The following is meant to provide a brief history of the pleadings and orders relevant to the instant motions.

-22-

On May 10, 2005, Richard Kipperman, not individually but solely in his capacity as Trustee for the Magnatrax Litigation Trust, filed a complaint against the Onex Defendants, Robert Ammerman, and Charles Blackman, and VicWest alleging actual or fraudulent conveyances in violation of O.C.G.A. §§ 18-2-70, *et seq.*, and 11 U.S.C. §§ 544, 548, and 550; transfers in violation of the Federal Debt Collections Procedures Act, 28 U.S.C. § 3304(a); breach of fiduciary duty; aiding and abetting breach of fiduciary duty; civil conspiracy; alter ego liability; disregard of corporate formalities; single business enterprise and *de facto* partnership liability; lender liability, avoidance of preferential transfers under 11 U.S.C. § 547; and unjust enrichment.

On September 30, 2005, Plaintiff voluntarily dismissed its claims against VicWest in Counts IV-VI [50]. The court issued an Opinion and Order on September 15, 2006, dismissing Plaintiff's Control Premium Acquisition Transfer claims incorporated throughout the fraudulent transfer counts, Disregard of Corporate Formalities claim (Count XIV), *de facto* Partnership Liability claim (Count XV), and Plaintiff's breach of fiduciary duty claim except as to Onex American, Hilson, and Wright. Following the court's Opinion and Order, the parties answered and asserted various affirmative defenses [72][73]. Plaintiff amended its complaint on October 18, 2006, to plead its claims with additional particularity [78]. The parties began to engage in discovery. The court has detailed the extensive and contentious discovery process in this matter in its May 27, 2009 Opinion and Order awarding more than

-23-

$1 million in discovery sanctions against Defendants [630].  On January 31, 2007, Plaintiff filed its More Definite Statement supplementing its Amended Complaint [123].

In April 2007 the Bankruptcy Court of Delaware held a hearing to consider reopening Magnatrax's bankruptcy to address Defendants' concerns about the Trustee's potential recovery in this matter.  The Bankruptcy Court explained that it was troubled by the effect that a $600 million recovery, or recovery significantly in excess of the dollar amount of the claims of the beneficiaries of the liquidation trust, would have on the integrity of the Plan. Regardless, on April 16, 2007, the Bankruptcy Court issued an order denying Defendants' Motion to Reopen and stated that a "decision on the motions would constitute an ill-advised advisory opinion and would interfere with the jurisdiction of the District Court in violation of the principle of comity and contrary to the best interests of justice."  On September 26, 2007, the court entered an order finding that Ammerman, Blackmon, Hilson, and Wright were all "Released Parties" under the Plan and should be dismissed.  The court also held that all ABCO Acquisition Transfers made prior to May 12, 1999, should be dismissed as time barred.  Following the court's September 26, 2007 Order, only Counts I-III, VII-XIII, XVI-XVII, and XIX remained a part of this litigation.

Plaintiff filed a Statement of Additional Transfer Information on December 7, 2007, further particularizing its claims [361].  On January 8, 2008, Plaintiff settled any outstanding matters with Defendants Ammerman and Blackmon [396].  The parties filed their respective

-24-

Motions for Partial Summary Judgment on April 30, 2009 [620][621].  These motions have been fully and extensively briefed.  The parties' briefs raised issues with respect to Plaintiff's asserted experts.  The court accepted a pre-hearing *Daubert* submission from Plaintiff and held a *Daubert* hearing on July 10, 2009. Plaintiff filed a Motion for Leave to File Post-Hearing Submission on *Daubert* Issues on July 22, 2009.

## II.    Discussion of Plaintiff's Claims

The instant matter involves statutory claims of fraudulent conveyance, preferences, and transactions under the Federal Debt Collection Procedures Act and common law claims relating to alter ego, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, lender liability, and unjust enrichment.  The Trustee moves for partial summary judgment (1) to establish that 255 individual financial transactions were "transfers of an interest of the debtor in property" for purposes of the Trustee's statutory claims; (2) to establish five of the six elements necessary to prove five of its preference claims in Count XVII; and (3) to bar the Defendants from asserting certain affirmative defenses.[12]

---

[12]Defendants' defenses are as follows: (4) Plaintiff lacks standing to obtain relief for, and therefore lacks standing to pursue, any amount claimed by any creditor who did not opt into the Litigation Trust; (7) doctrines of champerty and maintenance; (11) doctrine of laches; (12) doctrine of estoppel; (17) Plaintiff's fraudulent conveyance and preference claims fail because no Onex Defendant was a transferee or beneficiary of anything of value; (18) Plaintiff's preference claims fail because any payments were contemporaneous exchanges for new value; (25) Plaintiff's claims should be dismissed because, rather than benefit from any of the transactions at issue, the Onex Defendants have suffered significant financial losses; (26) doctrine of *in pari delicto*; (27) as the alleged assignee of ABCO's claims in this case, Plaintiff is required to indemnify Onex for any liability in this action,

-25-

Defendants move for partial summary judgment as to all of Plaintiff's claims except alter ego liability and claims under the Federal Debt Collection Procedures Act.

### A.     Fraudulent Conveyance Counts I, III, VII, and IX

In Counts I, III, VII, and IX of the First Amended Complaint, Plaintiff alleges that the Onex Entity Defendants executed "Credit Agreement Transfers," including a subset of "Tranche B Transfers," "Acquisition Transfers," and "Management Fee Transfers," which were voidable actual or constructive fraudulent conveyances.   Defendants have moved for summary judgment as to all of Plaintiff's allegedly fraudulent transfers. Defendants' Motion for Partial Summary Judgment addresses each category of Transfers separately and moves for summary judgment as to each category of Transfers on different grounds.   Defendants' motion addresses certain aspects of the prima facie case to avoid and recover a fraudulent transfer and does not address others.   Here, the court has only addressed those grounds on which Defendants moved; the court has not made an independent assessment of whether

---

including, without limitation, under the Management Agreement dated May 11, 1999, and under Delaware General Corporate Law; (28) Plaintiff lacks authority and standing under the Plan to assert any claims, and cannot seek to recover from the Onex Defendants any damages, attributable to any actions or inactions of other persons, including under the doctrines of indemnity, contribution, comparative fault and *in pari delicto*, and as set forth in the Plan and the Litigation Trust Agreement.  Whether or not Plaintiff asserts any claims against such other persons in this lawsuit, any judgment that Plaintiff could possibly obtain against any Onex Defendant must be reduced by the amount of any liability or responsibility of third parties for the conduct and transactions at issue in this lawsuit, including, but not limited to, any liability or responsibility of persons who have been released or whose claims have been settled, including, but not limited to, the Lenders, CIBC World Markets, Inc., and Messrs. Ammerman and Blackmon.  *See* Amended Answer, D.E. [547].

Plaintiff can make out *every* element of its *prima facie* case with respect to each group of Transfers.  The court did not do so because it did not want to penalize Plaintiff for not coming forth with evidence on a ground which Defendants had not yet attacked.

The following analysis of Plaintiff's fraudulent transfer claims is long and detailed.  In sum the court: (1) GRANTS Defendants' Motion for Partial Summary Judgment on Plaintiff's Credit Agreement Transfer claims because Plaintiff has not created a genuine issue of material fact as to whether the Debtors received reasonably equivalent value; (2) GRANTS Defendants' Motion for Partial Summary Judgment on Plaintiff's Acquisition Transfer claims because Plaintiff has not created a genuine issue of material fact as to insolvency or whether the Debtors received reasonably equivalent value; and (3) DENIES Defendants' Motion for Partial Summary Judgment on Plaintiff's Management Agreement Transfer claims because Plaintiff has created a genuine dispute of material fact as to whether the Debtors received reasonably equivalent value.  The court also finds that (1) Plaintiff has not presented a genuine dispute of material fact as to whether Defendants acted with "actual" fraudulent intent; (2) Plaintiff has standing to pursue all its fraudulent transfer claims; and (3) Plaintiff's ABCO Acquisition Transfer claims are barred by the statute of limitations.

Typically, a fraudulent transfer claim is made by a creditor who seeks to recover property that was wrongfully transferred by the debtor in an attempt to avoid paying the

-27-

debt.  Fraudulent transfers are prohibited by federal law as codified in 11 U.S.C. §§ 544, 548

and by numerous state statutes mirroring the Uniform Fraudulent Conveyance Act and the

Uniform Fraudulent Transfer Act.[13]  Georgia prohibits fraudulent transfers which occurred

prior to July 1, 2002, under O.C.G.A. § 18-2-22, and transfers which occurred after July 1,

---

[13]Pursuant to section 11 U.S.C. § 544(b), "a trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

Pursuant to section 548(a)(1),

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)     (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)     (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

-28-

2002, under the Uniform Fraudulent Transfer Act codified in O.C.G.A. §§ 18-2-70, *et seq.*[14]

---

[14]O.C.G.A. § 18-2-22 provides in relevant part:

The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void: . . . (2) Every conveyance of real or personal estate . . . had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid; and (3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

*Byers v. McGuire Properties, Inc.*, 285 Ga. 530, ___ (2009). Pursuant to the applicable law in O.C.G.A. §§ 18-2-74 and 75:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subsection (a) of this Code section, consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

-29-

*Gerschick v. Pounds*, 281 Ga. App. 531, 533 n.8 (2006).  These statutes allow courts to set

aside transfers made "with actual intent to hinder, delay, or defraud" creditors and transfers

indicative of fraud even though actual fraud may not be provable.  Once a court has set aside

a transfer, a plaintiff may recover the value of that conveyance under 11 U.S.C. § 550.[15]

---

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-75 states:

(a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b)  A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

[15]Under 11 U.S.C. § 550

(a)  Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

-30-

Therefore, in order for the Trustee to succeed in its suit against Defendants on these claims, the Trustee must establish that there has been a section 548 or 544 actual or constructive fraudulent transfer and that Defendants are the parties from whom it may seek recovery under section 550. *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir. 1988) (addressing whether a bank was initial transferee under section 550 when it honored a check before receiving wire to cover it).

In order to establish that there has been a constructive fraudulent transfer under either section 548 or section 544 and O.C.G.A. §§ 18-2-74(a)(2), 18-2-22(3) (repealed in 2002), the Trustee must prove that Magnatrax (1) received "less than reasonably equivalent value" in consideration for the transfers and (2) was insolvent at the time the transfer was made or was rendered insolvent as a result of the transfer. *See In re Clarkston*, 387 B.R. 882, 888

---

> (2) any immediate or mediate transferee of such initial transferee.
>> (b) The trustee may not recover under section (a)(2) of this section from–
>>> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
>>> (2) any immediate or mediate good faith transferee of such transferee.
>> (c) If a transfer made between 90 days and one year before the filing of the petition–
>>> (1) is avoided under section 547(b) of this title; and
>>> (2) was made for the benefit of a creditor that at the time of such transfer was an insider; the trustee may not recover under subsection (a) from a transferee that is not an insider.

-31-

(Bankr. S.D. Fla. 2008) (outlining prima facie case under section 548);[16] *In re Stewart*, No. 05-3085, 2007 WL 1704423, at *4 (Bankr. M.D. Ga. June 8, 2007) (outlining prima facie case under O.C.G.A. § 18-2-22(3));[17] *Word v. Stidham*, 271 Ga. App. 435, 436-37 (2004) (outlining the prima facie case under sections 18-2-74(a) and 18-2-75(a)).  In order to prove that the relevant transfers were actually fraudulent, a plaintiff must show through direct evidence or various "badges of fraud" that the relevant transfers "were made with actual intent to hinder, delay, or defraud" the debtor's unsecured creditors.  *See, e.g.*, O.C.G.A. § 18-2-74(a)(1).  In order to recover funds conveyed in a fraudulent transfer from a particular defendant, a trustee must show that the particular defendant was an initial

---

[16]     In order to avoid a transfer under § 548(a)(1)(B), the Trustee must show that (i) there was a transfer of an interest of the Debtor in property, (ii) the transfer occurred within two years preceding the Petition Date, (iii) the Debtor received less than reasonably equivalent value in exchange for the transfer, and (iv) the Debtor was either insolvent on the date of the transfer or became insolvent as a result of the transfer.

*In re Clarkston*, 387 B.R. at 888.

[17]     In order for the Trustee, or any plaintiff, to prevail under paragraph (3), it must be proven that: (1) the deed or conveyance was voluntary; (2) there was no valuable consideration exchanged for the transfer; and (3) the debtor was insolvent at the time of the transfer.  In *Stokes v. McRae*, the Supreme Court of Georgia stated that a "voluntary" deed or conveyance is a transfer made without valuable consideration.  Valuable consideration is something founded on money or something convertible to money, or having a value in money.

*In re Stewart*, 2007 WL 1704423 at *4 (internal citations omitted).

-32-

transferee, the entity for whose benefit the transfer was made, or a subsequent transferee of the initial transferee.  11 U.S.C. § 550(a).

Defendants contend that (1) Plaintiff has presented no evidence of actual fraud; (2) Plaintiff lacks standing to assert claims of constructive fraud occurring prior to December 1999; and (3) Plaintiff cannot make out a prima facie case for constructive fraudulent transfers after December 1999 as to the Credit Agreement,[18] Acquisition,[19] or Management Agreement Transfer claims.  Defendants insist that Plaintiff cannot establish that the Credit Agreement Transfers were fraudulent transfers because (1) the Debtors received "reasonably equivalent value," and (2) Defendants were neither initial transferees nor entities for whose benefit the transfers were made.  Defendants maintain that Plaintiff cannot establish that the Acquisition Transfers were fraudulent transfers because (1) the Debtors received "reasonably equivalent value," (2) the Debtors were solvent at the time of all the Acquisition Transfers, and (3)  Defendants were neither initial transferees nor entities for whose benefit the transfers were made.  Defendants further aver that to the extent Plaintiff can make a

---

[18]Plaintiff defines the Credit Agreement Transfers as repayments of the Tranche A Loan, the Tranche B Loan, the "revolving credit loan component" of the Credit Agreement, as well as quarterly commitment fees, attorney's fees, expense reimbursements, and wire transfer fees.  (P. 2/22/2008 Resp. at 58).

[19]Plaintiff defines Acquisition Transfers as "the amounts paid to the selling shareholders that allowed the Defendants to acquire the Debtors' stock," or put another way, "the additional liens granted to CIBC on the Debtors' assets that enabled the Debtors to obtain the money to pay the selling shareholders."  (P. Resp. at 18 n.15).

-33-

prima facie case for the Acquisition Transfer claims, the statute of limitation bars all such claims before May 12, 1999. Lastly, Defendants contend that Plaintiff cannot establish that the Management Agreement Transfers were fraudulent transfers because the Debtors received "reasonably equivalent" value for all such transfers. Defendants' contentions require the court to address six primary questions – (1) standing, (2) statute of limitations, (3) insolvency, (4) reasonably equivalent value, (5) proof of actual fraud, and (6) whether Defendants are the appropriate parties from whom Plaintiff can recover under section 550. Plaintiff's claims that – (1) the Debtors did not receive reasonably equivalent value for their transfers, and (2) the Debtors were insolvent or in poor financial condition at the time the transfers were made, rely upon the proffered expert testimony of Dennis E. Logue, Ph.D. Defendants have moved to exclude this testimony under Fed. R. Civ. P. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Therefore, in the course of evaluating Defendants' contentions as to reasonably equivalent value and insolvency, the court must address whether Logue's testimony is admissible.

1.   **Plaintiff's Standing to Bring Claims Related to Transfers Before December 1999**

Defendants insist that the Trustee lacks standing to assert claims for fraudulent transfers occurring prior to December 1999 due to the "subsequent creditors" rule. Defendants contend that this argument prohibits $5 million of Plaintiff's claims.

-34-

Under Georgia law a creditor may move to set aside a transfer made or an obligation incurred by a debtor that is fraudulent as to the creditor.  O.C.G.A. § 18-2-74. "Under 11 U.S.C. § 544(b), a [bankruptcy] trustee [or debtor in possession] in bankruptcy may 'step into the shoes' of an unsecured creditor and void a transfer of an interest in the debtor's property that the unsecured creditor would have the power to void under federal or state law." *In re Int'l Pharmacy & Discount II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005).  *See also* 11 U.S.C. § 1107(a) (Bankruptcy Code providing that such "debtor-in-possession" has essentially all the rights and powers of a trustee).  An assignee of claims from a trustee, or debtor-in-possession, "stands in the shoes" of the assignor and has the same rights, benefits and remedies as the assignor.  *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156 (2d Cir. 2003).

Here, Magnatrax was a debtor-in-possession under the Plan, and Magnatrax assigned all of its causes of action to the Trust.  Therefore, if the bankruptcy trustee or Magnatrax, as debtor-in-possession, would have had standing to pursue fraudulent conveyance claims that occurred prior to December 1999, so would the Trustee.  As stated above, the bankruptcy trustee's standing is based upon whether there was an unsecured creditor to bring the claim into whose shoes it may step.

Under Georgia's "subsequent creditors" rule a pre-transfer creditor has the right to recover property actually or constructively fraudulently transferred, but a subsequent

-35-

creditor or post-transfer creditor may only recover property which was *actually* fraudulently transferred. *In re Veterans Choice Mortgage*, 291 B.R. 894, 897 (Bankr. S.D. Ga. 2003).[20] A pre-transfer creditor is an entity which is a creditor at the time of the fraudulent transfer and reduces its claim to a judgment lien after the transfer. *Id.* at 897 n.4. The subsequent creditors rule is based on the principle that post-transfer creditors have the benefit of evaluating the effect of the transfer on the debtor before extending unsecured credit.

Defendants maintain that the Trustee can only step into the creditors' shoes with respect to the claims of those creditors that elected to opt into the Trust. Defendants insist that none of the Trust Beneficiaries' possible claims accrued before December 1999, or in other words, none of the Trust Beneficiaries are pre-transfer creditors with respect to the transfer before December 1999, and accordingly Plaintiff lacks standing to avoid any constructive fraudulent transfers that occurred prior to that time. Plaintiff insists that the relevant inquiry is whether *any* creditors, and not just the Trust Beneficiaries, had possible claims which accrued before December 1999. Plaintiff argues that if any such creditors existed, the Debtors could have pursued claims on their behalf and as the Debtors' assignee the Plaintiff may also do so. Regardless, Plaintiff contends that two creditors who opted into

---

[20]O.C.G.A. § 18-2-22 applies to all fraudulent transfers before July 1, 2002. "OCGA § 18-2-22 applies to creditors holding demands against the debtor at the time the allegedly fraudulent conveyance occurred." *Beeson v. Crouch*, 227 Ga. App. 578, 583 (1997).

-36-

the Trust, or Trust Beneficiaries, asserted claims that accrued before May 12, 1999, one going back to 1995.

Here, Defendants cite to no case law to support their position that Plaintiff's claims are limited by the creditors who opted into the Trust, and this court cannot find any. Plaintiff's standing in this matter derives from the Debtors, not the unsecured creditors or Trust Beneficiaries.  Under the Plan and the Litigation Trust Agreement the Debtors set up the Litigation Trust as the successor to and the representative of the Debtors' bankruptcy estate and transferred all of their rights, title, and interest to pursue, litigate, settle, or otherwise resolve any Cause of Action against Onex Corporation or any Onex Affiliate to the Litigation Trust, for and on behalf of the Trust Beneficiaries.  Therefore, if the Debtors could have brought the claim, the Plaintiff may bring it.  The Debtors' right to bring constructive fraudulent transfer claims under 11 U.S.C. § 544 and Georgia's subsequent creditor rule is contingent on there being an unsecured creditor into whose shoes they may step.  That creditor does not necessarily have to be one of the unsecured creditors who opted into the Litigation Trust.  The relationship between the Trust Beneficiaries and the Litigation Trust is not based upon assigned claims and does not control what constructive fraudulent transfer claims Plaintiff may bring.  The Litigation Trust simply sets up a relationship in which unsecured creditors forfeited their initial distribution to the Trust for

-37-

a stake in any future larger recovery.[21] Plaintiff has presented evidence of at least eight

proofs of claim that were filed against the Debtors by creditors indicating debts they had

incurred prior to May 12, 1999. (P. Resp. at 38 n.30).  The Debtors could have stepped into

the shoes of any of these claimants, and under the Plan the Trustee also had standing to do

so.  *See In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997) (explaining that the court need not

identify which creditor because trustee could step into shoes of any one).

Even if the court were to accept Defendants' argument, the court finds that two of

the Trust Beneficiaries were pre-transfer creditors as of December 1999.  Durwood Graddy

and Norman Mahan submitted proofs of claim for failure to pay pension benefits under

ABCO's Management Security Plan Agreement.  (App. 145 at MLT0007448-60, App. 146

at GC 0003005-24).  Mahan and Graddy signed the Plan Agreement with ABCO on April

4, 1995.  Mahan and Gaddy both contend that ABCO "incurred" its debt to them on or

---

[21]The court believes that this understanding of the Litigation Trust is consistent with the general law relating to the standing of litigation trustees. Litigation trustees do not have standing to directly pursue claims on behalf of creditors and creditors may not assign their claims to a litigation trust. *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) (finding Congress has not yet indicated an intention to allow trustee to sue on behalf of bond holders); *Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006) (finding that plan of reorganization did not expressly assign direct claims of creditors to litigation trust, and federal bankruptcy law is clear that litigation trusts do not have standing to pursue direct claims of creditors).  Litigation trustees pursue claims relating to creditors indirectly, or by "stepping into their shoes," just as a debtor would have done.

before January 1, 1999.  ABCO paid Mahan and Graddy benefits under the plan until early 2003.

Under Georgia law a creditor relationship arises when "one person, by contract or by law, is liable and bound to pay to another an amount of money, certain or uncertain." *Beeson v. Crouch*, 227 Ga. App. 578, 583 (1997) (quoting O.C.G.A. § 18-2-1).  A pre-transfer creditor is one "who held demands against the debtor at the time of the conveyance."  *Id.*  As soon as Mahan and Graddy signed the Management Security Plan with ABCO, they became creditors.  This occurred prior to December 1999; at that time these individuals were pre-transfer creditors.  The trustee and subsequently the Plaintiff could step into their shoes to pursue a fraudulent transfer claim.[22]  The court finds that

---

[22]The court is unpersuaded by Defendants' argument that Graddy and Mahan were not creditors as of December 1999 because they had not yet been denied pension payments. *See Hoover v. Bank of Am. Corp.*, 286 F. Supp. 2d 1326, 1333 (M.D. Fla. 2003) ("[I]n the context of an ERISA claim, a cause of action does not become an enforceable demand until a claim is denied.") (citing *Paris* v. *Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 361 (5th Cir. 1981)).  The relevant inquiry is when these individuals became creditors, or when the Debtors became "liable and bound to pay [them] an amount of money, certain or uncertain," not when they could have brought a legal claim under ERISA.  The court is unpersuaded by Defendants' contention that a "creditor" in this context cannot be an entity without a ripe claim.  *See* 11 U.S.C. § 101(10) (defining creditor as "entity that has a claim").  Defendants' argument is based upon the subsequent creditors' rule in Georgia law; therefore, it is the Georgia definition rather than the definition under the Bankruptcy Code that is most relevant.  *See* 3 Collier Bankr. Manual ¶ 544.09[2] ("Although federal law provides the trustee with the rights of an actual unsecured creditor, the extent of the rights is determined entirely by the applicable state or local law.").

Plaintiff had standing to bring constructive fraudulent transfer claims prior to December 1999, and DENIES Defendants' Motion for Partial Summary Judgment on this basis.

### 2.    ABCO Acquisition Claims and Statute of Limitations

Plaintiff's fraudulent transfer claims are governed by the statute of limitations in O.C.G.A. § 9-3-32 which states that "[a]ctions for recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years *after the right of action accrues.*" (Emphasis added). *See Stenger v. World Harvest Church, Inc.*, No. 1:04-CV-00151, 2006 WL 870310 (N.D. Ga. Mar. 31, 2006) (Story, J.) (relying on *In re Dulock*, 282 B.R. 54, 59 (Bankr. N.D. Ga. 2002)). The parties dispute whether the ABCO Acquisition claims "accrued" on or before May 11, 1999, when the Debtors became obligated to buy the shareholders' stock, or on or after May 11, 1999, when the Debtors physically transferred the funds necessary to purchase the stock. The court must determine as a matter of law when a claim for a fraudulent transfer "accrues" under Georgia law.

Defendants contend that (1) pursuant to the Tender Offer, ABCO Acquisition accepted for payment 4,727,559 of ABCO's 5,077,180 shares orally between 12:00 Midnight, New York City time, on May 10, 1999, and 9:30 a.m., New York City time, on May 11, 2009; (2) Onex and Acquisition combined these shares with the 255,000 shares owned by Onex; and (3) by the end of the day on May 11, 1999 at the latest, Onex and

-40-

Acquisition collectively owned 98% of ABCO's stock.[23]  Plaintiff contends that (1) there

is no evidence that ABCO Acquisition had actually wired the money to purchase the ABCO

stock as of May 11, 1999; (2) numerous documents show that May 12, 1999 was the date

the Debtors' property transferred, including closing statements showing money was paid

May 12, 1999; (3) financial statements said the deal closed on May 12, 1999; and (4)

---

[23]To support their contention Defendants point to (1) an amendment to the schedule
14D-1 dated 5/11/1999, which states that ABCO Acquisition accepted 4,727,559 shares
pursuant to the Offer and Onex and Acquisition already had 255,000 shares, ONEX
00058147-52 (App. 213) with a press release dated 5/11/1999 stating that ABCO Holdings
along with Onex owns 98% of stock; (2) a letter from ABCO Acquisition to the American
Stock Transfer and Trust Company dated 5/11/1999, and fax stamped 9:20 AM which
confirms that as of 8:47AM, ABCO Acquisition orally accepted for payment all shares
validly tendered pursuant to the Offer and a receipt signature page dated 9:34AM, ONEX
00000564 (App. 214); (3) a Contribution Agreement dated 5/11/1999, which states that
Onex American contributes 255,000 shares of ABCO in exchange for 255,000 shares of
ABCO Holding with a signature from Onex American fax stamped 6:07 PM on 5/11/1999
and a signature from ABCO Holdings fax stamped both 10:44 and 11:44 AM on 5/12/1999,
ONEX 00088682-83 (App. 215); (4) a share certificate dated 5/11/1999 indicating that Onex
American Holdings has 255,000 shares of ABCO Holdings stock, ONEX 00088685 (App.
216); (5) a Federal Reserve Form U-1, completed when a bank extends more than $100,000
in credit based on margin stock, indicating that CIBC is extending $82,400,000 in credit for
4,682,906 shares of ABCO, signed by ABCO Acquisition and CIBC representation on
5/11/1999, ONEX 00072593-94 (App. 217); (6) Def. Stmt. ¶ 62 supporting their position;
(7) a stock certificate dated 5/11/1999 indicating ABCO Acquisition owned 4,682,906
shares of ABCO, Livingston Ex. 12, at CIBC 001755; (8) a Consent of Sole Stockholder and
Subscription Agreement dated 5/11/1999, signed by ABCO Holdings on 5/11/1999, and
signed by Onex American and fax stamped 5/12/1999, 12:27 AM, ONEX 00078163-65
(App. 59); and (9) Plaintiff's admission in an answer that 98% of the stock had been
tendered at the expiration of the Offer, Plf. 5/1/2008 Ans. at 29 (App. 60).

-41-

backdated documents relating to the acquisition of ABCO call into question the date of all documents relating thereto.[24]

The Eleventh Circuit examined the meaning of "accrues" in the context of a conversion case in *Chep USA v. Mock Pallet Co.*, 138 Fed. Appx. 229 (11th Cir. 2005). The court found that under Georgia law "[t]he true test to determine when a cause of action accrues is to ascertain the time when the plaintiff could first have maintained her action to a successful result." *Chep*, 138 Fed. Appx. at 237. The court looked at the prima facie case for conversion and found that the plaintiff's cause of action accrued from the time defendant actually could be said to have "converted" the relevant property. *Id.* 238.

In order to make out a claim for fraudulent conveyance under Georgia law, a plaintiff must show (1) a transfer made or an obligation incurred, (2) for less than reasonably equivalent value, (3) while the debtor was insolvent or likely to become insolvent. O.C.G.A. §§ 8-2-74 and 75. "A transfer is not made until the debtor has acquired rights in the asset transferred," and an obligation is incurred "[i]f oral, when it becomes effective between the parties"; or "[i]f evidenced by a writing, when the writing executed by the

---

[24]To support its contentions Plaintiff presents (1) closing statements listing the "closing of Tender" as 5/11/1999, discussing "[s]hares purchased by funds submitted May 12, 1999," and funds wired 6/23/1999, (P.A.87, P.A.88); (2) Magnatrax financial statements and information circulars indicating that Magnatrax "purchased" ABCO on 5/11/1999, P.A.17 at MGXE112673, P.A.16 at Onex 51591; and (3) evidence of backdated documents such as a 6/8/1999 fax asking the parties to execute a Management Agreement dated 5/11/1999.

obligor is delivered to or for the benefit of the obligee." *Id.* § 18-2-76. The court finds that Georgia law supports Defendants' assertion that the relevant date for determining the statute of limitations on a fraudulent conveyance claim is the date that the debtor incurred the obligation to make the transfer. The court's conclusion finds support in case law outside the jurisdiction cited by Defendants. *See In re Van Vleck*, 211 B.R. 690, 694 (Bankr. E.D. Mo. 1997) (relying on Mo. Rev. Stat. § 428.034.(5)(b) containing language identical to O.C.G.A. § 18-2-76(4) and (5) and finding that the relevant time for examining whether debtor's payments were fraudulent transfers is the time when the debtor *incurred the obligation to make* those payments); *In re Gibraltar Res., Inc.*, 197 B.R. 246, 250 (Bankr. N.D. Tex. 1996) ("A transfer occurs on the date the contractual right to payment is assigned, not on the date payment is actually made or collected.").

Plaintiff contends that the relevant date for examining whether the payments were fraudulent transfers is when the Debtors *actually made* the payments or transfers. The court is unpersuaded by Plaintiff's citation to *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 674 (2006) (stating that a claim accrues no sooner than the date of injury), and *Logan v. Tucker*, 224 Ga. App. 404, 406 (1994) (date of injury in conversion case is the date of the conversion). The court finds that the "injury," if any, to the Debtors here occurred on the day they became obligated to pay the ABCO shareholders $36 per share tendered before midnight May 10, 1999.

-43-

The court finds that there is no genuine question of material fact as to whether the Debtors incurred the obligation to make the ABCO Acquisition Transfers on or before May 11, 1999. It is undisputed that ABCO entered into the Merger Agreement with ABCO Holdings and ABCO Acquisition Corp. on April 7, 1999, and that this Agreement set out the manner in which the ABCO shareholders would tender their shares and the price at which they would be paid. (*Merger Agreement*, Livingston Ex. 37 (App. 50)). It is likewise undisputed that on April 13, 1999, the parties filed a 14D-1 with the SEC and executed a Tender Offer Statement, an Offer to Purchase, and a Letter of Transmittal. (*Id.*). These documents detail exactly how ABCO shareholders were to tender their shares by midnight on May 10, 1999, unless the Tender Offer was extended, and how much they were to be paid for their shares. (D. Stmt. ¶ 56; P. Resp. Stmt. ¶ 56). It is further undisputed that the parties entered into the Tender Facility Agreement dated as of May 10, 1999, closing date May 11, 1999, and the ARCA dated as of May 10, 1999, closing date May 12, 1999, in which the Debtors agreed to provide the shares tendered as security in exchange for funding from CIBC to purchase the shares. On May 11, 1999, ABCO Acquisition sent a letter to the American Stock Transfer & Trust Company, to whom ABCO shareholders were to tender their shares pursuant to the Tender Offer, confirming its acceptance for payment of all tendered shares pursuant to the Offer to Purchase. (Def. Stmt. ¶ 62, ONEX 0058292 (App. 58)). The letter stated that ABCO Acquisition orally accepted the shares for payment at

-44-

8:47 a.m. on May 11, 1999.  Defendants have submitted a copy of this letter signed by both ABCO Acquisition and the American Stock Transfer & Trust Company fax dated 9:20 a.m. and 9:34 a.m., May 11, 1999.  Based on the foregoing, the court finds that Plaintiff's ABCO Acquisition Transfer Claims are barred by the four-year statute of limitations because the Debtors incurred the obligation to make them before May 11, 1999.

The court GRANTS Defendants' Motion for Partial Summary Judgment as to the ABCO Acquisition Transfer claims.  The court's statute of limitations analysis does not affect Plaintiff's Republic and Jannock Acquisition Transfer claims.

### 3.      Insolvency/Financial Condition and Reasonably Equivalent Value

Defendants contend that the Debtors were solvent at the time of each of the Acquisition Transfers.  Defendants do not move for summary judgment on the issue of insolvency with respect to the Credit Agreement Transfers or the Management Fee Transfers. Defendants contend that the Debtors received "reasonably equivalent value" for all three sets of transfers. Defendants maintain that Logue's proffered testimony with respect to insolvency and reasonably equivalent value is inadmissible.  In order to provide proper context for the reader, the court will address the legal standards for proving insolvency and reasonably equivalent value before addressing Defendants' contentions with respect to Logue's proffered testimony.  The court will then address the admissibility of Logue's

testimony and conclude with an analysis of whether Plaintiff has raised genuine issues of disputed fact with respect to insolvency and reasonably equivalent value.

### i.    Proving Insolvency or Poor Financial Condition

A plaintiff may show that a debtor was in a poor financial condition at the time of an alleged fraudulent transfer in three ways.  A plaintiff may show that the debtor (1) "was insolvent on the date that such transfer was made or such obligation incurred or would become so as a result of the transfer or obligation," (2) was engaged or was about to engage in a business or transaction that would leave it with unreasonably small capital, or (3) intended to incur, or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548; O.C.G.A. § 18-2-72.

The Bankruptcy Code and the Georgia Code define "insolvent" to mean a "financial condition such that the sum of an entity's debts is greater than all of such entity's assets, at a fair valuation."  11 U.S.C. § 101(32)(A); O.C.G.A. § 18-2-72.  Although a plaintiff may seek to prove "balance sheet" insolvency without an expert on the basis of the debtor's balance sheet and tax documents alone, *see, e.g., Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 648-49 (3d Cir. 1991), the majority of plaintiffs seem to employ experts to do so.  *See, e.g.*, *MFS/Sun Life Trust High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 938-44 (S.D.N.Y. 1995).  Experts typically rely on a combination of valuation methodologies including actual sale price, discounted cash flow,

-46-

or DCF, and comparable transactions. *Id. See also In re Inridium Operating LLC*, 373 B.R. 283, 344 (S.D.N.Y. 2007) (listing six different methodologies). The use of an expert is consistent with the notion shared by many courts and commentators that book value of an LBO company's assets does not control for purposes of insolvency, and the court may modify or reconstruct a company's balance sheet to determine its value on the date the LBO was consummated. *In re O'Day Corp.*, 126 B.R. 370, 398 (Bankr. D. Mass. 1991).

"Equitable insolvency," or whether a debtor is able to pay its debts as they become due, is a forward-looking standard. It is unclear whether a plaintiff must show that the debtor subjectively intended to become incapable of paying its debts or whether a plaintiff must merely show that a debtor should have foreseen such an outcome to prove the debtor "intended to incur, or believed that it would incur debts beyond its ability to pay as such debts matured." *MFS/Sun Life Trust*, 910 F. Supp. at 943. The term "unreasonably small capital" denotes a financial condition short of insolvency, and the "unreasonably small capital" test of financial condition is "aimed at transferees that leave the transferor technically solvent but doomed to fail." *Id.* at 944 (citing *Moody*, 971 F.2d at 1070). In order to determine whether a debtor is operating with inadequate capital, a court must look at the debtor's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue. *Id.* "While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks.'" *Id.*

-47-

"The test for determining whether parties to a leveraged buy-out left a business with unreasonably small assets is whether it was reasonably foreseeable that an acquisition would fail at the time the projections were made," and as with an equitable insolvency analysis, a "court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723 (E.D. Pa. 2007).

Courts should consider contemporaneous evidence "untainted by hindsight or post-hoc litigation interests" when evaluating a company's financial condition. *In re Iridium*, 373 B.R. at 346. Such contemporaneous evidence may include a company's stock price or opinions by contemporaneous market participants. *Id.* at 347 ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."). Courts should evaluate the company's own projections. *Id.* ("Without a firm basis to replace management's cost projections with those developed for litigation, the starting point for solvency analysis should be management's projections."). "[P]rojections tend to be optimistic, [so] their reasonableness must be tested by an objective standard anchored in the company's actual performance." *MFS/Sun Life*, 910 F. Supp. at 943. "Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are

-48-

likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073-74 (3d Cir. 1992).

When assessing whether a company's projections are reasonable, courts may look to expert analysis by investment bankers and independent accounting firms which affirm management's projections. *In re Iridium*, 373 B.R. at 347.   Courts should also recognize that "a powerful indication of contemporary, informed opinion as to value comes from private investors who with their finances and time at stake, and with access to substantial professional expertise, conclude at the time that the business was indeed one that could be profitably pursued."   *Id.   See also Peltz v. Hatten*, 279 B.R. 710, 740 (D. Del. 2002) (crediting valuations by informed and sophisticated parties at the time whose beliefs were confirmed by market comparables and contemporaneous DCF studies over expert post-hoc DCF).   Lastly, courts may also consider the ability of a debtor to obtain financing in determining its financial condition.   *In re Iridium*, 373 B.R. at 346 (placing great weight on the fact that the debtor closed three syndicated bank loans and raised more than $2 billion in the capital markets as an indication of solvency and capital adequacy).

### ii.    Proving Lack of Reasonably Equivalent Value

The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate.   Therefore, this provision does

not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly.  In such a situation, "the debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer.  *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990).  In order to determine whether a debtor received "reasonably equivalent value," the court must look at what "value" the debtor received in return for the transfer.  The court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case.  *See In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990) (addressing guarantee as reasonably equivalent value for loan and noting reasonably equivalent value is largely a question of fact).  "The issue of whether a debtor received reasonable equivalent value is a question of fact that must be evaluated as of the date of the transaction.  Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."  *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002).  *See also In re Dunham*, 110 F.3d 286, 289 n.3 (5th Cir. 1997) (noting largely question of fact); *In re Morris Commc'ns, NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given.").  The plaintiff seeking to set aside a transaction has the burden of proving a lack of reasonably equivalent value.  *In re Tucker*, No. 06-3091, 2007 WL 1548927, at *2 (Bankr. M.D. Ala. May 25,

-50-

2007) (finding plaintiff received reasonably equivalent value for his transfer of funds to pay off his antecedent unsecured loan because the lender released its claim against him once debt was paid).

A court determines reasonably equivalent value in an LBO case by "collapsing" the transaction and ascertaining what the target, rather than any third party, ultimately received in terms of debt retirement, working capital, etc., in exchange for taking on additional debt. *MFS/Sun*, 910 F. Supp. at 937. The "collapsing" methodology is applicable to both stock transfers with common ownership on both sides of the transaction and asset sales. *In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005). The Third Circuit Court of Appeals' decision in *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991), provides one of the most thorough discussions of this collapsing analysis at the appellate level. There, the court found that in a reasonably equivalent value analysis, "[t]he touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon*, 945 F.2d at 647.

*Mellon* and its progeny seem to hint at two methods for answering this question. The more prominent directs the court to determine the commercial value the debtor received (in terms of monetary value, tangible and intangible assets, debt forgiveness, etc.), or in the case of an acquisition, the value of the company acquired, and compare it to the commercial

-51-

value of the assets transferred, or the debts incurred.  This comparison may be difficult in an LBO because the assets of the target company are pledged as security for a loan that benefits the target's former shareholders rather than the target itself.  *MFS/Sun Life Trust*, 910 F. Supp. at 913.  This does not automatically mean that the debtor or the target gets no commercial value and a fraudulent conveyance has occurred, however, because courts must look beyond the actual money received to the indirect benefits to the debtor.  *Id.*  Such benefits may include synergistic effects of new corporate relationships, the arrival of a new, more successful management team, tax benefits, additional access to credit to facilitate new business opportunities, and the ability to protect a source of supply or customer relationships.  *Id.* (finding that an unproven tax benefit and a $10 million reasonably equivalent value of revolving credit line could not be reasonably equivalent to $26.8 million in net additional debt).  *See also Mellon*, 945 F.2d at 647-48 (finding that trustee did not meet burden to show less than reasonably equivalent value because it  introduced no evidence of value of synergies and ability to obtain credit); *In re Nirvana Rest., Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (listing protecting customer relationships and supply as indirect benefits); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 136 (Bankr. D. Mass. 1989) (finding that the debtor must receive the required value, not some third party, "[a]nd unlike the doctrine of consideration in contract law, that value must pass a measurement test.") .

-52-

Language in *Mellon* also appears to indicate that a court may determine whether reasonably equivalent value was given by analyzing the value of a target as a going concern before and after the transaction – "when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." 945 F.2d at 647. *Mellon* provides no citation for this statement, and the court does not indicate exactly when the valuation would need to take place whether the day before and the day after or at some other point in the transaction. *Mellon* also does not indicate the precise meaning of "value." The remainder of the discussion in *Mellon* addressing indirect benefits like the "value created by the LBO itself" would seem to indicate that the court is discussing more than asset or book value.

### iii.     Admissibility of Logue's Expert Testimony under Rule 702

Defendants maintain that Logue's proffered expert testimony is inadmissible.  In order to address Defendants' objections, the court will summarize Logue's qualifications and testimony, articulate the standard for admitting expert testimony under Fed. R. Civ. P. 702, and examine Defendants' specific objections to Logue's testimony.

In determining whether Logue's testimony is admissible under Rule 702, the court will only rely upon the information in the parties' summary judgment pleadings, the information in Plaintiff's Pre-Hearing *Daubert* submission [636], and the parties' arguments at the *Daubert* hearing held on July 10, 2009.  The court will not rely on Logue's declaration submitted with Plaintiff's Motion for Leave to File Post-Hearing Submission on *Daubert* Issues filed on July 22, 2009.  This declaration is an improper supplemental expert report submitted out of time far after the close of discovery and with no possibility for cross examination.  Federal Rule of Civil Procedure 26 requires that a party disclose to other parties any expert witnesses who may be used at trial to present evidence. Fed. R. Civ. P.26(a)(2)(A).  Furthermore, this disclosure is to be accompanied by a written report signed and prepared by the witness, which report is to contain: a complete statement of all opinions and the basis therefor; the data or other information used by the witness in forming the opinion; any exhibits to be used; the qualifications of the witness; compensation to be paid to the witness; and a listing of other cases in which the witness has testified within the

-54-

preceding ten years. Fed. R. Civ. P. 26(a)(2)(B). This court's local rules provide that "[a]ny party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert . . . ." LR 26.2C, N.D. Ga.  Any party failing to comply with the foregoing requirement "shall not be permitted to offer the testimony of the party's expert." *Id. See also* Fed. R. Civ. P. 37(c)(1) (stating that party who, without substantial justification, fails to disclose or supplement information required by Rule 26(a) "shall not . . . be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed").  For these reasons, the court will not consider Logue's declaration and DENIES Plaintiff's Motion for Leave to File Post-Hearing Submission [639].

Logue has a Doctorate from Cornell University in managerial economics with minors in finance and marketing and a Master's degree in Business Administration from Rutgers University.  (P.A. 52 at 5-6).  Logue has written and taught extensively on financial topics and has served on numerous boards of directors.  (*Id.*)  The Trustee engaged Logue to assess and analyze, among other things, the financial condition of ABCO/Magnatrax before and after each of the relevant leveraged buyouts and whether ABCO/Magnatrax received "reasonably equivalent value" in exchange for the transfers made and obligations incurred in each of the leveraged buyouts.  (*Id.* at 4-5).  With respect to the financial condition of ABCO/Magnatrax, Logue analyzed whether at each of the relevant times (1) the company

-55-

was "solvent"; (2) the company was in a position to repay its debts as they became due; and (3) the company was left with unreasonably small capital to conduct its business.  (*Id.*). Logue issued an expert report on April 28, 2008, which concluded that (a) at all times between May 12, 1999 and March 10, 2000, ABCO/Magnatrax was in the "zone of insolvency"; (b) at all times between March 10, 2000 and the bankruptcy petition date ABCO/Magnatrax was "insolvent"; (c) at all times between May 12, 1999 and the petition date ABCO/Magnatrax had unreasonably small capital to conduct its business and was unable to pay its debts as they became due; and (d) ABCO/Magnatrax did not receive "reasonably equivalent value" in exchange for the transfers made and the obligations incurred in connection with all three of the relevant LBOs.  (*Id.* at 6-7).

Logue defined "insolvency" to be a condition that exists when the fair value of a company's assets is less than the value of its liabilities.  (*Id.* at 5).  Logue employed two methods to assess the fair value of ABCO/Magnatrax at the relevant times – (1) the Comparable Company Multiple Valuation Analysis ("CompCo") and (2) the Discounted Cash Flow Analysis ("DCF").  Defendants' challenges to Logue's testimony largely relate to the DCF, which he weighted 75% to CompCo's 25%, and thus the court will focus its attentions on this model.  (*Id.* at 44).

In order to calculate the value of ABCO using DCF, Logue found it necessary to calculate the company's debt-free cash flows, or the after-tax cash flows generated from

firm operations and available to make payments to creditors and pay dividends to shareholders.  (*Id.* at 36-37).  Logue used the debt-free cash flow numbers along with the company's cost of capital and net debt to determine its value.  (*Id.* at 36).

In order to calculate debt free cash flow, Logue had to determine projected sales or revenue growth, EBITDA margin, changes in working capital, capital expenditures, and taxes.  (*Id.* 37-41).  Logue began his analysis of these factors by looking at the company's projections for the years 1999-2005 as detailed in various models.  Logue looked at models prepared by the Debtors' management in May, July, and December 1999, prior to each of the respective LBOs.[25]  He "reviewed key elements of these projections for reasonableness by comparing them with ABCO's historical performance, and by giving consideration to facts known or knowable as of the valuation date that would impact ABCO's ability to meet its performance objectives in the future," and when required, "adjusted the projections and derived from the revised figures the debt free cash flows that ABCO would be reasonably expected to generate over the years 1999-2005."  (*Id.* at 36, 48, 52, 63).  Logue adjusted the

---

[25]For his analysis as of May 12, 1999 (pre- and post-ABCO acquisition), Logue relies on the May 1999 Confidential Information Memorandum for ABCO's $210 million Senior Secured Credit Facilities.  (*Id.* at 36).  For his analysis as of September 1, 1999 (post-Republic acquisition), Logue relies on a July 27, 1999 memo from CIBC employees to CIBC's Senior Credit Committee requesting approval for an additional $25 million loan.  (*Id.* at 51-52).  For his analysis as of March 10, 2000 (post-Jannock acquisition), Logue relies on a December 11, 1999 memo from CIBC employees to CIBC's Capital Partners' Investment Committee, requesting that the Committee approve an additional $15.9 million equity investment.  (*Id.* at 62-63).

company's projections as to sales growth, EBITDA, working capital, capital expenditures, and the company's tax projections for each of the three time periods.  Logue's adjustments largely replaced management's nuanced projections with a flat figure representing a three-year historical average.  To calculate the three-year historical averages, Logue looked at the prior three years' statistics excluding the year of the transaction (1996-1998 for the ABCO LBO, 1996-1998 accounting for a portion of 1999 for the Republic LBO, and 1997-1999 for the Jannock LBO) and averaged them.  (*Id.* at Ex. 9(B)).  Logue's largest and most significant adjustments to managements' projections were his adjustments to projected sales growth.  He adjusted the company's May 1999 projection of 8.1% - 15.3% to 6.3%, September 1999 projection of 8.0% - 15.8% to 6.1%, and March 2000 projection of 6.5% - 7.8% to 4.4%.  (*Id.* at 37, 52, 64).

Logue rejected management's projections based on (a) conditions in the metal buildings industry as indicated by the growth rates of the Metal Building Manufacturing Association ("MBMA"), (b) capacity constraints in primary frame manufacturing and engineering creating bottlenecks and delays, (c) concerns regarding the company's system software and technical staffing, (d) the state of the company's builder/dealer network, and (e) the Debtors' historical numbers,  (*Id.* at 37-39, 53-54, 64-65).  For example, prior to the ABCO LBO in May 1999 the Debtors' management projected EBITDA margins of 9.9% in 1999, steadily increasing to 11.9% by 2005.  (*Id.* at 39).  Logue noted that ABCO's

-58-

EBITDA margins in the three years prior to the LBO never topped 10.6% and the EBITDA margin in 1998 was only 9.6% despite this being ABCO's best production year. (*Id.*). Logue stated without citation that the ABCO LBO "did not replace ABCO's management, bring the company additional expertise or sales channels, or otherwise create opportunities for cost savings and synergies," and thus management's dramatic increases in EBITDA were "simply unreasonable, even before factoring in a possible market downturn, the failure of the Systems Project [a technology initiative], and future impact of poor builder/dealer recruitment." (*Id.* at 40).   Based on these statements, Logue found that the three-year historical annual average EBITDA margin of 9.7% was a conservative estimate of profitability and used this number in his DCF analysis of the Debtors at the time of the ABCO LBO.  As a second example, Logue found that managements' projected growth rates of 8%-15.8% after the Republic LBO were too high because growth rates for the MBMA had begun to moderate from 1996 to 1998; ABCO's three-year annual growth rate lagged the MBMA's three-year annual growth rate indicating that ABCO had "little ability to accomplish market share gains;" ABCO was experiencing increased capacity constraints and problems with its technology systems; and ABCO's neglect of its builder dealer recruiting meant the company was destined to experience a poor sales year. (*Id.* at 52-54).  As such, Logue reduced the growth rate to the three-year historical growth rate of 6.1%. (*Id.*).

Logue used his adjusted variables to calculate more than debt free cash flow, and

ultimately fair value of equity. Logue also used an adjusted version of the debt free cash flow to calculate the company's cash available to meet debt payments. (*Id.* at 45). Logue determined the company's available capital by subtracting the necessary debt payments from the available cash, and making various assumptions about the company's use of its Revolving Credit Facility. (*Id.* at 46). Based on ABCO/Magnatrax's available capital, Logue found that it would be in default of various loan covenants beginning in 2000 and it would be unable to pay the sum of its loans if the Lenders chose to call them all in. (*Id.*). Logue found that even if the Lenders did not call the loan, ABCO/Magnatrax would be unable to make its required debt payment in 2005. (*Id.*). Thus, debt free cash flow was also the basis for Logue's capital adequacy or "ability to pay debts" analysis.

Finally, Logue used his DCF, with its imbedded debt free cash flow projections, and CompCo analyses to determine whether the Debtors received "reasonably equivalent value" in the ABCO, Republic, and Jannock acquisitions. Logue calculated reasonably equivalent value by comparing the Debtors' fair value equity at four points in time, May 12, 1999; September 1, 1999; March 10, 1999; and May 12, 2002, and the debt the Debtors took on in each transaction. (*Id.* at 50, 75, Ex. 4).[26] For example, Logue determined that the Debtors

---

[26]The court notes that Logue testifies to different values in the text of his report and in Exhibit 4. In the text of his report, Logue stated that Magnatrax's equity value was $21.6 million at the ABCO LBO, $20.7 million at the time of the Republic transaction, and -$39.3 million following the Jannock transaction. (*Id.* at 61, 75). In Exhibit 4, Logue stated that the equity value is $26.7 million after ABCO, $26.5 million after Republic, -$30.7 million after Jannock, and -$44.8 million at the time of the petition.

-60-

did not receive reasonably equivalent value in the Republic acquisition because the change in their equity between May 12, 1999, and September 1, 1999, was less than the amount of the Republic acquisition loans. Logue determined that the Debtors had not received reasonably equivalent value in any of the acquisitions.

Defendants object to Logue's report on several grounds: (1) Logue's analysis of the "zone of insolvency" is unreliable because there is no scientifically accepted meaning for this term or method to calculate it; (2) Logue did not use a reliable methodology in determining the Debtors' projected revenue growth and the other variables necessary to perform his DCF analysis; and (3) Logue's testimony on reasonably equivalent value will not assist the trier of fact because it is not relevant to the legal question of whether the Debtors received reasonably equivalent value. The court will address the relevant standards for the admission of expert testimony under Fed. R. Civ. P. 702 before addressing each of Defendants' objections.

### a. Standards for Admission of Expert Testimony under Rule 702

In *Daubert*, the Supreme Court directed trial judges to exercise their "gatekeeping responsibility" to ensure that all expert testimony admitted under Fed. R. Civ. P. 702[27] be

---

[27]Fed. R. Civ. P. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

-61-

"not only relevant, but reliable." 509 U.S. at 589. The importance of the district court's gatekeeping requirement is significant and cannot be overstated because an expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Id.* As such the court must engage in a rigorous three-part inquiry of expert testimony and may only admit that testimony if "(1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (addressing lost profit expert testimony). This inquiry is a flexible one; many factors will bear on the inquiry and there is no definitive checklist or test. *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (assessing qualifications of lost profits expert under *Daubert*). The burden of establishing an expert's qualifications, reliability, and helpfulness rests with the proponent of the expert's opinion. *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1310 (N.D. Ga.) (Forrester, J.), *aff'd*, 212 Fed. Appx. 916 (11th Cir. 2006).

_____

     reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

An expert may be qualified to testify due to his knowledge, skill, experience, training, or education.  While "an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case," an expert may not qualify through reading and preparation as an expert in "an entirely different field or discipline," and a court may exclude an expert's testimony if it determines the expert is "testifying to an area outside of-but related to-his expertise."  *See Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (Pannell, J.) (collecting cases); *see also Adani Exports Ltd. v. Amci (Export) Corp.*, No. 2:05-cv-0304, 2008 WL 4925647, at *6 (W.D. Pa. Nov. 14, 2008) (finding that financial expert could not testify on the reasonableness and timing of a business person's effort to obtain "cover" coal, whether an entity would have used Chinese instead of Australian coal, and cost savings from using Chinese coal over Australian coal where financial expert possessed no expertise regarding coal industry or international coal trading);[28] *Williams v. Energy Delivery Servs., Inc.*, No. Civ. A. 1:04CV3101-CC, 2005 WL 5976569, at *1 (N.D. Ga. Dec. 7, 2005) (Cooper, J.) (finding that a civil and structural engineer with no experience constructing power lines over highways was not qualified to testify that cross guard structure was required under industry regulations); *but see Roberds, Inc. v. Broyhill Furniture*, 315 B.R. 443 (Bankr. S.D. Ohio 2004) (rejecting argument that

---

[28]The court reconsidered its decision in *Adani Exports Ltd. v. AMCI (Export) Corp.*, No. 02:05-cv-0304, 2009 WL 137321 (W.D. Pa. Jan. 21, 2009).  The court did not alter any of its finding of law; rather the court examined new evidence that the expert in question did have experience in the coal industry.  On this basis the court decided to allow him to testify.

-63-

expert on credit practices generally could not testify as to "ordinary course of business" because he did not have sufficient knowledge of payment and credit practices in furniture industry).

The Supreme Court lists four factors in *Daubert* that courts should consider when determining whether testimony is reliable: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community.  509 U.S. at 593.  However, these factors may "neither necessarily nor exclusively appl[y] to all experts in every case."  *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful."  *Frazier*, 387 F.3d at 1262.  "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Kumho Tire*, 526 U.S. at 153.  "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."  *Frazier*, 387 F.3d at 1262.  Some courts have found it difficult to apply the technical factors in *Daubert* to experts testifying on financial matters.  *See, e.g.*, *First Tennessee Bank National Association v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding *Daubert* unhelpful to determine whether expert used

reliable methodology to determine bank not acting consistent with prudent banking standards); *In re Commercial Financial Services, Inc.*, 350 B.R. 520 (Bankr. N.D. Okla. 2005) (addressing challenge to expert valuation testimony); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 70 (Bankr. N.D. Ill. 2002) (addressing solvency analysis in LBO situation and finding "[a]ccounting is not an exact science.  Accountants are therefore required to make judgments about how to communicate financial information.  A *Daubert* hearing is not the time to fully test the validity of those assumptions.").

Even if a court chooses not to apply the technical *Daubert* factors, it must be careful to focus on the reliability of the expert's principles and methodology rather than the correctness of his conclusions.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Moreover, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005).  An expert must be able to explain step by step how and why he reached his given conclusions.  *See Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2d Cir. 2004) (finding valuation testimony unreliable where expert could not "explain a number of variables and assumptions used in his analysis" and failed to account for differences between companies).  Under *Daubert*, "any step that renders the analysis unreliable . . .

-65-

renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994).

The final requirement for admissibility under Rule 702 is whether the expert's testimony will assist the trier of fact.  In order to ensure that expert testimony will assist the trier of fact, the court must ensure that the "proposed expert testimony is 'relevant to the task at hand,' . . ., i.e., that it logically advances a material aspect of the proposing party's case." *Dukes*, 428 F. Supp. 2d at 1309.  The Supreme Court has described this test as one of "fit," and "scientific validity for one purpose is not necessarily scientific validity for other related purposes."  *Daubert*, 509 U.S. at 591.  Further, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

### b.    Logue's "Zone of Insolvency" Testimony

Logue testified that ABCO/Magnatrax was in a "zone of insolvency" at the time of the ABCO and Republic acquisitions.  Plaintiff references this testimony when discussing its fraudulent transfer and breach of fiduciary duty claims.  Defendants contend that this testimony is inadmissible, in part, because there is no scientifically accepted definition of, or methodology for calculating, the "zone of insolvency" among financial experts or legal scholars.

-66-

Logue does not define "zone of insolvency" in his report.  Logue testified extensively to his understanding of "zone of insolvency" in his deposition.  (P.R.A. 62 at 155-162). Logue defined the "zone" as "an inability to pay your bills when they're due, the probability of running afoul of the bank covenants, pretty small equity capital for the size of the company that you have."  (*Id.* at 155:11-15).  Logue could not identify any financial valuation textbook, article, or treatise defining the term "zone of insolvency," rather he claimed that it was a term of art that he has seen develop in the last year or two in contexts like this case.  (*Id.* at 155:24 - 156:12).  Logue had not personally seen the term used in any contemporaneous solvency valuation, but he claimed other people told him they had used it in such valuations.  (*Id.* at 156:17 - 158:6).  Logue testified that he had never used the term in a solvency evaluation before and that he had never been a part of a case where an expert had done so.  (*Id.* at 158:7-17).  Logue identified the "zone" as "subjective" and "a judgment call."  (*Id.* at 158: 21-23).  He stated that if "solvency" was a snapshot, then one should think of the "zone" as a video camera or "a general landscape."  (*Id.* at 161:7-11).  The zone was a "mosaic" in which one "must consider not only today but what might happen in the not too distant future."  (*Id.* at 162:22-25).  Logue explained the "zone" as a range, but he admitted that he had not quantified that range in his report and he could not give a specific range.  (*Id.* at 159:25 - 161:3, 163:10-15).  When asked how close to the line a company

-67-

must be to be in the "zone" in a quantifiable way, Logue testified that it would differ depending on the company and the investment opportunity.  (*Id.* at 161:12-17).

The court has researched the term "zone of insolvency" or "vicinity of insolvency" and finds that it arose out of a footnote in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, No. 12150, 1991 WL 277613, * 34 n.55 (Del Ch. Dec. 30, 1991) addressing the decision-making process of directors in a financially strained company.  The court can find no opinion written since *Credit Lyonnais* which has explicitly defined "zone of insolvency," and rather repeatedly sees this term referred to as "hazy,"  "ill defined," or "confusing."  *In re Teleglobe Communications Corp.*, 493 F.3d 345, 356 n.9 (3rd Cir. 2007); *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790 n.56 (Del. Ch. 2004).

The court finds that Logue's testimony that ABCO/Magnatrax was in the "zone of insolvency" at the time of the ABCO and Republic acquisitions is unreliable.  Logue has admitted that his conclusions as to the "zone" cannot be tested because they are based upon a subjective judgment call.  Logue further admits that he has never seen the term in an article or treatise related to valuations and that he has not personally seen his peers use it in valuations.  Logue contends that he is aware of other professionals using it but cannot point specifically to any work by other experts that he has reviewed.  Logue cannot quantify the term in any way, and although he appears to contend in parts of his testimony that the zone

-68-

is "a range," he admits in later portions that he is unable to provide Defendants with such a range or indicate any particular rate of error in calculating such a range.  Aside from Logue's testimony, the court's own exploration of the case law makes clear that there is no generally accepted meaning for the term "zone of insolvency."

The court finds that any testimony regarding a "zone of insolvency" is unreliable and will not allow Plaintiff to rely on any testimony by Logue that the Debtors were in a "zone of insolvency."  This holding does not prevent Plaintiff from offering testimony that the Debtors could not pay their debts when due, were statutorily "insolvent," or that they had unreasonably small amount of capital in which to operate their business; it merely prevents Plaintiff from using the term "zone of insolvency."

### c.    Logue's Methodology for Calculating DCF Variables

Logue rejected the Debtors' management's projections regarding the Debtors' projected sales and revenue growth, EBITDA, changes in working capital, capital expenditures, and taxes in the years 2000 through 2005 and used his own estimates of these values as variables in his DCF, CompCo, and capital adequacy analysis.  Specifically, Logue used three-year historical annual average numbers for  projected sales growth, EBITDA, and capital expenditures.  The court finds that (1) Logue provided no scientific or reasoned explanation for his decision to use three-year historical averages, and (2) Logue was not qualified to quantify the effect a poor builder/dealer recruitment and other

-69-

conditions as he perceived them would have on the Debtors' revenue growth, EBITDA, working capital and capital expenditures. Logue's unreliable and unqualified estimate of these variables tainted the reliability of his entire DCF analysis, and by extension his conclusions based on that analysis.

Logue utilized a DCF analysis to reach his conclusions. The court recognizes that DCF is "the preeminent valuation methodology" among experts for determining a company's value. *Neal v. Alabama By-Products Corp.*, Civ. A. 8282, 1990 WL 109243, *7 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del.1991). *See also Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 594 (8th Cir. 2007) (referring to method as preeminent); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362 (3d Cir. 2002) (affirming use of discounted cash flow analysis and noting that "[a] number of courts have commented on the propriety of the discounted cash flow methodology for certain valuation situations, particularly where valuing stock and other securities of a company"); *In re Valley-Vulcan Mold Co.*, Civ. No. 99-4129, 2001 WL 224066, *3 (6th Cir. Feb. 26, 2001) (affirming use of discounted cash flow analysis and noting that it is "a well-recognized methodology for determining a business's going-concern values."). It is not enough, however, for an expert to select a well accepted and scientifically valid methodology; he must also apply that methodology correctly to the facts of the case.

Logue testified that the Debtors' three-year average historical revenue growth rates and EBITDA margins were conservative estimates of the Debtors' condition. In explaining why he chose a three-year average of revenue growth, as opposed to a two- or a four-year average, Logue stated:

> Q       Why didn't you use a 2-year historical average?
>
> A       Two years, you know, it's like prunes, six is too many, three is too few.  In my looking at the data, it seemed that a 3-year average would, took away -- I mean, they had a bad year in there, they had two good years in there, and I thought this would be a pretty good estimate of what would happen going forward.
>
> Q       Why didn't you use a 4-year average?
>
> A       The 4-year average would have --I forget what that earliest year was, but that was coming out of the IPO, and it would have -- I don't remember what the number was – but I took a number that seemed to be, you know, consistent with the construction industry, the MBA forecasts which I think was 6.3 percent, which is a little bit higher.  I mean, every other forecast that we've seen suggests the company is going to grow around the rate of the economy -- even your experts when they do their Gordon growth model assume that the company will grow at either 3 percent or 4 percent.
>
> They don't have these astronomical growth rates embedded there.  In my sense, I thought 3 years was just right.

(P.R.A. 62 at 340:7 - 341:14).

Logue provided no explainable reason why the three-year rate was "just right." Logue did not refer to other experts who had used a three-year rate or a treatise which had done so.  Logue did not argue that using a three-year rate is generally accepted or produces

-71-

a low rate of error.  Logue did not explain that three years was the necessary time period to avoid creating a rate which relied too heavily on an outlying number, for example.  Rather Logue appears to have selected the three-year rate because it produced a revenue growth outcome closest to the MBMA industry numbers.

The MBMA industry numbers represent growth rates specific to metal buildings manufacture.  Defendants contend that metal buildings manufacture was 55% of ABCO's business at the time of the first LBO.  Logue does not indicate what percentage of the Debtors' business was metal buildings manufacture in either his expert report or his deposition.  Logue admits in his deposition that he did not examine industry growth statistics for these other industries, and he does not explain in his initial expert report why he believes these other industries are correlated with the metal buildings industry.  (P.R.A. 62 at 262:9-20, 265:7-9).  In explaining why he relied upon the MBMA growth statistics, Logue stated, "I know that many of these other industries or other product activities are correlated with the metal buildings business, but that was one indicator, and that was just a pass a smell test kind of thing."  (*Id.* at 263:9-14).  He further admitted that he did not value ABCO/Magnatrax's metal buildings division separately to determine whether it was consistent with MBMA growth rates, and he was unaware of the fact that management's projections for the metal buildings division *were* consistent with MBMA statistics.  (P.R.A. 62 at 259:4 - 260:10, 263:21-264:7, 264:25-265:6 ).

-72-

Logue did not provide any scientific explanation in his report as to why the MBMA statistics were an adequate bench mark for the Debtors' statistics.  Logue did not discuss how the MBMA statistics were compiled, whether they were subject to peer review, whether they were known to have a certain error range, or whether they are generally used by financial experts looking at the metal buildings industry.  The court also notes Logue's use of the three-year historical growth rate for the MBMA in selecting a three-year rate for revenue growth.  Logue provided no explanation for why he looked at the three-year MBMA rate of 6.5% when deciding that three years was appropriate for the Debtors' revenue growth rate because it yielded a rate of 6.3%.  For example, had Logue used a two-year, four-year, or five-year average to calculate the MBMA growth rate in his 1999 analyses of value at the time of the ABCO and Republic acquisitions, the rate would have been 9.8%, 9.4%, or 12.8%, respectively, rather than 6.5%.  (P.A. 52 at Exs. 7 and 9(b)).  Because Logue provided no reasoned explanation for his use of the MBMA statistics as a benchmark, he has no reasoned explanation for his use of three years to calculate the Debtors' historical revenue growth rate.

Logue also uses a three-year historical annual EBITDA margin and a three-year historical average for capital expenditures as a substitute for management's projected EBITDA margins and capital expenditures during each of the relevant time periods. (*Id.* at 40-41, 55, 57, 68, 70; P.R.A. 62 at 312:26-315:7).  Logue provides no explanation of any

-73-

kind as to why he chose a three-year historical annual average for these numbers.  Logue did testify in his deposition that "[e]verything [wa]s driven off revenues." (P.R.A. 62 at 318:16). Logue's decision to use three-year growth rates as opposed to a two- or four-year growth rates had a significant impact on the ultimate numbers used.  For example, had Logue used a two-year, four-year, or five-year rate rather than a three-year rate to calculate the growth rate in his 1999 analyses of the ABCO and Republic acquisitions, the rate would have been 10.9%, 14.1%, or 15.8%, respectively, rather than 6.3%.  (P.A. 52 at Ex. 9(b)). When an expert testifies that he is providing a "conservative estimate" but he provides no principled model or methodology from which that estimate was produced, his testimony is pure *ipse dixit.* An expert who applies a principled model but uses unprincipled variables in that model is akin to a magician who creates a distraction so the audience cannot see what he is really doing.

Logue testified in his deposition that he utilized three-year historical averages in his models rather than management projections, or the projections of the Debtors' lenders and investors, because (1) management's projections were inconsistent with the twenty-year average sales growth of 5.7% for the MBMA; (2) communications among the Debtors' management indicated that the Debtors had technology system problems that created capacity and service constraint; (3) communications among the Debtors' management indicated that the Debtors had struggled to secure enough dealer agreements and the lack

-74-

of these agreements could affect sales down the road; (4) management's strategic plans did not indicate how they were going to fix these problems or how they were going to beat industry numbers and their own historical numbers; and (5) investor and lender analyses seem to suffer from the same problems as management analyses. (P.R.A. 62 at 178:20 - 183:5).  Logue does not provide any explanation as to why the Debtors' three-year historical averages account for these concerns (while management projections do not) and why the historical averages account for these concerns to the appropriate degree.  For example, Logue has provided no testimony or explanation such as builder network concerns should decrease a company's sales by "x" percent or a range of percentages.  Logue appears to have concluded that the perceived "problems" of the Debtors will prevent them from growing and hold them at historical levels, as articulated by a arbitrary three-year average.  Logue's conclusion that the impact of the Debtors' problems is the difference between the Debtors' three-year historical averages and management's estimates is as much flagrant wand waving as his selection of a three-year average as a "conservative estimate."

Even if Logue had provided a scientific basis for the amount of his modifications, the court would have concerns about his qualifications to make them. Logue has written and taught on issues of valuation and served on numerous loan committees addressing credit analysis and solvency.  Logue  has taught on and claims to be familiar with principles of business administration.  The court does not dispute that Logue is a learned man or that he

-75-

is an expert in the area of business valuation.  The court can say with some certainty that Logue's general corporate experience would make him competent to evaluate the impact of technological system problems on a firm, the likelihood that a firm would outperform its historical numbers, and the correlation between a firm's numbers and industry averages. However, Logue's decision to modify management numbers was based on dealer network concerns as well.  Logue has testified that he is not an expert in the metal buildings or construction industries. (P.R.A. 62 at 97:14-20).  Logue's only experience in the metal buildings industry is a stint as a business conditions and forecasting consulting for AMCA, the predecessor to United Dominion, in the early eighties. (*Id.* at 93:15-94:5). AMCA had a subsidiary involved in the metal buildings industry, and Logue investigated a metal buildings company as an acquisition for AMCA.  (*Id.* at 94:6-17).  Defense counsel asked Logue, "Other than the work that you did for AMCA, any other experience that comes to mind in the metal buildings industry?" (*Id.* at 97:21-98:2).  Logue responded, "Only that my son played hockey in a metal building, Varco-Prudin building for years." (*Id.*).  The court finds that Logue's limited experience in the metal buildings industry does not qualify him to quantify the effect that the Debtors' managements' concerns about its dealer network would have on projected revenue, sales, and capital expenditures.

The court finds that Logue's determination of revenue growth, EBITDA margin, and capital expenditures had a tremendous impact upon his ultimate DCF conclusions.  The

-76-

court cannot determine exactly what the equity value for the Debtors would have been had Logue applied different numbers because Logue did not provide his exact DCF formula in his expert report. Logue's DCF valuations had a disproportionate 75% impact upon his determinations as to the Debtors' value. The court finds that Logue employed an unreliable methodology in determining revenue growth, EBITDA margin, and capital expenditures, and this methodology renders his asset valuation analysis unreliable. The court likewise finds that Logue used the numbers derived in his DCF debt free cash flow analysis to calculate projected free cash flows and perform his capital adequacy analysis. The court's concerns with Logue's methodology also render this analysis unreliable. The court cannot allow Logue to testify as to debt fee cash flow. As such the court cannot allow Logue to offer any conclusions with respect to "solvency," or capital adequacy, or ability to pay debts.

### d.     Logue's Calculation of Reasonably Equivalent Value

As stated above, Logue calculated "reasonably equivalent value" by comparing the equity value of the Debtors on May 12, 1999; September 1, 1999; March 10, 2000; and May 12, 2002. (P.A. 52 at Ex. 4). Defendants contend that Logue's reasonably equivalent value analysis is (1) unreliable because it relies upon equity figures improperly calculated using an unreliable DCF methodology as discussed above, and (2) irrelevant and unhelpful

AO 72A
(Rev.8/82)

to the trier of fact because it wrongly conflates an insolvency analysis with reasonably equivalent value analysis.

The court has already found that Logue's reasonably equivalent value analysis is based on an unreliable DCF analysis. The court also agrees with Defendants that Logue's "reasonably equivalent value" testimony is not relevant to the task at hand – determining whether the Debtors received "reasonably equivalent value" as that term is used in the fraudulent transfer context. Even if the court were to assume that Logue's equity figures were calculated reliably, the court would still find that Logue's proffered reasonably equivalent value testimony was a bad "fit" as that term is described in *Daubert.*

Under the primary analysis in *Mellon* and its progeny, the court must compare the value of the assets the Debtors received and the value of the assets the Debtors gave in each leverage buyout acquisition – here the value of the companies, assets purchased, and intangible benefits and the amount of the relevant loans and/or cash needed to finance the acquisitions. Logue admits, however, that he never performed *any* independent valuation of the assets of Republic or Jannock or their independent value as companies. (P.R.A. 62 at 142:3-19). He merely valued the Debtors as a whole after the acquisitions which incorporated these companies. Logue's testimony is also unhelpful under the secondary analysis in *Mellon*. Logue did not "value" ABCO/Magnatrax as a going concern directly before and after each acquisition. Logue compared (1) the value of the Debtors after the

-78-

ABCO acquisition and the value of the Debtors after the Republic acquisition seven months later; and (2) the value of the Debtors after the Republic acquisition to the value of the Debtors after the Jannock acquisition three months later.  Logue does not account for any changes that may have occurred in the Debtors' value between May 1999 and December 1999, and December 1999 and March 2000 for reasons unrelated to the acquisitions. Further, Logue's equity analyses of the LBOs  are based on "models;" these models did not project the Debtors' various financial statistics right at the time of the acquisitions, rather they were prepared in May, July, and December 1999 respectively.  The court finds that Logue's testimony about the change in the Debtors' equity between May 1999 and September 1999, between September 1999 and December 1999, and between March 2000 and the bankruptcy does not "logically advance[] a[ny] material aspect of the proposing party's case." *Dukes,* 428 F. Supp. 2d at 1309.  The court finds that allowing Plaintiff to proffer Logue's conclusions as to "reasonably equivalent value" would confuse rather than assist the trier of fact.

### iv.    Showing Insolvency or Lack of Reasonably Equivalent Value

Defendants argue that without Logue's report, Plaintiff cannot meet its summary judgment burden with respect to insolvency or reasonably equivalent value. Defendants contend that Plaintiff cannot prove that the Debtors were insolvent at the time of the Acquisition Transfers. Defendants insist that (1) the parties involved in the acquisitions believed the Debtors were solvent; (2) ABCO represented in its agreements with its creditors that it was and would continue to be solvent; (3) the Debtors had cash on hand at the time of the Republic Acquisition; (4) the lenders and equity contributors did due diligence and determined that the Debtors were solvent at the time of the transactions; (5) the Debtors made their loan payments under the Credit Agreement until 2002; (6) the Debtors continued to pay their unsecured creditors until a few months before the bankruptcy; and (7) Plaintiff's only potential evidence on insolvency comes from Logue. In response to Defendants' challenge, Plaintiff argues that (1) insolvency is a factually intensive question that may rarely be decided at summary judgment; (2) Logue's expert testimony should be admissible; and (3) Logue's expert testimony creates genuine issues of material fact on the issue of insolvency.

Defendants have identified facts which they believe support solvency and have pointed out a lack of reliable evidence to the contrary. As *Mellon* indicates, a plaintiff does not have to have an expert to present evidence on financial condition. However, Plaintiff

-80-

has relied exclusively on Logue's expert report and has not put forth any additional evidence on insolvency.  The court has found that Logue's conclusions with respect to solvency and capitalization are unreliable and inadmissible.  The court GRANTS Defendants' Motion for Partial Summary Judgment as to the remaining Acquisition Transfer claims.

Plaintiff is left with its Credit Agreement and Management Agreement Transfer claims.  Defendants insist that the Debtors received reasonably equivalent value for the Credit Agreement Transfers because for each payment made they received a corresponding decrease in antecedent debt.  Plaintiff maintains that decreases in antecedent debt cannot serve as a basis for reasonably equivalent value because the antecedent debt obligations are themselves avoidable fraudulent transfers.  Defendants argue that the Debtors received reasonably equivalent value for the Management Agreement Transfers because the Debtors received valuable management services.  Plaintiff avers that there are material questions of fact about what management services, if any, the Debtors received and the value of those services. The court will address the two types of transfers separately.

### a.    Credit Agreement Transfers

The court must determine whether the Debtors received reasonably equivalent value for their loan payments in the form of debt forgiveness – the Debtors make a loan payment and they get a reduction in the principal and interest of their loan by an equal amount.  As used in § 548, the term "value" includes "satisfaction . . . of a present or antecedent debt of

-81-

the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Antecedent debt is debt preexisting or prior to the transfer. *In re Cavalier Homes of Georgia, Inc.*, 102 B.R. 878, 885-86 (Bankr. M.D. Ga. 1989) (finding that debtor received reasonably equivalent value for its payments to bank for collecting accounts receivable because payments reduced balance due on promissory note and bond by same amount). A debtor receives equivalent value as required by section 548 if it makes a transfer to reduce its debt as long as the property conveyed is fairly equivalent in value to the debt satisfied and the transferee is not an officer, director, or major shareholder of the transferor. *Id.* at 886; *In re Tucker*, 2007 WL 1548927, at * 2.

As stated above, Plaintiff defines the Credit Agreement Transfers as repayments of the Tranche A Loan, the Tranche B Loan, the "revolving credit loan component" of the Credit Agreement, as well as quarterly commitment fees, attorney's fees, expense reimbursements, and wire transfer fees. (P. 2/22/2008 Resp. at 58). Under this definition, the Credit Agreement Transfers appear to be repayments of antecedent debt and the Credit Agreement transfer appear to be transfers for reasonably equivalent value.

Plaintiff argues, however, that a transfer made on account of an antecedent debt cannot constitute an exchange for reasonably equivalent value if the antecedent debt is itself an obligation subject to avoidance. *See In re Nirvana Rest., Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) ("[I]f [the incurrence of debt] is avoided as a fraudulent obligation, it cannot serve as 'fair consideration' for the subsequent [t]ransfers"). The Trustee's response brief

-82-

argues that the Trustee seeks to avoid the Debtors' incurrence of the Credit Agreement obligations as fraudulent obligations in Counts VII and IX; Defendants have not moved for summary judgment on Counts VII and IX; and thus, Plaintiff argues that until the court holds a trial to determine whether the underlying obligations in Counts VII and IX are voidable, the court cannot conclude that the Debtors received reasonably equivalent value. The court is unpersuaded by Plaintiff's argument.   Defendants explicitly moved for summary judgment on all of Plaintiff's fraudulent transfer claims including, Counts VII and IX. (D. MSJ, at 15).  Defendants' arguments regarding the "Acquisition Transfers" clearly address the underlying obligations which caused Plaintiff to have to repay the Tranche A, Tranche B, and revolving loans.   As stated above, Plaintiff explicitly defined the "Acquisition Transfers" to include "the additional liens granted to CIBC on the Debtors' assets that enabled the Debtors to obtain the money to pay the selling shareholders." (P. Resp. at 18 n.15).  The court has already dismissed Plaintiff's Acquisition Transfer claims. Therefore, the court cannot accept Plaintiff's argument that the Credit Agreement Transfers should be set aside because the obligations which underlie them (the Acquisition transfers) are fraudulent transfers which the court has not yet addressed.  Defendants' Motion for Partial Summary Judgment is GRANTED as to the Credit Agreement Transfers.

AO 72A
(Rev.8/82)

b.        **Management Agreement Transfers**

Defendants contend that the Debtors received reasonably equivalent value for the Management Agreement transfers in the form of management services. The Trustee denies this assertion. (P. SMF ¶¶ 136, 141). Both parties identified facts in the record relating to this issue. The court has examined these facts.

It appears that Blackmon testified generally that Defendants provided management services, but he did not specify what services were provided. Ammerman testified that Hilson and Wright performed due diligence and financial modeling in connection with the Jannock acquisition. Defendants also asked Wright specifically what services the Defendants provided.

Q        Can you tell me specifically what Onex Corporation did for American Building Company that falls under paragraph 2 [of the Management Agreement]?

A        What we did for them?

Q        Uh-huh.

A        We would be involved in, you know, reviewing and working with the management on corporate and strategic plans, you know, in terms of where to take the company. You know, you saw the list of the other acquisition opportunities that Bob Ammerman had suggested we would work with them in reviewing those, understanding how they fit into the company's strategic plan, whether or not we could do them, you know, how else we were going to grow the business, reviewing the company's budgeting process, forecasting, succession planning, all those types of things, you know, looking at major capital expenditure investments to ensure that they were sensible and logical and, you know, made sense, that they were achieving good rates of

-84-

> return, when you spend capital on improvement projects and whatnot, anything that was financing an acquisition obviously we would be assisting with and providing input and comments and whatnot.  As it says here, you know, any subsequent debt in equity financings, you know, such as when we bought Jannock, it would have been helpful in that whole process as well -- and just ongoing dialogue and meetings and, with management in terms of dealing with issues and opportunities that faced the company as it was going forward to try and build it into a successful business.

(D. SMF ¶ 136).  Wright further testified that Onex provided "tax structuring advice," "assistance in negotiating and settling the credit facilities in the [Jannock] transaction and assistance in the accounting and consolidation," and "assistance in strategic issues relating to carrying on the business of the acquisition." (*Id*. ¶ 141).

Plaintiff asked Schwartz, Hilson, and Wright if they could point to any record or documentation indicating what services the Defendants provided to the Debtors under the Management Agreement or when these services were provided.  (P. Resp. DSM ¶ 136).  They could not.  (*Id.*).  Wright and Hilson testified that there was no internal policy requiring the individuals at Onex to keep track of these services.  (*Id.*).  The Debtors received invoices detailing specific expenses to be reimbursed, but these invoices did not include any listing of services provided. (*Id.*).  Plaintiff presented testimony illustrating that Onex employees were sometimes confused as to who was providing services.  For example, Hilson testified that Ewout Heersink provided services, but Heersink himself stated, "I personally did not provide any of those services."  (*Id.*).  The Management Agreement provided for the Debtors to pay large sums of money to Defendants for "investment banking

-85-

services," yet Plaintiff pointed to testimony indicating that (1) no employee at Onex was an investment banker, (2) the Debtors found Republic and Jannock as possible acquisitions by themselves, and (3) the Debtors had independent investment bankers. (*Id.*).

In order to survive summary judgment, the Trustee must show that there is evidence sufficient to withstand a directed verdict motion on the issue of whether Debtors received reasonably equivalent value for the Management Agreement transfers. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004). The court finds that the Trustee has done so. The court DENIES partial summary judgment in favor of Defendants on Plaintiff's Management Agreement claims on the ground that the Debtors received reasonably equivalent value.

### 4.    Proving Actual Fraud

Defendants contend that Plaintiff cannot show that they acted with "actual intent to hinder, delay, or defraud" the Debtors' creditors. This court has already found that the Trustee cannot make out the elements of constructive fraudulent transfer; however, the Trustee may still be able to recover if it can show that the transfers were actually fraudulent.

"Fraudulent intent does not require an intent to run the company aground; it requires merely an intent to hinder or defraud creditors." *In re Toy King Distributors, Inc.*, 256 B.R. 1, 139 (Bankr. M.D. Fla. 2000). Proof of actual intent can rarely be accomplished by direct evidence, therefore, the court allows fact finders to "infer fraudulent conduct from the

circumstantial evidence and the surrounding circumstances of the transactions." *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998).   In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts may look to a number of badges of fraud.  *Id.* (listing eleven possible badges).  "Badges of fraud do not in themselves constitute fraud, but are only signs or indicia from which it may be inferred as a matter of evidence; and they are subject to explanation." *Burkhalter v. Glennville Bank*, 184 Ga. 147, 155 (1937).  "A badge of fraud may be defined to be any circumstance which tends to raise justifiable suspicion of fraud.  The determination of whether any particular circumstance is a badge of fraud is dependent upon facts, of the credibility and weight of which the jury are the exclusive judges." *See Battle* v. *F.S. Royster Guano Co.*, 155 Ga. 322 (1923).  "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, . . . several of them when considered together may afford a basis to infer fraud." *See General Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498-99 (11th Cir. 1997) (applying Florida's version of the Uniform Fraudulent Transfer Act).  "It is well established that whether a conveyance was made with the intent to delay or defraud creditors is a question of fact for the jury to decide from all of the circumstances of the case." *Artrac Corp. v. Austin Kelly Advertising, Inc.*, 197 Ga. App. 772, 773 (1990).

-87-

Here, Plaintiff asserts seven badges of fraud drawn from O.C.G.A. § 18-2-74(b)[29] and

fraudulent transfer case law.  Plaintiff does not discuss or support each badge of fraud in

detail.  Instead, Plaintiff emphasizes the factual nature of the intent inquiry and articulates

its general theory of the case without providing supporting citations.  Plaintiff contends in

sum that (1) Schwartz set up the LBO structure of the acquisitions in such a way that they

insulated Onex from risk and increased the risk to the Debtors' creditors; (2) Onex forced

the Debtors to incur massive debt knowing that the Debtors' management had made

aggressive financial projections; and (3) Onex collected transaction fees, increased

management fees, increased valuation for its stock, and "option value" with little concern

about the ultimate solvency of the Debtors.  The court will address each alleged badge of

fraud as best it can given the cursory nature of Plaintiff's argument.

First, Plaintiff insists that the transfers were made to or for the benefit of insiders.

O.C.G.A. § 18-2-74(b)(1); *In re Toy King Distributors*, 256 B.R. at 128.  The Georgia

Fraudulent Transfer Act and the Bankruptcy Code defines "insider" in the context of a

corporate debtor to include directors, officers, persons in control of the debtor, affiliates, and

insiders of affiliates.  11 U.S.C. § 101(31); O.C.G.A. § 18-2-71.  An "affiliate" includes

---

[29]Section 18-2-74(b) lists nine factors that a court may consider in determining whether a transfer was made with "actual intent to hinder, delay, or defraud any creditor of the debtor."

-88-

(I) an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor," and (II) a "corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly owns, controls, holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2). Onex American is an "affiliate" of and thus an "insider" with respect to the Debtors because it owned more than 50% of Magnatrax, and had control of more than 50% of its voting stock. Onex is an insider of an affiliate and thus an "insider" because it indirectly owned all of Onex American's stock. Onex LP does not fit within any of the technical definitions of section 101, however, the court finds that Onex LP had a sufficiently close relationship with Onex to be an insider of an affiliate.[30]  *See Matter of Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992) (discussing definition of insider in UFTA); *In re Florida Fund of Coral Gables, Ltd.*, 144 Fed. Appx. 72, 75 (11th Cir. 2005) (discussing definition of insider in bankruptcy code as illustrative rather than limiting); *In re Toy King Distributors, Inc.*, 256 B.R. at 111-12 (discussing legislative history of word insider in preference context).  *See also General Trading, Inc.*, 119 F.3d at 1499 (overturning ruling of Magistrate Judge who failed to recognize that while a party was not

---

[30]Onex LP is not an "affiliate" or an Onex "insider" under section 101(2)(B) despite the fact that Onex owns or controls it because section 101(2)(B) only applies to "corporations," and limited partnerships are excluded from the definition of "corporation" under section 101(9)(B).

technically an insider under Florida law, it was clear in substance that party was).  The Debtors made the Tranche B Transfers directly to Onex LP and the Management Agreement Transfers directly to Onex.  These transfers were clearly made "to insiders."  The Debtors made the non-Tranche B Credit Agreement Transfers to the Lenders and some of the Acquisition Transfers to the ABCO shareholders and other third parties. These parties are not "insiders."  The relevant question then is whether these transfers were made for "the benefit of" an insider.

Plaintiff's pleadings asserts a number of ways in which Defendants could have benefitted from these transfers -- (1) Defendants received tax benefits and interest payments from the Tranche B structure which was a part of the overall credit structure and were necessary to finance the acquisition; (2) the credit agreements allowed Defendants to acquire an interest in the Debtors without guaranteeing the debt necessary to do so; (3) Defendants received so-called "option value" from the potential upside of the LBOs, and (4) because Defendants were able to acquire the Debtors, they were able to force the Management Agreement on them and collect fees.

Defendants maintain that they did not "benefit" from the tax structure at the expense of the Debtors because the structure was neutral to them. Defendants argue that they received no "benefit" from the additional 25 basis points they charged the Debtors through the Tranche B structure because this additional interest was directly offset by a decrease in

-90-

management fees.  Defendants aver that Plaintiff's allegation that it benefitted from the Acquisition and Credit Agreement Transfers by forcing the Debtors into a Management Agreement and then collecting fees is simply a restatement of the Management Agreement transfer claims.  Defendants insist that the "option value" theory proposed by Plaintiff's purported expert, Dennis Logue, is a theory without any factual or legal support in transfer beneficiary law.  Defendants further aver that they never received any "option value" because Defendants never actually received any benefit from the LBOs as they were ultimately unsuccessful. Lastly, Defendants contend that they did not benefit from acquiring any interest in the Debtors because all equity interests were wiped out in the bankruptcy.

The court finds that Defendants benefitted from acquiring an interest in the Debtors. At the time the Debtors paid the stockholders so that Defendants could acquire an interest in the Debtors, the Debtors' stock had value. The Debtors purchased the stock of ABCO, Republic, and Jannock from their shareholders at a market price.  It is irrelevant that the value of the stock was later wiped out in the bankruptcy.  At the time the transfers were made, Defendants intended to benefit from them.   The court also finds that Plaintiff may assert the  management fees as a benefit.  Had the Debtors not entered into the relevant Credit Agreements and executed the acquisitions, there would have been no need for the Management Agreement between Onex and the Debtors.

The court also finds that Defendants received benefits from the credit structure in the form of potential Tranche B tax benefits.  The parties agree that as a result of the Tranche B Structure Onex has reported more than $83 million in available losses for tax purposes. (P. SMF ¶¶ 104-105; D Resp. P. SMF ¶ 104).  Plaintiff contends based on a report provided by proffered expert Todd Miller that as of the end of 2007, Onex had utilized at least CND$71 million in losses which has resulted in a reduction to its cash payable by at least CND$19 million.  (*Id.* ¶¶ 106-107).  Plaintiff further insists that Onex has more than CND$10 million in losses remaining for use.  (*Id.* ¶ 109).  Defendants dispute these contentions, claim that Defendants have not used the reported benefits, and insist that Miller's report is inadmissible.  (D. Resp. P. SMF ¶¶ 106-109).  The court need not resolve the question of fact as to whether Defendants have used their reported losses.  The court finds that the mere availability of the losses is a benefit.

The court finds that there is a dispute of fact as to whether the Defendants received benefits from the 25 basis points of interest in the Tranche B structure.  Defendants contend that they received no benefit because the 25 basis points in additional interest reduced, dollar for dollar, ABCO's obligations to Onex under the Management Agreement. (D. SMF ¶ 129).  Plaintiff disputes this.  (P. Resp. D. SMF ¶ 129).  The court need not resolve this dispute of fact because it is not material.  Even if Defendants' assertion is correct, that does not necessarily mean that Defendants did not benefit.  As explained above, Plaintiff has

-92-

created a genuine material dispute of fact regarding whether the Debtors actually received any management services pursuant to the Management Agreement. If the Debtors received nothing in exchange for their management fees, they did not receive a benefit when these fees were offset.

Although there are questions of fact regarding the alleged tax benefit and interest benefit Defendants may have received as a result of the Credit Agreement and Acquisition Transfers, these questions of fact are not material. The court can find as a matter of law that Defendants "benefitted" from the Acquisition and Credit Agreement transfers in the form of management fees, an ownership interest in the Debtors, and potential tax credits. Because the court finds that the Credit Agreement Transfers and the Acquisition Transfers were made to benefit the Defendants, the court finds that the transfers were made "for the benefit of insiders" and satisfy this badge of fraud.

Second, Plaintiff maintains that the transfers were in exchange for inadequate consideration, O.C.G.A. § 18-2-74(b)(8); *Gerschick v. Pounds*, 281 Ga. App. 531, 534 (2006). As the court held above, Plaintiff has not provided any admissible evidence that the Credit Agreement and Acquisition Transfers were for inadequate consideration, or for less than "reasonably equivalent value," but Plaintiff has raised a material dispute of fact as to whether the Management Agreement Transfers were. Third, Plaintiff contends that the transfers left the transferors, the Debtors, insolvent or with unreasonably small capital.

-93-

O.C.G.A. § 18-2-74(b)(9); 28 U.S.C. § 3304(b)(2)(I).  As the court stated above, Plaintiff has not presented any admissible evidence in support of insolvency or inadequate capital.

Fourth, Plaintiff maintains that the transfers resulted in the loss of substantially all the transferor's assets.  O.C.G.A. § 18-2-74(b)(5); 28 U.S.C. § 3304(b)(2)(E).  Plaintiff misstates the statutory badge of fraud which is whether "the transfer was of substantially all the debtor's assets."  While the transfers might have resulted in the Debtors' bankruptcy and the bankruptcy might have resulted in the loss of substantially all of the Debtors' assets, that is not the relevant inquiry.  The relevant inquiry is whether the Debtors lost substantially all their assets at the time of the transfer.  It is clear that none of the transfers at issue was of substantially all of the Debtors' assets.  *See In re XYZ Options, Inc.*, 154 F.3d at 1267, 1274 (finding that transfers in connection with implementation of settlement in which debtors gave up interest in litigation, interest in loan, real estate, and usury claim were transfers of substantially all assets); *General Trading, Inc.*, 119 F.3d at 1500 (finding that magistrate judge improperly inquired as to whether "all" rather than "substantially all" assets had been transferred when company was selling assets and inventory while closing doors for business); *ASARO, LLC v. Americas Mining Corp.*, 396 B.R. 278, 373 (S.D. Tex. 2008) (discussing whether sale of all stock of valuable subsidiary was sale of "substantially all the debtor's assets" in context of LBO).

-94-

Fifth, Plaintiff insists that the transfers were accomplished through the breach of a fiduciary duty. *In re Andersen*, 166 B.R. 516, 529 (Bankr. D. Conn. 1994). For the reasons discussed by the court in the section of this order addressing breach of fiduciary duty, the court finds that it is unclear whether Plaintiff can show that these transfers were accomplished through a breach of fiduciary duty. Sixth, Plaintiff argues that the transfers involved the use of dummy corporations. *In re Cambridge Capital, LLC*, 331 B.R. 47, 59 (Bankr. E.D.N.Y. 2005); *In re Corcoran*, 246 B.R. 152 (E.D.N.Y. 2000); *In re Montalvo*, 333 B.R. 145, 148 (Bankr. W.D. Ky. 2005); *U.S. v. Leggett*, 292 F.2d 423, 427 (6th Cir. 1961). It is clear that indeed the transfers involved the use of dummy corporations. Lastly, Plaintiff notes that the transfers were not in the ordinary course of the Debtors' business. *See In re OODC,* 321 B.R. at 140 (noting fact that LBO "clearly was not a transaction in the ordinary course" of debtor's business may be indicative of fraud). However, the court's decision in *OODC* addressing a motion to dismiss does not give a factual description of the debtor's business, so it is difficult for the court to determine Plaintiff's argument regarding this badge of fraud.

Plaintiff relies heavily on general statements outside its recitation of the badges of fraud. Plaintiff maintains that Schwartz structured Onex's LBO of ABCO to ensure that the risk of failure and loss would be borne by ABCO's creditors and that this evidences an intent to hinder and delay creditors at a minimum. (P.A. 6 at 86-89). Plaintiff's only

-95-

support for this accusation is a citation to Schwartz's deposition in which he testifies about

the risk language in Onex's annual report.

> Q      And then if you go down to the next paragraph, it states, "While we seek to maximize the risk/reward equation in all acquisitions, there is risk that the acquired company will not generate sufficient profitability or cash flow to service its debt requirements.  If such circumstances arise, the recovery of Onex' equity and any other investment in that subsidiary is at risk."  Is that an accurate statement of your understanding of the risks of the strategy that was described in the preceding paragraph?

> A      This statement is correct.

> . . . .

> Q      . . .  And what you're attempting to do here in making these statements is advise your shareholders of the risks that they might face if your acquisitions do not go as planned.  Correct?

> A      Correct.

> Q      Now, there are also risks from the leveraged structure that are experienced by the creditors of the operating subsidiaries.  Correct?

> A      [Defense Attorney]: Object to the form. [Schwartz]: Yes, creditors of every company in America, in the world, face risks.

> Q      And in particular, not just generally risks, but in particular, from the type of leverage transactions that Onex engages in, the creditors of the acquired company can face the same type of risk that Onex shareholders can face; that they will lose something if the leverage proves too great for the acquired company.  Correct?

> A      [Defense Attorney]: Object to the form.  Foundation. [Schwartz]:  Yes, generally that's correct.

Q       Okay.  And you understood that to be the case in 1999, March of 1999 when this report was issued.  Correct?

A       Onex would have understood it and I certainly did.

Q       And the risks that exist is [sic] that the loan that's been taken out, the leverage, if you will, can't be repaid.  Correct?

A       If the company doesn't -- is unable to in the future do as well as it's done in the past, yes.

Q       And when that [sic] typically those loans are collateralized by the assets of the acquired business.  Correct?

A       Yes.

Q       And the risk is that the bank will then take its collateral and the creditors who don't have liens will remain unpaid.  Correct?

A       [Defense Attorney]:  Object to the form.  [Schwartz]:  It depends on the amount of the -- if there's a loss, the amount of the loss. Whether it's the banks' and whether the banks have first security or second security or third security or whatever.  But yes, there is a risk to the equity investors as well as the creditors that in acquiring a business, that if it doesn't do as well in the future as it's done in the past or it's projected to do, that there could become a risk to the investors, yes, certainly.

(P.A. 6 at 85:21 - 88:23).  The court cannot find that this testimony is evidence of Onex's intent to hinder and delay creditors; Schwartz simply seems to be explaining the risks to creditors and equity holders when they choose to become involved in an LBO transaction.

Plaintiff further insists Defendants *forced* the Debtors to incur massive amounts of debt that they knew could hinder or delay the ability of the creditors to get paid.  Plaintiff insists that the Jannock acquisition provides a clear example of this.  (P.R.A. 29 at 135-36;

-97-

P.R.A. 120; P.A. 7 at Onex 54137).  The only documents Plaintiff cites for this proposition are (1) a confidential memo on December 16, 1999 from Ammerman to Hilson, Wright, and Blackmon giving the management estimates and models for 1999 and 2000 for Jannock's sales and EBITDA and stating, "[t]he plan that will probably be presented to the Jannock Board will be fudged upward by $2-4 million," (P.R.A. 129); (2) a portion of former Jannock employee Brian Jamieson's deposition describing how the tower structure Jannock had in place before the acquisition worked, (P.R.A. 29 at 135-36); and (3) a page from Onex's online 2000 annual report describing the Jannock acquisition, (P.A. 7 at Onex 54137).  The court finds that a reasonable fact finder could not find based on this evidence that Defendants forced the Debtors to incur debt which they knew would hinder or delay the ability of creditors to get paid.  Lastly, Plaintiff asserts without any citation that Defendants received transaction fees, increased management fees, increased valuation for its stock, and increased the potential (called an option value) for a large upside, and that Defendants had no downside if the Debtors became insolvent because all the debt would be shouldered by the Debtors' creditors.

To survive summary judgment, a nonmoving party must make a sufficient showing of a genuine dispute of fact. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant.  For factual issues to be considered genuine, they

-98-

must have a real basis in the record." *Id.* Plaintiff simply has not given the court sufficient basis in the record to allow the issue of actual fraud to go before a jury. The court GRANTS Defendants' Motion for Partial Summary Judgment as to the issue of actual fraud.

### 5.    Conclusion on Fraudulent Transfer Claims

The court has dismissed all of Plaintiff's Acquisition Transfer and Credit Agreement Transfer claims. As such, the court will not address Defendants' contentions that Plaintiff cannot recover the value of these fraudulent transfers from Defendants because Defendants are not "initial transferees" or "entities for whose benefit the transfers were made" under section 550. (D. MSJ Brief at 16-22, 24-26). Plaintiff's Management Agreement Transfer claims are the only fraudulent transfers remaining in this case. Defendants have not raised any arguments under section 550 with respect to these claims.

In sum, the court finds that (1) Plaintiff cannot make out a case for actual fraudulent transfer; (2) Plaintiff cannot make out a case for constructive fraudulent transfer as to the Credit Agreement Transfers because Plaintiff cannot show that the Debtors did not receive reasonably equivalent value for these transfers; (3) Plaintiff cannot make out a case of constructive fraudulent transfers as to the Acquisition Transfers because some of these claims are barred by the statute of limitations, and Plaintiff has presented no admissible evidence to show the Debtors were insolvent or that they did not receive reasonably equivalent value; and (4) Plaintiff has raised a genuine issue of material fact regarding the

-99-

issue of reasonably equivalent value as it relates to the Management Agreement Transfers. The court notes that Defendants did not move for summary judgment on the Management Agreement Transfer claims on the issue of insolvency. As such, the court will not dismiss these claims on that issue. The court GRANTS Defendants' Motion for Partial Summary Judgment on the Fraudulent Conveyance Counts I, III, VII, and IX, except as to the Management Agreement Transfers.

### B.    Preferences Count XVII

In Count XVII, the Trustee seeks to avoid roughly $13 million in transfers to Onex LP under the Tranche B loan structure and roughly $1.3 million in transfers to Onex and OMI under the Management Agreement made within one year of the Debtors' bankruptcy as preferences under 11 U.S.C. § 547(b).

Plaintiff has moved for partial summary judgment as to five transfers totaling roughly $1.2 million the Debtors made to OMI or Onex under the Management Agreement between June 2002 and February 2003 under 11 U.S.C. § 547(b). Plaintiff contends that all of the elements of these preference claims except insolvency are undisputed and requests that the court grant partial summary judgment as to the other elements of these preference claims to simplify the case for trial. Defendants concede that Plaintiff has proven four of the five elements it seeks partial summary judgment upon. Defendants dispute, however, whether

AO 72A
(Rev.8/82)

Plaintiff has shown that the transfers were "for or on account of an antecedent debt," and Defendants have asserted affirmative defenses under 11 U.S.C. § 547(c)(1), (2), and (4).

Defendants have cross moved for summary judgment on all of the Trustee's preference claims, Management Agreement and Tranche B.  Defendants insist that Plaintiff cannot avoid its alleged Tranche B preferences because it cannot show that Onex LP was an "insider," and it cannot recover its alleged Tranche B preferences because it cannot show that Onex LP was an "initial transferee" under 11 U.S.C. § 550.  Defendants also assert affirmative defenses under 11 U.S.C. § 547(c)(1) and (4).

In order to efficiently resolve the issues raised in both Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Partial Summary Judgment, the court will articulate the general law with respect to preferences first, address the prima facie case for the Management Agreement Preferences found in Plaintiff's motion, address the prima facie case for the Tranche B Preferences found in Defendants' motion, and conclude with a discussion of the affirmative defenses.

### 1.    General Law with Respect to Preferences under 11 U.S.C. § 547

To avoid transfers as preferences, a trustee must prove for each transfer that:  (1) the debtor has transferred an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor to the creditor before such transfer was made; (4) the transfer was made when the debtor was insolvent;

(5) the transfer was made on or within 90 days before the date of the filing of the petition or was made to an insider between ninety days and one year before the date of the filing of the petition; and (6) the transfer enabled the creditor to receive more than the creditor would have received as a distribution in a hypothetical Chapter 7 liquidation if the transfer had not been made. 11 U.S.C. § 547(b); *In re Tanner Family, LLC*, 556 F.3d 1194, 1196 (11th Cir. 2009). The provision allowing debtors to recover preferences was designed to (1) "encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse," and (2) "promote equality of treatment among creditors." *In re Jet Florida System, Inc.*, 841 F.2d 1082, 1083 (11th Cir. 1988).

A trustee may not avoid a transfer under § 547(b) if it fits within one of the nine exceptions in section 547(c). The trustee has the burden of proving the avoidability of a transfer under subsection (b), and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under one of the exceptions in subsection (c). 11 U.S.C. § 574(g). Further, just as with avoidable fraudulent transfers under 11 U.S.C. § 548, a trustee may only recover avoidable transfers under section 547 from an "initial transferee," "the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550; *In re Pony Exp. Delivery Services, Inc.*, 440 F.3d 1296, 1300 (11th Cir. 2006)

-102-

(addressing whether party could recover preference for another as "initial transferee" under section 550).

### 2. Plaintiff's Prima Facie Case for the Five Management Agreement Transfers at Issue in its Motion for Partial Summary Judgment

Plaintiff's Motion for Partial Summary Judgment specifically addresses a payment to OMI for third quarter 2002 management fees and four payments made to Onex to reimburse it and its affiliates for expenses incurred pursuant to the Management Agreement.[31]   Defendants contest whether Plaintiff has sufficiently proven that these transfers were "for or on account of an antecedent debt owed by the debtor to the creditor."

> A debt is "antecedent" to the transfer sought to be avoided under § 547(b) if it is pre-existing or is incurred before the transfer. Whether a debt is antecedent to the transfer at issue thus depends upon when the debt is incurred.  . . .
>
> The Code does not expressly define when a debtor "incurs" a debt, however, the definitions of "debt" and "claim" are instructive.  Under the Code, a

---

[31]Plaintiff seeks to avoid (1) a $81,750 payment to OMI for management fees covering July 1, 2002 through September 30, 2002, made on August 28, 2002, with a check dated August 16, 2002, in response to a July 23, 2002 invoice; (2) a $143,099.25 payment to Onex for expenses incurred in the period ending April 30, 2002, made on June 14, 2002, with a check dated May 10, 2002, in response to an April 23, 2002 invoice; (3) a $945,513.30 payment to Onex for expenses incurred from 2001 until the expense period ended August 23, 2002, made on August 29, 2002, with a check dated that same day, in response to numerous invoices including an August 28, 2002 invoice; (4) a $9,397.04 payment to Onex for expenses incurred  in the period ending October 31, 2002, made on December 5, 2002, with a check dated November 29, 2002, in response to a November 19, 2002 invoice; and (5) a $15,765.48 payment to Onex for expenses incurred in the period ending January 31, 2003, made February 28, 2003, with a check dated the same day, in response to a February 14, 2003 invoice. (P. MSJ, at 23).

-103-

> "debt" is a "liability on a claim."  A "claim," in turn, is a "right to payment,
> whether or not such right is reduced to judgment, liquidated, unliquidated,
> fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,
> secured, or unsecured." By making the terms "debt" and "claim" coextensive,
> Congress has adopted the broadest possible definition of debt.  Accordingly,
> a debtor incurs a debt to a creditor when the creditor has a claim against the
> debtor, *even if the claim is unliquidated, unmatured, unfixed, or contingent.*

*In re Tanner Family*, 556 F.3d at 1196 (internal citations and quotations omitted) (emphasis

in original).  In *In re Tanner Family*, the parties disputed whether a tenant incurred a "debt"

to a lessor at the time a lease was signed or at the time each payment became due.  *Id.*  The

Eleventh Circuit found that at the moment a lease was signed, the lessor had an unmatured

claim against a debtor to receive monthly rental payments for the duration of the lease's

five-year term and, because a "debt" covered both contingent and unmatured claims or

liabilities, the debtor had at that time a corresponding obligation to make the lease payments

that equaled its debt. *Id.*  The court stated, "[a]s the definitions of 'debt' and 'claim' make

clear, a debt need not be matured before the date of the transfer in question in order for it

to be antecedent to that transfer."  *Id.* at 1197.  The court concluded that any narrower

definition of "debt" would be inconsistent with Congress's intent that all legal obligations

of the debtor, no matter how remote or contingent, be dealt with in the bankruptcy case.  *Id.*

(internal quotations omitted).[32]

---

[32]In making its ruling in favor of the plaintiff, the Eleventh Circuit noted the
defendant's reliance on cases in other circuits holding that debt pursuant to a real estate lease
incurs periodically on the due date prescribed by the lease and not on the date the lease is
signed.  *Id.* (referring to *In re White River Corp.*, 799 F.2d 631, 633 (10th Cir.1986); *In re*

Defendants assert that the debt the Debtors incurred for the third quarter 2002 (July 1, 2002 - September 30, 2002) management fees was not antecedent to the transfer actually made on August 16, 2002, because the Debtors paid the fee in expectation of continuing services to be rendered after the date of payment.[33]  Defendants maintain that the other four payments were not antecedent debts because they were simply prompt reimbursements of expenses.  The court rejects Defendants' arguments.

The Management Agreement was for an initial five-year term and thus was to continue until at least May of 2004.  (P.A. 29 at MGXE370543).  The Management Agreement obligated the Debtors to pay quarterly management fees to Onex and its affiliates in advance on the last business day of March, June, September, and December beginning in June 1999.  (*Id.* at MGXE370541).  As such, the court finds that the Debtors

--------

*Child World, Inc.*, 173 B.R. 473, 476 (Bankr.S.D.N.Y.1994)).  *Id.*  The court found first and foremost that these cases were not binding upon it.  *Id.*  In addition, the court found the holdings in these cases to be factually inapplicable.  *Id.*  The holdings in *White River Corp.* and *In re Child World* were "premised upon the reasoning that, in exchange for rental payments made pursuant to a lease obligation, the lessee continues to possess, or to have an interest in, the leasehold estate," and the transfer at issue in *Tanner* involved a termination fee that extinguished any interest in future possession of the leased property.  *Id.*

[33]Defendants analogize the management fee payments to real estate lease payments, rely on *White River Corp.* and *In re Child World,* and contend that the *Tanner* holding does not apply because this matter involves a continuing business relationship analogous to a continuing lease interest.  The court in *Tanner* did not condition its holding on a continuing lease interest, and as such, this court will not rely on the out of circuit cases cited by Defendants in contradiction of *Tanner.*

-105-

incurred an unliquidated, unmatured, unfixed, or contingent debt to pay Defendants for the third quarter 2002 management fees on June 30, 2002, at the time they entered into the Management Agreement or "as of May 11, 1999." Therefore, the Debtors' payment of that fee in August 2002 was a payment for an antecedent debt.  The Management Agreement also obligated the Debtors to reimburse Onex for such reasonable out of pocket expenses as might be incurred by Onex and its subsidiaries in connection with rendering services under the Agreement within thirty days of receipt of an invoice therefor.  (*Id.* at MGXE370542).  Thus, it is arguable that the Debtors incurred an unfixed contingent debt to make the four reimbursement payments as early "as of May 11, 1999" when they signed the Management Agreement.  However, it is undisputed that the Debtors incurred a debt for these four payments as of the date of the invoices and that all four payments made to reimburse expenses were made after the date of these invoices.  These four transfers are therefore also payments made on account of antecedent debts.

The court finds that Plaintiff has proven five of the six elements of a preference with respect to the five transfers in his motion, or that  (1) the debtor has transferred an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor to the creditor before such transfer was made; (4) the transfer was made on or within 90 days before the date of the filing of the petition or was made to an insider between ninety days and one year before the date of the filing of the

-106-

petition; and (5) the transfer enabled the creditor to receive more than the creditor would have received as a distribution in a hypothetical Chapter 7 liquidation if the transfer had not been made. Therefore, the court GRANTS Plaintiff's Motion for Partial Summary Judgment on these elements. Plaintiff has not attempted to prove the sixth element, insolvency, and Defendants have not moved for summary judgment on this ground. As such, the parties will have to proceed to trial to determine whether the Debtors were "insolvent" at the time of these five alleged preference transfers.

### 3.      Plaintiff's Prima Facie Case for Tranche B Preference Transfers

Defendants aver that Plaintiff cannot make out a prima facie case against Onex LP to avoid and recover preferences made as part of the Tranche B structure because Plaintiff cannot show that Onex LP was an "insider" and a party from whom it can recover under section 550. For the reasons stated above in the court's discussion of actual fraud, the court finds that Onex LP was an "insider." The court will consider whether Plaintiff can recover from Onex LP as an initial transferee under section 550.

As the court explained above, for every alleged preference, a plaintiff must show that (1) the transfer may be set aside under sections 547, and (2) plaintiff may recover the value of the transfer from the defendant under section 550. Under section 550 of the Bankruptcy Code, a trustee may only recover the value of a fraudulent transfer from an initial or subsequent transferee or an entity for whose benefit the transfer was made. 11 U.S.C. § 550.

The purpose of section 550 is to recover from the correct party "to restore the estate to the financial condition that would have existed had the transfer never occurred." *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008).

Plaintiff seeks to recover the value of the Tranche B preferences from Onex LP as an "initial transferee." Defendants insist that Onex LP was a mere conduit and that all the parties understood ABCO, or the Debtors, to be the ultimate borrower. The term "initial transferee" is an undefined term of art the meaning of which under the Bankruptcy Code in any given transaction is not always straightforward. *See In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 705 (11th Cir. 2005) (describing why the first entity in receipt of funds is not always the "initial transferee.").

> The Eleventh Circuit has adopted the "conduit" or "control" test to determine whether a party is an initial transferee. The test recognizes that certain agents or fiscal intermediaries, which are usually banks, have no beneficial interest in an avoidable transfer and should not be thought of as initial transferees. A person must have dominion or control over the property received in the transfer to be an initial transferee. That is, he must be able to put the money to his own purposes, such as by using it to pay a debt.

*In re Whitacre Sunbelt, Inc.*, 200 B.R. 422, 425 (Bankr. N.D. Ga. 1996). *See also In re Pony Express Delivery Servs.*, 440 F.3d 1296, 1301 (11th Cir. 2006) ("[T]he control test turns on the recipient's legal rights and obligations toward the transferred assets, not simply their legal relationship with the debtor-transferor . . . ."); *In re Munford, Inc.*, 98 F.3d 604, 610 (11th Cir. 1996) (finding bank in LBO transaction that received funds from company

-108-

and sent money to selling shareholders when it received their stock was not transferee because it received no beneficial interest in funds); *Nordberg v. Arab Banking Corp.*, 904 F.2d 588, 600 (11th Cir. 1990) (finding that payments were recoverable where made for express purpose of paying off debt); *In re Chase*, 848 F.2d 1196, 1200 (11th Cir. 1988) (finding bank is initial transferee of funds to pay off an overdraft or "loan" but not when simply transferring wired money to customer's account).

"It is the ability of the transferee to use the money for his own benefit, not his actual mental state, that defines the dominion and control of the transferee." *In re Whitacre*, 200 B.R. at 426 (finding it irrelevant that insider planned to give check directly to third party). Further, "the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud." *In re International Administrative Services*, 408 F.3d at 705. A facilitator of funds is not a mere conduit when it has "intimate and thorough knowledge of the transactions and their desired effect," the funds have moved through multiple hands to be filtered away from creditors, and the facilitators were the "architects of a masterful plan aimed at diluting [the debtor's] coffers and lining their own pockets." *Id.* at 706 (finding that sole shareholder, officer, and director of financial marketing firm and various entities created by his lawyers were not mere conduits who naively transferred funds in scheme to hide firm's assets from creditors in lawsuit). Lastly, a party may not ask the court to consider the realities and not the form of a transaction as

-109-

to who is lender, borrower, guarantor, obligor, etc., where the party was instrumental in creating the very form of which it now complains. *In re Toy King Distributors, Inc.*, 256 B.R. at 86-88 (discussing an attempt to re-characterize transaction to avoid classification as initial transferee).

Here, the Tranche B Transfers directly occurred between the Debtors and Defendants. Onex LP is explicitly listed as a "Tranche B *Borrower*" in the ARCA. It is undisputed that funds flowed directly from the Lenders to Onex LP and Onex LP used Nova Scotia, Onex Finance I and Onex Finance II to lend these funds to the Debtors at an interest rate of 25 basis points higher than Onex LP borrowed them from the Lenders. The Debtors then transferred loan repayments back to Onex Finance which declared dividends and ultimately made loans with the funds to Onex Finance II and Nova Scotia. The Tranche B Structure clearly created a debtor-creditor relationship between the Debtors and the Onex entities. Under the Tranche B Structure the Onex entities had dominion or control over the money the Debtors  transferred to the Lenders because the Onex entities were able to put the money to their own purposes – re-loaning the money, declaring dividends, and creating a funding structure with tax benefits. It is irrelevant whether Defendants and the Lenders, or even the Debtors, subjectively understood ABCO to be the ultimate borrower as the control or conduit test ultimately turns on what a transferee can actually do with the relevant funds and not its subjective intent. Further, the Onex entities, unlike a bank, were not mere

-110-

innocent participants in a financial structure created by another party; rather the officers and directors of the Onex entities had "intimate and thorough knowledge of the transactions and their desired effect" because they crafted them.  Defendants chose to have the proceeds of the Lenders' investment in ABCO flow through the Tranche B structure rather than directly to ABCO; they did so because the structure provided them with a potential tax advantage. Defendants cannot now ask the court to ignore the "Borrower" label that they put in place just because in this scenario it works to their detriment.  If Plaintiff can prove that the Tranche B Transfers were preferences under section 547, it may seek to recover them from Onex LP as an "initial transferee."

### 4.    Defendants' Affirmative Defenses under Section 547(c)

Defendants have raised three affirmative defenses in their Motion for Partial Summary Judgment and in their response to Plaintiff's Motion for Partial Summary Judgment.  Defendants insist that (1) the Debtors received new value in substantially contemporaneous exchanges for their management agreement preferences under section 547(c)(1);[34] (2) the management agreement preferences were made in the ordinary course of business under section 547(c)(2); and (3) the amount of any of the Debtors' remaining preferences should be offset by the $10 million Onex contributed to the Debtors in

---

[34]Plaintiff also moves for summary judgment with respect to Defense 18, or Defendants' assertion that Plaintiff's preference claims fail because they were "contemporaneous exchanges for new value."

November 2002 under the "subsequent advance rule" in section 547(c)(4). Plaintiff disputes the merits of Defendants' defenses and also argues that they are procedurally barred from raising defenses under section 547(c)(2) and (4). The court will address Plaintiff's procedural argument before addressing the defenses on the merits.

Defendants did not raise either a section 547(c)(2) ordinary course of business defense or a section 547(c)(4) subsequent advance defense in their Amended Answer or at any time prior to the close of discovery, and Plaintiff maintains that this bars them from asserting it now. Defenses under section 547(c) are affirmative defenses that are waived if not affirmatively pled in a defendant's answer. *See* 11 U.S.C. § 547(g) (placing the burden to prove 547(c) exceptions on defendant); *In re Pugh*, 158 F.3d 530, 532 (11th Cir. 1998) (affirmative defenses not asserted are waived); *In re Moltech Power Systems, Inc.*, 326 B.R. 179, 183 (Bankr. N.D. Fla. 2005) (547(c) exceptions are affirmative defenses); *In re Fisher*, 100 B.R. 351, 355-56 (Bankr. S.D. Ohio 1989) (stating section 547(c) defenses must be pled in answer). Defendants claim they have not waived their defenses because Plaintiff can point to no additional discovery it would have taken on these defenses, and there can be no waiver in the absence of prejudice. *See In re Nat'l Lumber & Supply, Inc.*, 184 B.R. 74, 79 (9th Cir. 1995) (finding no abuse of discretion in trial court's decision to allow defendant to raise section 547(c)(2) and (4) defenses for first time at summary judgment); *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (finding plaintiff not

-112-

prejudiced by failure to plead affirmative defense because plaintiff had other notice of defense before trial).  The court is not persuaded by Defendants' argument that Plaintiff has suffered no prejudice.  Plaintiff repeatedly sought to elicit information about any affirmative defenses Defendants might be asserting during discovery so that it might adequately prepare.  Defendants had an opportunity to plead these defenses initially in their answer or reveal them in other pleadings.  Defendants did not do so; the court finds that these defenses are waived.

Defendants did properly assert their affirmative defense under section 547(c)(1) as Defense 18 in their Amended Answer.  Defendants maintain that Plaintiff cannot recover the Debtors' payments under the Management Agreement because the Debtors received "new value" in the form of continued management services in a "contemporaneous exchange" for these payments.  Plaintiff insists that (1) Defendants provided the management services, if any, under a preexisting contractual obligation, the Management Agreement, and thus these services did not constitute "new value" within the meaning of section 547(a)(1); and (2) the management preferences were payments for previously performed services, and a payment for past goods or services cannot be a "contemporaneous exchange."  Plaintiff also asserts that Defendants have not met their evidentiary burden with respect to this defense and have wrongly insisted that Plaintiff prove that it does not apply.

-113-

The contemporaneous-exchange-for-new-value exception is an affirmative defense with three basic requirements:  (1) The transferee must have extended new value to the debtor in exchange for the payment or transfer, (2) the exchange of payment for new value must have been intended by the debtor and transferee to be contemporaneous, and (3) the exchange must have been in fact substantially contemporaneous.  *See* 11 U.S.C. § 547(c)(1); *In re Arrow Air, Inc.*, 940 F.2d 1463, 1465 (11th Cir. 1991).  "The purpose of the contemporaneous exchange exception is to protect transactions that do not result in the diminution of the bankruptcy estate."  *Matter of Anderson-Smith & Associates, Inc.*, 188 B.R. 679, 688 (Bankr. N.D. Ala. 1995).

"New value" is:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2).  Congress intended the definition of ''new value'' to codify the principle of consideration from contract law.  *In re Spada*, 903 F.2d 971, 976 (3d Cir.1990).  "That familiar principle requires 'consideration' to be something that the promisor is not already obliged to give to the promisee (that is, something additional or new); the '[p]erformance of a legal duty owed to a promisor . . . is not consideration.'''  *In re Globe Bldg. Materials, Inc.*, 484 F.3d 946, 949 (7th Cir. 2007).  A "party seeking to shelter a

-114-

payment under the contemporaneous-exchange-for new value exception must do more than simply show that some new value was given the debtor; a party relying on the protection provided by this section must prove with specificity the measure of new value given the debtor in the exchange transaction he seeks to protect – and the challenged payment is protected only to the extent of the specific measure of new value shown." *In re Arrow Air, Inc.*, 940 F.2d at 1466.

New value can include the provision of services. *See In re NETtel Corp., Inc.*, 319 B.R. 290, 295 (Bankr. D.D.C. 2004) (addressing provision of technology maintenance and consulting services under contract after final contract payment). "New value involving the provision of services is deemed given on the date the personal services are rendered." *Id.*; *Collier on Bankruptcy* ¶ 547.04[4][c] (15th ed. 2003). It is irrelevant whether the services were contracted for prior to the preferential payment date as long as the services were rendered after the payment date. *In re NETtel Corp., Inc.*, 319 B.R. at 295 n.6. The increase in value to the estate arising from a subsequent performance of services is measured by the contract price of the services. *Id.* at 295.

A "contemporaneous exchange" is typically "a cash or quasi-cash transaction" such as a cash delivery or COD sale. *In re Family Home Sales Center, Inc.*, 65 B.R. 176, 177 (Bankr. N.D. Ga. 1986) (refusing to find defense applicable to COD sale not paid until forty days after delivery). However, the meaning of "substantially contemporaneous" is a flexible

standard that requires courts to examine all of the facts and circumstances of a particular transaction. *See In re Hedrick*, 524 F.3d 1175, 1190 (11th Cir. 2008) (finding that check received and deed recorded eight days after closing was "substantially contemporaneous"); *In re Gen Time Corp. GTC Props., Inc.*, 328 B.R. 243, 249 (Bankr. N.D. Ga. 2005) (finding that rent paid within thirty days was contemporaneous, new value was continuing to be able to stay in the premises). "In doing so, courts should take into account the objective reasonableness of the time taken to perfect the interest, the cause of any delay, and the motivations for it." *Id.* A "contemporaneous exchange" is not generally a payment for previously invoiced and incurred debt for past services or goods. *See In re Auto-Train Corp.*, 55 B.R. 69, 71 (Bankr. D. Co. 1985) (finding payment for services rendered during previous nine months made after payment was due on invoices was not contemporaneous exchange).

Here, the court must address three categories of transfers – (1) the third quarter 2002 payment of management fees referenced in Plaintiff's Motion for Partial Summary Judgment, (2) the four reimbursements for expenses referenced in the same, and (3) any other Management Agreement preferences not specifically discussed in Plaintiff's Motion. With respect to the third quarter 2002 management fee payment, the court finds that the only possible "new value" which could have enriched the estate as a result of this payment would be management services rendered in third quarter 2002. Defendants have not identified *any*

-116-

particular management services provided during this period and have most certainly not proven their value with specificity.  With respect to the reimbursement of expenses, the court can find no plausible "new value" and Defendants have not articulated one.  To the extent Defendants seek to assert a section 547(c)(1) defense as to any other Management Agreement Preferences that may exist but on which Plaintiff has not moved for partial summary judgment, the court finds that Defendants have failed to meet their burden of articulating "new value" for these preferences with specificity.

In sum, therefore, the court GRANTS Plaintiff's Motion for Partial Summary Judgment as to the five Management Agreement Preferences in its motion and as to Defense 18.  The court DENIES Defendants' Motion for Partial Summary Judgment as to Count XVII, Plaintiff's Preference Claims.

### C.    Breach of Fiduciary Duty Count X[35]

The only remaining breach of fiduciary duty claim in this action is against Onex American for its conduct following the ABCO acquisition.  (*See* Order, dated 9/15/2006 at 58-62 (dismissing claims against all Onex entities but Onex American post ABCO); Order, dated 9/26/2007 at 10 (dismissing Wright and Hilson)).  In Plaintiff's response to Defendants' Motion for Partial Summary Judgment, Plaintiff makes numerous allegations

---

[35]The parties agree, and the Court has already concluded, that Delaware law applies to Plaintiff's breach of fiduciary duty claim based on the "internal affairs doctrine." (See Order dated 9/15/2006 at 58 n.15.)

-117-

regarding the conduct of Onex, Schwartz, Hilson and Wright before, during, and after the ABCO acquisition.  To the extent that Plaintiff attempts to resurrect breach of fiduciary duty claims against Defendants other than Onex American or claims relating to the ABCO acquisition, the court denies such claims.  The court has reviewed Plaintiff's response in the light most favorable to it in conjunction with the Amended Complaint and has tried to distill Plaintiff's claims relating exclusively to Onex American after the ABCO Acquisition. Plaintiff appears to allege that Onex American breached its duty of loyalty to the Debtors and their creditors as the Debtors' majority shareholder when it allowed the Republic and Jannock transactions to go forward and allowed the Debtors to pay fees to Onex under the Management Agreement.  Plaintiff insists that these acts breached the duty of loyalty because they allowed Onex to obtain tax benefits and fees.

To prevail on a claim of breach of fiduciary duty, Plaintiff must prove "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Legatski v. Bethany Forest Assoc., Inc.*, No.03C-10-011, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006).  Plaintiff seeks to establish that Onex American had a fiduciary duty to Magnatrax as a majority shareholder and seeks to extend that fiduciary duty to Magnatrax's creditors via an insolvency theory.  The court finds that Onex American had no fiduciary duty to the Debtors' creditors.[36]  The parties do not dispute that Onex American had a fiduciary duty

_____

[36]As the court discussed above, Plaintiff submitted no admissible evidence to show that the Debtors were insolvent at the time of the Republic and Jannock transactions.  As

-118-

in certain circumstances to ABCO/Magnatrax as a majority shareholder. *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113-14 (Del. 1994).  Defendants simply dispute whether that fiduciary duty arose here with respect to resolutions authorizing the Republic and Jannock acquisitions and the payment of management fees.

Defendants insist that a majority shareholder must actually act in order to trigger a fiduciary duty.  Courts have described the duty as follows:

> Thus, when a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of the corporation.  When, on the other hand, a majority shareholder takes no such action, generally no special duty will be imposed.  More specifically, when a majority shareholder takes no action with respect to the negotiation for the corporation or approval of a proposed transaction (and uses no corporate information that would not be available to an arm's-length party), he has no duty to the corporation or its shareholders with respect to that transaction apart from such duties as are owed by any person in such circumstances.

*Cinerama, Inc. v. Technicolor, Inc.*, No. 8358, 1991 WL 111134, at *19 & n.24 (Del. Ch. June 24, 1991) (emphasis added), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993).  *See also Pfeffer v. Redstone*,

---

such, the court cannot find that Onex American owed any fiduciary duty to Magnatrax's creditors.  *See North Am. Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. Sup. Ct. 2007) (indicating that creditor may bring derivative claim for breach of fiduciary duty when company is insolvent); *Production Resources Group, L.L.C. v. NCT Group, Inc.* 863 A.2d 772, 791 (Del. Ch. 2004) (same); *Geyer v. Ingersoll Publications* Co., 621 A.2d 784, 787 (Del. Ch. 1992) (noting "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms" but noting that such duties may arise when corporation is insolvent).

-119-

No. 2317, 2008 WL 308450 (Del. Ch. Feb. 1, 2008) (dismissing Plaintiff's allegations that majority shareholder breached its fiduciary duty to minority shareholders "by causing" directors to approve and recommend exchange offer for minority shareholders because plaintiff failed to state any well pleaded facts that majority shareholder "did anything" in connection with exchange offer transactions).

The only relevant "act" Plaintiff alleges is that the Onex American Board agreed to contribute equity to the Jannock acquisition. Plaintiff does not allege that this was a breach of fiduciary duty to the Debtors. Plaintiff contends that Onex American "acted" here by controlling the ABCO/Magnatrax Board of Directors and forcing them to make payments under the Management Agreement and to approve the Republic and Jannock transactions. Plaintiff seems to allege that Onex American "controlled" ABCO's Board of Directors because Onex appointed them; many of the directors were Onex employees, including Wright and Hilson; and these Onex employees also acted on behalf of Onex American. The offering circular for ABCO Holdings, later Magnatrax, explained Onex Americans' majority shareholder status and stated that "Onex American will be able to exercise control over the outcome of all matters submitted to the shareholders of Holdings for approval, including the election of directors, and as a result will be able to control the Company's affairs and management." (P.R.A. 78 at MLT282209). The ABCO subscriptions agreement states that notice to Onex American should be provided to Hilson and Wright at Onex. (P.R.A. 79 at

-120-

ONEX 72217).  Hilson signed two ABCO/Magnatrax shareholder resolutions on behalf of ABCO/Magnatrax's majority shareholder Onex American which related to the appointment of directors to the ABCO Board.  He also signed a subscription agreement on behalf of Onex American for Magnatrax stock in 2000.  (P.R.A. 81 at ONEX 100200; P.R.A. 80 at ONEX-KS7386; P.R.A. 82 at ONEX 17864).

The Offering Circular does not create a genuine issue of material fact as to whether Onex American "controlled" the ABCO Board and directed them to engage in the relevant transactions; it simply outlines the power that a majority shareholder may exercise.  Plaintiff has created a genuine issue of fact as to whether Hilson and Wright were associated with Onex American even though they were not on its Board; however, this issue of fact is not material.  Even if Hilson and Wright were affiliated with both ABCO/Magnatrax and Onex American, that does not show that Onex American used Hilson and Wright to control the ABCO Board.  The documents Hilson signed are not particularly related to the acts underlying Plaintiff's breach of fiduciary duty claim and are nothing more than typical corporate transactions.  Plaintiff also presents evidence of a meeting of the Onex Executive Committee in January 2000 approving the Jannock acquisition; Hilson and Wright were present (P.R.A. 84 at ONEX37259-A).  This evidence says nothing about whether Onex American controlled the ABCO Board or forced them to make the decision to acquire Jannock; if anything it speaks to the relationship between Onex and Onex American.  The

-121-

court finds that Plaintiff has not created a genuine issue of material fact as to whether Onex American had a fiduciary duty to ABCO/Magnatrax as majority shareholder with respect to the decision to engage in the Republic and Jannock transactions and to continue making payments under the Management Agreement.  The court cannot find that Onex American had a fiduciary duty based on the evidence in the record without imputing the actions of Onex to Onex American.  Whether the actions of Onex are those of Onex American is a question of alter ego which is not currently before this court.  Therefore, the court GRANTS Defendants' Motion for Partial Summary Judgment as to Fiduciary Duty with LEAVE to RENEW in conjunction with the issue of alter ego.

**D.      Aiding and Abetting Breach of Fiduciary Duty Count XI and Civil Conspiracy Count XII**

In its aiding and abetting count, Plaintiff claims that Onex, Schwartz and Govan aided and abetted breaches of fiduciary duty committed by Hilson, Wright, Ammerman, Blackmon and Onex American.  Specifically, in its response to Defendants' Motion for Partial Summary Judgment, Plaintiff alleges that (1) "[b]ecause the Debtors became insolvent, . . . Hilson and Wright owed fiduciary duties to the Debtors and their creditors, whose right to the duty of loyalty was breached by their conduct;" (2) Hilson and Wright breached their fiduciary duties of loyalty when they conducted the ABCO acquisition which gave Onex unique benefits, and entered into the Management Agreement which awarded significant fees to Onex; (3) Onex, Schwartz, and Govan procured these breaches by structuring the transactions and causing Hilson and Wright to enter into them; (4) "Defendants understood that they were acting in a way that was not designed to protect creditors;" and (5) "Onex, Schwartz and Govan acted with intent to injure when they authorized and facilitated the LBOs and the Management Agreement." (P. Resp. at 62).

With respect to civil conspiracy, the Trustee asserts that Defendants conspired to embark on a scheme, artifice, or conspiracy  "together with Wright, Hilson, Ammerman, Blackmon, the Lenders and other released parties" to (1) divert value from ABCO and its subsidiaries to themselves; (2) fraudulently transfer assets from the Debtors to themselves; and (3) breach fiduciary duties. (Am. Cmplt. ¶¶ 221-23).

-123-

The parties raise choice-of-law arguments concerning these claims.  The court need not address the parties' choice-of-law arguments, however, because the court views civil conspiracy and aiding and abetting as theories of liability as opposed to discrete causes of action.  That is, civil conspiracy and aiding and abetting express another mechanism for affixing responsibility for an underlying wrong.[37]

In *Cook v. Robinson*, 216 Ga. 328 (1960), for example, the Supreme Court of Georgia explained:

> A conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort.  Where it is sought to impose civil liability, the conspiracy of itself furnishes no cause of action.  The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage. . . .

> While the conspiracy is not the gravamen of the charge, it may be pleaded and proved as aggravating the wrong of which the plaintiff complains, enabling him to recover in one action against all defendants as joint tortfeasors. . . .

> If no cause of action is otherwise alleged, the addition of allegations concerning conspiracy will not make one; but, where a cause of action is alleged, the fact of conspiracy, if proved, makes any

---

[37]Defendants strenuously argue that Alabama law applies to the aiding and abetting claim because ABCO was headquartered there.  Defendants then assert that Alabama fails to recognize a cause of action for aiding and abetting breach of fiduciary duty.  As the court has stated above, it need not reach the issue of choice of law and furthermore the court is not convinced that when put to the question, Alabama would decline to find such a theory of liability.

-124-

> actionable deed by one of the conspirators chargeable to all. . . .  The
> liability is joint and several.

*Id.* at 328-29 (quotations and citations omitted).

Thus, to the extent that Plaintiff has pleaded civil conspiracy as a separate cause of action, it does not survive.  Rather, an allegation of conspiracy is simply a way to hold liable the non-released parties who are shown to have planned or participated in an unlawful act. Proof of a conspiracy merely allows a plaintiff to expand the reach of his action to all joint tortfeasors/conspirators.

Similarly, courts have described aiding and abetting breach of fiduciary duty as a subset of civil conspiracy.  *See*, *e.g.*, *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038-39 (Del. Ch. 2006) ("in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law"); *Malpiede v. Townson*, 780 A.2d 1075, 1098 n.82 (Del. 2001) (stating in breach of fiduciary duty case, "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here"); *Weinberger v. Rio Grande Industries, Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) (stating claim for "civil conspiracy involving breaches of fiduciary duty is sometimes called 'aiding and abetting'").  *See also Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) (Posner, J.) ("We have said that there is no tort of aiding and abetting, but of course without meaning that one who aids and abets a tort has no liability.  The distinction is between a separate tort of aiding and

-125-

abetting, and aiding and abetting as a basis for imposing tort liability.  Although a number of cases do speak of a 'tort of aiding and abetting,' most of them also contain language suggesting that aiding and abetting is a basis for imposing liability for the tort aided and abetted rather than being a separate tort. . . There is nothing to be gained by multiplying the number of torts, and specifically by allowing a tort of aiding and abetting a fraud to emerge by mitosis from the tort of fraud, since it is apparent that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud.").

The court recognizes that Defendants contend that Plaintiff cannot make out an aiding and abetting breach of fiduciary claim because Plaintiff cannot show an underlying breach of fiduciary duty by a primary wrongdoer. The court declined to rule in subsection C above that Plaintiff cannot make out its breach of fiduciary duty claim against Onex American because of the possibility that the court may attribute the actions of Onex to Onex American.  The court dismissed all claims against Hilson, Wright, Ammerman, and Blackmon in its Order dated September 26, 2007, because the court found that they were "released parties" under the Plan and the Litigation Trust Agreement.  Here, however, the court rejects Defendants' argument that any alleged breach of fiduciary duty by the released parties cannot serve as "a breach of the primary wrongdoers' fiduciary duty" for purposes of Plaintiff's aiding and abetting claim.  The court's ruling as to these parties in its September 2007 order did not address the merits of Plaintiff's allegations against these

-126-

parties.  The court finds that Plaintiff may use the alleged breaches of fiduciary duty by Hilson and Wright as the underlying basis for its aiding and abetting claims.  The court notes, however, that Plaintiff appears to be basing its aiding and abetting claim on Hilson and Wright's breach of their fiduciary duty of loyalty to the creditors.  As the court held above, because Plaintiff has presented no admissible evidence that the Debtors were insolvent, none of the Defendants had a fiduciary duty to the Debtors' creditors.  Thus, Plaintiff can pursue the aiding and abetting/conspiracy theory only to the extent it alleges that Hilson and Wright owed fiduciary duties to the Debtors.

In sum, with respect to the breach of fiduciary duty, the court views aiding and abetting and conspiracy as two sides of the same coin and Plaintiff may go forward on those theories of liability.  The court recognizes that Plaintiff's conspiracy claim further alleges improper diversion of value from ABCO and fraudulently transferring assets from the Debtors to themselves.  Based on the rulings made above, however, the court has narrowed the scope of those alleged wrongs to fraudulent transfer under the Management Agreement and the preference claims.  Plaintiff may pursue a conspiracy theory of liability for those two categories as well.

### E.    Unjust Enrichment Count XIX

The Trustee maintains that the Onex Entity Defendants were unjustly enriched by benefits that included the value of the ABCO, Republic and Jannock acquisitions; tax

-127-

deductions stemming from the Tranche B Structure; ".25% interest on the Tranche B loan"; and $8.5 million in payments made under the Management Agreement. Defendants insist that the Trustee cannot prove unjust enrichment because all the alleged benefits arose in connection with express written contracts.

"Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment." 7 Ga. Jur. *Contracts* § 2:21; *Brown v. Cooper*, 237 Ga. App. 348, 350 (1999). "The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received . . . ." *Reidling v. Holcomb*, 225 Ga. App. 229, 232 (1997). A party cannot succeed on an unjust enrichment claim when "any benefit conferred on the defendants was triggered by a provision in [a] contract, the validity of which neither [the plaintiff] nor the defendants challenge." *Tidikis v. Network for Med. Commc'ns & Research, LLC*, 274 Ga. App. 807, 811 (2005).[38]

---

[38]Plaintiff cites no case law which calls into question the traditional notion that a plaintiff may not bring an unjust enrichment claim when there is a unchallenged underlying contract. The cases cited by Plaintiff, including *McBride v. Life Ins. Co. of Va.*, 190 F. Supp. 2d 1366, 1378 (M.D. Ga. 2002), and *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*, 679 F. Supp. 1564, 1579 (N.D. Ga. 1987), stand for the premise that a plaintiff may bring an unjust enrichment claim as an alternative to a breach of contract claim but he may not recover on both. *In re Healthco Intern., Inc.*, 195 B.R. 971, 989 (Bankr. D. Mass. 1996), addresses unjust enrichment as an alternative to breach of fiduciary

Here, Defendants obtained their interest in ABCO, Republic and Jannock through the relevant merger and stock purchase agreements, the tax deductions and interest stemming from the Tranche B Structure pursuant to the relevant credit agreements, and the $8.5 million in payments made under the Management Agreement pursuant to that agreement. All the benefits conferred were triggered by a provision in contracts and while Plaintiff has challenged whether these contracts violate statutory provisions against fraudulent transfers, Plaintiff has not challenged the underlying validity of these contracts. For this reason, the court will GRANT Defendants' Motion for Partial Summary Judgment as to the unjust enrichment claim.

### F.      Lender Liability Count XVI

In Count XVI, Plaintiff alleges that Defendants were insiders of and secured lenders to the Debtors, and Defendants exercised complete domination and control over the Debtors' operations, corporate finances, and acquisition strategy through the Management Agreement and common directors and senior officers. Plaintiff goes on to restate its alter ego and breach of fiduciary duty allegations. Plaintiff's claims appear to arise out of cases such as *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098 (5th Cir. 1973) ("If a lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability

_____

duty. The court here has for the most part dismissed all of Plaintiff's breach of fiduciary duty claims.

-129-

under the 'instrumentality' theory may be achieved"); *In re iPCS, Inc.*, 297 B.R. 283 (Bankr. N.D. Ga. 2003) (describing lender liability theory under Delaware law after *Krivo* and *Irwin & Leighton, Inc. v. W.M. Anderson Company*, 532 A.2d 983, 984 (Del. Ch. 1987)).

The case law makes clear that a critical issue in any claim of lender liability is whether "the dominant corporation exerted 'actual, operative, total control' such that the subservient corporation has 'no separate mind, will or existence of its own and was a business conduit' for the dominant corporation." *In re iPCS, Inc.*, 297 B.R. at 294 (quoting *Krivo*).  The court finds that this issue is critically intertwined with Plaintiff's claim for alter ego liability.  As the court has prevented the parties from addressing this claim in their first motions for summary judgment, the court cannot yet address Plaintiff's lender liability claim.  The court DENIES Defendants' Motion for Partial Summary Judgment as to Lender Liability with leave to renew in conjunction with a motion addressing alter ego liability.

## III.    Discussion of Defendants' Defenses as to Plaintiff's Remaining Claims

The court has dismissed all of the statutory claims on which Defendants moved for summary judgment except Plaintiff's Preference Claims and Plaintiff's Management Agreement Fraudulent Transfer Claims.  The court notes that it has not been called upon to address insolvency in either of these areas.   Plaintiff seeks to avoid as preferences approximately $1.2 million in payments of fees and expenses to OMI or Onex under the Management Agreement and approximately $13.1 million in Tranche B payments to Onex

-130-

LP under the Credit Agreement. (Plf. 2/22/2008 Resp. at 32, 33).  Between the time the Management Agreement went into effect and the time the last payment of quarterly fees was paid in August 2002, ABCO paid somewhere between roughly $8.2 and $8.5 million in fees and reimbursed roughly $1.8 million in expenses to Defendants under the Management Agreement.  (D. SMF and P. Resp. D. SMF ¶¶ 137-40, 143, 146).  The court estimates that Plaintiff's Management Fee and Preference claims overlap by at least $1.2 million, the amount of the management preference claims on which Plaintiff moved for partial summary judgment.  As such, the court finds that Plaintiff has approximately $20-25 million in statutory claims addressed in this order pending in this action.

The court notes that Plaintiff's Federal Debt Collection Procedures Act claims in Count II and Count VIII and Plaintiff's Alter Ego and Lender Liability claims in Count XIII and XVI are still pending before the court.  Plaintiff requests that the Court enter judgment on Counts II in an amount estimated to exceed $600 million and on Count VIII in an amount estimated to exceed $40 million.  Plaintiff requests the court hold the Defendants liable for "all the debts of Magnatrax, ABCO and the other Debtors, including any applicable interest" in Counts XIII and XVI and ask the court to enter judgment in that amount.  The Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001-3308, sets forth the "exclusive civil procedures for the United States . . . to recover a judgment on . . . an amount that is owing to the United States on account of restitution." *U.S. v. Mays*, 430 F.3d 963 (9th Cir. 2005).

Sections 3301, *et. seq.* under which Plaintiff moves address transfers which are fraudulent as to a debt to the United States and include many of the same elements as fraudulent transfer claims under 11 U.S.C. §§ 544, 547, and 548.  The court is making no rulings as to Counts II and VIII at this time, but the court supposes that Plaintiff may have difficulties proving these counts in the wake of the court's holdings in this order.  While these four counts remain, this order addresses the true "meat" of Plaintiff's case.  As such, the court finds it helpful to keep the $20-25 million figure relating to the remaining statutory claims addressed by this order in mind.

The court has not yet considered the parties' cross motions as to (1) "Defense 4," or the notion that Plaintiff's damages are capped by the outstanding balance of the opt-in creditors' claims; and (2) "Defenses 26 and 28" based on the doctrine of *in pari delicto*.  The court has also not yet addressed Defendants' claim in their Motion for Partial Summary Judgment that the court lacks personal jurisdiction over Defendant Gerald Schwartz. Finally, the court has not yet evaluated Plaintiff's requests in its Motion for Partial Summary Judgment to (1) establish that the transfers listed in paragraphs 138 through 383 of Plaintiff's Statement of Material Facts Not in Dispute were "transfers of the Debtors' interest in property" for purposes of Plaintiff's statutory claims, (2) to bar "Defenses 7, 11, 12, and 28", or the defenses laches, champerty and maintenance, estoppel, defendants suffered losses, and comparative fault and contribution, and (3) to bar "Defense 27", based

-132-

on the notion that the Trust is obligated to assume the Debtors' alleged obligations to indemnify the Defendants.  Because of Plaintiff's outstanding Management Agreement and Preference claims, the court finds it necessary to address all of these defense issues.

### A.        The Parties' Cross Motions on "Cap" Defense or Defense 4

Defendants contend in Defense 4 that "[t]o the extent Plaintiff has any standing, Plaintiff lacks standing to obtain relief for, and therefore lacks standing to pursue, any amount claimed by any creditor who did not opt into the Litigation Trust."  (Am. Answer ¶ 265).  Defendants insist in their Motion for Partial Summary Judgment that "[e]ven if the [c]ourt were to conclude that any claims should remain in this case, it should rule that Plaintiff is prohibited from recovering anything greater than the amount of the unpaid claims of the creditors he represents." (D. MSJ at 82).   Plaintiff refers to this as Defense 4. Throughout this case, Defendants have conflated the issue of standing with the amount of Plaintiff's recovery.  This is understandable, as many cases use the word "standing" when examining whether a party's recovery of a transfer would "benefit the estate."   The court has already found above, however, that the Trustee has standing to pursue any claim that the Debtor could have pursued under the Plan and the Trustee's "standing," or *right* to bring a cause of action, is not impacted in any way by which unsecured creditors opted into the Trust.  The only matter before the court is whether the amount of transfers that Plaintiff can recover under section 550 is "capped" by either the roughly $14.3 million in total allowable

-133-

claims for all unsecured creditors who opted into the Trust or by the at least $56 million in total allowable claims for all the unsecured creditors.  Defendants maintain that allowing Plaintiff to recover more than the value of the Trust Beneficiaries' claims would violate (1) "the absolute priority rule," (2) section 550 of the Bankruptcy Code, and (3) principles of judicial estoppel.

### 1.      The Absolute Priority Rule Does Not "Cap" the Trustee's Recovery

The Delaware Bankruptcy Court confirmed the Plan pursuant to 11 U.S.C.§ 1129(b) of the Bankruptcy Code. (D. App. 142); *In re Forklift LP Corp.*, 363 B.R. 388, 396 (Bankr. D. Del. 2007) ("A plan of reorganization has no effect without a court's confirmation."). Section 1129(b) allows the bankruptcy court to confirm a plan over the objection of a certain class as long as the proponent of the plan confirms that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b).   The confirmation process under section 1129(b) is known as a "cram down" process for imposing a plan on a dissenting class. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999).   A "cram down" can be fair and equitable to a group of unsecured creditors "only if the allowed value of the claim is to be paid in full," or, in the alternative, if the plan does not offer a junior claimant any property before each unsecured claimant receives full satisfaction of its allowed claim.  *Id.*  This is known as the "absolute priority

-134-

rule." *Id.* (internal quotations and citations omitted).  An essential "corollary of the absolute priority rule" holds "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs*., 303 B.R. 48, 61 (Bankr. D. Del. 2003), *quoting In re Mcorp Financial, Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992), *appeal dismissed*, 139 B.R. 820 (S.D. Tex. 1992).

Here, Defendants argue that the Plan would not be "fair and equitable" to the equity interests who received nothing under the Plan if under the Plan the Trustee were allowed to recover far more than the amount of the Trust Beneficiaries' outstanding claims. Defendants insist that their argument is supported by *In re MCorp Financial, Inc.*  There, the bankruptcy court refused to confirm a "cram down" plan under section 1129(b) which allocated the undetermined value of a lawsuit to junior creditors. 137 B.R. at 235.  The estimated value of the suit was greater the 100% of the amount of the junior creditors' claims.  *Id.*  The court found that it would be inequitable to allow the junior creditors, who were senior to the rejecting equity class, to recover more than the value of their claims while the equity class recovered nothing. *Id.*  The court noted that "[r]elatively simple plan language allocating to equity holders any excess  [recovery from the lawsuit] above 100% of principal (or principal plus interest if parties chose to litigate that issue) for Junior Creditors would have eliminated the problem."  *Id.*

-135-

Defendants' "absolute priority rule" argument fails.  First, all the absolute priority rule dictates is that a court should not confirm a plan in which the unsecured creditors, as a class, receive more than full compensation for their claims and the equity interests junior to them receive nothing.  There is nothing in the "absolute priority rule" or *MCorp* that would compel this court to limit Plaintiff's recovery to the amount of the Trust Beneficiaries' claims.  The unsecured creditors' claims here are worth at least $56.6 million. Plaintiff only has roughly $20-25 million in statutory claims remaining in this matter, excluding its Federal Debt Collection Procedures Act claims.  As such, the court could award Plaintiff 100% of his remaining claims and not violate the absolute priority rule. Second, the absolute priority rule and *MCorp* only govern whether a bankruptcy court should confirm a plan based on the valuation of the assets under the plan at the time of confirmation; they do not require, or even suggest, a district court in a subsequent piece of litigation to go back and re-assess equity among the parties based on subsequent events.

The Delaware Bankruptcy Court assessed the fairness and equity of the Plan to the equity interests when it confirmed it.  At that time the unsecured creditors received distributions of fixed amounts under section 3.10 of the Plan based on their distribution percentage.  The total distribution was less than the value of the unsecured creditors' claims. The unsecured creditors also received the right to use their distributions to "purchase" a piece of any recovery the Trust might obtain based on the Debtors' claims against Onex.

-136-

The Creditors' Committee estimated these claims to be between $8 and $24 million, however, the unsecured creditors and the court were aware that these numbers were just an estimate and the Trust had no guarantee of recovering anything. The Trustee analogized the distribution of the potential value from a subsequent piece of litigation to the distribution of stock. When a plan distributes stock and the stock appreciates or depreciates in value, section 1129(b) does not compel the bankruptcy court to reassess whether the party receiving the stock has received too much or not enough value relative to the total value of the party's claim and the distributions to the other parties. The court finds this analogy helpful.

Here, the bankruptcy court had an opportunity to value the Debtors' potential claims against the Onex entities based on the Creditors' Committee's estimate, the uncertainty of that estimate, the probability of the Trust's success, and the probability that the Trustee would be able to recover any judgment. *See In re Apex Automotive Warehouse, L.P.*, 238 B.R. 758, 771-72 (Bankr. N.D. Ill. 1999) (indicating that value of litigation claim as distribution may be discounted by probability of success and judgment). The court then determined that awarding the unsecured creditors the right to opt into the Litigation Trust in addition to their fixed distributions was fair and equitable to the other parties and did not violate the absolute priority rule. It is not for this court to engage in a post-hoc evaluation of the Plan's fairness. The Plan does not "cap" Plaintiff's recovery.

-137-

### 2.    Section 550 Does Not "Cap" the Trustee's Recovery

Section 550 of the Bankruptcy Code governs the amount that a Trustee may recover – it provides that "to the extent that a transfer is avoided under [sections 544, 547, and 548] the trustee may recover, for the benefit of the estate, the property transferred."  11 U.S.C. § 550.  This section puts no limit on the amount recoverable except that it must "benefit the estate."  The "estate" comprises all interests, including all creditors and equity.  ''Whether the recovery of an avoidance will benefit the estate is determined on a case-by-case basis.''  *In re Skyway Communications Holding*, *Corp.*, 389 B.R. 801, 808 (Bankr. M.D. Fla. 2008).  Recovery of the avoided transfer is appropriate even if the benefit to the estate is indirect, such as an increase in the probability of a successful reorganization.  *In re NextWave Personal Communications, Inc.*, 235 B.R. 305, 308–09 (Bankr. S.D.N.Y.1999). *See also In re Acequia, Inc.*, 34 F.3d 800, 809-11 (9th Cir. 1994) (finding debtor-in-possession's recovery of fraudulent transfer would benefit estate even though no money would go to creditors because recovery would reimburse estate for cost of litigation and increase likelihood debtors in possession would make post confirmation payments on notes issued to creditors); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 973 (Bankr. D.  Del. 1994) (collecting indirect benefit cases).  The basic purpose of a recovery pursuant to § 550(a) is to enlarge the estate for the benefit of creditors; however, "[h]ow, in any particular case, a recovery is used and whether any of it is distributed to creditors is a function of the conduct

-138-

of the case and the negotiations of the plan of reorganization." *In re Trans World Airlines.*, 163 B.R. at 973.

The court finds *Mellon Bank v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003), helpful in resolving the issue of indirect benefits. There, Qualitech Steel entered bankruptcy; its equity was worthless and its secured debts exceeded the value of its assets. The creditors, secured and unsecured, decided that the company should be sold. In order to finance Qualitech in the meantime, a syndicate of lenders advanced funds. A number of pre-petition secured creditors did not want to participate in the plan because they feared the new loans would make it more difficult for them to collect. In order to mollify them, the bankruptcy judge promised them that if their position deteriorated while the company was being sold, he would give them up to $30 million in Qualitech's remaining assets, including the value of any preference recovery actions. The company was sold. The sale price was insufficient to cover the new loans and the original secured loans – i.e. the secured creditors' position deteriorated. The original secured lenders' unsatisfied debts exceeded the value of any anticipated preference recovery. A committee of secured lenders advanced funds to finance the preference actions through Mellon Bank, which was appointed the creditors' agent to collect on behalf of the dissolved debtor in possession. Mellon filed multiple preference actions. Two defendants contested the preference claims against them – they argued that

-139-

any recovery in the action would flow directly to the pockets of secured creditors and thus would not be "for the benefit of the estate" under section 550.

The court found that the preference transfers had benefitted the estate during bankruptcy by securing the best course of action – sale.  The bankruptcy court ensured that objecting secured creditors would go along with the financing/sale plan, which was in the best interest of the estate, by compensating them for their risk with the potential to recover funds in preference actions.  If the bankruptcy court had not promised the unsecured creditors preference recovery they might have called off the sale, required more of the debtors' limited assets, or taken some other step that (the bankruptcy judge believed at the time) would have made the creditors and the estate worse off.  The court found that this *ex ante* benefit was sufficient to satisfy section 550.  The court also found that the granting of the preference claims in exchange for funding and forbearance was the same as the unsecured creditors purchasing the preference claim recovery for $30 million in cash from the estate.

Here, Plaintiff argues that the Litigation Trust Agreement (or allowing the unsecured creditor Trust Beneficiaries the right to recover fraudulent transfers and preferences) facilitated the confirmation of the Plan.  If the bankruptcy court had not given the Class 9 Unsecured Creditors the right to opt into the Litigation Trust, they might have objected to the Plan, refused to release Magnatrax from all claims, or taken some other action not in the

-140-

estate's best interest. Defendants contend that this alleged benefit cannot serve as a "benefit" under section 550 because it has already been realized and has no connection to Plaintiff's recovery under this action.

The court rejects Defendants' arguments on the basis of *Mellon* and finds that the recovery will benefit the estate. *Mellon* makes clear that an *ex ante* benefit is all that section 550 requires. 351 F.3d at 293 ("Having put the *prospect* of preference recoveries to work for the benefit of all creditors (including the unsecured creditors) *ex ante* by effectively selling them to the secured creditors in exchange for forbearance – and in the process facilitating a swift sale that was beneficial all around – the bankruptcy judge did not need to use them *ex post* a second time, for still another benefit to the estate; there was no further benefit to be had."). The court likewise rejects Defendants' contention that the benefit of getting the Plan confirmed would still be present if the court capped Plaintiff's recovery to the amount of the unsecured creditors' claims. Section 550 does not "cap" Plaintiff's recovery.

### 3.        Judicial Estoppel Does Not "Cap" the Trustee's Recovery

The bankruptcy court relied upon the Debtors' Disclosure Statement, along with other documents in confirming the Plan. The following statement appeared in the Debtors' Disclosure Statement at the request of the Creditors' Committee:

> The value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonably certainty because of the amount of discovery

and investigation yet to be completed. Based on the limited discovery obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million.

(P. Resp. D. SMF ¶ 172.).   The total amount of claims of all unsecured creditors eligible to opt into the Trust was an estimated $56.6 million.  (*Id.* ¶ 156).  Defendants insist that by representing to the bankruptcy court that the value of the claims was between $8 million and $24 million—and thus within the range of the allowable claims of unsecured creditors—the Creditors' Committee successfully obtained confirmation of the Plan and equity holders suffered the consequences of cram down. Plaintiff has repeatedly claimed to be the "successor-in-interest" to the Creditors' Committee. The court must address this issue even though Plaintiff has only roughly $20-25 million in statutory claims left before the court in this order because Plaintiff has up to $600 million in claims, however unlikely, remaining before the court on its Federal Debt Collection Procedures Act, alter ego, and lender liability claims.

Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial system and prohibits a litigant from taking inconsistent positions in litigation according to the exigencies of the moment. *Burnes v. Pemco Aeroplex, Inc.* 291 F.3d 1282, 1285 (11th Cir. 2002); *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1308 (11th Cir. 2001). In the Eleventh Circuit, courts consider two factors in the application of judicial estoppel to a particular case – (1) whether the allegedly inconsistent positions were made

-142-

under oath in a prior proceeding, and (2) whether such inconsistencies were calculated to make a mockery of the judicial system.  *Id.*

The court finds that the Creditors' Committee/Trustee did not take inconsistent positions here.  The amount of the Debtors' potential claims in the disclosure was an estimate.  Defendants have cited no cases which compel the court to apply judicial estoppel. All the cases cited by Defendants involve debtors who explicitly denied potential claims in their disclosures and then later tried to recover on them for their own benefit to the detriment of their creditors.  *See, e.g., In re Coastal Plains, Inc.*, 179 F.3d 197, 212 (5th Cir. 1999) (debtor failed to disclose claims estopped from asserting them later); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (applying equitable estoppel against debtor litigating claim because it failed to disclose it to creditors).  The matter here is factually distinguishable.  The court finds that judicial estoppel does not "cap" the Trustee's recovery.  Defendants have not provided any persuasive argument that Plaintiff's claims are "capped" in any way.   The court GRANTS Plaintiff's Motion for Partial Summary Judgment as to Defense 4.

**B.**     **The Parties' Cross Motions on the Doctrine of *In Pari Delicto***

The doctrine of *in pari delicto* prohibits a wrongdoer from profiting from his own wrongful acts.  *Official Comm. of Unsecured Creditors of PSA v. Edwards*, 437 F.3d 1145, 1149-50 (11th Cir. 2006).  "The doctrine of *in pari delicto* is based on the policy that courts

-143-

should not lend their good offices to mediating disputes among wrongdoers and denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* at 1152.

Defendants contend that all of Plaintiff's remaining claims should be barred by the doctrine of *in pari delicto* due to the wrongdoing of the Debtors. Defendants insist that Plaintiff, by its own terms, has alleged wrongdoing by the Debtors. For example, Plaintiff alleges that the Debtors were party to all of the relevant transactions and that Hilson, Wright, Ammerman, and Blackmon, in their capacities as officers and directors of Magnatrax, approved and directed the alleged fraudulent transfers. Since the acts of a corporation's agents are generally imputed to the corporation, Plaintiff has in essence alleged that Magnatrax itself approved and directed the alleged fraudulent transfers. *See Liquidation Comm'n of Banco Intercont'l, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008) ("Corporations act only through their agents, . . . an agent's guilty conduct and knowledge is typically imputed to his principal."). If Magnatrax itself authorized the prohibited conduct, the doctrine of *in pari delicto* would bar it from asserting claims regarding that conduct. Defendants argue that the debtor inherits the bankruptcy estate as it was before bankruptcy was filed and if a claim of the debtor would have been subject to a defense at the commencement of the bankruptcy, then the same claim, when asserted by a trustee, is subject to the same affirmative defense. *Edwards*, 437 F.3d at 1150 (addressing

-144-

as a matter of first impression whether defense of *in pari delicto* may be asserted against a bankruptcy trustee in a claim under § 541); *Nisselson v. Lernout*, 469 F.3d 143, 153 (1st Cir. 2006) (addressing § 541 claim and finding that "there is no 'innocent successor' exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an *in pari delicto* defense against the debtor.").

Plaintiff insists that *in pari delicto* should not bar its claims because it is not recognized as a viable defense against claims for preference or fraudulent transfer. The Eleventh Circuit has never directly ruled on whether the defense of *in pari delicto* may be applied to claims under 11 U.S.C. §§ 544, 547, 548. Other circuits have ruled that the defense may not be applied in the context of these sections. *See In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 245-47 (3rd Cir.2003) (distinguishing claims under § 541, like those brought in *Edwards* and *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356-358 (3d Cir. 2001), from claims under §548, and finding that court need not apply doctrine of *in pari delicto* to the latter); *Corzin v. Fordu (In re Fordu)*, 209 B.R. 854, 863 (6th Cir. BAP 1997) (noting that "courts have consistently recognized that the Trustee may pursue fraudulent or preferential transfers despite the fact that the debtor was a knowing and willing participant to such conveyances").[39] The court finds that the

---

[39]*In re Fordu* involved claims under 11 U.S.C. § 544. 209 B.R. at 863. The Sixth Circuit Bankruptcy Appellate Panel explained:

> [There are a] panoply of powers the Bankruptcy Code grants to a trustee. A trustee not only stands in the shoes of a debtor, but is accorded this footwear

Eleventh Circuit's decisions in *In re Davis*, 785 F.2d 926 (11th Cir. 1986) and its *dicta* in *Edwards*, 437 F.3d 1145, indicate that the Eleventh Circuit would follow the Third and Sixth Circuits and find that *in pari delicto* may not be used against the trustee to bar fraudulent transfer and preference actions for the following reasons.

In *In re Personal & Bus. Ins. Agency*, the Third Circuit addressed whether the fraudulent conduct of a company's CEO could be imputed to a company's bankruptcy trustee bringing a fraudulent transfer action under 11 U.S.C. § 548. *See* 334 F.3d at 240. The court explained that a trustee may take one of two types of actions in pursuing a bankruptcy – he may either bring suit as successor to the debtor's interest included in the estate under section 541, or he may bring suit under one or more of the trustee's avoiding powers such as those in sections 547 and 548. *Id.* at 245. Section 541 states that "all legal or equitable interests of the debtor in property as of the commencement of the case" belong

---

> unsoiled by the debtor's previous steps. In addition, a trustee can further choose the footwear of any creditor holding an allowable unsecured claim under applicable law. It has long been recognized that for privity to exist, the interest between a debtor and a trustee must be so similar that the debtor was the trustee's virtual representative in the prior action. Unless the interest is virtually identical, the defense of a cause of action by a debtor pre-bankruptcy does not necessarily represent the rights of a bankruptcy trustee. Additionally, courts have consistently recognized that the Trustee may pursue fraudulent or preferential transfers despite the fact that the debtor was a knowing and willing participant to such conveyances. The distinction recognized repeatedly by the courts is that although privity may bar a trustee's actions if the prior judgment involved a personal cause of action of the debtor, privity does not bar causes of action brought by the trustee as a representative of creditors.

*Id.* (internal citations and quotations omitted).

to the bankruptcy estate, and courts have found that such "interests" include causes of action. *Id.* Therefore, the Third Circuit had previously concluded in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001), that the explicit and plain language of section 541 directed courts to evaluate defenses as they existed at the commencement of the bankruptcy and barred courts from considering a trustee's status as an innocent successor in determining whether to impute a debtors' conduct to the trustee. *Id.* The court in *In re Personal & Bus. Ins. Agency* found that the holdings under section 541 did not apply to cases brought under section 548 because the latter, unlike the former, did not include specific language directing the court not to consider post-petition events. *Id.* at 246. The court found that because the section 541 holdings did not apply, it was free to pursue a more equitable solution. *Id.* The court then held that it would be inequitable to impute the debtors' bad conduct to a trustee who came to the court with clean hands to pursue claims on behalf of innocent creditors. *Id.* at 246-47.

In *Davis,* a farmer borrowed money from the federal Farmers' Home Administration ("FmHA") to finance his crop. 785 F.2d at 927. The farmer then went bankrupt. *Id.* The bankruptcy trustee acting under 11 U.S.C. § 544, obtained a decision from the bankruptcy court requiring the FmHA to return over $300,000 to the estate as an illegal preference payment under 11 U.S.C. § 547(b) and (c)(5). *Id.* The district court reversed the decision on review; it found that Davis had defrauded FmHA in obtaining the loan by giving false

-147-

collateral and by using the proceeds of the 1981 loan to pay what remained on his 1980 loan.
*Id.* The district court dismissed the trustee's claim under 28 U.S.C. § 2514, which requires
that a claim against the United States be forfeited to the United States by any person who
corruptly practices or attempts to practice any fraud against the United States in the proof,
statement, establishment, or allowance thereof. *Id.* On appeal, the Eleventh Circuit noted
that "[t]he trustee acting under section 544 represents the creditors" and found "[s]ince the
trustee's claims are for the benefit of the creditors, the fraud of the bankrupt does not require
them to be forfeited." *Id.* Although *Davis* did not address *in pari delicto*, this court finds that
it essentially stands for the premise that a debtor's wrongdoing should not bar a trustee's
fraudulent transfer and preference claims under sections 544 and 547.

In *Edwards*, using federal racketeering and aiding and abetting theories, a trustee of
the bankruptcy estate of debtor-corporation that operated a massive Ponzi scheme brought
suit pursuant to section 544 to recover from entities that allegedly facilitated this scheme.
437 F.3d at 1145.   These entities argued that the doctrine of *in pari delicto* barred the
trustee's claims because the sole shareholder of the debtor-corporation had participated in
the Ponzi scheme and his bad conduct should be imputed to the debtor corporation. *Id.* at
1149.  The Eleventh Circuit addressed whether *in pari delicto* may be asserted against a
trustee, and found that it could be, relying in part on the Third Circuit's decision in *Lafferty*.
*Id.* at 1151.  In doing so, the court addressed an argument by the trustee which relied on

-148-

*Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir.1995) (refusing to impute conduct of officer to corporation for purposes of *in pari delicto* in fraudulent transfer action filed by receiver). The Eleventh Circuit refused to allow the trustee in *Edwards* to rely on the *Scholes* defense because he was bringing suit pursuant to 11 U.S.C. § 541 rather than fraudulent transfer law. *Id.* at 1151-52. The court explained that "[f]raudulent conveyances . . . are an exception to the general rule that the trustee takes the debtor estate as it is at the commencement of the bankruptcy." *Id.* This court reads the *dicta* in *Edwards* to support the notion that fraudulent transfer claims are an exception to the general rule that defenses which can be asserted against the debtor can be asserted against the trustee. There is no reason to believe that the Eleventh Circuit would not distinguish *Edwards* and *Lafferty* from cases brought under section 547 and 548 in the same way the Third Circuit did in *In re Personal & Bus. Ins. Agency*. Further, the court's reading of *Davis* and *Edwards* is consistent with bankruptcy opinions which have refused to allow *in pari delicto* to be applied against the trustee in fraudulent transfer actions. *In re Skyway Communications Holding Corp*., 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008) (*in pari delicto* does not apply when a trustee brings a claim pursuant to section 544); *In re Fuzion Technologies Group, Inc.*, 332 B.R. 225, 232 (Bankr. S.D. Fla. 2005) (same).

Defendants have provided the court with no case law compelling it to apply the doctrine of *in pari delicto* to cases involving fraudulent transfers or directly refuting the

AO 72A
(Rev.8/82)

court's conclusions above. *In pari delicto* is ultimately a doctrine of equity, a last stop-gap to prevent wrongdoers from profiting from their wrongdoing. The essence of this case is whether the acquisitions orchestrated by Defendants and the Debtors' former officers and directors were simply bad business decisions or were an attempt to secure lucrative benefits for themselves while harming the Debtors and impermissibly shifting all of the risk of the Debtors' failure to their unsecured creditors. Under either scenario, the Debtors lose. The court does not find that this is the kind of matter for which the doctrine of *in pari delicto* was intended, and in the interest of equity it will not apply it here. The court GRANTS Plaintiff's Motion for Partial Summary Judgment as to the defense of *in pari delicto* raised in Defenses 26 and 28.

## C. Defendants' Claim that the Court Lacks Personal Jurisdiction over Gerald Schwartz

Defendant Schwartz is a citizen of Canada and resides in Ontario. Plaintiff's original complaint stated that this court had personal jurisdiction over Defendants, including Schwartz, because they "transacted business in Georgia, committed tortious or wrongful acts or omissions in Georgia, or committed tortious or wrongful injuries within Georgia caused by acts or omissions outside of Georgia." (Am. Cmplt. ¶ 11). Plaintiff insisted that Defendants established minimal contacts with Georgia by owning and directing the affairs of and transacting business with Magnatrax headquartered in Georgia. (*Id.*). Defendants moved to dismiss Plaintiff's claims on personal jurisdiction grounds [DE 42-2]. The court

-150-

found that Defendants had presented no evidence to controvert Plaintiff's allegations of jurisdiction in the complaint.  The court accepted Plaintiff's allegations with regard to personal jurisdiction as true and denied Defendants' motion to dismiss [DE 67].

Defendants have moved to dismiss Schwartz again on summary judgment. Defendants contend that Plaintiff has no evidence that Schwartz has had any personal contacts with Georgia in connection with the transactions at issue in this case or that he has committed any tortious act, omission, or injury in Georgia.  Defendants further assert that any activity Schwartz might have conducted in Georgia would have been in his role as an officer of Onex.  Defendants have presented Schwartz's own testimony that he has never visited Georgia or conducted business here and the testimony of other executives that they do not recall Schwartz ever visiting ABCO or Magnatrax facilities or participating in their board meetings. (Def. SMF ¶ 11).

Plaintiff contends that it is unclear whether Schwartz "ever" transacted business related to Magnatrax in Georgia.  Plaintiff presented evidence that Schwartz listened to and commented upon presentations regarding Magnatrax at Onex Board meetings; Schwartz was involved in the process of hiring key Magnatrax employees; and Schwartz approved transactions involving ABCO/Magnatrax in his role with Onex.   Plaintiff attempted to present evidence that Schwartz directed Hilson and Wright to meet and spend time with

-151-

ABCO executives to accomplish the ABCO acquisition[40] and directed the strategy to purchase ABCO.[41]  Plaintiff contends these activities fall within the "transacting business" language of the Georgia long arm statute.

O.C.G.A. § 9-10-91 states that Georgia may exercise personal jurisdiction over any nonresident if in person, or through an agent, the non-resident (1) transacts any business in Georgia, (2) commits a tortious act or omission in Georgia, or (3) "[c]ommits a tortious injury in Georgia caused by an act or omission outside of Georgia if the tort-feasor regularly

---

[40]To support its assertions that Schwartz directed Hilson and Wright to meet with ABCO management and directors to accomplish the ABCO acquisition, Plaintiff presents an email from Schwartz to Hilson and Wright in September 2000 instructing them to "spend time in the field with salesmen, customers, contractors, engineers, suppliers, etc." and attempt to understand Magnatrax's business as well as Bob Ammerman and Charles Blackmon. (P.R.A. 131 at 169589-90).  Plaintiff also cites an email from Schwartz to Hilson in February 1999 advising Hilson to develop a personal relationship with Bob Ammerman to facilitate a deal with ABCO. (P.R.A. 130 at ONEX 143744-45).  Plaintiff presents evidence that Hilson and Wright did meet with Ammerman and Blackmon and other ABCO officials in Atlanta in March 1999; Schwartz was not present. (P.R.A. 108 at MGXE 562016-18).

[41]To support its assertion that Schwartz directed the strategy of the ABCO purchase, Plaintiff cites Schwartz's deposition testimony (1) discussing a number of "contacts" related to the ABCO Acquisition; Schwartz denies being part of or claims he does not recall being a part of a number of meetings and phone calls and admits to being a part of a meeting in Toronto with Ammerman and Blackmon; (2) denying any involvement in an investment circular to ABCO management; (3) stating that the Onex directors selected Kay to be a member of the Magnatrax board; (4) denying personally providing any services to ABCO or Magnatrax under the Management Agreement; and (5) stating that Nigel Wright signed a document on behalf of ABCO. (P.A. 6 at 132-143, 165-67, 172).  Plaintiff points to numerous meetings between Onex officials and ABCO officials in Atlanta in which there is no evidence that Schwartz was present.

-152-

does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in Georgia. Georgia may only exercise jurisdiction over any nonresident who transacts any business in Georgia to the maximum extent permitted by procedural due process. *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames*, 279 Ga. 672, 675 (2005). Following *Innovative Clinical*, Georgia courts explained that to exercise jurisdiction over a nonresident for transacting business in this state (1) the nonresident defendant must have purposefully done some act or consummated some transaction in this state, (2) the cause of action must arise from or be connected with such act or transaction, and (3) the exercise of jurisdiction by the courts of this state must not offend traditional notions of fairness and substantial justice. *Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga.) (Forrester, J.) (relying on *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 518 (2006)), *reversed on other grounds*, 552 F.3d 1290 (11th Cir. 2008).

Further, "[a] nonresident individual cannot be subject to personal jurisdiction based solely upon acts in Georgia taken in his or her corporate capacity." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 784 (11th Cir. 2004).

> [A] corporate officer cannot be haled into a foreign forum simply because he is the president of a corporation that may have done business in the forum. Rather, there must be a determination that the corporate officer, himself, took acts, such as negotiating a contract or "enjoying substantial financial benefit" from a contract.

-153-

*Adventure Outdoors*, 519 F. Supp. 2d at 1273.  In *Club Car*, the president of a Canadian golf cart distributor argued that a Georgia court lacked personal jurisdiction over him in a contract dispute with a Georgia-based golf cart manufacturer because the president's only visits to Georgia had been in his capacity as president. 362 F.3d at 778, 784.  The court rejected the president's argument because (1) he had negotiated with the Georgia company for the underlying distribution agreement and had signed a personal guaranty to secure it; (2) he was the principal and primary shareholder of the distributor and enjoyed substantial financial benefits from the distribution agreement; and (3) the agreement itself provided for its enforcement in Georgia under Georgia law. *Id.* at 784-85.  In *Adventure Outdoors*, a Georgia gun seller sued the officials of New York City for defamation arising out of an illegal gun sale sting operation. 519 F. Supp. 2d at 1258.  The New York defendants argued that Georgia had no personal jurisdiction over them because they took all the actions complained of in their official capacities and cited *Club Car*.  *Id.* at 1273.  This court rejected the defendants' analogy to *Club Car* and found that the defendants were not being sued because they had positions in the government of New York City but rather because they had purposefully directed acts to Georgia by directing investigators to visit specific Georgia stores and conduct sting operations.  *Id.*

Here, Plaintiff has presented no evidence that Schwartz personally visited Georgia or conducted any business here.  Therefore, any basis for jurisdiction must come from

Schwartz's role as Onex CEO and his direction of his agents Hilson and Wright who did visit Georgia and did conduct business here. Schwartz is not simply a figurehead for Onex or just any "officer;" he is the company's founder, leader, and majority shareholder. In this role he is essential in approving Onex transactions. He personally invests in Onex's ventures and was heavily invested in Magnatrax. In this way Schwartz is similar to the CEO in *Club Car* who was the principal and primary shareholder of the defendant distributor, enjoyed substantial financial benefits from the disputed agreement, and personally guaranteed that agreement. Under Plaintiff's theory of the case, Schwartz is not being sued because of his position at Onex but rather because Plaintiff believes he is the ultimate parent of the all the Onex entities and he purposefully sought to acquire a Georgia business, drain its value for himself and his various entities, and leave it bereft for its creditors. The court DENIES Defendants' Motion for Partial Summary Judgment as to Personal Jurisdiction over Schwartz.

### D.  Plaintiff's Request to Establish Certain "Transfers"

In Plaintiff's Motion for Partial Summary Judgment, Plaintiff asks the court to establish that the transfers listed in paragraphs 138 through 383 of Plaintiff's Statement of Material Facts Not in Dispute were "transfers of the Debtors' interest in property" for purposes of Plaintiff's statutory claims. Plaintiff believes these "transfers" were not in dispute as of the time of summary judgment. The court recognizes that many of these

-155-

"transfers" may be connected to now dismissed claims; however, the court cannot determine

which transfers are related exclusively to the Management Agreement Fraudulent Transfer

and Preference claims, so the court must address them all.   Although Defendants offer

minor disputes to many of these "transfers" in their response to Plaintiff's Statement of

Material Facts Not in Dispute, they do not address these "transfers" at all in their response

to Plaintiff's Motion for Partial Summary Judgment. Because Defendants have failed to

respond, the court will deem any of their objections to these transfers as waived.  The court

GRANTS Plaintiff's Motion for Partial Summary Judgment as to the "transfers" in

paragraphs 138 through 383 of Plaintiff's Statement of Material Facts Not in Dispute.

### E.   Plaintiff's Motion to Bar Defenses 7, 11, 12, 27 and 28

Defendants assert in Defenses 7, 11, and 12 that Plaintiff's claims are barred by the

doctrines of champerty and maintenance, laches, and estoppel. (Am. Answer ¶¶ 268, 272-

73).  Defendants maintain in Defense 27 that "[a]s the alleged assignee of ABCO's claims

in this case, Plaintiff is required to indemnify Onex for any liability in this action, including,

without limitation, under the Management Agreement dated May 11, 1999, and under

Delaware General Corporate Law." (Am. Answer ¶ 288).  Defendants aver in Defense 28

that "any judgment that Plaintiff could possibly obtain against any Onex Defendant must

be reduced by the amount of any liability or responsibility of third parties for the conduct

and transactions at issue in this lawsuit, including, but not limited to, any liability or

-156-

responsibility of persons who have been released or whose claims have been settled, including, but not limited to, the Lenders, CIBC World Markets, Inc., and Messrs. Ammerman and Blackmon." (*Id.* ¶ 281).  Defendants failed to address Defense 27 (the indemnification defense) in their response to Plaintiff's Motion for Partial Summary Judgment.  As such the court will deem that defense waived and will GRANT Plaintiff's Motion for Partial Summary Judgment as to Defense 27.  The court has already ruled on the issue of judicial estoppel above.   The court GRANTS Plaintiff's Motion for Partial Judgment as to Defense 12. Plaintiff argues that the court should bar Defendants from asserting the equitable defenses of champerty and maintenance (Defense 7), laches (Defense 11), and contribution (Defense 28) because (1) they are not cognizable against his remaining statutory transfer claims; and (2) Defendants have provided no evidentiary support for these defenses in their answer and in their supplemental interrogatories to Plaintiff.  The court will address these arguments below.

The parties mention champerty and maintenance in a cursory fashion and provide virtually no analysis with respect to this defense. In response to Plaintiff's challenge that Defendants had not provided sufficient evidentiary support for this defense, Defendants stated simply "Defendants have submitted as exhibits to their Statement of Additional Facts documents concerning Plaintiff's arrangement with Insolvency Management Limited ("IML"), including the March 2005 'funding agreement' that Defendants contend is

-157-

champertous." (D. Resp. at 35-36). After independently investigating these common law defenses, the court finds that they are not cognizable in this matter.

Blackstone defined maintenance as the "officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it. . . . This is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." 4 W. Blackstone, Commentaries *134-*135. *See Sprint Communications Co., L.P. v. APCC Services, Inc.*, ___ U.S. ___, 128 S. Ct. 2531, 2554 n.3 (2008) (Roberts, J., dissenting). Champerty "is a species of maintenance, . . . being a bargain with a plaintiff or defendant *campum partire*, to divide the land or other matter sued for between them, if they prevail at law; whereupon the champertor is to carry on the party's suit at his own expense." *Id.* (citing Blackstone Commentaries, at *135). *See also* Black's Law Dictionary (8th ed. 2004) (defining "champerty" as an "agreement between an officious intermeddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds; specif., an agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim."). The common law notions of champerty and maintenance have lost much of their force in modern day litigation and today are more akin to a standing

-158-

argument. *Sprint Communications*, for example, was analyzed as a standing case. The court addressed above and rejected Defendants' standing argument.

Even if the court considers champerty and maintenance as a separate non-standing argument, Defendants cannot assert it to bar Plaintiff's claims. A third party who is not party to an agreement cannot raise the agreement's nature as a champertous or maintenance contract as a defense to claims between it and a party to the agreement. *See, e.g., Rolleston v. Cherry*, 226 Ga. App. 750 (1997) (where estate of property owner filed suit against attorney who had represented owner in connection with proposed sale of property, no defense to suit against attorney to argue that contract between third party and estate whereby third party would receive portion of proceeds from suit was champertous, citing *Ellis v. Smith & Bussey*, 112 Ga. 480, 484 (1900) ("[T]he fact that there is an illegal and champertous contract for the prosecution of an action is no ground for an abatement of such action, nor a defense thereto.")). Here, the alleged funding agreement was made between the Litigation Trustee (Richard Kipperman) as the assignee of the Debtor's claims and IML. Defendants were not a party to the funding arrangement. Therefore they cannot raise the nature of the arrangement as a defense to claims between them and Plaintiff. For these reasons, the court GRANTS Plaintiff's Motion for Partial Summary Judgment as to Defense 7 (champerty and maintenance).

-159-

The court has reviewed the cases cited by Plaintiff and Defendants as to whether the equitable claim of laches is cognizable under sections 544, 547-548.  The court agrees with Defendants that the defense of laches is cognizable in the statutory setting. *See, e.g.*, *In re Smith*, 236 B.R. 91, 99-100 (Bankr. M.D. Ga. 1999) (reviewing the merits of laches and equitable estoppel defenses to Section 547 claim); *In re Brown Transp. Truckload, Inc.*, 161 B.R. 735, 737-38 (Bankr. N.D. Ga. 1993) (analyzing whether laches barred trustee from pursuing avoidance action under Section 547).  The court agrees with Plaintiff, however, that Defendants have not come forth with sufficient evidence to support this affirmative defense.

In response to Plaintiff's challenge, Defendants merely state, "facts sufficient to support the defense of laches—including the dates of Magnatrax's bankruptcy and Plaintiff's Complaint—[we]re clearly established in the record."  (D. Resp. at 35-36). To prove the affirmative defense of laches, a defendant must show it would be inequitable to allow the plaintiff to enforce his legal rights.  *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008).  The presence of inequity depends on the particular circumstances, including the "length of the delay in the claimant's assertion of rights, the sufficiency of the excuse for the delay, the loss of evidence on disputed matters, and the opportunity for the claimant to have acted sooner."  *Id.* The court finds that Defendants have not asserted sufficient evidence of inequity or prejudice to maintain the

-160-

laches defense. The court GRANTS Plaintiff's Motion for Partial Summary Judgment as to Defense 11.

In response to Plaintiff's challenge to Defense 28 addressing contribution and comparative fault, Defendants point to O.C.G.A. §§ 51-12-32, 51-12-33 and Article 10 of the Litigation Trust Agreement. Article 10 provides:

> The Litigation Trustee and the Litigation Trust shall not be entitled to recover from any Released Party, and no Released Party shall have any obligation, in whole or in part, for, any amount that the Litigation Trustee and the Litigation Trust seeks to recover from any Person. If at a trial (or by settlement) where the issue of relative fault, responsibility or liability, including but not limited to contribution or indemnity, is determined between any of the Released Parties, on the one hand, and any Person, on the other hand, if any of the Released Parties are found to be liable for a portion of the damages awarded to the Litigation Trustee or the Litigation Trust, then any Person shall be liable only for that amount or percentage of the damages awarded for which the Person is found to be at fault or responsible and not for any amount or percentage of the damages awarded which is found to be the fault or responsibility of the Released Parties.

*Id.* While the Litigation Trust Agreement was made among Magnatrax, the Debtors of Magnatrax, and the Litigation Trustee, Article 10 clearly envisions the protection of other "Persons" which includes Defendants. If a determination of liability and damages were to be made in this litigation, the court finds that Defendants would be permitted to raise Article 10 in conjunction with a discussion of apportionment of damages. To that extent, therefore, the court DENIES Plaintiff's Motion for Partial Summary Judgment as to Defendants' "comparative fault and contribution" affirmative defense.

-161-

**IV.   Conclusion**

The court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial Summary Judgment as to Fraudulent Transfers, Counts I, III, VII, and IX. The court finds that Plaintiff cannot move forward with its constructive Credit Agreement Transfer Claims because it has failed to demonstrate that the Debtors did not receive reasonably equivalent value. The court finds that Plaintiff cannot move forward with its constructive Acquisition Transfer Claims because it has failed to demonstrate that the Debtors did not receive reasonably equivalent value; it has failed to demonstrate insolvency; and the ABCO Acquisition Transfers are barred by the statute of limitations. The court will allow Plaintiff to move forward with its constructive Management Agreement Transfer Claims because it has raised a genuine issue of material fact as to whether the Debtors received reasonably equivalent value and Defendants did not move for summary judgment on the issue of insolvency. The court finds that Plaintiff cannot move forward with any of its Fraudulent Transfer Claims under a theory of actual fraud because Plaintiff has failed to raise a genuine issue of material fact using badges of fraud.

The court DENIES Defendants' Motion for Partial Summary Judgment as to Plaintiff's Preference Claims, Count XVII. Plaintiff may pursue these claims at trial.

The court GRANTS Defendants' Motion for Partial Summary Judgment as to Plaintiff's claims of Breach of Fiduciary Duty, Count X WITH LEAVE TO RENEW on the

issue of alter ego. Plaintiff may not allege that Defendants breached a fiduciary duty to the Debtors' creditors.

The court DENIES Defendants' Motion for Partial Summary Judgment as to Plaintiff's claims of Aiding and Abetting Breach of Fiduciary Duty, Count XI; and Conspiracy, Count XII to the extent the court does not recognize these as separate causes of action.

The court GRANTS Defendants' Motion for Partial Summary Judgment as to Plaintiff's claim of Unjust Enrichment, Count XIX.

The court DENIES Defendants' Motion for Partial Summary Judgment as to Plaintiff's claim for Lender Liability, Count XVI, with LEAVE TO RENEW. The court finds that it must determine the issue of lender liability in conjunction with Plaintiff's claim of alter ego liability, on which the parties have not moved.

The court DENIES Defendants' Motion for Partial Summary Judgment as to personal jurisdiction over Gerald Schwartz.

The court GRANTS Plaintiff's Motion for Partial Summary Judgment with respect to the transfers listed in paragraphs 138-383 of the Plaintiff's Statement of Material Facts Not in Dispute. The court finds that all of the "transfers" were "transfers of the Debtors' interest in property" for purpose of Plaintiff's remaining fraudulent transfer and preference claims.

-163-

The court GRANTS Plaintiff's Motion for Partial Summary Judgment as to five elements of Plaintiff's prima facie case in support of five Management Transfer Preference claims on which Plaintiff moved. The court makes no determination with respect to these five transfers and the sixth element of the prima facie case, insolvency.

The court GRANTS Plaintiff's Motion for Partial Summary Judgment as to Defenses 4 (the "cap" defense), 7 (champerty and maintenance), 11 (laches), 12 (judicial estoppel), 17 (Defendants are mere conduits), 18 ("contemporaneous exchanges for new value"), 25 (defendant suffered losses), 26 (*in pari delicto*), 27 (indemnity under the Management Agreement), and 28 (*in pari delicto*). Defendants may not present these defenses to the jury.

The court DENIES Plaintiff's Motion for Partial Summary Judgment as to Defense 28 (contribution) and finds that Defendants may assert this defense as to apportionment of damage.

IN SUM Plaintiff may proceed with its constructive fraudulent transfer claims under the Management Agreement, its Preference Claims (Count XVII), its claims for Alter Ego (Count XIII) and Lender Liability (Count XVI), and its claims under 28 U.S.C. § 3301, *et. seq.* (Count II, VIII).

The court GRANTS IN PART AND DENIES IN PART Trustee's Motion for Partial Summary Judgment [620]; GRANTS IN PART AND DENIES IN PART the Onex Defendants' Motion for Partial Summary Judgment [621]; and DENIES Plaintiff's Motion for Leave to File Post-Hearing Submission on *Daubert* Issues [639].

-164-

**IT IS SO ORDERED** this 13th day of August 2009.


/s J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

-165-