**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Richard M. Kipperman,       :
                                   :
           Plaintiff,         :
                                   :
          v.               :        CIVIL ACTION NO.
                                   :        1:05-cv-01242-JOF
Onex Corporation, et al.,     :
                                   :
          Defendants.     :
                                   :

## <u>OPINION & ORDER</u>

This matter is before the court on Plaintiff's motion for reconsideration [644].

The court issued a comprehensive order on the parties' cross-motions for partial summary judgment on August 13, 2009. *See* Docket Entry [642]. While the following discussion presumes familiarity with that order, the court will summarize as is necessary to rule on the issues raised in Plaintiff's motion for reconsideration. Plaintiff makes four arguments in its motion for reconsideration:

1.    The court erred in dismissing the ABCO Acquisition Transfer claims as time-barred because Eleventh Circuit authority points to the date of the transfers – May 12, 1999 – as the relevant date for statute of limitations purposes, not the date the obligation was incurred.

2. The court should reconsider its decision that the Trustee could not show actual fraud in its fraudulent transfer claims because the Trustee presented evidence of recognized badges of fraud and established a *prima facie* case for recovery.

3. The court should clarify or reconsider its decision to exclude the testimony of Professor Logue because Dr. Logue's later-filed declaration does not change his opinions but only clarifies them.

4. The court committed clear error when it dismissed the Credit Agreement Transfer claims finding that the Trustee's claims had already been dismissed. Plaintiff argues that the Trustee's Fair Debt Collection Practices Act claims remain and those offer an independent basis for the Trustee to avoid the underlying Credit Agreement obligations.

The parties are well-aware of the few bases upon which parties may move for reconsideration and the court will not review them here and will not deny Plaintiff's motion for reconsideration for failing to fit within any of those boxes. The parties and the court have invested incalculable time and money in the litigation of this case and the court desires to "get it right" before any further expense is incurred. The court is willing to rethink its prior positions should they be shown to be flawed as such a reconsideration now will serve the most judicial and economic efficiencies. The court is not willing, however, to assist either party in laying the groundwork for appeal on the basis of mis-characterizations of the

2

lengthy record of this litigation.  In its consideration of Plaintiff's legal arguments, the court notes such mis-characterizations when they occur.

### Statute of Limitations for ABCO Acquisition Transfer Claims

In its August 13, 2009, order, the court discussed whether Plaintiff's fraudulent conveyance claims on the ABCO Acquisition were barred by the statute of limitations.  *See* Order, at 40-45.  In sum, the court found that such claims in Georgia were governed by O.C.G.A. § 9-3-32 which establishes a four year statute of limitations after the right of action accrues.  *Id.* at 40.

As the court noted in its previous order, the "parties dispute whether the ABCO Acquisition claims 'accrued' on or before May 11, 1999, when the Debtors became obligated to buy the shareholders' stock, or on or after May 11, 1999, when the Debtors physically transferred the funds necessary to purchase the stock."  *Id.* at 40.  The court ultimately held that "Plaintiff's ABCO Acquisition Transfer Claims are barred by the four-year statute of limitations because the Debtors incurred the obligation to make them before May 11, 1999."  *Id.* at 45.

In its motion for reconsideration, Plaintiff argues that the Georgia statute allows a plaintiff to avoid both constructively fraudulent transfers and the incurrence of constructively fraudulent obligations.  *See* Motion, at 4.  The Trustee, however, could not have brought its claim for the "transfers" – as distinct from the "obligation" – until those

3

transfers actually occurred. *Id.* Because the actual payment of money was not made to Debtors' shareholders until May 12, 1999, Plaintiff argues, those transfers are not barred by the statute of limitations. *Id.* at 7 (citing *Advanced Telecommunications Network, Inc. v. Allen*, 490 F.3d 1325, 1331-32 (11th Cir. 2007). Defendants respond that the court's interpretation of *In re Van Vleck* and *In re Gibralter Res., Inc.*, is correct to show that under the law of fraudulent conveyance, a transfer occurs when the obligation is incurred, not when physical payment is made. *See* Response, at 10.

As the court's prior order and the parties' briefing on the motion for reconsideration suggest, there is competing case law on the issue of when claims accrue in the context of an "obligation" and a "transfer." In the end, however, even if the court concludes that Plaintiff can seek to avoid the "transfer" that occurred on May 12, 1999, as opposed to the "obligation" to make that transfer that occurred outside of the four year limitations period, the court still would have the alternative holding that Plaintiff is not able to demonstrate that the Debtors were "insolvent" or did not receive "reasonably equivalent value" at the time of the Acquisition Transfers. *See* Order, at 80-81. The court recognizes that the parties have addressed the insolvency issue in the second round of summary judgment motions. Depending on the outcome of those motions, it is possible that the court will need to revisit whether Plaintiff is able to establish insolvency. Since the court would only need to reconsider the statute of limitations issue if Plaintiff can show insolvency or lack of

reasonably equivalent value, the court will not rule on this aspect of the motion for reconsideration after ruling on the second round of motions for summary judgment.

### Badges of Fraud

In its prior order, the court considered Plaintiff's arguments of actual fraud and evidence presented by Plaintiff through "badges of fraud" and concluded that although Plaintiff had proffered some evidence as to badges of fraud, the cumulative effect of such evidence was not such that a reasonable jury could conclude Defendants had engaged in actual fraud. *See* Order, at 86-99.

As the court explained in its order, Plaintiff offers three statutory bases for its actual fraud claim: one grounded in the Bankruptcy Code and the other two in Georgia law. Neither party spent much, if any, time briefing what might be the differences among the three statutes. In some respects, the court understands this. Substantively, the "badges of fraud" identified in the three statutes are in large part identical. The court notes further that much of the case law cited by the parties is from out of jurisdiction. Again, the court understands this as over 40 states have now adopted the Uniform Fraudulent Transfers Act which has a statutory recitation of certain "badges of fraud." Prior to that uniform statute, however, although "badges of fraud" may have been codified in statute at some point, there was development of law outside the statute, to address such issues as burden of proof, presumptions, and jury instructions. It is here that the parties failed to focus their attentions.

AO 72A
(Rev.8/82)

In the end, however, the court finds that nothing argued by Plaintiff in its motion for reconsideration necessitates any alteration of the court's prior order, but perhaps a more full explanation will assist the parties.

Georgia did not adopt the Uniform Fraudulent Transfer Act until July 1, 2002. Prior to that time, Georgia's statute on fraudulent conveyances, O.C.G.A. § 18-2-22, was patterned after the English Statute of 13 Elizabeth, Chapter 5 enacted by the British Parliament in 1570. *See In re Dulock*, 282 B.R. 54, 57 n.4 (Bankr. N.D. Ga. 2002) (citing *Chattanooga Fed. Sav. & Loan Ass'n v. Northwest Recreational Activities, Inc. (In re Northwest Recreational Activities, Inc.)*, 4 B.R. 36, 39 (Bankr. N.D. Ga. 1980)). O.C.G.A. § 18-2-22 had been codified into Georgia law in 1818. *See id* and *Hickman v. Turitto*, Civil Action No. 1:06-CV-151, 2007 WL 2892788 (E.D. Tenn. Sept. 28, 2007) (providing historical discussion of Statute of Elizabeth first reported "badges of fraud" case *Twyne's Case*, 76 Eng. Rep. 809, 30 Co. Rep. 80 b (Star Chamber 1601)).

With Georgia's enactment of the Uniform Fraudulent Transfer Act, O.C.G.A. § 18-2-22 has been repealed. Thus, those claims that arose prior to July 1, 2002 are considered under § 18-2-22 and those after under § 18-2-74(b). *See Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1087 (11th Cir. 2004) (claims which vested prior to enactment of Uniform Fraudulent Transfers Act are substantive claims which may be pursued under the former law). While the statutes address the same harm, § 18-2-22 did not list "badges of fraud" in precisely the

same manner that the Uniform Fraudulent Transfer Act does. *See* O.C.G.A. § 18-2-74(b). Because of the relatively recent enactment of the Act, Georgia does not have a well-developed body of law dealing with the "badges of fraud." In fact, the parties cited substantially to other jurisdictions in their briefing of this issue in motions for summary judgment and now in the motion for reconsideration.

As Chief Judge Collier discussed in *Hickman*, the badges of fraud cases prior to the Uniform Act discuss the issue of "shifting the burden of proof" so that once the plaintiff/creditor puts forward some evidence on the badges of fraud, the burden shifts to the defendant/debtor to show the transaction was undertaken in good faith. *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485 (11th Cir. 1997), for example, applies Florida state law and holds that based on a Florida statute, the debtor has the burden of proof to show the transfer at issue was not made to delay, hinder or defraud the plaintiff. *Id.* at 1497-98.

The original Uniform Fraudulent Conveyance Act drafted in 1919 mimicked the Statute of Elizabeth and "left the presumptions and burden shifting schemes of the original common law undisturbed." *See Hickman*. The modern Uniform Fraudulent Transfer Act replaces the Uniform Fraudulent Conveyance Act. The Uniform Fraudulent Transfer Act lists most of the traditional "badges of fraud" considered by courts but commentary to the Act states that "[p]roof of the existence of any one or more of the factors . . . may be relevant

evidence . . . but does not create a presumption." *Uniform Fraudulent Transfer Act § 4*, cmt. 5. Commentary suggests that the intent of the drafters was to eliminate the common law presumptions and instead use the badges of fraud as factors for a fact finder to consider. *See id.*; Peter Alces, *Law of Fraudulent Transactions*, § 1:15 (1989).

In *Hickman*, the court considered whether the elimination of burden shifting had been adopted by the Tennessee legislature when it enacted the Uniform Fraudulent Transfer Act. The court found that the introduction of the Badges of Fraud – by stating "consideration may be given among other factors, to whether" any of the listed badges is present – was indicative of the fact that there is no presumption rebuttable or otherwise in the new statute. *Id.* at *6. (Georgia's language is the same.) The *Hickman* court then noted that most of the states that have adopted the Badges of Fraud under the Uniform Fraudulent Transfer Act have declined to carry over the common law shifting of burden of proof. *Id. But see Kelly v. Armstrong*, 141 F.3d 799 (8th Cir. 1998) (in § 548 action, holding that once "trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent" and "burden shifts to transferee to prove some 'legitimate supervening purpose' for the transfers as issue"). One Georgia case seems to reject the burden shifting approach. *See Battle v. Williford*, 160 Ga. 287 (1925) ("The defendant's answer being wholly defensive, it was error to charge the jury that, if the evidence 'has developed what is known in law as badges of fraud,' the burden of proof would shift to the defendants.").

8

Plaintiff cites to case law which suggests the application of burden-shifting in actual fraud cases. *See*, *e.g.*, *United States v. Fernon*, 640 F.2d 609 (5th Cir. 1981); *Duncan v. First National Bank of Cartersville*, 597 F.2d 51 (5th Cir. 1979); *United States v. Hickox*, 356 F.2d 969, 974 (5th Cir. 1966). In those cases, however, the matter had already been presented to the finder of fact (the judge at bench trial). Once the finder of fact determined that there were sufficient badges of fraud to establish a *prima facie* case of fraud, then, those cases held, the burden shifted to defendant to show good faith.

As with any statute that asks a court to consider various factors, parties and courts can adopt a focus on marching through the list and counting up the check marks. *See Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594 (7th Cir. 2005) (Posner, J.) (applying law of Illinois) (noting "badges of fraud" is "archaic term, an unfortunate legal cliché that like many such can exercise a mesmerizing force on lawyers and judges. . . To treat [the statutory list as additive] as such is the equivalent of saying that if there are 11 common symptoms of serious disease, and a patient has only 5 (a low white corpuscle count, internal bleeding, fever, shortness of breath, and severe nausea), he is not seriously ill.").

Importantly, therefore, there is no case law which holds that once evidence on any badge of fraud is present, the cause of action must go to the jury. In fact, the opposite is true. *See*, *e.g.*, *In re Commercial Loan Corp.*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008) ("With evidence sufficient to establish only two badges of fraud – lack of reasonably

9

equivalent value and insolvency – the Trust has raised no inference of fraudulent intent.");

*Lindholm v. Holtz*, 581 N.E.2d 860 (Ill. Ct. App. 1991) ("proof of some, or even all, of the factors listed in the Fraudulent Transfer Act does not create a presumption of actual intent to defraud. Rather, those factors are indicators of such intent on which the trial court may rely to make its findings based on evidence presented by the parties."). There is no magic formulation. One badge may be enough; many badges may not be enough. With this context in mind, the court proceeds to address Plaintiff's specific arguments for reconsideration on badges of fraud.

So that the record is clear, the court did not require Plaintiff to "prove every badge of fraud to go to trial." *See* Plaintiff's Motion, at 7. Rather, the court held "[w]hile a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud." *See* Order, at 87. Nor did the court "weigh[] the facts," *see* Plaintiff's Reply, at 7, on Plaintiff's actual fraud argument. Rather, the court stated that under *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996), a nonmoving party must make a sufficient showing of genuine dispute of fact to survive summary judgment. *See* Order, at 98. The court also reminds Plaintiff that in its briefs, it did not "discuss or support each badge of fraud in detail," but rather "just emphasize[d] the factual nature of the intent inquiry and articulate[d] its general theory of the case without

providing supporting citations." *Id.* at 88. The motion for reconsideration is not an opportunity to better brief this cause of action.

As the court previously noted, Plaintiff theorizes that (1) Schwartz set up the leveraged buyout structure of the acquisitions in such a way that it insulated Onex from risk and increased the risk to the Debtors' creditors; (2) Onex forced the Debtors to incur massive debt knowing that the Debtors' management had made aggressive financial projections; and (3) Onex collected transaction fees, increased management fees, and increased valuation for its stock and "option value" with little concern about the ultimate solvency of the Debtors. *Id.* at 88. Standing alone, there is nothing overtly fraudulent about these allegations. It is not a surprise that Onex structured the leveraged buyout that would benefit Onex the most. No case has yet determined that the structure of a leveraged buyout, itself, constitutes a badge of fraud. *Compare In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002) (noting that "Ponzi scheme is by definition fraudulent").

With respect to various badges of fraud, the court found as a matter of law that Defendants "benefitted" from the Acquisition and Credit Agreement transfers in the form of management fees, an ownership interest in the Debtors, and potential tax credits. Because the court found that the Credit Agreement Transfers and the Acquisition Transfers were made to benefit the Defendants, the court also found that the transfers were made "for the

11

benefit of insiders," another badge of fraud. *Id.* at 93. While "Plaintiff has not provided any admissible evidence that the Credit Agreement and Acquisition Transfers were for inadequate consideration, or for less than 'reasonably equivalent value,' . . . Plaintiff has raised a material dispute of fact as to whether the Management Agreement Transfers were." *Id.* The court further found that it was "unclear whether Plaintiff can show that these transfers were accomplished through a breach of fiduciary duty." *Id.* at 95. The court also found that the transfers were accomplished through the use of "dummy" corporations. *Id.* This is the extent to which the court found Plaintiff had presented sufficient evidence on the "badges of fraud."

The ultimate issue here is that Plaintiff must show an "intent to hinder or defraud creditors." *See* Order, at 86. Because individuals will rarely state directly they are acting with an intent to hinder or defraud creditors, the law allows the plaintiff to present circumstantial evidence of such an intent through "badges of fraud." *Id.* at 87. As the court noted above, "badges of fraud," however, are not a mere checklist, such that if a plaintiff satisfies one or two, it may automatically proceed to the jury. It is possible that the evidence presented by a plaintiff on one badge of fraud could be so strong that it would be sufficient to go to the jury, but it is not always the case. Put another way, proving one badge of fraud is a necessary, but not sufficient, threshold to get to the jury. Badges of fraud are a mechanism created to allow a plaintiff to present circumstantial evidence, much like the

*McDonnell-Douglas* test that exists in employment discrimination. The mere production of a pretext argument does not open the gates to the jury. Here, the badges upon which the court determined Plaintiff had presented sufficient evidence are slight in relation to the factual and theoretical context of Plaintiff's arguments. The court has made the determination that no reasonable jury could look at the evidence presented by Plaintiff on these badges and reach the conclusion that Plaintiff had proved actual fraud.

Finally, Plaintiff relied to a great extent on testimony of Gerald Schwartz in its generalized attempt to show "badges of fraud." Plaintiff again emphasizes this testimony in its motion for reconsideration. Contrary to Plaintiff's assertion, the court did not "refuse" to consider Mr. Schwartz's testimony. *See* Plaintiff's Motion, at 7. Rather, the court excerpted a lengthy portion of Mr. Schwartz's testimony but determined that it simply explained the risks of leveraged buyouts and did not evidence any badge of fraud, despite Plaintiff's argument to the contrary. Nor did the court find Mr. Schwartz's testimony "outside" the badges of fraud. *See* Plaintiff's Motion, at 8. Rather, the court noted that Plaintiff, itself, had not assigned Mr. Schwartz's testimony significance with respect to any particular statutory badge of fraud, in contrast to Plaintiff's other arguments. As the court is certain Plaintiff's counsel understands, disagreeing with a party's argument is not the equivalent of refusing to consider the argument.

13

Plaintiff argues that Mr. Schwartz's testimony does not need to evidence an evil motive to constitute a badge of fraud, rather it only needs to show that the defendant "understood the effect of his actions would be to hinder or delay or defraud creditors." *See* Plaintiff's Motion, at 8. The court makes no comment as to whether Plaintiff's assertion is an accurate statement of the law, but assuming it is, the court found that Mr. Schwartz's testimony did not rise even to that level. The court again excerpts the portion of Mr. Schwartz's testimony relied upon by Plaintiff. Mr. Schwartz here testifies about the risk language in Onex's annual report:

> Q      And then if you go down to the next paragraph, it states, "While we seek to maximize the risk/reward equation in all acquisitions, there is risk that the acquired company will not generate sufficient profitability or cash flow to service its debt requirements. If such circumstances arise, the recovery of Onex' equity and any other investment in that subsidiary is at risk." Is that an accurate statement of your understanding of the risks of the strategy that was described in the preceding paragraph?

> A      This statement is correct.

> . . . .

> Q      . . . And what you're attempting to do here in making these statements is advise your shareholders of the risks that they might face if your acquisitions do not go as planned. Correct?

> A      Correct.

> Q      Now, there are also risks from the leveraged structure that are experienced by the creditors of the operating subsidiaries. Correct?

A      [Defense Attorney]: Object to the form. [Schwartz]: Yes, creditors of every company in America, in the world, face risks.

Q      And in particular, not just generally risks, but in particular, from the type of leverage transactions that Onex engages in, the creditors of the acquired company can face the same type of risk that Onex shareholders can face; that they will lose something if the leverage proves too great for the acquired company. Correct?

A      [Defense Attorney]: Object to the form. Foundation. [Schwartz]: Yes, generally that's correct.

Q      Okay. And you understood that to be the case in 1999, March of 1999 when this report was issued. Correct?

A      Onex would have understood it and I certainly did.

Q      And the risks that exist is [sic] that the loan that's been taken out, the leverage, if you will, can't be repaid. Correct?

A      If the company doesn't -- is unable to in the future do as well as it's done in the past, yes.

Q      And when that [sic] typically those loans are collateralized by the assets of the acquired business. Correct?

A      Yes.

Q      And the risk is that the bank will then take its collateral and the creditors who don't have liens will remain unpaid. Correct?

A      [Defense Attorney]: Object to the form. [Schwartz]: It depends on the amount of the -- if there's a loss, the amount of the loss. Whether it's the banks' and whether the banks have first security or second security or third security or whatever. But yes, there is a risk to the equity investors as well as the creditors that in acquiring a business, that if it doesn't do as well in the future as it's done in the past or it's projected to do, that there could become a risk to the investors, yes, certainly.

AO 72A
(Rev.8/82)

(P.A. 6 at 85:21 - 88:23).

As the court previously noted, Mr. Schwartz's testimony was essentially an explanation of how the leverage buyout process occurs and what risks are inherent in that process. *See* Order, at 97 ("The court cannot find that this testimony is evidence of Onex's intent to hinder and delay creditors; Schwartz simply seems to be explaining the risks to creditors and equity holders when they choose to become involved in an LBO transaction."). Taking Plaintiff's argument to its logical conclusion would require the court to hold that leveraged buyouts are by their very nature and definition fraudulent transactions. Again, while it appears that leveraged buyouts are not held in the highest esteem by the law, no court has yet declared them to be per se fraudulent. Plaintiff must show more than simply an economic explanation of the manner in which leveraged buyouts are structured to reach an argument for badge of fraud from Mr. Schwartz's testimony.

In its reply brief, Plaintiff asserts that it is sufficient that Mr. Schwartz's testimony shows that he intended for the leveraged buyout to occur and therefore, he must have intended the foreseeable consequences of the leveraged buyout. *See* Reply, at 7-8. Mr. Schwartz's testimony, however, states no such thing. He has essentially testified that when acquiring a business, there is risk to the equity investors ***and*** the creditors because there is the possibility that the business will not do as well in the future as it has in the past. If that happens, the creditors will often lose their financial security because the bank will close on

16

the collateral. There really could be nothing more unremarkable in this testimony. It certainly does not support Plaintiff's assertion that Mr. Schwartz was aware at the time of the transaction that the Debtor would not be able to pay its present and future debts. *See* Reply, at 8. Rather, Mr. Schwartz said if the business did not do as well as projected or as well as it had in the past, there would be risk. This is certainly true and this is certainly not testimony which supports evidence of actual fraud.

For the foregoing reasons, the court declines to reconsider its holding that Plaintiff has not adduced sufficient evidence from which a reasonable jury could conclude that Defendants engaged in actual fraud.

### **Logue's Expert Testimony**

Plaintiff asks that the court (1) reconsider its order barring the testimony of Dennis Logue and his submission of a supplemental expert report and (2) "clarify" how much of Logue's testimony it intended to strike. Plaintiff complains that the court's consideration of Defendants' *Daubert* arguments was not fair because of the "short" page limits for motions for summary judgment (75 pages for motion and response, and 25 pages for reply). Plaintiff further states that Defendants had delayed in producing some documents and Plaintiff had warned the court that it might need to file supplemental expert reports. *See* Plaintiff's Motion, at 9. Because Defendants had not filed a *Daubert* motion at the time they filed their motion for summary judgment, Plaintiff also contends it relied almost exclusively

17

on its expert's testimony to establish "insolvency." In light of the fact that the court has granted Defendants leave to file second motions for summary judgment, Plaintiff further argues the court's ruling on Logue is "unnecessarily punitive."

The court held a *Daubert* hearing on Logue's testimony on July 10, 2009. Prior to the hearing, Plaintiff complained about the procedural posture of its expert's testimony and whether Defendants had properly raised a *Daubert* challenge. Plaintiff requested leave to file a pre-hearing brief on the issue, which the court granted. After the hearing, Plaintiff filed a motion to file a post-hearing brief attempting to rehabilitate Logue and the court denied that motion in conjunction with its August 13, 2009, ruling on the parties' cross motions for summary judgment.

To be clear, regardless of the order in which information was presented, it is clear from the record and the court's comments at the July 10, 2009, hearing, that Plaintiff was given the opportunity to fully brief the *Daubert* issues prior to the hearing. Further, the hearing lasted over two hours and Plaintiff had every opportunity at that hearing to present the views of its expert. Plaintiff's true complaint here is that the court excluded the testimony of Logue. The court finds no reason to reconsider that determination. The court gave ample reason in its August 13, 2009, order, for why (1) Logue's methodology was flawed, (2) his testimony was not helpful to the trier of fact and (3) was not a good "fit" for the legal issues presented. *See* Order, at 45-80. Further briefing from counsel or further

"explanation" from Logue does not alter those conclusions. Logue cannot "untestify" to what he stated in his deposition.

A "supplemental" expert report filed after briefing and a hearing on the matter is not the time to inform the court and Defendants as to what materials the expert may have relied upon. The Federal Rules of Civil Procedure and this court's Local Rules as to the use of experts establish clear and well-defined time deadlines for the disclosure of expert reports. *See* Federal Rule of Civil Procedure 26 (each report must contain "a complete statement of all opinions to be expressed ***and the basis and reasons therefor***" as well as "the data or other information considered by the witness in forming the opinions"), Local Rule, N.D.Ga. 26. (emphasis added). To allow otherwise would lay a constantly shifting ground upon which a party would need to defend against the use of an expert.

This cases raises novel and elevated issues of economic analysis. The fact the parties employed experts indicates that Plaintiff's counsel understood the nature of the proof that would be required to pass through summary judgment and ultimately prevail on its causes of action. The court put the parties on notice on June 29, 2009, that it intended to hold a *Daubert* hearing. By that point, Plaintiff was aware of Defendants' arguments challenging Logue's testimony.

Plaintiff vehemently contends that Logue's "supplemental" report raises nothing new but rather "clarifies" his prior testimony. Plaintiff continues that it has a right – even an

19

obligation – to supplement Logue's testimony under Rule 26(e). The court finds these arguments without merit. The court spent a great deal of time in its order discussing the importance of Logue's decision to use a three-year historical picture in his analysis. The court notes that the point of contention is not necessarily that Logue used historical analysis, but rather that he chose a three year period to make this analysis, as opposed to some other time frame. Logue was questioned extensively on why he made this decision in his deposition. Logue testified that the three year historical average is a process of "eyeballing." *See* Logue Depo., at 249. "My judgment over in using the 3 years was that as you averaged over those 3 years, it sort of looked like it would be a normal period." *Id.* at 249-50. When further questioned on this decision, Logue stated that [i]t's like prunes, six is too many, three is too few." *Id.* at 340.[1] "In my looking at the data, it seemed that a 3-year average would, took away – I mean, they had a bad year in there, they had two good years in there, and I thought this would be a pretty good estimate of what would happen going forward." *Id.* at 340. He also admitted that taking any other period of years would change the result. *Id.* at 344-45. Logue simply testified that the decision to use three years was based on "my judgment." *Id.* at 346. Logue never testified that he had looked at treatises and concluded

---

[1]Plaintiff complains that this statement of Logue's is "flippant" and taken out of context and the court might agree that one stray comment made late in a deposition might not be a sufficient basis to exclude an expert's testimony. But Logue never gave any explanation for the three year cycle other than it was his judgment to use three years. He never explained why three years would be an acceptable time period under any prevailing economic theory or practice.

AO 72A
(Rev.8/82)

that this was the appropriate time frame. Logue never mentioned the four treatises he and Plaintiff's counsel now cite in their supplement as support for the decision to take a three year historical average for performance. Logue repeatedly was asked to explain his decision and gave his own "judgment" as the reason. This is the classic form of *ipse dixit*.

In his supplemental report, Logue is not attempting to "clarify" his prior report so much as he was responding to Defendants' motion for summary judgment and the July 10, 2009, hearing. Finally, the court rejects Plaintiff's contention that Defendants' alleged failure to produce documents affects whether Logue was able to provide a complete report of his opinion the first go around. There are no documents Defendants would need to provide so that Logue could explain his methodology.

For every case that Plaintiff cites to argue that an expert should be permitted to expand on the details of his expert report, *see* Plaintiff's Motion, at 12-14, Defendants can provide contrasting authority standing for the proposition that experts should not be permitted to "bolster" their expert opinions through "supplements." *See* Response, Docket Entry [646], at 16-17 & n.5. The court finds no reason to reconsider its prior ruling that Plaintiff may not submit a new supplemental report from Logue.

Plaintiff next asks the court to "clarify" how much of Logue's opinion it bars. Plaintiff avers that the court "focused" its attention on Logue's discounted cash flow analysis and three year average growth rate. *See* Motion, at 15. Therefore, Plaintiff asserts

AO 72A
(Rev.8/82)

that Logue's opinions unrelated to the discounted cash flow analysis should not be barred.

Specifically, Plaintiff points to Logue's (1) 2002 valuation of the Debtor; (2) refutation of Defendants' experts in his rebuttal report; (3) comparable company valuation analysis; (4) discussion of Magnatrax's system problems; (5) calculation of Debtors' weighted average cost of capital; (6) discussion of management's ability to forecast; and (7) discussion of Magnatrax's performance in comparison to its competitors.

With respect to the 2002 valuation, the court has already addressed the flaws of Logue's valuation. *See* Order, at 69-76. The court concluded this portion of its order by stating that:

> The court finds that Logue's determinations of revenue growth, EBITDA margin, and capital expenditures had a tremendous impact on his ultimate DCF conclusions. The court cannot determine exactly what the equity value for the Debtors would have been had Logue applied different numbers because Logue did not provide his exact DCF formula in his expert report. Logue's DCF valuations had a disproportionate 75% impact upon his determinations as to the Debtor's value. The court finds that Logue employed an unreliable methodology in determining revenue growth, EBITDA margin, and capital expenditures, and this methodology renders his asset valuation analysis unreliable. The court likewise finds that Logue used the numbers derived in his DCF debt free cash flow analysis to calculate projected free cash flows and perform his capital adequacy analysis. The court's concerns with Logue's methodology also render this analysis unreliable. The court cannot allow Logue to testify as to debt f[r]ee cash flow. As such the court cannot allow Logue to offer any conclusions with respect to "solvency," or capital adequacy, or ability to pay debts.

*Id.* at 76-77. Therefore, the court cannot conclude that Logue's 2002 valuation is admissible.

AO 72A
(Rev.8/82)

With respect to the other areas Plaintiff addresses in its motion for reconsideration, the court notes that it has not yet been called upon to consider those issues. To the extent the court has not already touched upon them in its order on the parties' first motions for summary judgment, the court does not find Logue's opinion on these matters to be either admissible or inadmissible. Should it become necessary to consider these matters on the parties' second motions for summary judgment, the court will address them at that time.

Finally, Plaintiff asks the court to reconsider its decision to bar Logue's reasonably equivalent value opinion testimony. Plaintiff avers that although the court found that Logue "did not 'value' ABCO/Magnatrax as a going concern directly before and after each acquisition," *see* Order, at 78, with respect to the other acquisitions, Logue did value the Debtors immediately before and after the acquisitions with no gap in timing.

The court's holding on this matter, however, was not limited to the "gap in timing." The court also rejected Logue's reasonably equivalent value testimony because it relied on Logue's discounted cash value methodology which the court had already rejected. *See* Order, at 77-78 ("The court has already found that Logue's reasonably equivalent value analysis is based on an unreliable DCF analysis. The court ***also*** agreed with Defendants that Logue's 'reasonably equivalent value' testimony is not relevant to the task at hand – determining whether the Debtors received 'reasonably equivalent value' as that term is used in the fraudulent transfer context.") (emphasis added). The court further rejected Logue's

23

reasonably equivalent value testimony because "he never performed *any* independent valuation of the assets of Republic or Jannock or their independent value as companies." *Id.* at 78 (emphasis in original). Thus, even if Logue valued ABCO/Magnatrax before and after each acquisition, it would still not resolve the other three problems identified with Logue's reasonably equivalent value testimony. The court identified the problem as the fact that Logue did not consider value given and value received, but rather just looked at the value at two different points in time. Altering, or even shortening, those two points in time, does not address that concern.

For these reasons, the court will not reconsider its *Daubert* ruling on Logue or its order denying Plaintiff's request to submit a post-hearing *Daubert* brief.

### Credit Agreement Transfer Claims

Plaintiff makes two arguments with respect to the Credit Transfer Agreement claims: (1) the court should not have dismissed these claims as time-barred under Georgia's four year statute of limitations because Plaintiff also brings them under the Fair Debt Collection Practices Act, 28 U.S.C. §§ 3301 *et seq.*, and those claims have not yet been briefed. If Plaintiff succeeds on its Fair Debt claims, then Plaintiff can also avoid the Amended and Restated Credit Agreement (ARCA) and the Second Amended and Restated Credit Agreement (SARCA); (2) Plaintiff also asserts that the court has mistakenly conflated its Acquisition Transfer claims with its ARCA and SARCA claims. Plaintiff contends this is

24

in error because when ABCO entered in to the ARCA on May 12, 1999 (for the purpose of borrowing money to replay Onex's Tender Facility obligations), it incurred an entirely new obligation that is distinct from Plaintiff's Acquisition Transfer claims.

In its prior order, the court held:

> As stated above, Plaintiff defines the Credit Agreement Transfers as repayments of the Tranche A Loan, the Tranche B Loan, the "revolving credit loan component" of the Credit Agreement, as well as quarterly commitment fees, attorney's fees, expense reimbursements, and wire transfer fees.  (P. 2/22/2008 Resp. at 58).  Under this definition, the Credit Agreement Transfers appear to be repayments of antecedent debt and the Credit Agreement transfer appear to be transfers for reasonably equivalent value.
>
> Plaintiff argues, however, that a transfer made on account of an antecedent debt cannot constitute an exchange for reasonably equivalent value if the antecedent debt is itself an obligation subject to avoidance.  *See In re Nirvana Rest., Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) ("[I]f [the incurrence of debt] is avoided as a fraudulent obligation, it cannot serve as 'fair consideration' for the subsequent [t]ransfers").  The Trustee's response brief argues that the Trustee seeks to avoid the Debtors' incurrence of the Credit Agreement obligations as fraudulent obligations in Counts VII and IX; Defendants have not moved for summary judgment on Counts VII and IX; and thus, Plaintiff argues that until the court holds a trial to determine whether the underlying obligations in Counts VII and IX are voidable, the court cannot conclude that the Debtors received reasonably equivalent value.  The court is unpersuaded by Plaintiff's argument.  Defendants explicitly moved for summary judgment on all of Plaintiff's fraudulent transfer claims including, Counts VII and IX.  (D. MSJ, at 15).  Defendants' arguments regarding the "Acquisition Transfers" clearly address the underlying obligations which caused Plaintiff to have to repay the Tranche A, Tranche B, and revolving loans.  As stated above, Plaintiff explicitly defined the "Acquisition Transfers" to include "the additional liens granted to CIBC on the Debtors' assets that enabled the Debtors to obtain the money to pay the selling shareholders." (P. Resp. at 18 n.15).  The court has already dismissed Plaintiff's Acquisition Transfer claims.  Therefore, the court cannot accept

Plaintiff's argument that the Credit Agreement Transfers should be set aside because the obligations which underlie them (the Acquisition transfers) are fraudulent transfers which the court has not yet addressed.

*See* Order, at 81-83.

The court finds that Plaintiff's second argument is foreclosed by the court's prior ruling. That is, the court ruled previously – based on Plaintiff's own definition of the Acquisition Transfers – that the liens granted to CIBC as part of the acquisitions fit within the definition of the Acquisition Transfers and the court considered them there.

Plaintiff's first argument might be more persuasive. Plaintiff asserts that a transfer made on account of an antecedent debt cannot constitute an exchange for reasonably equivalent value if the antecedent debt is itself an obligation subject to avoidance. The court accepted the premise of this argument in its prior order. *See* Order, at 82. But the court ultimately ruled against Plaintiff finding that the court had already granted Defendants' motion for summary judgment with respect to the broadly defined Acquisition Transfers. Therefore, the Acquisition Transfers could not be the antecedent debt obligation subject to avoidance. In its motion for reconsideration, Plaintiff notes that it also seeks to avoid the allegedly fraudulent transfers that occurred through the ARCA and SARCA under a theory that those transfers violate the Fair Debt Collection Practices Act. The parties have submitted additional motions for summary judgment which address the Fair Debt Collection Practices Act claims, but the court has not yet ruled on them. Once the court rules on those

causes of action, if necessary, the court will reconsider Plaintiff's argument that the Fair Debt Collection Practices Act offers a separate and independent basis for finding the ARCA and SARCA transfers are avoidable and therefore cannot constitute reasonably equivalent value. The court notes, however, that the statute of limitations issue is separate from the reasonably equivalent value issue. That is, even if Plaintiff would succeed on a statute of limitations issue, it is possible the court could still find that Plaintiff failed to show a lack of reasonably equivalent value.

**Conclusion**

The court HOLDS IN ABEYANCE IN PART AND DENIES IN PART Plaintiff's motion for reconsideration [644].

**IT IS SO ORDERED** this 2nd day of March 2010.


      /s  J. Owen Forrester
      J. OWEN FORRESTER
      SENIOR UNITED STATES DISTRICT JUDGE