# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| Richard M. Kipperman, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:05-cv-01242-JOF |
| Onex Corporation, et al., | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the court on Defendants' motion for partial summary judgment [651]; Plaintiff's second motion for summary judgment [652]; Defendants' motion to strike [658]; Plaintiff's motion to have certain material facts deemed admitted [660]; and Defendants' motion for extension of time [663].

## I.   Background

### A.   Procedural History

On May 10, 2005, Richard Kipperman, in his capacity as Trustee for the Magnatrax Litigation Trust, filed a complaint against the Onex Defendants, Robert Ammerman, and Charles Blackmon, and VicWest alleging actual or fraudulent conveyances in violation of O.C.G.A. §§ 18-2-70, *et seq.*, and 11 U.S.C. §§ 544, 548, and 550; transfers in violation of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304(a); breach of fiduciary duty;

aiding and abetting breach of fiduciary duty; civil conspiracy; alter ego liability; disregard of corporate formalities; single business enterprise and *de facto* partnership liability; lender liability, avoidance of preferential transfers under 11 U.S.C. § 547; and unjust enrichment.

On September 30, 2005, Plaintiff voluntarily dismissed its claims against VicWest in Counts IV-VI [50].  The court issued an Opinion and Order on September 15, 2006, dismissing Plaintiff's Control Premium Acquisition Transfer claims incorporated throughout the fraudulent transfer counts, Disregard of Corporate Formalities claim (Count XIV), *de facto* Partnership Liability claim (Count XV), and Plaintiff's breach of fiduciary duty claim except as to Onex American, Hilson, and Wright.  Following the court's Opinion and Order, the parties answered and asserted various affirmative defenses [72][73].  Plaintiff amended its complaint on October 18, 2006, to plead its claims with additional particularity [78].  The parties began to engage in discovery.  The court has detailed the extensive and contentious discovery process in this matter in its May 27, 2009 Opinion and Order awarding more than $1 million in discovery sanctions against Defendants [630].  On January 31, 2007, Plaintiff filed its More Definite Statement supplementing its Amended Complaint [123].

On September 26, 2007, the court entered an order finding that Ammerman, Blackmon, Hilson, and Wright were all "Released Parties" under the Plan and should be dismissed.  The court also held that all ABCO Acquisition Transfers made prior to May 12,

1999, should be dismissed as time barred. Following the court's September 26, 2007, Order, only Counts I-III, VII-XIII, XVI-XVII, and XIX remained a part of this litigation.

Plaintiff filed a Statement of Additional Transfer Information on December 7, 2007, further particularizing its claims [361]. On January 8, 2008, Plaintiff settled any outstanding matters with Defendants Ammerman and Blackmon [396]. The parties filed their respective Motions for Partial Summary Judgment on April 30, 2009 [620][621]. The parties' briefs raised issues with respect to Plaintiff's asserted experts. The court accepted a pre-hearing *Daubert* submission from Plaintiff and held a *Daubert* hearing on July 10, 2009. Plaintiff filed a Motion for Leave to File Post-Hearing Submission on *Daubert* Issues on July 22, 2009.

On August 13, 2009, the court issued a comprehensive 165-page order on the parties' first motions for summary judgment. *See* [642]. Shortly thereafter, on August 26, 2009, the court issued a scheduling order directing the parties to file dispositive rulings on the remaining claims by October 1, 2009, with responses and replies briefed through November 24, 2009. The court described the remaining claims as including Plaintiff's constructive fraudulent transfer claims under the Management Agreement, its Preference Claims (Count XVII), its claims for Alter Ego (Count XIII) and Lender Liability (Count XVI), and its claims under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301, *et. seq.* (Counts

II and VIII). The court also noted that depending on the outcome of the alter ego issue, it might be possible for Plaintiff to renew portions of its breach of fiduciary duty claim.

Plaintiff then filed a motion for reconsideration, which the court denied in part and held in abeyance in part on March 2, 2010. *See* [668]. After reviewing the pertinent history of the case, the court now takes up the second motions for summary judgment, filed by the parties on October 1, 2009, as well as some related motions.

### B.    First Summary Judgment Order

The court issued an order on the first round of summary judgment briefing on August 13, 2009. *See* [642]. The court provides a brief summary of that order here, but the court presumes familiarity with the entirety of the August 13, 2009, order.

The instant action arises out of Magnatrax Corporation ("Magnatrax") and its subsidiaries' (collectively "the Debtors") bankruptcy in 2003 in the Delaware Bankruptcy Court following a number of leveraged buyouts ("LBOs") involving Magnatrax, its predecessor entity American Building Company ("ABCO") and Onex Corporation ("Onex"). The Plaintiff in this matter is Richard M. Kipperman, in his capacity as Trustee for the Magnatrax Litigation Trust ("the Trust"). The Trust was established during Magnatrax's bankruptcy pursuant to the Litigation Trust Agreement and the Magnatrax Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("the Plan").

(Rev.8/82)

The Defendants in this matter include Onex, various entities associated with Onex (referred to collectively as "the Onex entities"), and individuals who serve or have served as officers for Onex or the Onex entities. The following Defendants are "Onex entities": Onex ABCO Limited Partnership ("Onex LP"), 1354495 Ontario, Inc. ("Ontario"), Onex American Holdings, LLC ("Onex American"), 302733 Nova Scotia, Inc. ("Nova Scotia"), Onex ABCO Finance, LLC ("Onex Finance I"), Onex ABCO Finance II, LLC ("Onex Finance II"), and OMI Partnership Holdings, LTD ("OMI").[1]

Canadian Imperial Bank of Commerce ("CIBC") is a financial institution that was heavily involved in the transactions relevant to this case. The court will refer to CIBC and other affiliated institutions that lent money to the Debtors as "the Lenders."

In December 1997 ABCO acquired the Windsor Door division of Dominion Industries, Inc., a metal door manufacturer. In order to finance the acquisition, ABCO entered into a credit agreement with CIBC and several other lenders dated December 4, 1997 ("the Credit Agreement"). Onex engaged in a LBO with ABCO in 1999, and the new company was renamed Magnatrax. The purchase price for the ABCO Acquisition was financed through equity contributions to ABCO Holdings and two credit agreements – the

---

[1]Onex owns ninety-nine percent of Onex LP. Ontario, a wholly-owned subsidiary of Onex, owns the remaining one percent. Onex LP is the sole shareholder of Onex American. Nova Scotia is a wholly-owned subsidiary of Onex LP and serves as the majority shareholder for Onex Finance I and II. Onex Finance I and II are wholly-owned indirect subsidiaries of Onex. OMI was at all relevant times a wholly-owned indirect subsidiary of Onex.

5

Tender Facility Credit Agreement dated May 10, 1999, and the Amended and Restated Credit Agreement ("ARCA") dated May 10, 1999. ABCO Acquisition and ABCO Holdings entered into the Tender Facility Credit Agreement with CIBC and other Lenders.

Under the Tender Facility Credit Agreement, the Lenders agreed to loan ABCO Acquisition $110 million secured by the ABCO shares being tendered. ABCO Holdings, ABCO as borrower, and Onex LP as "Tranche B borrower,"[2] entered into the ARCA with the Lenders. The ARCA refinanced the Debtors' existing debt under the 1997 Credit Agreement and the Tender Facility Credit Agreement. Under ARCA the Lenders provided a $40 million five-year term loan facility to ABCO ("the Tranche A Loan"), a $30 million revolving credit facility to ABCO ("the Revolving Credit Loan"), and a $140 million, six-and-one-half-year term loan facility to Onex LP ("the Tranche B Loan").

The Tranche B loan flowed through the Tranche B Structure, which was a "tower" financing structure. The Tranche B Structure involved six steps – (1) the Lenders distribute the Tranche B Loan proceeds to the Tranche B Borrower, Onex LP; (2) Onex LP invests all the proceeds in the capital common stock of Nova Scotia; (3) Nova Scotia invests all the proceeds of Onex LP's investment in the capital common stock of Onex Finance II; (4)

---

[2]A "tranche" is "a division or portion of a pool or whole; *specifically*: an issue of bonds derived from a pooling of like obligations (a securitized mortgage debt) that is differentiated from other issues especially by maturity or rate of return." Merriam-Webster Online Dictionary. http://mw1.merriam-webster.com/dictionary/tranche.

Onex Finance II invests all the money from the prior transaction in Onex Finance I; (5) on the closing date Onex Finance I lends ABCO, Windsor Door, and an ABCO subsidiary ABC Transportation the entire amount invested in Onex Finance I on economic terms and conditions identical to those applicable to the Tranche B Term Loans, except with an interest rate 25 basis points higher; and finally (6) Windsor Door and ABC Transportation pay cash dividends and/or repay existing debts owed to ABCO in an amount equal to the principal amount of the loans made to them by Onex Finance I.

The ARCA funds were also used to finance costs under a management agreement between Onex and ABCO dated May 11, 1999 ("the Management Agreement"). Under the Management Agreement, Onex agreed to perform certain management functions and "consulting services" for ABCO. Pursuant to the Management Agreement, ABCO agreed to pay the Onex entities an initial fee of $1.5 million and a yearly fee of $375,000, subject to an increase equal to 0.75% of the annual EBITDA[3] of any businesses acquired by ABCO or its subsidiaries. ABCO was also required to "reimburse Onex for such reasonable travel expenses and other direct out-of-pocket expenses as may be incurred by Onex or its subsidiaries and their personnel in connection with the rendering of services [under the Management Agreement], including, without limitation, services of such personnel as

---

[3]"EBITDA is defined as Earnings Before Interest, Taxes, Depreciation, and Amortization. It is a widely-used measure of a company's earnings and its ability to service debt." *In re Vivendi Universal, S.A. Securities Litigation*, 605 F. Supp. 2d 586, 590 n.4 (S.D.N.Y. 2009).

7

members of the Board and the fees of external advisors, consultants and professionals." The Management Agreement also provided for ABCO to pay the Onex entities "[i]f [ABCO] uses Onex personnel to provide investment banking or financial advice in connection with any acquisition, Onex will be entitled, if the acquisition is consummated, to receive fees equal to 1.25% of the transaction value of such acquisition . . . less any amount paid by the Company for similar services to any investment banker or other third party in connection such [sic] transaction."   The larger payments received by Onex under the Management Agreement were for these "investment banking services."   ABCO paid the Onex entities transaction fees associated with the Republic and Jannock acquisitions.  The parties disagree as to whether Onex ever actually performed any services pursuant to the Management Agreement.

Republic Builders Products ("Republic"), based in Tennessee, manufactured and sold metal doors and frames for commercial, industrial, and instructional use.  Republic became a target for acquisition.  On or about September 1, 1999, Republic Builders Products Company, a subsidiary of ABCO and a Delaware corporation, purchased Republic pursuant to the Asset Purchase Agreement dated August 11, 1999, as amended on September 1, 1999, for $44.1 million.  ABCO funded the acquisition of Republic with additional equity and additional funds from the Lenders.  CIBC, Onex LP and the Debtors amended the ARCA as of August 5, 1999, to provide for additional loans from the Lenders to ABCO to partially

8

fund the purchase of Republic.  The terms of the Second Amendment increased the Tranche A loan by $5 million and the $140 million Tranche B loan by $20 million, to $160 million, and increased the interest on the existing $140 million Tranche B loan by 25 basis points. Increasing the Tranche B loan by $20 million increased the size of each of the last two balloon payments which would become due on the Tranche B loans in 2005.  The remainder of the purchase was funded by an $8.5 million equity contribution by Onex, a $1.9 million equity contribution by CIBC World Markets, and a $2.5 million contribution by Teachers' Pension Fund.

After Jannock lost the bid to acquire ABCO in June 1999, Jannock put itself up for sale in a public auction process.  Magnatrax Corporation acquired Jannock on March 10, 2000, pursuant to the Jannock Arrangement Agreement for a purchase price of $445 million. ABCO financed the acquisition of Jannock through additional equity contributions and loans from the Lenders.  On March 10, 2000, Magnatrax, through its wholly-owned subsidiary Delta Acquisition Corporation ("Delta"), executed the Second Amended and Restated Credit Agreement ("SARCA") with the Lenders.   Under the SARCA, the Lenders provided financing for the Jannock transaction including an additional $5 million in Tranche A borrowing, $27 million in additional Tranche B borrowing, and $15 million in revolving credit commitments, as well as certain Canadian credit facilities.  In addition to the SARCA indebtedness, the Debtors incurred additional debt  relating to a seven-year subordinated

9

note (the "Subordinated Note") in the amount of CND $83,984,035 (approximately US $57 million).

In early 2001 the United States economy began to slip into a recession, and by November 2001, the construction industry was experiencing severe challenges.  In March 2002, the U.S. Government imposed tariffs on certain types of steel imported into the United States — a core raw material in Magnatrax's business.  On May 12, 2003, Magnatrax and its subsidiaries, including ABCO, Republic, and Jannock, each filed Chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware.  On November 17, 2003, the U.S. Bankruptcy Court for the District of Delaware confirmed the Plan which outlined how all the Debtors' assets would be allocated.

The Plan also established the Trust pursuant to the Litigation Trust Agreement and confirmed Richard Kipperman as the Trustee.  The Magnatrax Debtors transferred the assigned causes of action to the Litigation Trust, for and on behalf of the Trust Beneficiaries. The Plan gave the Debtors' Class 9 general unsecured creditors the opportunity to opt into the Trust, contribute a portion of their bankruptcy distributions, and become one of the Trust Beneficiaries.  As a Trust Beneficiary an unsecured creditor would be eligible to receive a portion of any return garnered by the Trustee minus litigation expenses.

In the first motions for summary judgment filed on April 30, 2009, the Trustee moved for partial summary judgment (1) to establish that 255 individual financial transactions were

AO 72A
(Rev.8/82)

"transfers of an interest of the debtor in property" for purposes of the Trustee's statutory claims; (2) to establish five of the six elements necessary to prove five of its preference claims in Count XVII; and (3) to bar the Defendants from asserting certain affirmative defenses.  Defendants moved for partial summary judgment as to all of Plaintiff's claims except alter ego liability and claims under the Federal Debt Collection Procedures Act.

In Counts I, III, VII, and IX of the First Amended Complaint, Plaintiff alleged that the Onex Entity Defendants executed "Credit Agreement Transfers," including a subset of "Tranche B Transfers," "Acquisition Transfers," and "Management Fee Transfers," which were voidable actual or constructive fraudulent conveyances.  In its August 13, 2009, order, the court (1) granted Defendants' Motion for Partial Summary Judgment on Plaintiff's Credit Agreement Transfer claims because Plaintiff had not created a genuine issue of material fact as to whether the Debtors received reasonably equivalent value; (2) granted Defendants' Motion for Partial Summary Judgment on Plaintiff's Acquisition Transfer claims because Plaintiff had not created a genuine issue of material fact as to insolvency or whether the Debtors received reasonably equivalent value; and (3) denied Defendants' Motion for Partial Summary Judgment on Plaintiff's Management Agreement Transfer claims because Plaintiff had created a genuine dispute of material fact as to whether  the Debtors received reasonably equivalent value.  The court also found that (1) Plaintiff had not presented a genuine dispute of material fact as to whether Defendants acted with

AO 72A
(Rev.8/82)

"actual" fraudulent intent; (2) Plaintiff had standing to pursue all its fraudulent transfer claims; and (3) Plaintiff's ABCO Acquisition Transfer claims were barred by the statute of limitations.

The court devoted a great deal of time in the August 13, 2009, order to discussing how a party could prove insolvency and reasonably equivalent value. *See* Order, at 45-54. The court then discussed whether the testimony of Plaintiff's expert, Dr. Dennis Logue, met the *Daubert* standards for expert testimony with respect to these elements. *See* Order, at 54-79. After lengthy discussion of the law and the specifics of Logue's proffered testimony, the court held that Logue could not testify as to solvency, capital adequacy, or ability to pay debts. *Id.* at 77. The court further concluded that Logue's testimony concerning "reasonably equivalent value" did not meet the *Daubert* threshold. *Id.* at 77-79.

The court next considered Plaintiff's preference claims in Count XVII. The Trustee sought to avoid roughly $13 million in transfers to Onex LP under the Tranche B loan structure and roughly $1.3 million in transfers to Onex and OMI under the Management Agreement made within one year of the Debtors' bankruptcy as preferences under 11 U.S.C. § 547(b). The court determined that Plaintiff had proven five of the six elements of a preference with respect to the five transfers in his motion.[4] The court noted, however, that

---

[4]Those five elements are: (1) the debtor has transferred an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor to the creditor before such transfer was made; (4) the transfer was made on or within 90 days before the date of the filing of the petition or was made to an insider

Plaintiff had not attempted to prove insolvency – and Defendants had not moved for summary judgment on insolvency – and that was an issue that remained for trial. *Id.* at 106-107.

As to the transfers that were made as part of the Tranche B structure, the court held that Onex LP was an "initial transferee" and if Plaintiff could prove the Tranche B transfers were "preferences" under section 547, it could seek to recover them from Onex LP. *Id.* at 111. The court also rejected Defendants' affirmative defenses on the preference claims. *Id.* at 111-117.

On Plaintiff's breach of fiduciary duty claim, the court found that Plaintiff had not created a genuine issue of material fact as to whether Onex American had a fiduciary duty to ABCO/Magnatrax as majority shareholder with respect to the decision to engage in the Republic and Jannock transactions and to continue making payments under the Management Agreement. The court could not find that Onex American had a fiduciary duty based on the evidence in the record without imputing the actions of Onex to Onex American. Whether the actions of Onex are those of Onex American is a question of alter ego which the court was not considering on the first round of summary judgment. As such, the court granted Defendants' Motion for Partial Summary Judgment as to Fiduciary Duty with the option of

---

between ninety days and one year before the date of the filing of the petition; and (5) the transfer enabled the creditor to receive more than the creditor would have received as a distribution in a hypothetical Chapter 7 liquidation if the transfer had not been made.

AO 72A
(Rev.8/82)

the Plaintiff to renew the claim in conjunction with the issue of alter ego. *Id.* at 117-122.

Similarly, Defendants' motion for summary judgment on Plaintiff's lender liability claim

could be renewed in conjunction with the alter ego claim. *Id.* at 130.

> The court also determined that:
>
> with respect to the breach of fiduciary duty, the court views aiding and abetting and conspiracy as two sides of the same coin and Plaintiff may go forward on those theories of liability. The court recognizes that Plaintiff's conspiracy claim further alleges improper diversion of value from ABCO and fraudulently transferring assets from the Debtors to themselves. Based on the rulings made above, however, the court has narrowed the scope of those alleged wrongs to fraudulent transfer under the Management Agreement and the preference claims. Plaintiff may pursue a conspiracy theory of liability for those two categories as well.

*Id.* at 127. The court then granted Defendants' motion for summary judgment on unjust

enrichment claims because of the unchallenged validity of the underlying contracts. *Id.* at

129.

Finally, the court turned to the affirmative defenses raised in the case. The court

rejected Defendants' (1) "cap" defense or defense 4, *id.* at 133-143, (2) *in pari delicto*

defense, *id.* at 143-150; and (3) champtery and maintenance, laches, and estoppel, *id.* at 156-

161. The court found, however, that Defendants could assert the defense of contribution as

to apportionment of damage pursuant to Article 10 of the Litigation Trust Agreement. *Id.*

at 161.

14

Therefore, the remaining claims in the litigation after the court's August 13, 2009, order were: Plaintiff's constructive fraudulent transfer claims under the Management Agreement, its Preference Claims (Count XVII), its claims for Alter Ego (Count XIII) and Lender Liability (Count XVI), and its claims under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301, *et. seq.* (Count II, VIII). The court also noted that depending on the outcome of the alter ego issue, it might be possible for Plaintiff to renew portions of its breach of fiduciary duty claim.

### C.    Reconsideration

On August 27, 2009, Plaintiff filed a motion for reconsideration arguing:

1.    The court erred in dismissing the ABCO Acquisition Transfer claims as time-barred because Eleventh Circuit authority points to the date of the transfers – May 12, 1999 – as the relevant date for statute of limitations purposes, not the date the obligation was incurred.

2.    The court should reconsider its decision that the Trustee could not show actual fraud in its fraudulent transfer claims because the Trustee presented evidence of recognized badges of fraud and established a *prima facie* case for recovery.

3.    The court should clarify or reconsider its decision to exclude the testimony of Professor Logue because Dr. Logue's later-filed declaration does not change his opinions and only clarifies them.

15

4.      The court committed clear error when it dismissed the Credit Agreement Transfer claims finding that the Trustee's claims had already been dismissed. Plaintiff argues that the Trustee's Fair Debt Collection Procedures Act claims remain and those offer an independent basis for the Trustee to avoid the underlying Credit Agreement obligations.

With respect to Plaintiff's first argument, the court noted that even if the court ruled in Plaintiff's favor on the issue of "obligation" and "transfer," the court would still have the alternative holding that Plaintiff is not able to demonstrate "insolvency" or "reasonably equivalent value" at the time of the Acquisition Transfers. *See* Reconsideration Order, at 4. Recognizing that the parties had addressed those issues again in the second round of summary judgment, the court held in abeyance any further consideration of statute of limitations issues until the court rules on the insolvency and reasonably equivalent value issues. *Id.* at 4-5.

The court again considered Plaintiff's evidence on badges of fraud and reached the same conclusion that Plaintiff had not submitted sufficient evidence of actual fraud to get to the jury. *Id.* at 5-17.

Plaintiff next asked the court to reconsider its order barring the testimony of Logue and his supplemental report and also to "clarify" how much of Logue's testimony it intended to strike.   The court refused to reconsider its order barring Logue's testimony and

16

supplemental report. *Id.* at 17-21. In terms of clarification, the court reiterated that Logue's 2002 valuation would not be admissible, nor would his testimony on "reasonably equivalent value." *Id.* at 22, 23-24. But the court declined to address other areas of clarification mentioned by Plaintiff unless it became necessary to consider them in conjunction with the parties' second motions for summary judgment. *Id.* at 23.

Finally, the court rejected Plaintiff's argument that the court mistakenly conflated its ARCA and SARCA claims. *Id.* at 24-26. The court held, however, that Plaintiff was correct in asserting that it is possible the court could find under the Federal Debt Collection Procedures Act that the ARCA and SARCA transfers were avoidable, so the court might have to revisit that issue after ruling on the FDCPA claims on the second round of summary judgment motions. *Id.* at 26-27.

### D.   Contentions

Defendants move for summary judgment on Plaintiff's Federal Debt Collection Procedures Act (FDCPA) claims (Counts II and VIII) arguing Plaintiff (1) does not qualify as "counsel for the United States," (2) cannot show that the debts it pursues are debts owed to the United States under the FDCPA and (3) cannot demonstrate insolvency or reasonably equivalent value. Plaintiff responds that it has standing to pursue an FDCPA claim not as "counsel for the United States," but rather through the procedural vehicle of 11 U.S.C. § 544(b) which allows the Trustee to stand in the shoes of a creditor holding an unsecured

17

claim.  The Trustee has identified the IRS as such a creditor and therefore the Trustee is not acting as the assignee of Trust beneficiaries when bringing his FDCPA claim.

Defendants also argue they are entitled to summary judgment on Plaintiff's alter ego claim (Count XIII) because Delaware does not recognize such a claim as an independent cause of action.  Further, in order to establish alter ego liability, Delaware law requires evidence of domination and control of a shell company used to perpetuate a "fraud or similar injustice" and Plaintiff has not provided sufficient evidence of this.  Plaintiff responds that its alter ego claim is a stand-alone claim and that Delaware law does recognize such a claim as an independent cause of action.  Even if alter ego were simply a theory of liability, Plaintiff contends, it can satisfy the elements of such liability because (1) the parent and the subsidiary should be deemed a single economic entity and (2) an overall element of injustice or unfairness or fraud is present.

Defendants contend that Plaintiff's Lender Liability claim (Count XVI) fails because no reasonable jury could conclude that Onex ABCO Finance, LLC, sometimes referred to by the parties as "FIN," totally controlled Magnatrax.  Plaintiff responds that Onex ABCO Finance, LLC was created to carry out the Acquisition Transfers and facilitate the Tranche B transfers.  Further, Plaintiff alleges, Onex controlled the FIN lending arrangement and was able to extract a premium of 25 basis points more interest on the loan than CIBC originally charged Onex LP.  Plaintiff contends that Onex LP forced this structure on ABCO so that

18

Onex could gain tax benefits.  Thus, Plaintiff asserts that it can show (1) that Onex acted through its lender, FIN, to control the finances and loan terms of the Debtors, (2) Onex used this control to commit fraudulent transfers for its benefit, and (3) Onex's control and breach of duties caused injury to the creditors.

Because the court has previously determined that Plaintiff cannot demonstrate insolvency on the Acquisition Transfers, Defendants aver that Plaintiff's Management Fee Transfer claims for the ABCO, Republic, and Jannock acquisitions should also fail.  The Management Fees for those transactions amount to approximately $6.2 million of the $8.5 million claim.  The Trustee responds that it has shown in the second round of briefing that he can demonstrate insolvency and therefore his Management Transfer Fee claims should be allowed to proceed.

Finally, Defendants argue that Plaintiff's Tranche B preference claims should be limited to the 25 basis points in interest that Onex Finance actually received because, under the Litigation Trust Agreement, Plaintiff cannot recover from Defendants any damages that are the responsibility of "Released Parties" and CIBC is a Released Party.  Defendants aver this would limit Plaintiff's Tranche B claim to $234,416.28.  Plaintiff responds that its recovery under the Tranche B claims is not limited by Article 10 of the Litigation Trust Agreement because Article 10 requires the preconditions of (1) a determination of relative fault and (2) that the determination be made at a trial or by settlement.  Further "fault" is not

19

an issue under § 547(b) or § 550(a), which is a strict liability statute with no right of contribution.  Finally, because Defendants released CIBC, CIBC will not ever be found in "relative" fault.

In his second motion for summary judgment, the Trustee filed a cross-motion for summary judgment on its FDCPA claims with respect to the Bankruptcy Code Tranche B and one-year management agreement transfer preference claims (Count XVII) and two year fraudulent transfer claims (Count II).  The Trustee also argues that it can demonstrate insolvency and that it can recover avoided transfers under § 550(a) even without the expert testimony of Logue.  Finally, the Trustee argues it is entitled to prejudgment interest because it is a "common practice" to compensate the plaintiff for the use of funds that were rightly his.

In addition to the reasons presented in their own motion for summary judgment, Defendants oppose the Trustee's motion arguing that in an attempt to show insolvency, the Trustee has presented "schedules" of financial information that constitute new, undisclosed expert reports using a flawed comparable-company (CompCo) analysis.  Defendants contend this information is inadmissible and without it, Plaintiff has only discussions of operational problems, bad management, stretched payables, and missed forecasts which do not meet the legal standard for insolvency.  Defendants also assert that Plaintiff's motion for summary judgment should be denied because Plaintiff for the first time asserts a preference claim for

20

$29,621,726.37 in damages under the FDCPA (which contains a two year preference period for "insiders") as opposed to its previous claim under § 547(b), the Bankruptcy Code provision for preferences (which contains a one year period).  Finally, Defendants aver that Plaintiff is not entitled to prejudgment interest because the court has found that Defendants have not engaged in actual fraud or wrongfully withheld funds and they have presented valid defenses to Plaintiff's preference claims.

## II.   Discussion

### A.   Preliminary Matters

On December 11, 2009, Plaintiff filed a motion for the court to deem admitted certain statements of undisputed material facts offered by Plaintiff contending that Defendants' responses do not comply with Local Rule 56.1(B)(2)(a)(2).[5]  That Rule requires:

(2) A respondent to a summary judgment motion shall include the following documents with the responsive brief:

a. A response to the movant's statement of undisputed facts....

(2) This Court will deem each of the movant's facts as admitted unless the respondent: (I) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's

---

[5]The court GRANTS Defendants' motion for an extension of time to respond to Plaintiff's motion to have certain facts deemed admitted [663].

> fact or that the movant's fact is not material or
> otherwise has failed to comply with the
> provisions set out in LR 56.1 B.(1).

*Id.*  Plaintiff is correct that courts in this district have applied Local Rule 56.1(B)(2)(a)(2) to deem facts admitted when the court determines the response is not in compliance with the Rule.  *See, e.g.*, *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1302-03 (11th Cir. 2009) (affirming ruling of Judge Murphy deeming defendants' statements admitted because plaintiffs' responses were "convoluted, argumentative and non-responsive"); *Boezman v. Per-Se Technologies*, 456 F. Supp. 2d 1282, 1295 n.19, 1302 nn.47-48, 1313 n.93 (N.D. Ga. 2006) (Vining, J.); *Johnson v. Morehouse College, Inc.*, 199 F. Supp. 2d 1345, 1348 n.1 (N.D. Ga. 2002) (Carnes, J.).

Two of the statements Plaintiff asks to be deemed admitted relate to whether the Debtors were "insolvent" as of the time Ernst & Young prepared certain annual financial statements and whether Debtors were "balance sheet insolvent." Specifically, the statements and responses are as follows:

22

¶ 257  Statement:  The Debtors' financial statements from January 1, 2002 through the Petition Date showed the Debtors to be insolvent. (T.X.37 at MGXE14680, MGXE14689.) The annual financial statements audited by Ernst & Young, as of December 31, 2002 showed the Debtors' liabilities to exceed their assets by approximately $109 million. (T.X.37 at MGXE14680.)

¶ 257  Response:  Disputed, and Defendants object to paragraph 257 on the grounds that it is stated as a legal conclusion, L.R. 56.1B(1)(c), and that the cited document does not support the proposed fact, L.R. 56.1B(2)(a)(2)(I) & (iii). Defendants do not dispute that the cited document shows that, as of December 31, 2002, Magnatrax's balance sheet shows liabilities exceeding assets by approximately $109 million. (T.X.37 at MGXE014680.) The same document shows that, as of December 31, 2001, Magnatrax's assets exceeded its liabilities by more than $225 million, and says nothing about Magnatrax's balance sheet as of January 1, 2002. (*Id.*; *see also* Gunning Ex. 13 at MGXE112683 (App. 122) (Magnatrax's December 31, 2001 audited financial statements, showing that assets exceed liabilities by $225,112,000).

23

¶ 259  Statement:  The Debtors were balance sheet insolvent as of January 1, 2002. (T.X.27 at ONEX00157569; T.X.127 at ONEX00407028; T.X.128 at ONEX00316257-58; T.X.55 at MGXE0205034; T.X.49 at ONEX00404933; P.R.A.16 at ONEX00351350.)

¶ 259  Response:  Disputed, and Defendants object to paragraph 259 on the grounds that it is stated as a legal conclusion, L.R. 56.1B(1)(c), and that the cited documents do not support the proposed fact, L.R. 56.1B(2)(a)(2)(I) & (iii). Plaintiff fails to define the term "balance sheet insolvent," rendering paragraph 259 vague and ambiguous. None of the cited documents even discusses Magnatrax's balance sheet as of January 1, 2002, much less demonstrates that Magnatrax was "balance sheet insolvent" on that date. As an initial matter, all of the documents cited in paragraph 259 of Plaintiff's Statement are dated October 2002 or later. A November 2002 Onex document states that "[g]eneral economic difficulties plague Magnatrax Corp. and several automotive companies" and that in "*September* 2002, Magnatrax defaulted on covenants related to its $475 million in total debt[.]" (T.X.49 at ONEX 00404932 (emphasis added).) That November 2002 document states that "the market is *presently* valuing Onex's investments in Magnatrax

24

and J.L. French at $0." (Id. at ONEX 00404933 (emphasis added).)
Similarly, a 2003 Confidential Memorandum prepared for Onex by
Credit Suisse First Boston states that, due to the general economic
downturn and the introduction of new steel tariffs in the United States,
Magnatrax "defaulted under the terms of its senior credit facility and
subordinated notes." (P.R.A.16 at ONEX 00351350.) This document
does not state when the default occurred, though, as indicated in
paragraph 120 above, Magnatrax continued to make good on all of its
obligations to CIBC, its other lenders and trade creditors through at
least the fall of 2002. The remainder of the documents cited are emails
that have nothing to do with Magnatrax's balance sheet as of January
2002. One—from Anne Savage to various Magnatrax accounting
personnel on October 28, 2002—discusses "major changes to the
accounting for goodwill and other intangibles" enacted by the
Financial Accounting Standards Board, and states that Magnatrax was
required to implement such changes "in our September 30 financial
statements." (T.X.55 at MGXE025034.) An exchange of emails
between Savage, Hilson, Wright and others on October 14 and 15,
2002 also addresses the implementation of this new accounting

25

change, but indicates nothing about Magnatrax's solvency as of January 2002 or at any other time. (T.X.27 at ONEX 00157569.) An October 25, 2002 email from Donald Lewtas to various Onex executives attaches a file named "VALUE SUMMARY Sep 2002.xls," and states: "Attached is an updated value summary. The values of French, Magnatrax and Radian have been set at NIL for this purpose." (T.X.127 at ONEX 00407028.) An October 26, 2002 email from Scott Lawrence to Onex executives states that, in "the NAV report *for the week ended October 25, 2002*," carrying values "have been adjusted to reflect zero values for French, Radian, and Magnatrax." (T.X.128 at ONEX 00326257-58 (emphasis added).) In sum, Plaintiff has offered no evidence to support the assertion that Magnatrax was balance sheet insolvent as of January 1, 2002. And, as indicated in paragraphs 257 and 258 above, the company's audited financial statements reflected that as of December 31, 2001, Magnatrax's assets exceeded its liabilities by more than $225 million. (T.X.37 at MGXE014680; *see also* Gunning Ex. 13 (App. 122).)

Defendants admit the second sentence of Plaintiff's ¶ 257 – that the annual financial statements audited by Ernst & Young as of December 31, 2002, show substantial excess of

26

liabilities over assets.  The first sentence of statement ¶ 257 –"The Debtors' financial statements from January 1, 2002 through the Petition Date showed the Debtors to be insolvent." – is not supported by the documents to which Plaintiff points because these are documents that exist only as to the condition of the company on December 31, 2001 and December 31, 2002.  Therefore, the court denies Plaintiff's request to deem ¶ 257 admitted.

As to ¶ 259, the court understands the meaning of "balance sheet insolvency" but in the context of this case, a fair meaning of that statement would be audited financial statements as of January 1, 2002, and the documents cited by Plaintiff are not such documents.  Therefore, the court also denies Plaintiff's request to deem ¶ 259 admitted.

The remainder of the statements addressed by Plaintiff relate to a comparison of Debtors' financial condition with that which the Debtors might have previously projected.

¶ 56    Statement:    In 2000, the Debtors' actual sales revenues for the year were 14.1% below the plan they had set for the year, and their EBITDA was 26.2% below plan. (T.X.95 at ONEX00041547.)

¶ 56    Response:    Defendants object that the cited document does not support the proposed fact, L.R. 56.1B(2)(a)(2)(I) & (iii), and that the proposed fact is not material to the question of solvency presented by Plaintiff's summary judgment motion, L.R. 56.1B(2)(a)(2)(iii). Though T.X.95, a December 2000 Magnatrax Board Report, references a "Plan," the

27

document does not define that term, and does not indicate when the plan referenced was created or for what purpose. (T.X.95 at ONEX00041547.) Defendants note that the year 2000 actual sales figure set forth in T.X.95 ($881.1 million) far exceeds the "Projected revenue" figure for 2000 ($543.2 million) that Plaintiff himself has cited as representing the company's strategic plan for that year. (*See* Pl. Stmt.¶ 47 (citing P.R.A.127 at ONEX 00042303).)

¶ 57   Statement:   In 2001, the Debtors' actual sales revenues for the year were 20.7% below the plan they had set for the year, and their EBITDA was 37.9% below plan. (T.X.148 at ONEX00056772.)

¶ 57   Response:   Defendants object that the cited document does not support the proposed fact, L.R. 56.1B(2)(a)(2)(I) & (iii), and that the proposed fact is not material to the question of solvency presented by Plaintiff's summary judgment motion, L.R. 56.1B(2)(a)(2)(iii). Though T.X.148, a December 2001 Magnatrax Board Report, references a "Plan," the document does not define that term, and does not indicate when the plan referenced was created or for what purpose (T.X.148 at ONEX 00056772.) Defendants note that the year 2001 actual sales figure set forth in T.X.148 ($735.3 million) is considerably higher than the

28

"Projected revenue" figure for 2001 ($595.0 million) that Plaintiff himself has cited based on Magnatrax's 2000-2004 Strategic Plan. (*See* Pl. Stmt. ¶ 47 (citing P.R.A.127 at ONEX00042303).) Further, Defendants note that T.X.148 states that "December's results continued to reflect a very difficult market," that "the economy appears to have reached the bottom of the cycle," and that "[a]lthough it is clear that we are operating in troubled economic conditions, we intend to meet our 2002 Plan EBITDA commitment." (T.X.148 at ONEX 00056770-71.)

¶ 58   Statement:   In 2002, the Debtors' actual sales revenues for the year were 16.3% below the plan they had set for the year, and their EBITDA was 79.7% below plan. (T.X.162 at MGXE015802.)

¶ 58   Response:   Defendants object that the cited document does not support the proposed fact, L.R. 56.1B(2)(a)(2)(I) & (iii), and that the proposed fact is not material to the question of solvency presented by Plaintiff's summary judgment motion, L.R. 56.1B(2)(a)(2)(iii). Though T.X.162, a December 2002 Magnatrax "Financial Highlights" chart, references a "Plan," the document does not define that term, and does not indicate when the plan referenced was created or for what purpose. (T.X.162

29

at MGXE015802.) Defendants note that the year 2002 actual sales figure set forth in T.X.162 ($664.3 million) exceeds the "Projected revenue" figure for 2002 ($650.9 million) that Plaintiff himself has cited based on Magnatrax's 2000-2004 Strategic Plan. (*See* Pl. Stmt. ¶ 47 (citing P.R.A.127 at ONEX00042303).) Defendants further state that Blackmon and Bruce Zorich (Magnatrax's then-CEO) described metal buildings market conditions in 2002 as "the worst downturn this industry has seen for twenty years." (*See* paragraphs 87-88 *infra*.).

¶ 71   Statement:   Magnatrax finished 2000 with sales of $881.1 million, short of its plan by more than 14%. (T.X.159 at MGXE011893.)

¶ 71   Response:   Disputed, and Defendants object that the proposed fact is not material to the question of solvency presented by Plaintiff's summary judgment motion. L.R. 56.1B(2)(a)(2)(iii). Defendants further object to paragraph 71 on the ground that it fails to define "plan" and is therefore impermissibly vague. Defendants note that Magnatrax's actual sales of $881.1 million in 2000 far exceeded the "Projected revenue" for that year of $543.2 million that Plaintiff himself sets forth, on the basis of Magnatrax's 2000-2004 Strategic Plan, in

30

paragraph 47 of Plaintiff's Statement. (*See* Pl. Stmt. ¶ 47 (citing

P.R.A.127 at ONEX 00042303).)

While the court agrees that Defendants' argument that the term "plan" is vague or

unknowable is without merit, Defendants are correct in their more substantive argument that

whether a company meets projected sales revenue is not necessarily connected with whether

the company is insolvent or not.  Even though there is not a direct correlation, the statements

about Debtors' projections are relevant in the entire context of the economic information.

The parties have extensively argued the issue of insolvency in their briefs and now here on

the motion to deem certain statements of fact as admitted.  The length of those arguments,

themselves, demonstrate that insolvency and any particular point that might evidence

insolvency is complicated and not especially well suited to resolution on arguments back and

forth on statements of material fact.  The court will consider the entirety of the statements

and responses in its insolvency discussion.

For all of these reasons, the court DENIES Plaintiff's motion to have certain material

facts deemed admitted [660].

## B.    Insolvency Revisited

Because the parties have again briefed the issue of insolvency, the court reviews what

it held in the August 13, 2009, order, concerning insolvency:

A plaintiff may show that a debtor was in a poor financial condition at the time of an alleged fraudulent transfer in three ways. A plaintiff may show that the debtor (1) "was insolvent on the date that such transfer was made or such obligation incurred or would become so as a result of the transfer or obligation," (2) was engaged or was about to engage in a business or transaction that would leave it with unreasonably small capital, or (3) intended to incur, or believed that it would incur debts beyond its ability to pay as such debts matured. 11 U.S.C. § 548; O.C.G.A. § 18-2-72.

The Bankruptcy Code and the Georgia Code define "insolvent" to mean a "financial condition such that the sum of an entity's debts is greater than all of such entity's assets, at a fair valuation." 11 U.S.C. § 101(32)(A); O.C.G.A. § 18-2-72. Although a plaintiff may seek to prove "balance sheet" insolvency without an expert on the basis of the debtor's balance sheet and tax documents alone, *see, e.g., Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 648-49 (3d Cir. 1991), the majority of plaintiffs seem to employ experts to do so. *See, e.g., MFS/Sun Life Trust High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 938-44 (S.D.N.Y. 1995). Experts typically rely on a combination of valuation methodologies including actual sale price, discounted cash flow, or DCF, and comparable transactions. *Id. See also In re Inridium Operating LLC*, 373 B.R. 283, 344 (S.D.N.Y. 2007) (listing six different methodologies). The use of an expert is consistent with the notion shared by many courts and commentators that book value of an LBO company's assets does not control for purposes of insolvency, and the court may modify or reconstruct a company's balance sheet to determine its value on the date the LBO was consummated. *In re O'Day Corp.*, 126 B.R. 370, 398 (Bankr. D. Mass. 1991).

"Equitable insolvency," or whether a debtor is able to pay its debts as they become due, is a forward-looking standard. It is unclear whether a plaintiff must show that the debtor subjectively intended to become incapable of paying its debts or whether a plaintiff must merely show that a debtor should have foreseen such an outcome to prove the debtor "intended to incur, or believed that it would incur debts beyond its ability to pay as such debts matured." *MFS/Sun Life Trust*, 910 F. Supp. at 943. The term "unreasonably small capital" denotes a financial condition short of insolvency, and the "unreasonably small capital" test of financial condition is "aimed at transferees that leave the transferor technically solvent but doomed to fail."

AO 72A
(Rev.8/82)

*Id.* at 944 (citing *Moody*, 971 F.2d at 1070).  In order to determine whether a debtor is operating with inadequate capital, a court must look at the debtor's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue.  *Id.*  "While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks.'"  *Id.*  "The test for determining whether parties to a leveraged buy-out left a business with unreasonably small assets is whether it was reasonably foreseeable that an acquisition would fail at the time the projections were made," and as with an equitable insolvency analysis, a "court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723 (E.D. Pa. 2007).

Courts should consider contemporaneous evidence "untainted by hindsight or post-hoc litigation interests" when evaluating a company's financial condition.  *In re Iridium*, 373 B.R. at 346.  Such contemporaneous evidence may include a company's stock price or opinions by contemporaneous market participants.  *Id.* at 347 ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.").  Courts should evaluate the company's own projections.  *Id.* ("Without a firm basis to replace management's cost projections with those developed for litigation, the starting point for solvency analysis should be management's projections."). "[P]rojections tend to be optimistic, [so] their reasonableness must be tested by an objective standard anchored in the company's actual performance." *MFS/Sun Life*, 910 F. Supp. at 943.  "Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses.  However, reliance on historical data alone is not enough.  To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073-74 (3d Cir. 1992).

When assessing whether a company's projections are reasonable, courts may look to expert analysis by investment bankers and independent accounting firms which affirm management's projections. *In re Iridium*, 373 B.R. at 347.   Courts should also recognize that "a powerful indication of contemporary, informed opinion as to value comes from private investors who

with their finances and time at stake, and with access to substantial
professional expertise, conclude at the time that the business was indeed one
that could be profitably pursued." *Id. See also Peltz v. Hatten*, 279 B.R. 710,
740 (D. Del. 2002) (crediting valuations by informed and sophisticated parties
at the time whose beliefs were confirmed by market comparables and
contemporaneous DCF studies over expert post-hoc DCF). Lastly, courts may
also consider the ability of a debtor to obtain financing in determining its
financial condition. *In re Iridium*, 373 B.R. at 346 (placing great weight on
the fact that the debtor closed three syndicated bank loans and raised more
than $2 billion in the capital markets as an indication of solvency and capital
adequacy).

*See* Order, at 46-49.

Plaintiff has focused on the court's statement that "[a]lthough a plaintiff may seek to

prove 'balance sheet' insolvency without an expert on the basis of the debtor's balance sheet

and tax documents alone, . . . the majority of plaintiffs seem to employ experts to do so."

*Id.* at 46. It is theoretically possible to prove insolvency without the use of experts, but it

is clear from a review of the case law that it is very difficult to do so, particularly in this case

which has the background context of extremely complicated leveraged buyouts and complex

tax structures. The procedural posture of *Mellon* itself is telling. The *Mellon* court rejects

a "per se" rule that "LBO loans collateralized with the target's assets are fraudulent," and

states that the bankruptcy court was "surprisingly cavalier" in determining insolvency. *See*

945 F.2d at 649. The court then finds that the Committee "failed to satisfy its burden of

proving that Metro was insolvent on the date of the transfer or became insolvent as a result

of the transfer." *Id.* at 650.

34

*Porter v. Yukon Nat'l Bank*, 866 F.2d 355 (10ᵗʰ Cir. 1989), cited by Plaintiff, also does not set forth any rules on how to prove insolvency.  There, the court simply stated that when applying an asset and liability test, appraisal of property is sometimes required.  *Id.* at 357 (citing *Collier on Bankruptcy*).  But "valuation of property varies with time and circumstances" and the finder of fact must be permitted to arrive at "fair valuation," therefore, the court rejected the defendant's "suggestion that the trustee failed to carry his burden simply because he did not introduce expert testimony." *Id.*  None of this is a hearty endorsement of proving insolvency without expert testimony. *See*, *e.g.*, *In re Iridium Operating LLC*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) ("although not dispositive, expert appraisals and valuations should be considered, when possible, in a solvency analysis").[6]

After the court struck numerous portions of the testimony of Plaintiff's expert Dr. Dennis Logue in the first motion for summary judgment, Plaintiff now attempts to argue insolvency through the "Schedules" it has attached to its briefs.  To clarify the parties' positions, the court notes that Defendants have not moved on summary judgment as to Magnatrax's ***solvency*** during the bankruptcy preference period or the two year period for

---

[6]Plaintiff cites several statements of the court at various hearings in the case, including July 10, 2009, where the parties were discussing the use of expert witnesses at trial.  During the discussion, the court noted that juries were capable of understanding complex material such as cross elasticity and had certain common sense instincts that could render expert testimony superfluous. *See* Transcript, July 10, 2009, at 47-48.  The court's statements at these hearings were not holdings in the case.

AO 72A
(Rev.8/82)

the FDCPA claims but rather Defendants have only sought summary judgment on solvency as to the three acquisition dates in 1999 and early 2000. In its second motion for summary judgment, Plaintiff now moves for summary judgment to establish Debtor's ***insolvency*** from May 12, 2001 through May 12, 2003.

To summarize the evidence Plaintiff has marshaled to demonstrate insolvency or undercapitalization, Plaintiff argues that Debtors were insolvent at least as early as December 2001:

- ABCO's pre-LBO stock price shows that the ABCO LBO caused ABCO to become insolvent in May 1999. Plaintiff bases this argument on the fact that on April 7, 1999 ABCO's stock price was $21.88 per share and with 5.1 million shares outstanding, ABCO equity was $111.67 million market value. ABCO's debt was $73 million yielding a total enterprise value of $184.67 million. As of the May 12, 1999 ABCO LBO, ABCO's outstanding debt increased to $185.50 million which exceeds ABCO's pre-LBO enterprise value of $184.67 million leaving ABCO with an equity value of negative $1.13 million. (Schedule I)

- CompCo analyses for May 12, 1999 through December 31, 2000 show that Debtors were either insolvent or as of May 12, 1999 severely undercapitalized

(Schedules J-O).  The comparison of EBITDA and EBIT multiples show that Debtors underperformed peers (Schedules P-1 and P-2).

- Undercapitalization of Debtors from ABCO LBO through Petition Date shown through comparisons of long-term debt ratio, interest coverage ratio, return on assets, leverage ratio, days payable outstanding, and total debt/total equity ratio to peer group (Schedules Q-1 through Q-6).

- Contemporary analysis projected Debtors would be unable to make loan payments or otherwise default on their loans in the event of "certain foreseeable scenarios" SAF ¶ 464 (1999 CIBC document that if economic slowdown were to occur from 2000 to 2003, Debtors would violate loan covenants by 2000); SAF ¶ 467 (Valuation Research Corporation, an advisory firm hired to provide opinion letter before ABCO LBO concluded that ABCO would not be able to make August 2005 balloon payment and would need to refinance acquisition debt); SAF ¶ 465 (with respect to Jannock and Republic, CIBC concluded that if recession occurred between 2000 and 2003, Debtors would violate loan covenants by 2001); SAF ¶ 466 (CIBC's determination that even under management's best case scenario, Debtors would be unable to make loan payments as they became due in 2005); SAF ¶ 466 (as to

37

Jannock LBO, CIBC projected that 2000-2002 recession would cause Debtors to default by 2001).

- On September 10, 2002, Magnatrax was unable to make a principal repayment under the Credit Agreement (SF¶ 275); December 2000, Magnatrax stretched payables to 49.5 days (SF¶ 220); in first quarter of 2001, Magnatrax's management instructed divisions to hold large payables until last two weeks of quarter (SF¶ 221); the same instruction was given at the end of the second quarter of 2001 (SF¶ 221); June 15, 2001, Magnatrax's Chief Financial Officer Charles Blackmon informs large vendor that Debtors would be delaying payment on two invoices totaling $1.3 million past their due date (SF¶ 223); October 2001, Debtors' President Robert Ammerman informs Debtors did not have enough money to fix roof even though it posed safety concerns and halted production in the rain (SF¶ 227); Debtors delayed payments to suppliers "beyond agreed standards" (SF¶ 225); March 2002 ABCO stretched payables to 63.7 days after being invoiced (SF¶ 230); July 2001, Standard & Poor's placed Debtors on "CreditWatch with negative implications" (SF¶ 245); September 2002, S&P lowered Debtor's ratings to "CC" and in November 2002, down to "D" meaning unable to pay all or substantially all of their obligations as they became due (SF¶¶ 248, 250-51).

- Plaintiff cites communications from Debtor that the financial picture was not rosy because Debtors had been "betting" on improvements in information systems to get it past a certain point in growth (SF¶ 147) and the future was based on the information system (SF¶ 157), but by mid-June 2000, clear that information system was a failure and was halted (SF¶¶ 152, 158); further, Debtor's network of builders and dealers was not well-developed, preventing Debtor from meeting its financial projections (SF¶¶ 168-71, 190-92); Debtor recognized failure to meet these objectives (SF¶¶ 37-95), leading to Debtor asking counsel to prepare bankruptcy filings in November 2002 (SF¶¶ 273-77); in December 2002, Debtor recorded $28 million in intangible asset write downs to software development costs (SF¶ 269).

With respect to "reasonably equivalent value," Plaintiff argues that

- ABCO's pre-LBO stock price shows that the ABCO LBO caused ABCO to become insolvent in May 1999. Plaintiff bases this argument on the fact that on April 7, 1999 ABCO's stock price was $21.88 per share and with 5.1 million shares outstanding, ABCO equity was $111.67 million market value. ABCO's debt was $73 million yielding a total enterprise value of $184.67 million. As of the May 12, 1999 ABCO LBO, ABCO's outstanding debt increased to $185.50 million which exceeds ABCO's pre-LBO enterprise

39

value of $184.67 million leaving ABCO with an equity value of negative $1.13 million.  (Schedule I)

•     CompCo analyses show Debtor received less than equivalent value in the Republic and Jannock transactions.  (Schedules S and T)

As can be seen in the summary of evidence above, in conjunction with its response to Defendants' motion for summary judgment, and its own motion for summary judgment, Plaintiff submitted 79 "Schedules" in an attempt to demonstrate the insolvency element of many of Plaintiff's claims.  (The Schedules are attached to Plaintiff's Opposition to Defendants' Second Motion for Partial Summary Judgment.)  Plaintiff attached these Schedules as exhibits to its brief without specific explanation of their origins.  Plaintiff did submit the declaration of David Plastino, a Manager with the Michel-Shaked Group, who stated that he retrieved certain data from electronic information provider Capital IQ and information on foreign exchange rates from a database maintained by the Federal Reserve. Plaintiff's expert, Dr. Dennis Logue, also works for the Michel-Shaked Group.  There appears to be no dispute that some of these Schedules (A-H) come from Logue's expert report.  Defendants make the assertion and Plaintiff does not deny it.  *See* Revised Expert Report, Dr. Dennis Logue, April 28, 2008, P.A. 52, at 136-151, 157, and 161-307. Therefore, the court presumes that some of this material had its origins in Logue's expert report.

40

Defendants ask the court to strike these Schedules arguing that they are inadmissible at trial noting that Plaintiff has not signed or dated the Schedules, or attached them to an affidavit or expert report, nor has it identified their author. Defendants contend the Schedules are neither sworn testimony nor are they supported by the testimony of a witness with personal knowledge of the matter, as required under Federal Rule of Evidence 602. Defendants further aver the Schedules are inadmissible because they are based on data from third-party metal buildings companies and therefore are hearsay. Defendants next contend that the schedules are inadmissible lay opinion testimony because (1) they are not based on the perception of any fact witness and (2) they are based on specialized knowledge that falls within Rule 702 expert testimony. Defendants further state that the Schedules are inadmissible expert testimony because they are untimely and unreliable.

Plaintiff responds that Defendants' motion to strike is procedurally and substantively improper. Plaintiff argues that Defendants' motion contains no actual argument and simply refers the court to Defendants' reply to their second motion for summary judgment and therefore violates Federal Rule of Civil Procedure 7(b)(1)(B). Plaintiff also contends the motion does not conform with Rule 12(f) which allows a party to move to strike a *pleading* but not a motion. Plaintiff further argues that Defendants' motion to strike attacks the Trustee's insolvency evidence, but Defendants did not move on insufficient evidence of

41

insolvency.  Plaintiff also claims that Defendants' argument comes down to an assertion that they have contrary evidence on insolvency and that is not a sufficient basis to strike.

With regard to Defendants' evidentiary objections, Plaintiff argues that the Schedules consist of summaries or calculations of data that are currently admissible or may be made admissible at trial.  Earnings and debt data incorporated into the Schedules was retrieved from Capital IQ's electronic database which compiles information from public SEC filings which themselves could be admitted as business records pursuant to Federal Rule of Evidence 803(6), authenticated through a witness pursuant to Rule 902(11), or through judicial notice.  Market quotations on Debtors' peers is explicitly admissible under Rule 803(17).  Once the underlying data has been admitted, Plaintiff states, the summaries of that data in the form of the Schedules can be admitted through Rule 1006.  Plaintiff states that it may rely on a lay witness to introduce the Schedules at trial because they summarize the results of a series of calculations, including CompCo calculations the usefulness of which courts have widely recognized.

Schedules A-D are a list of the Management Agreement and Tranche B transfers. There is no dispute about the content of these schedules and the court finds that Schedules A-D are simply a summary form of alleged transfers and there is nothing untoward about their attachment to Plaintiff's second motion for summary judgment.

42

The Schedule E documents conduct a Comparative Company analysis among Butler Manufacturing, NCI Building Systems, and Magnatrax based on Magnatrax's May 12, 2002 valuation. Schedule E-3 calculates the unadjusted and adjusted EBITDA and EBIT for Magnatrax.[7] Schedule E-2 shows the calculation of Business Enterprise Values (BEVs), EBIT multiples, and EBITDA multiples, for Butler Manufacturing and NCI Building Systems, Inc.[8] Schedule E-1 compares the figures developed in E-2 and E-3. E-1 also utilizes T.X. 147 which is Magnatrax's Condensed Consolidated Balance Sheets from April 30, 2002 and December 31, 2001.

The F Schedules undertake the same analysis for the date of January 1, 2002 (and utilizing the same source documents as in the E Schedules); the G Schedules as of September 17, 2001;[9] and the H Schedules as of May 12, 2001.[10]

---

[7] Schedule E-3 is based on information taken from T.X. 148 (Magnatrax's Board Report December 2001); T.X. 149 (Magnatrax's Management Report, dated May 24, 2002); and T.X. 150 (October 15, 2002 e-mail from Nigel Wright to Christine Donaldson discussing EBITDA adjustments to goodwill).

[8] E-2 takes figures from T.X. 154, a Capital IQ printout of Butler Manufacturing Company's financials and T.X. 155 Capital IQ's compilation of NCI Building Systems, Inc.'s financials.

[9] The G Schedules cite T.X. 151 (Magnatrax Board Report August 2001), T.X. 152 (Magnatrax Board Report December 2000), T.X. 150 (the October 15, 2002 e-mail from Nigel Wright to Christine Donaldson), as well as the Capital IQ documents.

[10] The H Schedules cite T.X. 153 (Magnatrax Board Report April 2001), T.X. 152 (Magnatrax Board Report December 2000), T.X. 150 (the October 15, 2002 e-mail from Nigel Wright to Christine Donaldson), as well as the Capital IQ documents.

Schedule I is an Analysis of Equity Value Lost by ABCO due to the ABCO Acquisition. It reaches a numerical determination of equity value lost by calculating pre-LBO announcement market value plus pre-LBO debt outstanding to reach an ABCO business enterprise value. That figure is then compared to the post-LBO debt outstanding.[11]

The J Schedules return to a Comparable Company Multiple Valuation Analysis as of December 2000 and using Butler Manufacturing Company and NCI Building Systems, Inc. Schedule J-5 analyzes Magnatrax's Operating Figures from December 31, 2000.[12] Schedule J-2 calculates the business enterprise values for Butler Manufacturing and NCI Building Systems, Inc.[13] Schedules J-3 and J-4 calculate EBITDA and EBIT multiples, respectively, for the two companies relying on the figures developed in J-2, as well as additional data from the Capital IQ records in T.X. 195 and T.X. 197. Finally, Schedule J-1 takes the data calculated in Schedules J-3, J-4, and J-5, and with further input from T.X. 95,

_____

[11]Schedule I cites T.X. 190 as a source document. T.X. 190 is a listing of ABCO's closing price, market capitalization, and shares outstanding from March 1, 1999 through May 13, 1999. It appears this document came from Capital IQ. Schedule I also relies on T.X. 189 which is a memo dated April 23, 1999 from Messrs. Kilgour, Worsley, and Rangooni of CIBC Capital Partners to CIBC's Investment Committee.

[12]Schedule J-5 relies on figures taken from T.X. 201 (Magnatrax's Executive Summary Business and Strategic Plan 2001-2005) and T.X. 150 (October 15, 2002 e-mail from Nigel Wright to Christine Donaldson discussing EBITDA adjustments to goodwill).

[13]Schedule J-2 is based on T.X. 197 (Capital IQ's reporting of Butler Manufacturing's financials and T.X. 195 (Capital IQ's reporting of NCI Building Systems, Inc.'s financials).

44

Magnatrax Board Report from December 2000, conducts a Comparable Company Multiple

Valuation Analysis for December 2000.

Schedule K undertakes the same analysis as that in the J Schedules but as of March

10, 2000, after the Jannock Acquisition.  The K Schedules add Miller Building Systems and

Robertson-Ceco Corporation to the Comparable Companies.[14]  The L Schedules run the

comparable company analysis with these same four corporations as of March 9, 2000, before

the Jannock Acquisition.[15]  The M and N Schedules do the same analysis before and after

the Republic acquisition on September 1, 1999 and August 31, 1999, respectively.[16]

---

[14]The K Schedules rely on P.R.A. 88 (Confidential Information Memorandum for
Magnatrax/ABCO's $381,268,750 Amended and Restated Senior Secured Credit Facilities
February 2000); T.X. 203 (undated Executive Summary and financials for ABCO); T.X. 195
(Capital IQ's reporting of NCI Building Systems, Inc.'s financials); T.X. 197 (Capital IQ's
reporting of Butler Manufacturing's financials); T.X. 198 (Capital IQ's reporting of Miller
Building System's financials); T.X. 199 (Capital IQ's reporting of Robertson-Ceco
Corporation's financials); T.X. 204 (unidentified transaction summary for Project Solitaire
– Delta Transaction dated March 7, 2000); and T.X. 150 (October 15, 2002 e-mail from
Nigel Wright to Christine Donaldson discussing EBITDA adjustments to goodwill).

[15]The L Schedules rely on P.R.A. 88 (Confidential Information Memorandum for
Magnatrax/ABCO's $381,268,750 Amended and Restated Senior Secured Credit Facilities
February 2000); T.X. 203 (undated executive summary and financial information for
ABCO); T.X. 195, 197, 198, and 199 (Capital IQ's financial information for NCI Building
Systems, Inc., Butler Manufacturing, Miller Building System, and Robertson-Ceco
Corporation, respectively); T.X. 204 (unidentified transaction summary for Project
Solitaire); and T.X. 150 (October 15, 2002 e-mail from Nigel Wright to Christine Donaldson
discussing EBITDA adjustments to goodwill).

[16]The M Schedules rely on T.X. 206 (CIBC memo dated July 27, 1999 from
Livingston and Benyaminy to Senior Credit Committee, Ian Dinning and Frank Del Giudice
re: ABCO Acquisition of Republic Door); T.X. 207 (ABCO Board Report June 1999); T.X.

45

Schedule O runs the comparable company analysis with these same four corporations as of May 12, 1999.[17]

The P Schedules develop further comparisons among the five companies, including ABCO, from Fourth Quarter 1998 through First Quarter 1999.  The Schedule builds from P-7 which computes business enterprise value for each of the companies as of March 31, 1999.[18]  Schedules P-8 and P-9 compare EBITDA and EBIT multiples (respectively) as of

---

195, 197, 198, and 199 (Capital IQ's financial information for NCI Building Systems, Inc., Butler Manufacturing, Miller Building System, and Robertson-Ceco Corporation, respectively); and T.X. 150 (October 15, 2002 e-mail from Nigel Wright to Christine Donaldson discussing EBITDA adjustments to goodwill).  In addition to these documents, the N Schedules also refer to T.X. 40 (American Buildings December 1998 Board Report presented by Robert Ammerman to the Board of Directors).

[17]Schedule O relies on T.X. 208 (CIBC memo dated April 23, 1999 from Messrs. Kilgore, Worsley, and Rangooni to CIBC Investment Committee re: American Buildings Company); T.X. 195, 197, 198, and 199 (Capital IQ's financial information for NCI Building Systems, Inc., Butler Manufacturing, Miller Building System, and Robertson-Ceco Corporation, respectively); T.X. 40 (American Buildings December 1998 Board Report presented by Robert Ammerman to the Board of Directors); T.X. 209 (American Buildings April 1999 Board Report presented by Robert Ammerman to the Board of Directors) and T.X. 150 (October 15, 2002 e-mail from Nigel Wright to Christine Donaldson discussing EBITDA adjustments to goodwill).

[18]P-7 relies on T.X. 195, 197, 198, and 199 (Capital IQ's financial information for NCI Building Systems, Inc., Butler Manufacturing, Miller Building System, and Robertson-Ceco Corporation, respectively); T.X. 194 (Capital IQ download of market capitalization data); and T.X. 200 (American Buildings March 1999 Board Report presented by Robert Ammerman to the Board of Directors).

March 31, 1999.[19]   Schedules P-4 through P-6 do the same analysis as of December 31, 1998 and rely on the same documents as P-7 through P-9, in addition to T.X. 196 (Capital IQ's financial information on ABCO).  Using the information gleaned in Schedules P-4 through P-9, Schedule P-3 presents a multiples comparison for the two time periods in tabular form, while Schedules P-1 and P-2 graph the EBITDA Multiple and EBIT Multiple of the five companies, including ABCO, from Fourth Quarter 1998 through First Quarter 1999 based on the table in P-3.

The Q Schedules compare long-term debt ratio, interest coverage, return on assets, leverage ratio, days payable, and total debt/total equity, among the five companies from March 31, 1999 through March 31, 2002.[20]  Schedules Q-8 through Q-20 illustrate the ratio

---

[19]These schedules cite  T.X. 40 (American Buildings December 1998 Board Report presented by Robert Ammerman to the Board of Directors); T.X. 200 (American Buildings March 1999 Board Report presented by Robert Ammerman to the Board of Directors), as well as T.X. 195, 197, 198, and 199 (Capital IQ's financial information for NCI Building Systems, Inc., Butler Manufacturing, Miller Building System, and Robertson-Ceco Corporation, respectively).

[20]For a tax rate found on Schedules Q-8 through Q-20 (return of assets), Plaintiff also cites to the Declaration of David Plastino.  However, the linked declaration (dated October 1, 2009) does not reference tax rates.  Mr. Plastino's November 2, 2009 declaration does state that he has reviewed the reports of Plaintiff's Expert Dennis Logue and Defendants' expert Kevin Collins, and both use a 40% income tax rate for the Debtors in their valuation analysis.  *See* Plastino (11/2/09) Declaration, ¶ 5.

calculations for Magnatrax at various intervals from March 31, 1999, through March 31, 2002.[21]

Schedule Q-7 displays the ratio comparisons in tabular form using the data developed in Schedules Q-8 through Q-20 for Magnatrax.[22] Finally, Schedules Q-1 through

---

[21]Q-8 through Q-20 rely on source information: T.X. 264 (American Building Company Consolidated Balance Sheets); T.X. 40 (American Buildings December 1998 Board Report presented by Robert Ammerman to the Board of Directors); T.X. 200 (American Buildings March 1999 Board Report presented by Robert Ammerman to the Board of Directors); T.X. 207 (ABCO Board Report June 1999); T.X. 205 (American Buildings Company June 1999 financials); P.A. 67 (American Buildings Company June 1999 Board Report presented by Robert Ammerman); T.X. 210 (American Buildings Company September 1999 Board Report presented by Robert Ammerman);  T.X. 211 (American Buildings Company September 1999 Board Report presented by Robert Ammerman); T.X. 212 (American Buildings Company Preliminary Board Summary December 1999); T.X. 7 (American Buildings Company December 1999 Board Report presented by Robert Ammerman); T.X. 213 (American Buildings Company Preliminary Board Summary March 2000); T.X. 214 (American Buildings Company Preliminary Board Summary February 2000); T.X. 235 (American Buildings Company Preliminary Board Summary June 2000); T.X. 237 (American Buildings Company Preliminary Board Summary September 2000); T.X. 238 (American Buildings Company Preliminary Board Summary September 1999); T.X. 239 (American Buildings Company Preliminary Board Summary September 1999); T.X. 98 (Magnatrax Board Report December 2000); T.X. 242 (American Buildings Company Preliminary Board Summary December 1999); T.X. 243 (American Buildings Company Preliminary Board Summary March 2001); T.X. 244 (Asset Management Statistics of unknown source); T.X. 255 (Magnatrax Preliminary Board Summary June 2001); T.X. 257 (Magnatrax Preliminary Board Summary September 2001); T.X. 41 (Magnatrax Consolidated Financial Statements and Andersen Auditors' Report); T.X. 148 (Magnatrax Board Report December 2001); T.X. 259 (Asset Management Statistics of unknown source); T.X. 260 (Magnatrax Statement of Earnings Period Ended March 31, 2002); T.X. 261 (Magnatrax Management Report, dated May 2, 2002); and T.X. 262 (Magnatrax Preliminary Board Summary February 2002).

[22]Schedule Q-7 also relies on T.X. 195, 197, 198, and 199 (Capital IQ's financial information for NCI Building Systems, Inc., Butler Manufacturing, Miller Building System,

Q-6 present the information in individual graph form for (1) long-term debt ratio, (2) interest coverage ratio, (3) return on assets, (4) leverage ratio, (5) days payable outstanding, and (6) total debt/total equity – relying on the tables created in Q-7.

Schedule R is Plaintiff's analysis of the "equity value lost" by Magnatrax due to the acquisition of Jannock, Ltd.[23]  Schedule S shows Plaintiff's position on the "overpayment" for Jannock as of March 10, 2000 using data from Schedules L-1 and K-1, as well as P.R.A. 89.[24]   Schedule T, the "overpayment" for Republic as of September 1, 1999 citing Schedules N-1 and M-1, as well as T.X. 206 (ABCO's application for corporate credit dated July 27, 1999).

The court notes that the numerous documents underlying the Schedules, themselves, generally do not appear to present evidentiary problems at the summary judgment stage.[25] It is axiomatic that on summary judgment, the court can consider hearsay documents that

---

and Robertson-Ceco Corporation, respectively).

[23]Schedule R undertakes calculations with data sourced from  P.A. 16 (Management Information Circular Jannock Limited and ABCO and Delta Acquisition February 2000); T.X. 191 (Jannock Limited Stock Prices Capital IQ); T.X. 192 (Federal Reserve System Canada-U.S. Foreign Exchange Rate dated October 6, 2009); T.X. 193 (Jannock Acquisition Press Release dated January 26, 2000) and P.R.A. 88 (Confidential Memorandum Information Magnatrax Amended and Restated Senior Secured Credit Facilities February 2000).

[24]Although Plaintiff cites to P.R.A. 89, the exhibit lists show that this document has been intentionally left blank.

[25]The court reserves for trial any final ruling on a specific document.

could be reduced to admissible form at trial.  In *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir.

1999), the Eleventh Circuit reaffirmed the "general rule [] that inadmissible hearsay cannot

be considered on a motion for summary judgment." *Id.* at 1322 (quotation and citation

omitted).  However, a district court may "consider a hearsay statement in passing on a

motion for summary judgment if the statement could be reduced to admissible evidence at

trial or reduced to admissible form." *Id.* at 1323 (quotations and citations omitted); *see also*

*Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004);

*McMillan v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (court may consider allowing

"otherwise admissible evidence to be submitted in an inadmissible form at the summary

judgment stage, though at trial it must be submitted in admissible form").  While some of

the data relied on by Plaintiff in compiling the Schedules does consist of data from third-

party metal buildings companies and other publicly-available databases, the hearsay

evidentiary problems could be solved by having the appropriate witnesses appear at trial.

The remainder of the documents are basic corporate documents produced by Defendants

during discovery in this case.  Therefore, the court will not – at this time, anyway – strike

the Schedule for evidentiary reasons.  There are, however, greater problems with the

Schedules.

Defendants argue that the Schedules are based upon specialized knowledge that falls

within Rule 702 and because Plaintiff did not disclose an expert or these Schedules, Plaintiff

may not now add them on a second round of summary judgment motions.  Plaintiff does not

dispute that no expert notice has been given, but rather contends that the Schedules do not

require expert testimony and can be introduced through lay testimony under Rule 701.

Plaintiff has suggested that they could introduce these materials through Onex Officer Nigel

Wright or perhaps David Plastino, the individual at the Michel-Shaked Group who

apparently produced the schedules.

> Federal Rule of Evidence 701 discusses lay testimony and provides:
>
> If the witness is not testifying as an expert, the witness' testimony in the form
> of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in issue,
> and (c) not based on scientific, technical, or other specialized knowledge
> within the scope of Rule 702.

*See* Fed. R. Evid. 701 (2000).  *See also* Fed. R. Evid. 701 (Adv. Comm. Notes (2000

Amend.)) ("[T]he distinction between lay and expert witness testimony is that lay testimony

results from a process of reasoning familiar in everyday life, while expert testimony results

from a process of reasoning which can be mastered only by experts in the field.") (internal

quotation marks omitted).

Rule 701 was amended in 2000.  The Advisory Committee notes from that

amendment show that an officer or business owner can testify to certain facts without being

an expert witness only because the testimony is tied to his own personal knowledge.  The

Committee explained:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See*, *e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir.1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

Fed. R. Evid. 701 (advisory committee notes).

The Eleventh Circuit discussed the amendment of Rule 701 in *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1216-23 (11th Cir. 2003), where the lay witnesses were the project manager on the ship repair and the president of one of the subcontractors responsible for repairs to the ship's rudder.  These individuals were involved in the details of repairing the ship in dispute and based their testimony on "particularized knowledge garnered from years of experience within the field." *Id.* at 1216-23.  The district court allowed their testimony under Rule 701 and the Eleventh Circuit affirmed.  *Id.  See also United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2003) (experienced financial analyst did not need to be classified as an expert witness where he "simply added and subtracted numbers from a long catalogue of defendant's records, and then compared those numbers in a straightforward fashion").

52

The court in *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima, v. Titan International, Inc.*, 533 F.3d 555 (7th Cir. 2008), demonstrated the importance of the personal knowledge element. There, the plaintiff creditor filed suit for breach of guaranty contract. Titan, an international tire manufacturer, raised an affirmative defense that the plaintiff had impaired the collateral (a tire plant in Uruguay) that secured the guaranteed debt. Titan attempted to have a witness, Mark Haron, testify as to the value of the tire plant based on his experience buying and selling tires and equipment on the worldwide tire market. *Id.* at 558. The plaintiff opposed this witness arguing that he was an expert who had not been timely disclosed.

Because of this challenge, in response to the plaintiff's motion for summary judgment, Titan submitted the affidavit of Maurice Taylor, the President and CEO of Titan at the time. *Id.* Taylor stated that the value of the collateral exceeded $10 million. Taylor based this estimate on his experience buying and selling used Tire and Wheel manufacturing equipment on the world market. The plaintiff again moved to strike Taylor's testimony as that of an undisclosed expert witness. *Id.* at 558-59. The district court agreed.

On appeal, the Seventh Circuit considered whether Taylor's testimony could be lay testimony outside of the Rule 702 disclosure requirements. Titan argued that Taylor's testimony was "quintessential Rule 701" material because it regarded the "value of his property." *Id.* at 559. Titan relied on cases holding that business owners or officers could

53

testify without being qualified as experts. *Id.* at 560. But the Seventh Circuit found under Rule 701 that the ability for business owners to offer lay testimony is tied to the owners' personal knowledge. *Id.*

> The court found that:

> [t]his case does not present such a circumstance. Taylor purported to value the collateral by applying his generalized knowledge of the worldwide tire market, gained through his experience in the worldwide tire business, to a proffered list of specific items owned by a third party. Taylor's only connection to the items in question is the fact that he is an officer of a company that, at one time, held a controlling interest in a company that, at one time, owned the collateral. Titan, however, had no ownership interest in [the tire plant] at the time that Taylor made his purported valuation. Furthermore, Titan identifies no evidence that Taylor participated in [the tire plant's] initial purchase of the particular items in question, and his affidavit belies any contention that he based his valuation opinion on personal knowledge of the collateral. Indeed, in his deposition, Taylor specifically disclaimed any personal knowledge of the particular items that were included in the sale.

> Taylor's position therefore was not akin to the owner of a small business testifying to the value of that business. His attempt at valuation was not based on any knowledge obtained through his special relationship with the items in question; instead, he simply looked at a list of items provided by [plaintiff] and he estimated their value based on his extensive experience purchasing and selling the type of goods at issue. This is the kind of testimony traditionally provided by an expert: "[I]t could have been offered by any individual with specialized knowledge of the [tire] market." *Conn*, 297 F.3d at 555. *In fact, Taylor's testimony on this issue was essentially the same as that of Titan's originally retained valuation expert, Haron, whose statements already had been excluded by the district court because they were untimely disclosed.*

*Id.* at 560 (emphasis added).   "Taylor's valuation attempt was based on his special experience in the tire industry, not on his personal knowledge of the goods in question; therefore, it falls within the purview of Rule 702." *Id.* at 561.

In addition, a business owner is not permitted to give lay testimony on matters that go beyond "straightforward common sense calculations." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929-30 (10th Cir. 2004).   In *LifeWise*, a lending company sued its loan financier for breach of contract.   In pretrial proceedings, LifeWise submitted four damages models to the court. The first expert was rejected under *Daubert*.   LifeWise then submitted a model based on the testimony of its Chief Executive Officer, Mark Livingston. The district court also rejected this model based on *Daubert*.   The third model, based on regression analysis, was rejected under Rule 702.

LifeWise submitted a fourth model for damages based on Livingston's testimony of a reliance theory.   The district court ruled in part that Livingston's testimony did not meet the requirements of Rule 702.   On appeal, LifeWise argued that his testimony was lay testimony under Rule 701.   Livingston had testified that he was not a damages modeler and had not used the regression techniques that resulted in the fourth model of damages.   *Id.* at 928.   The district court had noted that Livingston was "not a trained economist and cannot legitimately educate a jury on many of the complex economic aspects of [the damages

model] such as 'S-curves.'" *Id.*  Therefore, the court of appeals affirmed the district court's exclusion of Livingston's testimony under Rule 702.

As to Rule 701, the *LifeWise* court noted that the fourth damages model "concerned moving averages, compounded growth rates, and S-curves." *Id.*  "Mr. Livingston could not testify about these technical, specialized subjects under Rule 701." *Id.* at 929.  The court specifically rejected the cases cited by LifeWise that allowed a business owner to opine as to value.  *Id.*  The court noted that in those cases, the "owners had sufficient personal knowledge of their respective businesses *and* of the factors on which they relied to estimate lost profits." *Id.* (emphasis added).  Further, "the owners offered valuations based on straightforward, common sense calculations" such as "actual decrease in sales" or "lost profits equaled its lost profit per computer times 29 lost sales" or "historical gross profit margin and historic gross sales." *Id.* at 929-30.  The court found that Livingston's testimony did not fit either circumstance.  *Id.* at 930.  *See also United States v. White*, 492 F.3d 380, 403-04 (6th Cir. 2007) (reversing district court's decision to allow witnesses to testify without being qualified as experts where subject matter was "complex and intricate regulatory scheme" of Medicare where lay person would not "command[] a working knowledge of Medicare reimbursement procedures" and lay person " would be incapable of making sense of the various exhibits which the [] witnesses helped to clarify and link together on the basis of the 'reasoning process' employed in their highly specialized jobs");

AO 72A
(Rev.8/82)

*compare Schlier v. Rice*, 2008 WL 4922435 (M.D. Pa. Nov. 14, 2008) (permitting business owner to testify on lost profits based on invoice and billing statements of which he had personal knowledge and where calculations done by owner "were based on relatively simple lost profits formula of lost revenue, less avoided costs").

After reviewing the Schedules and the case law described above, the court concludes that Schedules E through H, J through Q-7, and S and T (which rely on data adduced in Schedules K through N) are not documents with which Onex Officer Nigel Wright would have sufficient personal knowledge to be able to testify. Each of these Schedules involves some form of the CompCo analysis involving four other corporations. Nigel Wright would not have personal knowledge of the calculations involving those other corporations. Just as Taylor was not permitted to testify as to his valuation of the tire plant because it was based on his generalized market experience and not upon any personal knowledge of the collateral, Wright cannot testify as to his generalized knowledge of financial information related to competitors on the marketplace. Wright would not have any "special relationship" with the information presented in Schedules E through H, J through Q-7, and S and T.      T h e court, however, finds that Schedules Q-8 through Q-20 are a different matter. These Schedules reflect various debt ratio calculations for Magnatrax only, including long-term debt, interest coverage, return on assets, leverage, and total debt/total equity. The court finds these calculations are one which any businessperson, such as Nigel Wright, overseeing

57

the operations of a Magnatrax-type company would be familiar with and would calculate on his own.  Likewise, Schedules I and R present straightforward figures about the shares and cost of ABCO and Jannock stock at the time of acquisitions and how much Magnatrax paid for Jannock.  The court will not exclude these particular Schedules on the basis of a Rule 701/702 argument.

In theory, therefore, the court finds that Plaintiff could attempt to proffer Schedules Q-8 through Q-20 and Schedules I and R through Nigel Wright on the stand because Nigel Wright is an officer of the company that would undertake these types of basic business calculations.  The court, of course, can imagine a variety of scenarios that might occur when Plaintiff attempts to do this.  The remainder of the Federal Rules of Evidence are still in play.  For example, Plaintiff would have to lay the proper foundation that Nigel Wright has personal familiarity with these types of calculations.  Relevancy may become an issue.  The court need not speculate further, but provides these comments only to state that the fact the court does not exclude these Schedules at the summary judgment stage is only the first step in the evidentiary process.

Presuming that Schedules Q-8 through Q-20 and Schedules I and R were to come into evidence, the court now considers the impact of this information on Plaintiff's ability to prove "reasonably equivalent value" and "insolvency."  In the August 13, 2009, order, the court discussed the concept of "reasonably equivalent value" and how to prove it in the

context of an LBO.  For example, the court noted that a "court determines reasonably equivalent value in an LBO case by 'collapsing' the transaction and ascertaining what the target, rather than any third party, ultimately received in terms of debt retirement, working capital, etc., in exchange for taking on additional debt."  *See* Order, dated Aug. 13, 2009, at 51.  Further, a court must "look beyond the actual money received to the indirect benefits to the debtor. . . .  Such benefits may include synergistic effects of new corporate relationships, the arrival of new, more successful management team, tax benefits, additional access to credit to facilitate new business opportunities, and the ability to protect a source of supply or customer relationships."  *Id.* at 52 (citations omitted).  In *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 647-48 (3d Cir. 1991), the court of appeals found the trustee did not meet its burden to show less than reasonably equivalent value because it introduced no evidence of value of synergies and ability to obtain credit.  *See* Order, dated Aug. 13, 2009, at 52.

The court then considered the testimony of Plaintiff's expert, Dr. Dennis Logue and reached the following conclusions:

> The court has already found that Logue's reasonably equivalent value analysis is based on an unreliable DCF analysis.  The court also agrees with Defendants that Logue's "reasonably equivalent value" testimony is not relevant to the task at hand – determining whether the Debtors received "reasonably equivalent value" as that term is used in the fraudulent transfer context.  Even if the court were to assume that Logue's equity figures were calculated reliably, the court would still find that Logue's proffered

59

reasonably equivalent value testimony was a bad "fit" as that term is described in *Daubert.*

Under the primary analysis in *Mellon* and its progeny, the court must compare the value of the assets the Debtors received and the value of the assets the Debtors gave in each leverage buyout acquisition – here the value of the companies, assets purchased, and intangible benefits and the amount of the relevant loans and/or cash needed to finance the acquisitions. Logue admits, however, that he never performed *any* independent valuation of the assets of Republic or Jannock or their independent value as companies. (P.R.A. 62 at 142:3-19). He merely valued the Debtors as a whole after the acquisitions which incorporated these companies. Logue's testimony is also unhelpful under the secondary analysis in *Mellon*. Logue did not "value" ABCO/Magnatrax as a going concern directly before and after each acquisition. Logue compared (1) the value of the Debtors after the ABCO acquisition and the value of the Debtors after the Republic acquisition seven months later; and (2) the value of the Debtors after the Republic acquisition to the value of the Debtors after the Jannock acquisition three months later. Logue does not account for any changes that may have occurred in the Debtors' value between May 1999 and December 1999, and December 1999 and March 2000 for reasons unrelated to the acquisitions. Further, Logue's equity analyses of the LBOs are based on "models;" these models did not project the Debtors' various financial statistics right at the time of the acquisitions, rather they were prepared in May, July, and December 1999 respectively. The court finds that Logue's testimony about the change in the Debtors' equity between May 1999 and September 1999, between September 1999 and December 1999, and between March 2000 and the bankruptcy does not "logically advance[] a[ny] material aspect of the proposing party's case." *Dukes,* 428 F. Supp. 2d at 1309. The court finds that allowing Plaintiff to proffer Logue's conclusions as to "reasonably equivalent value" would confuse rather than assist the trier of fact.

*Id.* at 78-79.

The only evidence Plaintiff presents on "reasonably equivalent value" is contained in Schedules I, R, S, and T. The court has barred Schedules S and T above in the Rule

60

701/702 discussion.  The court finds that Schedules I and R fall prey to the same criticisms as Plaintiff's evidence in the first round of summary judgment motions and therefore are not material to demonstrating "reasonably equivalent value."  Schedules I and R, for example, make no attempt to value the intangible benefits of the acquisition.  (This is before the court would even get to the methodology criticisms raised by Defendants in the November 24, 2009, Atkins Declaration, ¶¶ 19-24.)  The court concludes that based on Schedules I and R alone – as they would be at trial – Plaintiff has not presented any additional evidence through these Schedules (in addition to that already noted in the August 13, 2009, order) from which a jury could reach a conclusion on reasonably equivalent value, other than those claims the court already allowed to proceed in the August 13, 2009, order.

The court understands that Plaintiff presents Schedule Q in an effort to demonstrate Debtor had unreasonably small capital at various points in time from March 31, 1999 through March 31, 2002.  Again, setting aside what will be Defendants' criticisms of the methodology of Schedules Q-8 through Q-20 (*see* Atkins Decl. (Nov. 24, 2009), ¶¶ 25-30), the court must consider what this evidence – standing alone – would mean to a jury.  In its August 13, 2009, order, the court noted that a

> plaintiff may show that the debtor (1) "was insolvent on the date that such transfer was made or such obligation incurred or would become so as a result of the transfer or obligation," (2) was engaged or was about to engage in a business or transaction that would leave it with unreasonably small capital, or (3) intended to incur, or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548; O.C.G.A. § 18-2-72.

*See* Order, dated Aug. 13, 2009, at 46.   The court went on to explain that the term

"unreasonably small capital" denotes a financial condition short of insolvency, and the

"unreasonably small capital" test of financial condition is "aimed at transferees that leave

the transferor technically solvent but doomed to fail." *Id.* at 47 (quoting *MFS/Sun Life Trust*

*High Yield Services v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 944 (S.D.N.Y.

1995).   Therefore, in

> order to determine whether a debtor is operating with inadequate capital, a
> court must look at the debtor's debt to equity ratio, its historical capital
> cushion, and the need for working capital in the specific industry at issue.  *Id.*
> "While a company must be adequately capitalized, it does not need resources
> sufficient 'to withstand any and all setbacks.'"  *Id.*  "The test for determining
> whether parties to a leveraged buy-out left a business with unreasonably small
> assets is whether it was reasonably foreseeable that an acquisition would fail
> at the time the projections were made," and as with an equitable insolvency
> analysis, a "court must consider the reasonableness of the company's
> projections, not with hindsight, but with respect to whether they were prudent
> when made."  *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723
> (E.D. Pa. 2007).

*Id.* at 47-48.

After processing through the calculations in Schedules Q-8 through Q-20, the end

result is figures in six categories for each of the time periods: (1) long-term debt, (2) interest

coverage, (3) return on assets, (4) leverage ratio, (5) days payable outstanding, and (6) total

debt/total equity.  If these documents were admitted at trial, however, those figures would

exist in a vacuum, **and Plaintiff offers no admissible interpretation of this data.**  There

is no information about whether these numbers and/or ratios are too high or too low; what

type of working capital is necessary in the industry; whether these numbers mean that the debtor would not be able to withstand some financial setback; or whether it would have been reasonably foreseeable based on these numbers that the debtor would fail as a result of the acquisitions. While the court recognizes that "nothing is as emphatic as zero,"[26] these numbers are not in that category and without further context are rendered near to meaningless. The court finds this evidence, alone, cannot be material for a jury's consideration.

With respect to insolvency, Plaintiff also presented what it describes as "contemporaneous evidence" of insolvency. Some of this evidence does not implicate an insolvency analysis. For example, whether the Debtors' information system was sufficient to grow into the future or whether Debtor had an appropriate network of builders and dealers is not relevant to insolvency at any particular time.[27] These issues may factor into whether

---

[26]*United States v. Hinds County School Board*, 417 F.2d 852, 858 (5th Cir. 1969) (*per curiam* panel of Brown, C.J.; Thornberry, J; and Morgan, J.). The full quotation is "Statistics are not, of course, the whole answer, but nothing is as emphatic as zero."

[27]Specifically, Plaintiff argues that the Debtor's financial picture was not rosy because Debtors had been "betting" on improvements in information systems to get it past a certain point in growth (SF¶ 147) and the future was based on the information system (SF¶ 157), but by mid-June 2000, clear that information system was a failure and was halted (SF¶¶ 152, 158); further, Debtor's network of builders and dealers was not well-developed, preventing Debtor from meeting its financial projections (SF¶¶ 168-71, 190-92); Debtor recognized failure to meet these objectives (SF¶¶ 37-95), leading to Debtor asking counsel to prepare bankruptcy filings in November 2002 (SF¶ 273-77); in December 2002, Debtor recorded $28 million in intangible asset write downs to software development costs (SF¶ 269).

63

a company is successful over the long term, but they cannot be used to pinpoint insolvency because companies with these types of structural problems may or may not work them out.

Another category of facts relied on by Plaintiff deals with whether Magnatrax was generally paying its debts as they became due.[28]   This formulation is extracted from a statutory presumption built into the FDCPA, 28 U.S.C. § 3302(b), but is also present in some sense in O.C.G.A. § 18-2-72 and 11 U.S.C. § 548.   Finally, Plaintiff points to certain contemporary analysis projecting Debtors would be unable to make loan payments or otherwise default on their loans in the event of "certain foreseeable scenarios."[29] Defendants

---

[28]Plaintiff notes that on September 10, 2002, Magnatrax was unable to make a principal repayment under the Credit Agreement (SF¶ 275); December 2000, Magnatrax stretched payables to 49.5 days (SF¶ 220); in first quarter of 2001, Magnatrax's management instructed divisions to hold large payables until last two weeks of quarter (SF¶ 221); the same instruction was given at the end of the second quarter of 2001 (SF¶ 221); June 15, 2001, Magnatrax's Chief Financial Officer Charles Blackmon informs large vendor that Debtors would be delaying payment on two invoices totaling $1.3 million past their due date (SF¶ 223); October 2001, Debtors' President Robert Ammerman states Debtors did not have enough money to fix roof even though it posed safety concerns and halted production in the rain (SF¶ 227); Debtors delayed payments to suppliers "beyond agreed standards" (SF¶ 225); March 2002 ABCO stretched payables to 63.7 days after being invoiced (SF¶ 230); July 2001, Standard & Poor's placed Debtors on "CreditWatch with negative implications" (SF¶ 245); September 2002, S&P lowered Debtor's ratings to "CC" and in November 2002, down to "D" meaning unable to pay all or substantially all of their obligations as they became due (SF¶¶ 248, 250-51).

[29]SAF ¶ 464 (1999 CIBC document that if economic slowdown were to occur from 2000 to 2003, Debtors would violate loan covenants by 2000); SAF ¶ 467 (Valuation Research Corporation, an advisory firm hired to provide opinion letter before ABCO LBO, concluded that ABCO would not be able to make August 2005 balloon payment and would need to refinance acquisition debt); SAF ¶ 465 (with respect to Jannock and Republic, CIBC concluded that if recession occurred between 2000 to 2003, Debtors would violate loan

vigorously dispute the significance of these statements, particularly in their greater context. These are issues a fact-finder may consider, but without any other evidence, the court will not find that the only conclusion to be reached in the face of these facts is that Magnatrax was insolvent from May 2001 onward.  Therefore, the court DENIES Plaintiff's motion as to insolvency.

Defendants moved for insolvency only as to the time period surrounding the three acquisitions in May 1999, September 1999, and March 2000.  The court has found that Plaintiff cannot demonstrate insolvency as to these time periods because the court has found that Logue's testimony does not pass *Daubert*; some of the additional Schedules Plaintiff submitted in the second round of summary judgment are inadmissible expert testimony, those Schedules that could potentially come into evidence are not material to the task of demonstrating insolvency, reasonably equivalent value, or unreasonably small capital, and the "contemporaneous evidence" of insolvency mostly relates to time periods *after* the final acquisition which occurred on March 10, 2000.

Because Plaintiff cannot demonstrate insolvency during the acquisition periods, Defendants move for summary judgment on three of the Management Fee transfer claims that occurred in connection with the ABCO, Republic, and Jannock acquisitions in the

---

covenants by 2001); SAF ¶ 466 (CIBC's determination that even under management's best case scenario, Debtors would be unable to make loan payments as they became due in 2005); SAF ¶ 466 (as to Jannock LBO, CIBC projected that 2000-2002 recession would cause Debtors to default by 2001).

amounts of: $1.5 million, $585,625, and $4.1 million. In response, Plaintiff argues only that the court should revisit its insolvency decision based on the new evidence submitted by Plaintiff. As the court has determined Plaintiff has not proffered evidence from which a jury could determine insolvency during the acquisition periods, the court finds that Plaintiff cannot succeed on the Management Fee transfer claims that occurred in connection with the ABCO, Republic, and Jannock acquisitions and GRANTS Defendants' motion for summary judgment as to those three fees.

Practically speaking, Plaintiff only moves for summary judgment on insolvency after May 2001. Defendants move the court to find that Plaintiff cannot prove insolvency as to the acquisition periods of May 1999, September 1999, and March 2000. Particularly in light of the fact that even Plaintiff's expert Logue agreed that Debtors were solvent at least in May and September 1999, as well as all of the information discussed by the court above, the court finds there is no evidence from which a jury could conclude that Debtors were insolvent from May 1999 through March 2000.[30]

The court determined that Logue cannot testify as to "solvency," or capital adequacy, or ability to pay debts, *see* Order, dated Aug. 13, 2009, at 77, and through its order on Plaintiff's motion for reconsideration left open other issues as to his testimony. The court

---

[30]Because of this finding, the court need not revisit its ruling on the statute of limitations issue as to whether the "obligation" or "transfer" in the ABCO acquisition occurred on May 12, 1999.

has barred Plaintiff from submitting some of its Schedules to a jury and has determined that other Schedules, even if admissible are not material to the relevant issues in the litigation, but has found that other "contemporaneous evidence" of insolvency could be presented to a jury.  Thus, while the court does not grant Plaintiff's motion for summary judgment on insolvency from May 2001 forward, this information may be presented to a jury as Defendants have declined to move for summary judgment on insolvency during this time period.

### C.    Tranche B Claims

In their second motion for summary judgment, Defendants note that Plaintiff's remaining preference claim includes $13.1 million in Tranche B transfers in the one year period preceding Magnatrax's bankruptcy filing on May 12, 2003.  In its previous order, the court noted that "there is a dispute of fact as to whether the Defendants received benefits from the 25 basis points of interest in the Tranche B structure." *See* Order, at 92.  The 25 basis point amount for the one year preference period totals $234,416.28.  It is undisputed that the remainder of the $13.1 million went to CIBC.

Defendants argue that under the terms of Article 10 of the Litigation Trust Agreement, Plaintiff cannot seek to recover from Defendants amounts of money that were indisputably received by CIBC because CIBC is a "Released Party."  Defendants contend that any amounts other than those received under the 25 basis points are the "fault or

67

responsibility" of CIBC.  Defendants move, therefore, for summary judgment on all but $234,416.28 of Plaintiff's Tranche B preference claims in Count XVII.

Plaintiff responds that Article 10 does not apply because (1) there has not yet been a determination of "relative fault, responsibility or liability, including contribution or indemnity" and (2) any such determination must come through a trial or settlement.  Plaintiff also states that the court previously ruled that Defendants waived their indemnification defense.  Plaintiff further avers that Article 10 exists to protect the Released Parties from contribution or indemnification claims by Defendants and not to protect Defendants.

Plaintiff also argues that a Released Party cannot be found at fault with respect to the Tranche B transfers because (1) § 550 is a strict liability statute with no determination of relative fault, (2) § 550 does not allow for a right of contribution among various parties that might be liable to return an avoided transfer, and (3) even if Defendants could assert CIBC was at fault for these transfers, Defendants have already released CIBC from liability through a July 8, 2005 Stock Purchase Agreement with CIBC.

68

The court discussed Article 10 in its previous order.  There, the court stated:

Article 10 provides:

> The Litigation Trustee and the Litigation Trust shall not be entitled to recover from any Released Party, and no Released Party shall have any obligation, in whole or in part, for, any amount that the Litigation Trustee and the Litigation Trust seeks to recover from any Person.  If at a trial (or by settlement) where the issue of relative fault, responsibility or liability, including but not limited to contribution or indemnity, is determined between any of the Released Parties, on the one hand, and any Person, on the other hand, if any of the Released Parties are found to be liable for a portion of the damages awarded to the Litigation Trustee or the Litigation Trust, then any Person shall be liable only for that amount or percentage of the damages awarded for which the Person is found to be at fault or responsible and not for any amount or percentage of the damages awarded which is found to be the fault or responsibility of the Released Parties.

> *Id.*  While the Litigation Trust Agreement was made among Magnatrax, the Debtors of Magnatrax, and the Litigation Trustee, Article 10 clearly envisions the protection of other "Persons" which includes Defendants.  If a determination of liability and damages were to be made in this litigation, the court finds that Defendants would be permitted to raise Article 10 in conjunction with a discussion of apportionment of damages.

*See* Order, at 161.

Article 10 begins by stating: "The Litigation Trustee and the Litigation Trust shall not be entitled to recover from any Released Party, and no Released Party shall have any obligation, in whole or in part, for, any amount that the Litigation Trustee and the Litigation

69

Trust seeks to recover from any Person." *Id.* The court agrees that this statement indicates Article 10 implicates the authority of the Trustee.

Article 10 goes on to state that: "[i]f at a trial (or by settlement) where the issue of . . . contribution . . . is determined between any of the Released Parties, on the one hand, and any Person, on the other hand," and "if any of the Released Parties are found to be liable for a portion of the damages awarded to the Litigation Trustee or the Litigation Trust, then any Person shall be liable only for that amount or percentage of the damages awarded for which the Person is found to be at fault or responsible and not for any amount or percentage of the damages awarded which is found to be the fault or responsibility of the Released Parties." *Id.* As stated in the August 13, 2009, order, this means a Defendant can argue that its damages liability should be limited based on the actions/obligations of a Released Party.

It is true, however, that under Article 10 there needs to be: (1) a trial or settlement, (2) a defense of contribution raised between CIBC and Defendants, and (3) a determination that CIBC is liable for portions of the Tranche B preference claims made by Plaintiff. At that point, the court would then apply Article 10 and find that Defendants "shall be liable only for that amount" that is Defendants' "responsibility" and not for that which is determined to be CIBC's "responsibility."

Based on the language of Article 10, the court finds that Plaintiff misapprehends that nature of Defendants' argument on the Tranche B basis point transfers. It is not relevant to

70

Defendants' argument that § 550 is a strict liability statute and does not allow for a right of contribution. It is also not material that Defendants may have already released CIBC. What is relevant is the amount of damages the Trustee is authorized to seek in a "contribution" context.

While there has been no trial or settlement, there is no dispute that all of the Tranche B funds – but for the $234,416.28 – was remitted to CIBC. However, there has been no determination that CIBC – but for its status as a Released Party – would be liable for the remainder of the $13.1 million alleged by Plaintiff in the Tranche B preference claim (Count XVII). As the court stated in its previous order, should such a determination be made, Defendants would be permitted to raise Article 10 in conjunction with a discussion of apportionment of damages.

### D.   FDCPA

In Counts II and VIII of its complaint, Plaintiff seeks to recover certain fraudulent transfers pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), codified at 28 U.S.C. §§ 3001-3308,[31] in conjunction with 11 U.S.C. § 544 and § 550. These transfers include $29,621,726.37 in Tranche B transfers, as well as $1,658,868.37 in transfers under

---

[31]The Federal Debt Collection Procedures Act shares its acronym with the Fair Debt Collection Practices Act, codified at 15 U.S.C. §§ 1692 *et seq*. In this order, the court uses FDCPA to refer to the Federal Debt Collection Practices Act. The court recognizes that it misstated the name of the statute in its order on Plaintiff's motion for reconsideration. *See* Order, dated Mar. 2, 2010, at 26-27.

the Management Agreement.  The parties have filed cross-motions for summary judgment

on the FDCPA claims.  Generally speaking, the FDCPA "establishes civil procedures

outside of bankruptcy for the United States to collect debts owed to the government.  These

include procedures for the avoidance of fraudulent transfers. The FDCPA avoidance

procedures are similar to the bankruptcy fraudulent transfer provision." *In re Bonham*, 224

B.R. 435, 436 (Bankr. D. Alaska 1998).

The FDCPA provides in relevant part that "[e]xcept as provided in subsection (b), the

chapter provides the exclusive civil procedures for the United States – (1) to recover a

judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in

connection with such claim." 28 U.S.C. § 3001(a).  "Debt" is defined as:

> (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or
>
> (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States;
> . . .

28 U.S.C. § 3002(3).  Here, Plaintiff identifies Claim Nos. 1651 and 1802 as unsecured

claims of the Internal Revenue Service in the bankruptcy relating to unpaid taxes of

American Buildings Co. and Windsor Door, Inc. respectively.

72

In its previous order, the court discussed the use of § 544(b) with respect to fraudulent transfers under Georgia state law. *See* Order, dated Aug. 13, 2009, at 35. Quoting *In re Int'l Pharmacy & Discount II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005), the court noted "[u]nder 11 U.S.C. § 544(b), a [bankruptcy] trustee [or debtor in possession] in bankruptcy may 'step into the shoes' of an unsecured creditor and void a transfer of an interest in the debtor's property that the unsecured creditor would have the power to void under federal or state law." *Id. See also id.* ("The Debtors' right to bring constructive fraudulent transfer claims under 11 U.S.C. § 544 and Georgia's subsequent creditor rule is contingent on there being an unsecured creditor into whose shoes they may step. That creditor does not necessarily have to be one of the unsecured creditors who opted into the Litigation Trust.").

Under § 544(b), in particular, "the trustee steps into the shoes of an actual unsecured creditor holding an allowed claim and utilizes whatever state or nonbankruptcy federal law remedies that particular creditor might have." *See In re Porter*, 2009 WL 902662 (Bankr. D.S.D. Mar. 13, 2009) (citing *Williams v. Marler (In re Marler)*, 267 F.3d 749, 753 (9th Cir. 2001)). The provisions of the FDCPA operate very much like those of the Uniform Fraudulent Transfer Act that the court discussed in the August 2009 order. *Id.* The FDCPA

> includes provisions that allow both an actually fraudulent transfer and a constructively fraudulent transfer to be avoided. 28 U.S.C. § 3304(a) (constructively fraudulent as to existing debt), § 3304(b)(1)(A) (actual intent to defraud regarding existing or future debt), § 3304(b)(1)(B) (constructively

73

fraudulent as to existing or future debt), and § 3306 (remedies). When considering whether a debtor acted with actual fraudulent intent, the same badges of fraud are considered. 28 U.S.C. § 3304(b)(2). When assessing whether a constructively fraudulent transfer has occurred, FDCPA utilizes similar definitions for insolvency.

*Id.*

Defendants move for summary judgment on Plaintiff's FDCPA claims (Counts II and VIII) arguing that Plaintiff (1) does not qualify as "counsel for the United States," (2) cannot show that the debts it pursues are debts owed to the United States under the FDCPA and (3) cannot demonstrate insolvency or reasonably equivalent value.

Plaintiff responds that it has standing to pursue an FDCPA claim not as "counsel for the United States," but rather through the procedural vehicle of 11 U.S.C. § 544(b) which allows the Trustee to stand in the shoes of a creditor holding an unsecured claim. The Trustee has identified the IRS as such a creditor and therefore the Trustee is not acting as the assignee of Trust beneficiaries when bringing his FDCPA claim, Plaintiff argues.

Because the court ultimately holds that Plaintiff cannot use the FDCPA to pursue the fraudulent transfers alleged here as the payment of such claims would not inure to the benefit of the fisc of the United States, the court does not address the remainder of the arguments made by the parties in the briefing on the FDCPA. The court notes, however, that the Trustee's inability to demonstrate insolvency and reasonably equivalent value at certain

74

time periods as found in this order and the court's August 13, 2009, order could also

preclude Plaintiff's FDCPA claims.

For the same reasons as the court addressed in its previous order, the court agrees

with Plaintiff that Defendants' "standing" argument is misplaced.  The court recognizes the

broad powers of Section 544(b).  As one court has described:

> Congress crafted § 544(b) to give the representative of the estate the ability
> to avoid any transaction that any unsecured creditor of the estate could have
> avoided as of the petition date.  The estate representative steps into the shoes
> of each such unsecured creditor and is cloaked with the rights of that creditor.
> If an unsecured creditor of the estate could have avoided a transaction under
> state law despite the existence of a state statute of limitations on that claim
> because the creditor was acting in a "governmental capacity," so too can the
> estate representative avoid the transfer under § 544(b).  The unsecured
> creditor's ability to trump the applicable state statute of limitations might
> derive from its sovereign immunity, but the estate representative's ability to
> override that same limitation derives from § 544(b).  The focus of the court
> in determining who is acting in a "governmental capacity" is the unsecured
> creditor, not the estate representative.

*In re Greater Southeast Community Hospital Corp.*, 365 B.R. 293, 304 (Bankr. D. Colo.

2006) (footnotes omitted).  Thus, the difficulty in Plaintiff's FDCPA claim does not derive

from the fact that it is the Trustee – and not the federal government – pursuing the claim.

But this does not end the matter.  Plaintiff must still demonstrate that the claims it pursues

come within the purview of the FDCPA.

To support its FDCPA claim, Plaintiff relies most heavily on *In re Greater Southeast*

*Community Hospital Corp.*, 365 B.R. 293 (Bankr. D. Colo. 2006).  In *Greater Southeast*,

AO 72A
(Rev.8/82)

the Trustee for a Liquidating Trust sought to avoid and recover certain fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act. *Id.* at 296-97. The bankruptcy involved various medical facilities and asset purchase agreements. *Id.* at 297-98. The debtors filed for Chapter 11 relief and as part of the reorganization plan, the Trust was created to pursue fraudulent conveyance claims. On summary judgment, the only issue facing the court was whether the Trustee was time-barred from pursuing the claims because more than four years had passed since the asset purchase. *Id.* at 299. The Trustee argued that he was entitled to invoke the statute of limitations available to any unsecured creditor of the estate at the time the bankruptcy petition was filed. *Id.* The Trustee stated that there were two such creditors: the United States Department of Health and Human Services, which held a claim for Medicare overpayments, and the Internal Revenue Service, which held a claim for taxes owed under the Federal Unemployment Tax Act and unpaid employment taxes. *Id.* The Trustee argued that because of the existence of these claims, he could take advantage of the six year statute of limitations under Medicare, 28 U.S.C. § 2415 or the ten year statute of limitations under Section 6502 of the Internal Revenue Code. *Id.* Defendants argued that (1) the Trustee did not have standing to pursue the HHS or IRS claims, (2) the Trustee could not invoke any statute of limitations other than that under the Illinois Uniform Fraudulent Transfer Act, and (3) there were no facts in the record to show that HHS or the IRS were unsecured creditors. *Id.* at 300.

76

Like this court has, the *Greater Southeast* court rejected defendants' standing argument finding that the provisions of the Bankruptcy Plan allowed the Trustee to pursue these claims and that under the provisions of § 544(b), the claims belonged to the estate. *Id.* at 300 n.12 ("Sections 544(b) and 548 of the [Bankruptcy] Code expressly vest in the trustee or debtor-in-possession the right to assert a claim for fraudulent conveyance under state or federal law.") (citation omitted). The court also found that HHS and the IRS would benefit from recoveries made by the Trustee because "even creditors who hold no interest in a trust benefit from the creation of the trust because they receive a greater *pro rata* distribution under the debtor's plan of reorganization than they would have received had other creditors not exchanged their claims for shares in the trust." *Id.* at 301. The court concluded by stating:

> [i]n any event, § 544(b) simply does not require an estate representative to demonstrate that the creditor into whose shoes she steps as of the petition date will benefit from the recovery, nor does it recognize as an equitable defense on those grounds to recovery of otherwise avoidable transfers of assets. Even if the IRS and HHS claims had been paid in full mere hours after commencement of the case, that would not alter the estate representative's ability to invoke § 544(b).

*Id.*

The court next rejected defendants' statute of limitations argument finding that *United States v. Summerlin*, 310 U.S. 414, 416 (1940), held that the United States is not bound by state statutes of limitations in enforcing its rights. *Id.* at 302. Ultimately,

77

however, the court held that the Trustee did not provide sufficient evidence of the existence of the HHS and IRS claims. *Id.* at 306-12.

While the court appreciates the reasons for Plaintiff's reliance on *Greater Southeast* and its discussion of powers under § 544(b), there are several factors which distinguish the case – the first and most significant being that the case does not arise under the FDCPA. Additionally, because the *Greater Southeast* court essentially concludes that the Trustee did not present sufficient evidence of unsecured claims by the IRS and HHS (albeit with the provision that the Trustee could present additional evidence), the discussion of § 544(b) could be considered dicta.

The more persuasive case for Plaintiff would appear to be *In re Porter*, 2009 WL 902662 (Bankr. D.S.D. Mar. 13, 2009). In *Porter*, the Small Business Administration had instituted an action against the Porter Debtors. The bankruptcy trustee then – pursuant to § 544(b) and the FDCPA – sought to void the transfer of a certain piece of property from James Porter to Beverly Porter. The court determined that the Small Business Administration had an allowable claim at the time of the bankruptcy petition and the Small Business Administration could have brought a pre-petition action for the claim under the FDCPA. *Id.* Thus, the court held that the Trustee could step into the Small Business Administration's shoes under § 544(b). But *Porter* did not focus on the nature of the "debt."

78

The court finds it important to understand the context of the FDCPA to understand the context of "debt." "Congress enacted the FDCPA as Chapter XXXVI of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4933, effective May 29, 1991, thus creating a framework under which the United States might more efficiently collect debts owed to it." *United States v. Bongiorno*, 106 F.3d 1027, 1036 (1st Cir. 1997) ("Congress passed the FDCPA with an end game in mind: to 'lessen [] the effect of delinquent debts on the massive federal budget deficit now undermining the economic well-being of the Nation.'") (citation omitted). "The framework includes procedures that the government can utilize to recover on, or secure, such debts, and to that extent relieves the federal sovereign's need to rely on a patchwork of state laws." *Id.* (citing H.R. Rep. No. 101-736, at 23-25 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6472, 6631-33). *See also Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*, 509 F.3d 216, 221 (5th Cir. 2007); *United States v. Mays*, 430 F.3d 963, 965 (9th Cir. 2005) ("The FDCPA was enacted 'to give the Justice Department uniform Federal procedures – prejudgment remedies and post judgment remedies – to collect debts owed the United States nationwide.'" H.R. Rep. No. 103-883, at 81 (1995)); *United States v. Rostoff*, 164 F.3d 63, 69 (1st Cir. 1999).

*United States v. Bongiorno*, 106 F.3d 1027 (1st Cir. 1997), contains an extensive discussion of the FDCPA. There, the United States attempted to use the FDCPA to collect on a restitution order entered for violation of the Child Support Recovery Act. But the

79

proceeds of the collection would go to a private party (Bongiorno's daughter) and not to the

government.  The court had to determine whether such an obligation constituted a "debt"

under the FDCPA.  After reviewing the history and text of the FDCPA, the court noted that

> [m]imicking the way in which Congress chose to define the statute's terms,
> courts have tended to draw the line between included and excluded debts
> depending on whether a particular debt is owed to the United States in the
> sense that the debt's proceeds, if collected, will inure directly to the
> government's benefit (in contrast to benefitting a third party).  Thus, a fine –
> which is payable to the government and which, when paid, swells the public
> fisc – is a debt for purposes of the FDCPA. *See United States v. Coluccio*, 51
> F.3d 337, 339 (2d Cir.1995); *United States v. Coluccio*, 19 F.3d 1115, 1116
> (6th Cir.1994).  Similarly, federal tax indebtedness – which is owed to the
> government and which, when collected, is deposited in the Treasury – is a
> debt for purposes of the FDCPA. *See Markham v. Fay*, 74 F.3d 1347, 1354
> (1st Cir.1996).  A promissory note held by the Small Business Administration
> – the proceeds of which will enrich the government's coffers when payment
> is effected – is also a debt for FDCPA purposes. *See United States v. Golden*
> *Elevator, Inc.*, 868 F. Supp. 1063, 1066-67 (C.D. Ill.1994) (dictum). By like
> token, cleanup expenses in environmental cases – which are owed by statute
> to the government, *see* 42 U.S.C. § 9607(a)(4)(A) (1994), and which are used
> to reimburse or defray monies actually expended by it – are considered debts
> for purposes of the FDCPA. *See United States v. Dickerson*, 790 F. Supp.
> 1583, 1584-85 (M.D. Ga.1992). This approach squares neatly with the statute
> and its legislative history. The types and kinds of debts enumerated in section
> 3002(3) – for example, "a direct loan," an "insured or guaranteed" loan, an
> amount owing as an unpaid "fee" or "duty" – seem to contemplate payments
> in which the government has a direct pecuniary stake. The legislative history
> sounds much the same theme. *See* H.R.Rep. No. 101-736, *supra*, at 23, 1990
> U.S.C.C.A.N. at 6631.

*Id.* at 1036-37.  The court continued:

> [m]indful of the statutory definitions, the legislative history, and the way in
> which courts have approached the problem of determining which debts are
> within the FDCPA's grasp and which are not, we conclude that inclusion

80

> necessitates an inquiry aimed at determining to whom the debt is owed and to whose benefit the proceeds of the debt will inure when it is paid. At the very least, a debt cannot qualify if both parts of this inquiry point toward exclusion: a debt cannot be eligible for inclusion under the FDCPA if the United States is neither the formal owner nor the direct beneficiary of it.

*Id.* at 1037.

To make this determination, the *Bongiorno* court relied heavily on the dissent written by Judge Walker in *NLRB v. E.D.P. Med. Computer Sys., Inc.*, 6 F.3d 951 (2d Cir. 1993). In *E.D.P.*, the Second Circuit considered whether a back pay award issued by the National Labor Relations Board to remedy an unfair labor practice constituted a "debt" to the United States under the FDCPA.  The majority held that it did, stating:

> [i]t is precisely because the Board acts in the public's interest and not those of private individuals that persuades us that the back pay award sought by the Board may be considered a debt to the United States under the FDCPA. The Board serves as more than a mere conduit when it initiates an action to collect a back pay award.

6 F.3d at 955.  Judge Walker, however, wrote in dissent that the back pay award could not constitute a "debt" under the FDCPA because any money collected by the NLRB would flow to the pockets of the victimized employees and would not directly benefit the government.  *Id.* at 958 (Walker, J., dissenting).

The First Circuit in *Bongiorno* found Judge Walker's reasoning to be persuasive.  106 F.3d at 1038.  The court explained:

> [w]hile there may be a somewhat stronger argument for regarding a debt as owing to the United States if the federal government is the only entity able to

> recover it (the *E.D.P.* scenario), the decision to extend the FDCPA to such a situation is a decision properly reserved for the legislative branch. Because the statute, as written, contains no language suggesting that all debts subject to exclusive federal enforcement are included within the grasp of the FDCPA, we find the position taken by the *E.D.P.* majority to be unsatisfactory.

*Id.* The *Bongiorno* court also noted that the language of the FDCPA paralleled certain provisions of the Bankruptcy Code under which the Supreme Court in *Nathanson v. NLRB*, 344 U.S. 25 (1952), had determined a debt owed to the NLRB was not a "debt" owed to the United States. *Id.* "Congress enacted the FDCPA to relieve the strain on the federal deficit created by persistent nonpayment of debts owed to the United States." *Id.* In "both the FDCPA and the bankruptcy milieux, the statutory mechanism does not serve the legislative purpose except when it operates in regard to a debt whose recovery will directly augment the public coffers." *Id.* at 1039. The court also rejected the argument that because public assistance provides for shortfalls in unpaid child support, the government was receiving an indirect benefit. *Id.* Ultimately, the court held that because the child support payment was "not owed to the United States in an economically meaningful sense, the government cannot utilize the FDCPA as a vehicle for collecting such awards." *Id. See also United States v. Rostoff*, 164 F.3d 63, 70 (1st Cir. 1999) ("The controlling question [in FDCPA cases] remains: Who will receive the beneficial interest? In this case, it is the government. Therefore, the FDCPA is a proper collection vehicle.")

AO 72A
(Rev.8/82)

The court recognizes that *Bongiorno* has been distinguished, particularly by the Fifth

Circuit in *FTC v. National Business Consultants, Inc.*, 376 F.3d 317 (5th Cir. 2004) where

the court stated "[a]lthough a portion of the judgment representing the damages awarded for

consumer redress may ultimately be paid by the government to the defrauded franchisees,

nothing in the statutory text requires that the government be the exclusive beneficiary of the

judgment for the statute to apply." *Id.* at 320. Here, of course, the government would not

be even a partial beneficiary and the government, unlike in *FTC*, is not the entity pursuing

the claim.

The court also finds persuasive *FDIC v. Todd & Hughes Constr. Corp.*, 2006 WL

2128667 (N.D. Tex. Jul. 27, 2006) (Fitzwater, J.). There, Sobranes Recovery Pool I was the

assignee and successor in interest to a judgment obtained by the FDIC on a note owed by

Todd & Hughes Construction Company. Sobranes asked the court to apply to its claim the

statute of limitations period set forth in the FDCPA rather than that under Texas law.

Defendants contended that the FDIC judgment was "dormant" under Texas law because no

writ had been issued on the judgment within ten years after the judgment was rendered. The

court, therefore, considered the interaction of Federal Rule of Civil Procedure 69(a) with the

FDCPA.

83

The court first noted that:

Sobranes has not identified (and the court has not located) any instance where a private party such as Sobranes, as assignee or otherwise, has been held to be entitled to recover judgment on a debt, or otherwise to assert rights or benefits under the FDCPA. The cases all appear to provide that the United States is the proper party to invoke the benefits of the FDCPA, even where the United States was not entitled to recover the debt.  *See*, *e.g.*, *FTC v. National Business Consultants, Inc.*, 376 F.3d 317, 319 n.2 (5th Cir. 2004) (agreeing that FDCPA applies where unpaid judgment owed to FTC constituted debt to United States); *United States v. Bongiorno*, 106 F.3d 1027, 1035-40 (1st Cir. 1997) (holding that federal government lacked authority to use FDCPA as instrument for enforcing restitution order issued in connection with antecedent criminal conviction); *NLRB v. E.D.P. Med. Computer Sys., Inc.*, 6 F.3d 951, 954-55 (2d Cir. 1993) (affirming prejudgment writ of garnishment sought by National Labor Relations Board pursuant to FDCPA).

*Id.* at n.7 (referring also to *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 75-76 (5th Cir. 1993) (*per curiam*) (holding disgorgement order resulting from consent decree does not constitute debt within meaning of FDCPA)); *SEC v. Huffman*, 996 F.2d 800, 802-03 (5th Cir. 1993) (holding disgorgement order does not constitute debt within meaning of FDCPA).

The court distinguished *FTC*, 376 F.3d at 319-20, where a portion of the relief the FTC sought under the FDCPA would inure to the benefit of private individuals, by noting that in that case, the FTC was not only the "formal owner of the judgment," but also the party seeking to rely on the FDCPA.  *Id.*  By contrast, in *Todd & Hughes*, a "private party is seeking to rely on the FDCPA to enforce a judgment.  The Fifth Circuit did not hold in *FTC* that an entity other than the United States can rely on the FDCPA."  *Id.*

84

The court concluded by stating that:

> Sobranes has failed to demonstrate that the FDCPA has ever been applied in circumstances like those presented here, where a private party assignee seeks the benefits of a statute that explicitly provides the exclusive civil procedures for the United States to recover a judgment on a debt. See 28 U.S.C. § 3001(a)(1).

*Id.* (noting that it did not "hold that a private litigant can *never* rely on the FDCPA in other circumstances unlike those presented here").

The Fifth Circuit affirmed this decision in *Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*, 509 F.3d 216 (5th Cir. 2007) (finding that note underlying FDIC's judgment was originally entered into by private parties and therefore not "debt" under FDCPA).  The Fifth Circuit further offered support for Judge Walker's dissent in *E.D.P.. Id.* at 226.  Likewise, here, Plaintiff is a private party seeking to asserts rights and benefits under the FDCPA.

Similarly, in *In re Bonham*, 224 B.R. 435 (Bankr. D. Alaska 1998), a Chapter 7 Trustee sought to utilize the fraudulent transfer provisions of the FDCPA to avoid transfers in alleged derogation of government rights under an SEC disgorgement order.  While the SEC had filed a proof of claim in bankruptcy, it had not attempted to use the FDCPA to exercise on the disgorgement order.  The court considered whether the disgorgement order was a "debt" pursuant to the FDCPA.  The court found that the SEC's disgorgement claim did not "inure to the benefit of the United States" because "by the explicit wording" of the disgorgement order, "any recovery is to be administered in the bankruptcy case of the debtors." *Id.* at 437.  "Attempting to utilize the FDCPA's avoidance powers against the []

defendants seems far afield from the intent of the FDCPA, and does not mesh factually with the claims based on the FDCPA which the trustee has actually filed." *Id.* at 437-38.

The court finds the reasoning of *Bongiorno*, *Sobranes Recovery Pool I*, and *In re Bonham*, to be persuasive. The government is not pursuing the debts identified in this case, collection on this debt will not inure to the benefit of the United States fisc, and utilizing the FDCPA's avoidance powers under these circumstances "seems far afield" from the purpose of the FDCPA. For these reasons, the court GRANTS Defendants' motion for summary judgment on the FDCPA claims and DENIES Plaintiff's motion for summary judgment on the FDCPA claims. (In the alternative, the court notes that its ruling on insolvency would also bar Plaintiff's FDCPA claims at certain points in time.)[32]

### E.    Alter Ego

In its alter ego claim, Plaintiff asserts that Onex acted through Onex American to control and dominate ABCO/Magnatrax. Onex "caused great injustice to the Debtors' creditors by doubling ABCO's debt and pledging all of ABCO's assets for the ABCO LBO, implementing the complex Tranche B structure to unilaterally obtain tax benefits and forcibly imposing excessive Management Fees upon the Debtors." *See* Response [654], at 43.

---

[32]Because the court grants Defendants' motion for summary judgment on FDCPA, the court need not address Plaintiff's argument on its motion for reconsideration that the FDCPA claims could serve as an independent basis for the Trustee to avoid the underlying Credit Agreement obligations.

86

The parties first contest whether "alter ego" is a stand-alone claim under Delaware law or whether – like aiding and abetting fiduciary duty and civil conspiracy – it is a theory of liability to "express another mechanism for affixing responsibility for an underlying wrong." *See* Order, dated Aug. 13, 2009, at 124.  Delaware has not specifically addressed this issue, although other jurisdictions and authorities have done so.  *See Peacock v. Thomas*, 516 U.S. 349, 354 (1996) ("Piercing the corporate veil is not itself an independent ERISA cause of action, 'but rather is a means of imposing liability on an underlying cause of action.'"); *Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir.1999) ("A request to pierce the corporate veil is only a means of imposing liability for an underlying cause of action and is not a cause of action in and of itself."); *In re Grothues*, 226 F.3d 334, 337-38 (5th Cir.2000) (alter ego theory is remedy to enforce substantive right, not independent cause of action); *Western Oil & Gas. JV, Inc. v. Griffiths*, 91 Fed. Appx. 901, 904 (5th Cir.2003) ("Like alter ego, the single business enterprise doctrine is an equitable remedy and not a cause of action."). The rule was summarized in Fletcher Cyclopedia of the Law of Corporations:

> A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather to disregard the corporation as a distinct defendant is procedural.  A finding of fact of alter ego, standing alone, creates no cause of action.  It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation.  An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract.

87

1 Fletcher Cyclopedia of the Law of Corporations § 41.10.

None of the cases cited by Plaintiff counsels a different result.[33]   The court finds that cases cited above to be persuasive legal authority that alter ego is not a stand alone cause of action.   Therefore, alter ego is not the vehicle by which Plaintiff can make Onex liable for anything anyone else is liable for.

The court further notes that the Trustee's argument ignores at least two realities. First, wholly owned subsidiaries are never free from substantial control by their parents and that has never been found as a reason for courts to pierce the corporate veil, particularly in strategic matters.   Second, leveraged buyouts almost always leave the acquired company with greater debt and fewer liquid assets than they had before the acquisition.   This has not been found to be a basis for inferring that the corporate form was being used to commit injustice.

---

[33]*Hughes v. BCI International Holdings, Inc.*, 452 F. Supp. 2d 290 (S.D.N.Y. 2006) (applying Delaware law), denies the defendants' motion to dismiss because veil-piercing is a fact bound inquiry. *Id.* at 308 (seeming to support defendants' argument that alter ego was not stand-alone claim). *Leber Associates, LLC v. Entertainment Group Fund, Inc.*, Case No. 00 Civ. 3759 LTS MHD, 2003 WL 21750211 (S.D.N.Y. Jul. 29, 2003) (applying Delaware law) admits that Delaware has not spoken on this issue. *Id.* at *13. *In re Kilroy*, 357 B.R. 411 (Bankr. S.D. Tex. 2006) (applying Delaware law) appears to call alter ego a "direct" claim but in the context of the court's discussion the import of this statement is not clear. *Id.* at 429.   In any event, none of these cases has addressed the issue squarely.

88

Delaware law on alter ego is not in dispute.[34]  A plaintiff must prove (1) the parent and subsidiary operated as a single economic entity and (2) an overall element of injustice or unfairness is present.  The standard formulation for determining whether a parent and subsidiary operated as a single economic entity instructs the court to consider various factors such as: (1) whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholder siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder.[35]

_____

[34]The thorough discussion of the law in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 317-21 (S.D. Tex. 2008) (applying Delaware law) sets forth the lay of the land. *See also In re Foxmeyer Corp.*, 290 B.R. 229 (Bankr. D. Del. 2003); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989).

[35]Defendants offered facts supporting its argument that corporate form was observed. *See* DSMF, ¶¶ 5-6, 9-11, 13-21, 73-76, 78-80, 82-85.  Defendants also note that because three companies were interested in acquiring ABCO in the Spring of 1999, ABCO obtained the services of Warburg Dillon Read LLC as financial advisor. DSMF & Resp. ¶ 30.  Onex, ABCO, and CIBC were represented by separate counsel during the merger negotiations. DSMF & Resp. ¶ 38.  The court has not found support for Plaintiff's contention that Fulbright & Jaworski's representation ended prior to the ABCO acquisition.  *See* PASMF, ¶ 28 & Resp.  Nor can the court finds support for Plaintiff's statement that Kaye, Scholer, Fierman, Hays & Handler, LLP's representation ended prior to the ABCO Acquisition.  *Id.*, ¶ 29.

Plaintiff has not been clear in telling the court whose corporate identity it would have

the court disregard and on what basis.[36]  Assuming the Trustee had informed the court, the

_____

[36]The majority of argument offered by Plaintiff is contained in Plaintiff's response to Defendants' Statement of Material Undisputed Fact, ¶ 69.  The court has considered that statement and its supporting documentation in detail.  *See also* PASMF, ¶¶ 23, 38, 40-41, 71, 77, 102, 124, 137.  Plaintiff focuses on the fact that Onex employees were on the Board of Directors of ABCO Holdings and that Schwartz controlled the Onex employees.  Plaintiff states that "Onex, at the direction of Schwartz, caused Hilson and Wright to conduct the ABCO acquisition and to enter into the Management Agreement, which awarded significant fees to Onex."  *See* PASMF, ¶¶ 114, 498, 545, 566.

However, while Plaintiff argues that Onex "forced" ABCO to enter into the Tranche B structure and the Management Agreements, and that the terms of the agreements were "dictated" to ABCO by Onex, none of the documentation Plaintiff cites to in these statements of fact support the extent of those statements.  The cited portions of Todd A. Miller's April 27, 2009, expert report concern which entities derived tax benefits from the Tranche B structure and did not address corporate governance.  While the citations provided by Plaintiff do support the fact that there was a tax benefit to Onex in the Tranche B structure, those documents do not show there was "no benefit" to Debtors.  *See* PASMF, ¶¶ 103, 339, 476.  Furthermore, *Alberto v. Diversified Group, Inc.*, 55 F.3d 201 (5th Cir. 1995) (applying Delaware law), strongly implies that using corporations for the purposes of income tax benefits is not fraudulent on its own and does not call for disregard of the corporate form.  *Id.* at 207 (holding nothing unfair or unjust about parent corporation including subsidiary's losses in consolidated tax returns to offset income from other profitable corporations owned by parent).  The same applies to the portions of Christopher Govan's deposition.

Plaintiff also states that "the Defendants have provided no evidence in these cases that suggest that ABCO participated in deciding or negotiating the debt/equity structure of the ABCO Acquisition.  Instead it appears that the terms of the ABCO Acquisition, including the terms of the ARCO were dictated to it by Onex."  DSMF & Resp., ¶ 37.  The two citations Plaintiff list for this assertion do not support it.  One is a chain of e-mails regarding whether Doug Caldwell should be appointed to the Board.  The other is the May 12, 1999 opinion letter from Kaye Scholer on the Amended and Restated Credit Agreement.  These same documents are used by Plaintiff to support its Additional Statement of Material Fact, ¶ 586, that ABCO had no say in the amount of debt, but again, the documents do not

Trustee would still have the burden of producing evidence concerning the standard considerations, which he has not done in the main.[37]   The bottom line is that "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task."   *Wallace ex rel.*

_____

relate to this comment.

Plaintiff repeats this assertion in its own statement of facts, *see* PASMF, ¶ 585, which states: "No documents have been produced in this case that suggest that ABCO participated in deciding or negotiating the debt/equity structure of the ABCO Acquisition." *Id.* Although a clever attempt, the assertion of a negative is not sufficient evidence to support Plaintiff's positive allegation that ABCO did not participate in structuring the acquisitions.

In sum, Plaintiff has not cited any materials which support the proposition that ABCO did not have any role in the creation of the Management Agreements and Tranche B structure or was "forced" into the agreements or that Schwartz "caused" ABCO to enter into the agreements.

[37]For example, the court notes that Plaintiff's assertion that "Schwartz represented himself as the 'Ultimate Parent Entity' of Onex in U.S. government filings" is misleading as that is a term of art under the Hart-Scott-Rodino Act.  *See* PASMF & Resp., ¶ 44. Because the term has a specific meaning under the Act, it is not particularly useful for purposes of an alter ego analysis.

Plaintiff also avers that Hilson and Wright, Onex employees, were the sole directors of ABCO Holdings prior to July 1999.  But the documents cited to support this statement do not so state.  The first is a 1999 ABCO Holdings Corp. Offering Circular.  On page 26 of the document, Hilson, Wright, and Blackmon are listed as Director (Holdings) with Ontario Teacher Pension Plan Board and CIBC WMC, Inc. entitled to nominate one additional director of Holdings, but not having yet done so.  Plaintiff does cite to an undated unanimous written consent of all shareholders of ABCO Holdings Corp. which appears to give consent to add Ammerman and Blackmon to the Holdings Board.  *See* DSMF & Resp., ¶ 69; PASMF & Resp., ¶ 23.  But the May 11, 1999, minutes of the Board of Directors Meeting of ABCO show that Messrs. Levy and Shapiro resigned as members of the Board and Mark Hilson, Eric Rosen, Donald West, and Nigel Wright were added as directors.  *See* PASMF & Resp., ¶ 567.

AO 72A
(Rev.8/82)

*Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (citations and quotations omitted).[38]   The Trustee has not connected the separate corporate entities with the perpetuation of any particularized fraud or injustice.[39]   Therefore, the court GRANTS Defendants' motion for summary judgment as to the issue of alter ego liability.

In the Trustee's "conclusion" paragraph in its response to Defendants' second motion for summary judgment, the Trustee writes:

> As the Trustee has established the requisite level of control and domination by Onex over Onex American, and given the existence of the claims in Counts II and VIII, this Court should reconsider (as it said it would (Order 122)) the Trustee's Breach of Fiduciary duty claims, and the scope of the Aiding and Abetting Breach of Fiduciary Duty claims and Civil Conspiracy claims (Order 127).

───────────────

[38]A plaintiff must show "complete domination and control." *Id.* at 1183-84. "The degree of control required to pierce the veil is 'exclusive domination and control . . . to the point that [the General Partner] no longer ha[s] legal or independent significance of [its] own." *Id.* "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.* at 1184.

[39]Plaintiff makes several sweeping conclusory statements in its efforts to create an issue of fact on alter ego. Plaintiff's statement that "Onex American merely took the steps to effectuate" the ABCO LBO is unsupported by Plaintiff's citation and meaningless in the context as to any significance in the alter ego analysis. *See* Plaintiff's Resp. [654], at 39.

Similarly, Plaintiff baldly asserts that "[i]t was the decision by Onex American, on behalf of Schwartz and Onex, that allowed the LBO transactions to go forward." *See* DSMF & Resp., ¶ 69, at 48; PASMF, ¶ 71 (April 22, 1999, minutes of Onex American). To support this conclusory allegation, Plaintiff cites to various pages of Logue's expert report none of which support such a statement and some of which refer to Logue's insolvency analysis which the court has already determined is flawed.

92

*See* Response [654], at 50.  In its prior order, the court granted Defendants leave to renew their motion for summary judgment as to Plaintiff's breach of fiduciary duty claim after the court considered evidence on alter ego.  *See* Order, dated Aug. 13, 2009, at 122.  The court then described aiding and abetting and conspiracy as "two sides of the same coin" and permitted Plaintiff to pursue those theories of liability.  *Id.* at 127.

The court has granted Defendants' motion for summary judgment on alter ego. Therefore, the court finds that Plaintiff's aiding and abetting breach of fiduciary duty claims brought against Onex American cannot proceed because the court has found no evidence from which a jury could attribute the acts of Onex to Onex American.  As the court stated in its previous order, although claims against certain individual defendants were dismissed because the individuals are "Released Parties," Plaintiff could use their breach of fiduciary duty allegations against Hilson, Wright, Ammerman, and Blackmon as an underlying basis for aiding and abetting breach of fiduciary duty claims.  *See id.*, at 126-127.  The court noted, however, that "Plaintiff appears to be basing its aiding and abetting claim on Hilson and Wright's breach of their fiduciary duty of loyalty to the creditors," which the court rejected as Plaintiff had not demonstrated debtors were insolvent.  *Id.* at 127.  "Thus, Plaintiff can pursue the aiding and abetting/conspiracy theory only to the extent it alleges that Hilson and Wright owed fiduciary duties to the Debtors."  *Id.*  The court cannot locate any allegations by Plaintiff that Hilson and Wright owed fiduciary duties to the Debtors.

AO 72A
(Rev.8/82)

Therefore, the court finds there are no breach of fiduciary duty, aiding and abetting breach

of fiduciary duty, or conspiracy with respect to breach of fiduciary duty claims remaining

in the litigation.  The court did recognize in its previous order that Plaintiff could pursue its

conspiracy theory of liability as to fraudulent transfer under the Management Agreement and

preference claim and that holding stands.  *See id.*

### F.    Lender Liability

Because the issues of lender liability and alter ego are related, the court bears in mind

the facts and law discussed above with respect to alter ego when considering Plaintiff's

claim of lender liability.  The court addressed the issue of lender liability in its previous

order and stated:

> In Count XVI, Plaintiff alleges that Defendants were insiders of and
> secured lenders to the Debtors, and Defendants exercised complete
> domination and control over the Debtors' operations, corporate finances, and
> acquisition strategy through the Management Agreement and common
> directors and senior officers.  Plaintiff goes on to restate its alter ego and
> breach of fiduciary duty allegations.  Plaintiff's claims appear to arise out of
> cases such as *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*,
> 483 F.2d 1098 (5th Cir. 1973) ("If a lender becomes so involved with its
> debtor that it is in fact actively managing the debtor's affairs, then the
> quantum of control necessary to support liability under the 'instrumentality'
> theory may be achieved"); *In re iPCS, Inc.*, 297 B.R. 283 (Bankr. N.D. Ga.
> 2003) (describing lender liability theory under Delaware law after *Krivo* and
> *Irwin & Leighton, Inc. v. W.M. Anderson Company*, 532 A.2d 983, 984 (Del.
> Ch. 1987)).
>
> The case law makes clear that a critical issue in any claim of lender
> liability is whether "the dominant corporation exerted 'actual, operative, total
> control' such that the subservient corporation has 'no separate mind, will or

> existence of its own and was a business conduit' for the dominant
> corporation." *In re iPCS, Inc.*, 297 B.R. at 294 (quoting *Krivo*). The court
> finds that this issue is critically intertwined with Plaintiff's claim for alter ego
> liability.

*See* Order, dated Aug. 13, 2009, at 129-30. Because the issue was closely connected to alter ego liability, the court did not rule on lender liability in the first round of summary judgment motions. *Id.*

Defendants now move again for summary judgment on lender liability. Plaintiff's allegations on lender liability remain a bit hazy. It is not clear which Defendants Plaintiff believes should be liable under this theory. Defendants note that in its complaint, Plaintiff contends that all Defendants "were secured lenders to ABCO and its subsidiaries" and "exercised complete domination and control over ABCO's operations and corporate finance and acquisition strategy." *See* [78], ¶¶ 241, 243. In Plaintiff's contention interrogatories, Plaintiff appears to narrow the lender liability claim to Onex and Onex Finance. Plaintiff's response to Defendants' motion for summary judgment on lender liability confirms this narrowing by alleging that (1) Onex acted through Onex Financial to control the finances and loan terms to debtors, (2) Onex used the control to commit fraudulent transfers for its benefit, and (3) Onex's control and breach caused injury to creditor. *See* [654] at 45.

Plaintiff's claims arise out of the Tranche B loan structure employed in the financing of the acquisitions. To review again the financing arrangements:

95

> Under [the Amended Restated Credit Agreement] the Lenders provided a $40 million five-year term loan facility to ABCO ("the Tranche A Loan"), a $30 million revolving credit facility to ABCO ("the Revolving Credit Loan"), and a $140 million, six-and-one-half-year term loan facility to Onex LP ("the Tranche B Loan").
>
> The Tranche B loan flowed through the Tranche B Structure, which was a "tower" financing structure. Such a financing structure, commonly used in transactions involving Canadian companies, permits a Canadian company, under certain circumstances, to report the equivalent of interest expense deduction, without removing the deduction of interest from the U.S. taxpayer, or in other words allowing the company to "double dip." Under the Tranche B Structure, CIBC lent money to Onex LP rather than directly to ABCO. The money flowed through numerous subsidiaries and shells to ABCO. The Tranche B Structure involved six steps – (1) the Lenders distribute the Tranche B Loan proceeds to the Tranche B Borrower, Onex LP; (2) Onex LP invests all the proceeds in the capital common stock of Nova Scotia; (3) Nova Scotia invests all the proceeds of Onex LP's investment in the capital common stock of Onex Finance II; (4) Onex Finance II invests all the money from the prior transaction in Onex Finance I; (5) on the closing date Onex Finance I lends ABCO, Windsor Door, and an ABCO subsidiary ABC Transportation the entire amount invested in Onex Finance I on economic terms and conditions identical to those applicable to the Tranche B Term Loans, except with an interest rate 25 basis points higher; and finally (6) Windsor Door and ABC Transportation pay cash dividends and/or repay existing debts owed to ABCO in an amount equal to the principal amount of the loans made to them by Onex Finance I. The parties dispute the ultimate impact of the Tranche B Structure on the Debtors and its ultimate benefit to the Onex Defendants.

*See* Order, dated Aug. 13, 2009, at 11-12.

As the court indicated in its prior Order, the lender liability cases arise out of *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098 (5th Cir. 1973). In *Krivo*, plaintiffs were ten creditors of a reorganized corporation. Those creditors sued

96

National Distillers & Chemical Corp., the major creditor of the corporation, on their debts. The plaintiffs alleged a theory that "when one corporation controls and dominates another corporation to the extent that the second corporation becomes the 'mere instrumentality' of the first, the dominant corporation becomes liable for those debts of the subservient corporation attributable to an abuse of that control." *Id.* at 1101.

To analyze the "instrumentality" theory, the court stated that "we agree, that two elements are essential for liability under the 'instrumentality' doctrine. First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control." *Id.* at 1103. The "fact that the allegedly dominant corporation held an ownership interest in another, allegedly subservient, corporation does not, per se, resolve the question of control." *Id.* at 1104 (stating that plaintiff will not succeed if it cannot show more than "that defendant had done nothing beyond the authority legally vested in it as a creditor and a stockholder").    Similarly, "a creditor-debtor relationship also does not per se constitute control under the 'instrumentality' theory. The general rule is that the mere loan of money by one corporation to another does not automatically make the lender liable for the acts and omissions of the borrower." *Id.* (citing *Peterson v. Chicago, Rock Island & Pacific Ry. Co.*, 205 U.S. 364 (1907)). "The logic of this rule is apparent, for otherwise no lender would be willing to extend credit. The risks and liabilities would simply be too great. Nevertheless,

97

lenders are not automatically exempt from liability under the 'instrumentality' rule. If a lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the 'instrumentality' theory may be achieved." *Id*. at 1104-05.

"An examination of 'instrumentality' cases involving creditor-debtor relationships demonstrates that courts require a strong showing that the creditor assumed actual, participatory, total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control, as used in the 'instrumentality' doctrine, by the creditor corporation." *Id.* at 1105.  In "the cases resulting in 'instrumentality' liability for the creditor, the facts have unmistakably shown that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had no separate, independent existence of its own." *Id.  See also FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 104 (1st Cir. 2009); *In re KDI Holdings, Inc.*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999) (elements of lender liability are: (1) control in the nature of complete domination; (2) use of that domination to commit fraud or worse; and (3) control and breach of duty must proximately cause injury).

Plaintiff cites *In re iPCS, Inc.*, 297 B.R. 283 (Bankr. N.D. Ga. 2003) (Drake, B.J.), in support of its position.  However, *iPCS* was on a motion to dismiss and even at that stage, the proposed complaint contained far more specific allegations than Plaintiff has mustered

98

here.  For example, the *iPCS* complaint alleges "one-sided contractual agreements" which gave defendant "effective veto power" over the debtor's business affairs, including raising capital and marketing and technology decisions; defendant required debtor company to "pre-clear" technological changes and required alterations to those plans; defendant set down guidelines for software, technology, and equipment that debtor had to meet; defendant required debtor to raise debt and equity capital and controlled debtor's cash flow through billing and collection, ultimately using those funds interchangeably with its own, and defendant set fees at a "commercially unreasonable" level and imposed charges on debtors that were not authorized by their contracts.  *Id.* at 295.  Plaintiff has not alleged facts anywhere similar to that level of control and domination.

Similarly, the court in *In re KDI Holdings*, also cited by Plaintiff, permitted the complaint to proceed on a motion to dismiss under facts which alleged that officers of the debtors' corporations were "installed" by defendants who obtained control over the debtors' performance and dictated when payments were to be made.  *Id.* at 515-16 (noting that plaintiffs alleged "actual managerial and voting control" over debtors, as well as day-to-day management of debtors).  *Compare FAMM Steel*, 571 F.3d at 103-04 (even if bank forced company to hire financial advisor of bank's choosing, no instrumentality where plaintiff could not allege that financial advisor acted under bank's instructions).

AO 72A
(Rev.8/82)

Here, the facts alleged by Plaintiff to support its lender liability claim relate mostly to describing the Tranche B structure. There can be no dispute that the Tranche B structure was put into place so that Onex could utilize losses for Canadian tax purposes. Onex Financial was part of the Tranche B tower structure. *See* PASMF, & Resp., ¶¶ 489-502.[40] The court notes, however, that none of the facts listed by Plaintiff supports a contention that Onex controlled the lending arrangement. The closest Plaintiff comes is Additional Statement of Material Fact ¶ 498 which alleges that Onex directed ABCO to enter into the acquisitions and the Management Agreement. As the court explained in the alter ego section, however, this statement of fact is not supported by the citations given by Plaintiff.

Similarly, in Statement of Additional Material Fact ¶ 499, Plaintiff contends:

Onex directed Magnatrax to continue to pay Tranche B payments even after payments to other creditors were stretched or neglected. (P.A.19 at MGXE 371226-27; Tr.'s SOF for 1st SJ at paragraphs 137-675; Tr.'s 2d SJ at 15-17; *see, e.g.*, Trs. 161, 171, 178 and 185 (examples of timely Tranche B Credit Agreement payments made in 2001 and 2002)).

*Id.* Nothing in the cited materials, however, relates to Onex "directing" Magnatrax.[41]

––––––––––––––––––––

[40]The parties dispute what happens to the money on the way back down the tower. That is, when ABCO repays the money to CIBC, what steps does it go through on the way back and who uses the repayment for what purpose. *See* PASMF & Resp., ¶¶ 517-18, 530-32. Those details are not materially relevant to an alter ego or lender liability analysis.

[41]The court notes that the citation to 538 statements of material undisputed fact from the first round of summary judgment motions is singularly unhelpful to the court. It is not the court's job to sift through 132 pages of statements and supporting documentation to distill one statement. The salient fact about ¶ 499 is the allegation of "directed." Plaintiff should point the court to any particular statement of fact that supports that allegation and

> The same analysis applies to Statement of Additional Material Fact ¶ 103:
>
> ABCO/Magnatrax did not have any role in the creation of the Tranche B Structure and did not have an opportunity to change the Tranche B Structure. (P.A.19 at MGXE371221, 24, 51; P.A.80 at 21-26.)

*Id.*, ¶ 103. But the documents cited – the Credit Agreement and the expert report of Todd Miller – do not discuss ABCO/Magnatrax's role, rather they set forth the Tranche B Structure itself.

The law on lender liability through an instrumentality theory is clear that the plaintiff must show absolute control and domination. Plaintiff has failed to adduce evidence from which a reasonable jury could so conclude. Even if the court presumes that the actions of Onex and Onex Financial should be attributed to one another – a presumption Plaintiff has not yet shown is warranted – Plaintiff still needs to proffer facts from which a jury could conclude that Onex/Onex Financial controlled ABCO/Magnatrax such that ABCO/Magnatrax had no choice but to accept the Tranche B financing arrangement proposed by Onex. Plaintiff has failed to do so. Onex, ABCO, and CIBC were represented by separate counsel during the acquisition negotiations. ABCO also utilized the services of an investment firm as it was considering offers from three different companies for takeover. Therefore, at the time the decision was made to engage in the ABCO acquisition, the Management Agreements, and the Tranche B structure, Plaintiff cannot show that Onex

---

Plaintiff has not done so.

and/or any of the Onex-related entities so controlled ABCO that ABCO was but an empty shell of a corporation.

For these reasons, the court GRANTS Defendants' motion for summary judgment on lender liability.

### G.    Prejudgment Interest

Plaintiff asks the court to award prejudgment interest from the dates of the transfers at the rate set forth in Georgia state law for liquidated debts accruing at 1.5% per month simple interest and interest for unliquidated debt at the prime rate plus 3% simple interest. *See* O.C.G.A. §§ 7-4-16, 51-12-14.  Defendants oppose this request arguing that it is (1) premature as Plaintiff has not been awarded any monetary relief and (2) would not be equitable because (a) the court has already dismissed Plaintiff's actual fraudulent transfer claims, (b) interest should be awarded only to the extent the defendant "wrongfully held" the plaintiff's money, and (c) this is not a unique situation where the defendant failed to put forward a substantive defense.

The Eleventh Circuit has stated that "[a]lthough the Bankruptcy Code does not explicitly provide for prejudgment interest, it has become a common practice, especially when transfer have been made with the actual intent to hinder, delay, or defraud creditors." *In re International Administrative Services, Inc.*, 408 F.3d 689, 709-710 (11th Cir. 2005). "[P]rejudgment interest is not a penalty, but compensation to the plaintiff for the use of

102

funds that were rightfully his." *Id.* (quotation and citation omitted). "In the absence of a controlling statute, the choice of a rate at which to set the amount of prejudgment interest is also within the discretion of the federal court. That decision is usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest." *Id.* (quotations and citations omitted).

It is not, however, mandatory for a court to award prejudgment interest. *In re Globe Manufacturing Corp.*, 567 F.3d 1291, 1300 (11th Cir. 2009). Courts "have the discretion to award such interest as a matter of federal common law." *Id.* (quotation and citation omitted). "An award of prejudgment interest must be equitable." *Id.* In *Globe Manufacturing*, the Eleventh Circuit determined that the bankruptcy court's decision ***not*** to award prejudgment interest was reasonable where "the parties' dispute was genuine and [] there was no evidence that either party was responsible for delaying the dispute's resolution." *Id.* The Eleventh Circuit contrasted its flexible rule on interest with the *Milwaukee Cheese* rule in the Seventh Circuit in which "interest must be awarded in the ordinary case, and only considerations such as delay by the trustee can be a basis for declining to award interest." *Id.* (citing *In re Milwaukee Cheese Wisconsin*, 112 F.3d 845, 849 (7th Cir. 1997)). *See also In re JSL Chemical Corp.*, 424 B.R. 573, 583 (Bankr. S.D.

103

Fla. 2010) (declining to award prejudgment interest where defendant "presented a colorable, if ultimately unpersuasive, ordinary course of business defense").

The Eleventh Circuit's rule on prejudgment interest does not set a presumption to award interest in the ordinary case.  The court is not unmindful of Plaintiff's point that Defendants' conduct in discovery could form an equitable basis for the award of prejudgment interest, but prejudgment interest is not supposed to be a penalty and the court has already sanctioned Defendants' discovery behavior.  There is no question in this case that the parties' dispute is genuine and Defendants have substantive defenses to Plaintiff's claims.  For these reasons, the court DENIES Plaintiff's motion for summary judgment on prejudgment interest.

### H.    Remaining Claims

Based on the rulings made in this order, the court notes that the remaining claims are Counts I and II Management Fees except for those fees associated with the three acquisitions; Count XVIII Preference claims; and, Count XII conspiracy on the remaining Management and Preference Claims.

Knowing the parties as the court does, the court presumes there will be motions for reconsideration of this order.  The parties are directed to file within twenty (20) days of the date of this order skeletal motions simply stating the propositions for reconsideration and listing the authorities in support of those propositions.  It is the court's intention to hear the

104

parties on those matters which appear to have colorable merit.  The court anticipates that it will call in pre-trial orders on December 15, 2010.  It is unlikely that the court will adjust that date.

## III.    Conclusion

The court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment [651]; DENIES Plaintiff's second motion for summary judgment [652]; GRANTS Defendants' motion to strike [658]; DENIES Plaintiff's motion to have certain material facts deemed admitted [660]; and GRANTS Defendants' motion for extension of time [663].

**IT IS SO ORDERED** this 29th day of September 2010.


         /s   J. Owen Forrester
            J. OWEN FORRESTER
    SENIOR UNITED STATES DISTRICT JUDGE

105